**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF TEXAS**

**AUSTIN DIVISION**

| | |
|---|---|
| LOWTECH STUDIOS, LLC,<br>Plaintiff,<br>v.<br>KOOAPPS LLC, JONATHAN CHANG, and CHUN-KAI WANG,<br>Defendants. | CASE NO.: 1:23-cv-1437-DAE |
| KOOAPPS INC.,<br>Counterclaim-Plaintiff,<br>v.<br>LOWTECH STUDIOS, LLC and STEVEN HOWSE,<br>Counterclaim-Defendants. | |

**KOOAPPS INC.'S *DAUBERT* MOTION TO EXCLUDE THE OPINION AND TESTIMONY OF PLAINTIFF'S SURVEY EXPERT SARAH BUTLER**

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ........................................ 1

II. BACKGROUND OF MS. BUTLER'S SURVEYs ........................................ 2

A. The Logo Survey ........................................ 2

B. Game Design Survey ........................................ 4

C. Consumer Perception Survey ........................................ 5

III. LEGAL STANDARD ........................................ 6

IV. ARGUMENT ........................................ 7

A. The Logo Survey is Unreliable, Based on an Improper Methodology, and Unhelpful to the Trier of Fact. ........................................ 7

1. Butler's Logo Survey Failed to Replicate Marketplace Conditions ........... 7

2. Butler's Logo Survey Design Created Improper Demand Effects ........... 10

3. Butler's Logo Survey Used Improper Leading Questions ........................ 12

4. The Logo Survey Does Not Utilize a Proper Control ............................... 13

B. The Game Design Survey Should be Excluded as it is Unreliable, Fails to Adhere to Proper Survey Methodology and is Unhelpful to the Jury .................... 15

1. The Game Design Survey Failed to Replicate Marketplace Conditions .. 15

2. Butler's Game Design Survey Fails to Utilize a Proper Control .............. 16

C. The Consumer Perception Survey Should be Excluded Because it Tests Irrelevant Subject Matter ........................................ 17

V. CONCLUSION ........................................ 19

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*American Footwear Corp. v. General Footwear Co.*,
609 F.2d 655 (2d Cir. 1979)....................7, 9

*Bank of Tex. v. Commerce Southwest, Inc.*,
741 F.2d 785 (5th Cir. 1984)....................7

*Brighton Collectibles, Inc. v. RK Tex. Leather Mfg.*,
923 F. Supp. 2d 1245 (S.D. Cal. 2013)....................10

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993)....................6

*Jackpocket, Inc. v. Lottomatrix NY LLC*,
645 F. Supp. 3d 185 (S.D.N.Y. 2022), *aff'd*, 2024 WL 1152520 (2d Cir. Mar. 18, 2024)....................12, 13

*Jones v. ConAgra Foods, Inc.*,
2014 WL 2702726 (N.D. Cal. June 13, 2014)....................19

*Juicy Couture, Inc. v. L'Oreal USA, Inc.*,
2006 WL 1012939 (S.D.N.Y. Apr. 19, 2006)....................16

*In re KIND LLC "Healthy & All Natural" Litig.*,
627 F. Supp. 3d 269 (S.D.N.Y. 2022)....................18

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)....................6

*Maker's Mark Distillery, PBC v. Spalding Grp., Inc.*,
2024 WL 947475 (W.D. Ky. Mar. 5, 2024)....................15, 17

*Malletier v. Dooney & Bourke, Inc.*,
525 F. Supp. 2d 558 (S.D.N.Y. 2007)....................9

*New Century Fin., Inc. v. New Century Fin. Corp.*,
2005 WL 5976552 (S.D. Tex. Nov. 29, 2005)....................6

*Saxon Glass Techs., Inc. v. Apple Inc.*,
393 F. Supp. 3d 270 (W.D.N.Y. 2019), *aff'd*, 824 F. App'x 75 (2d Cir. 2020)....................13

*Scott Fetzer Co. v. House of Vacuums Inc.*,
381 F.3d 477 (5th Cir. 2004)....................7, 13

*Simon Prop Grp., L.P. v. mySimon, Inc.*,
104 F. Supp. 2d 1033 (S.D. Ind. 2000) ..........8

*Sunbeam Corp. v. Equity Indus. Corp.*,
635 F. Supp. 625 (E.D. Va. 1986), *aff'd*, 811 F.2d 1505 (4th Cir. 1987) ..........11

*THOIP v. Walt Disney Co.*,
690 F. Supp. 2d 218 (S.D.N.Y. Feb. 9, 2010) ..........7, 9

*THOIP v. Walt Disney Co.*,
788 F. Supp. 2d 168 (S.D.N.Y. 2011) ..........11

*Tokidoki, LLC v. Fortune Dynamic, Inc.*,
2009 WL 2366439 (C.D. Cal. 2009) ..........14

*Valador, Inc. v. HTC Corp.*,
242 F. Supp. 3d 448 (E.D. Va. 2017), *aff'd*, 707 F. App'x 138 (4th Cir. 2017) ..........7, 9

*Water Pik, Inc. v. Med-Systems, Inc.*,
726 F.3d 1136 (10th Cir. 2013) ..........9

**RULES**

Fed. R. Evid. 702 ..........6

**MISCELLANEOUS**

5 McCarthy on Trademarks & Unfair Competition § 32:172 (5th ed.) ..........10, 12

5 McCarthy on Trademarks & Unfair Competition § 32:187 (5th ed.) ..........13, 14

## I. INTRODUCTION

Lowtech and Kooapps offer the computer games Slither.io and Snake.io, respectively. These games have competed with one another on mobile devices since early 2016, when they launched within a month of each other. Yet Lowtech waited until November 2023 to file this lawsuit, and only did so only after it had effectively abandoned Slither.io by failing to maintain the app and largely disabling the features necessary to make money. But instead of retrospection, Lowtech claims that Slither.io's problems are the result of Kooapps' alleged trademark and trade dress infringement. As relevant to this motion, Lowtech alleges claims for: (1) trademark infringement related to the parties' independently trademarked logos; (2) trade dress infringement related to the "overall look and design" of Slither.io; and (3) false advertising as to whether Snake.io is an "online multiplayer game."

In discovery, Lowtech failed to find anything more than isolated instances of confusion between the two games or that anyone is confused or cares about whether Snake.io is a multiplayer game. And those cherry-picked examples are dwarfed by the mountain of evidence that consumers are not confused between the two apps. So Lowtech shifted to Plan B, and engaged Sarah Butler to conduct three surveys to gin up "evidence" of: (1) likelihood of confusion between Lowtech and Kooapps' independently trademarked logos (the "Logo Survey"); (2) likelihood of confusion between the "overall look and design" of Slither.io and Snake.io (the "Game Design Survey"); and (3) "the extent to which advertising for [Snake.io] causes consumers to believe that Snake.io is a multiplayer game." ("Consumer Perception Survey").

To achieve Lowtech's desired results, Ms. Butler impermissibly put her foot on the scale. Each of her surveys suffers from fatal methodological flaws that require its exclusion under *Daubert* and the Federal Rules of Evidence.

The Logo Survey violates the canons of scientifically valid survey research, including (among other problems): (1) failure to replicate marketplace conditions; (2) biased stimuli leading to improper demand effects; (3) using leading and suggestive design and questions; and (4) failure to utilize a proper control. These flaws in the Logo Survey render its output and her corresponding conclusions meaningless, confusing, and unhelpful to a jury.

The Game Design Survey is also defective. First, it fails to replicate marketplace conditions in her test and control stimuli. Instead, to lean on the scales, Butler eliminates from view real-world conditions that would dispel confusion. Second, Butler uses a control stimulus that improperly includes many of the accused infringing elements of the trade dress, undermining any resulting data purporting to show "net" confusion. The net result is that the survey does not test the likelihood of confusion based on the alleged trade dress but rather as to the look and feel of the game as a whole, which is not what Lowtech alleges Kooapps copied. These fatal flaws render the Game Design Survey results unreliable to show any confusion in the relevant market.

The Consumer Perception Survey likewise suffers from fatal defects. It uses a restricted definition of "multiplayer game," concocted to fit Lowtech's narrative, which is at odds with the more expansive definition that both parties agree applies to define the outer bounds of what a multiplayer game is. Because it tests the incorrect narrow definition, presumably to gin up results favorable to Lowtech, the survey results are irrelevant. Allowing Butler to present it to the jury would prejudice Kooapps. It should therefore be excluded.

Accordingly, the Court should exercise its gatekeeping function and exclude Ms. Butler's Logo, Game Design, and Consumer Perception Surveys at trial.

## II. BACKGROUND OF MS. BUTLER'S SURVEYS

### A. The Logo Survey

The Logo Survey purported to test "whether consumers would be confused by the Snake.io

logo and would believe, based on this logo, that Snake.io was an app put out by or associated with Lowtech's Slither.io." Expert Report of Sarah Butler ("Butler Report") ¶ 9, attached as Exhibit 4 to the Declaration of Chloe Delehanty, filed concurrently herewith. Respondents were presented a set of search results from the Apple App Store or the Google Play Store and were then told they would be shown "some of the apps from this search." *See id.*, Ex. C.1 at 10.

But they were never shown any apps at all. First, they were shown a picture labeled "APP A," which was an image of the Slither.io logo with no other information (*id.* ¶ 59):



APP A

Next, Respondents were randomly assigned to test or control groups and were presented with an "array of apps selected from those that had appeared in the search results," listed as "APPS B, C, D, and E." But again, they were never shown any apps. Instead, they were shown arrays of logos:




*Id.* ¶ 60, Ex. C.1. The test group included the allegedly infringing Snake.io logo, along with logos for "distractor apps" Agar.io, Snake Clash!, and Wormate.io. *Id.* ¶ 60. The control group was presented the same distractor logos, but Butler replaced the Snake.io logo with a prior Kooapps Snake.io logo from 2016-2020.

Even though consumers who download these apps see far more information than only the logo, including the name of the app, its developer, ratings and reviews, video trailers, and the category of the game, Butler omitted this information, showing only the logo. *See* Butler Report Ex. C.2; Ex. 16.

Moreover, at deposition, Butler was not able to explain why she chose the "distractor" logos she did, as opposed to other logos that appear in real-world app store search results that are more similar to the logos for Snake.io and Slither.io, of which there are many. Deposition Transcript of Sarah Butler ("Butler Tr.") at 104:1-106:1, 108:23-118:23 (Ex. 15). Nor was she able to state unequivocally that the control logo does not infringe Lowtech's alleged logo trademark. *Id.* at 122:3-124:10, 135:4-137:9.

After viewing the apps, respondents were asked whether "any of **APPS B, C, D, or E** <u>are from the same company</u> that puts out **APP A**, the app you were shown first?" Butler Report, Ex. C.1 at 11. Respondents then were asked whether "any of **APPS B, C, D, or E** <u>are associated or affiliated with</u> **APP A's** company, the app you were shown first?" *Id.* at 13. Finally, respondents were asked whether "any of **APPS B, C, D, or E** <u>are licensed or approved by</u> **APP A's** company, the app you were shown first?" *Id.* at 15. Butler reported a net confusion level of 19.7%. *Id.* ¶ 77.

### B. Game Design Survey

The Game Design Survey was meant to test whether "based on the overall look and design of the game, consumers would confuse Snake.io with Slither.io and would believe that Snake.io was a game put out by, or associated with, the company that put out Slither.io …." *Id.* ¶ 15. After screening questions, Respondents were shown a video of "GAME 1," which Butler shows the "Slither.io gameplay …." *Id.* ¶¶ 84, 95. Respondents were then assigned to a test or control group and were shown three additional video clips in sequential order and asked a series of questions. *Id.*

¶ 85. The test group was shown a video of Snake.io, while the control group was shown a video of Paper.io 2, a different mobile game in the market:

**Snake.io (Test)**




**Paper.io 2 (Control)**



*Id.* ¶¶ 85, 96, 98. Respondents were then asked a series of questions about whether the respondents believed each game they saw was made or put out by the same company, associated or affiliated, or licensed or approved by as "GAME 1." *Id.*, Ex. D.1. Based on these survey results, Butler estimated an overall net confusion level of 18.5%. *Id.* ¶ 108.

### C. Consumer Perception Survey

Butler's Consumer Perception Survey purported to test whether consumers believe Snake.io is an "online multiplayer game played against other human players …." *Id.* ¶ 21. In the survey, test group respondents were shown an advertisement for Snake.io. *Id.* ¶ 124. Control group respondents were shown a video that removed features that allegedly suggest the game is a multiplayer game and added "Single Player Game" to the game credits. *Id.* ¶ 125.

Respondents were not asked any open-ended questions about their perception of the advertisement, but instead, were asked: "If you played the game in the video shown, do you or do you not think you would be playing against human players over the internet, in real time?" *Id.* ¶ 115. The implicit definition of multiplayer "playing against human players over the internet in real time," is not consistent with the broader definition of "online multiplayer video game" that both sides agree applies: that it is "[redacted]

[redacted]" Kooapps Inc's *Daubert* Motion to Exclude Opinions of Plaintiff's Expert Dr. Zagal ("Zagal *Daubert*") at 5. Based on this, Butler reported that, net of control, 20.1% of respondents believed that "Snake.io was a multiplayer game, played live against other human players, over the internet, in real time." *Id.* ¶ 130.

Those who indicated they would be playing against other "human players" were also asked whether knowing that "all of the other snakes in this game were bots and were not other human players" would have an impact on their interest in or likelihood of downloading the game and how often they played the game. *Id.* ¶¶ 118-121.

## III. LEGAL STANDARD

Rule 702 governs the admissibility of expert testimony. Federal Rule of Evidence 702 requires that an expert must be qualified to testify based on "scientific, technical, or other specialized knowledge," in a way that would "assist the trier of fact to understand the evidence or to determine a fact in issue …." *See New Century Fin., Inc. v. New Century Fin. Corp.*, 2005 WL 5976552, at *2 (S.D. Tex. Nov. 29, 2005) (quoting Fed. R. Evid. 702). Pursuant to Rule 702, a qualified expert may testify only if the evidence is deemed reliable in that it is based on sufficient facts or data; is the product of reliable principles and methods; and the witness has applied the principles and methods reliably to the facts of the case. *See* Fed. R. Evid. 702(b)-(d). Courts are to operate as "gatekeepers," ensuring expert testimony meets the standard of reliability prior its admission. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 145 (1999). Where expert testimony fails to satisfy the parameters of Rule 702, Courts should exercise their gatekeeping function and exclude such testimony. *See Kumho Tire*, 526 U.S. at 145; *Daubert*, 509 U.S. at 597.

## IV. ARGUMENT

In cases brought under the Lanham Act, survey evidence should be excluded where "serious flaws in a survey will make any reliance on that survey unreasonable." *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 488 (5th Cir. 2004) (citing *Bank of Tex. v. Commerce Southwest, Inc.*, 741 F.2d 785, 789 (5th Cir. 1984). As set forth below, each of Butler's surveys has serious flaws that require its exclusion.

### A. The Logo Survey is Unreliable, Based on an Improper Methodology, and Unhelpful to the Trier of Fact

The Logo Survey has no probative value because it is riddled with methodological errors, each of which alone justify exclusion, and all of which together require it.

#### 1. Butler's Logo Survey Failed to Replicate Marketplace Conditions

A survey purporting to measure likelihood of confusion in the marketplace must replicate marketplace conditions. *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 231 (S.D.N.Y. Feb. 9, 2010) ("The failure of a survey to approximate actual marketplace conditions can provide grounds for inadmissibility."); *Valador, Inc. v. HTC Corp.*, 242 F. Supp. 3d 448, 462 (E.D. Va. 2017) (excluding likelihood of confusion survey in part because expert's survey "did not show the marks as they appear in commerce"), *aff'd*, 707 F. App'x 138 (4th Cir. 2017); *see also* Ex. 17 at 354 ("[T]he survey expert must make *every reasonable effort* to duplicate the marketplace conditions under which consumers are likely to encounter the mark at issue. At a minimum, this requires the survey expert to find out how the allegedly infringing product is typically encountered in the marketplace.") (emphasis added). Failure to replicate marketplace conditions renders the survey meaningless, and results in exclusion of the proffered survey and testimony. *See, e.g.*, *American Footwear Corp. v. General Footwear Co.*, 609 F.2d 655, 660 n.4 (2d Cir. 1979) (affirming district court's decision to exclude survey for "failure to conduct it under actual marketing conditions");

*Simon Prop Grp., L.P. v. mySimon, Inc.*, 104 F. Supp. 2d 1033, 1039 (S.D. Ind. 2000) (excluding survey for, among other things, failure to replicate marketplace because there was no evidence that consumers would have viewed the pages in such a manner).

The Logo Survey did not replicate marketplace conditions. Customers decide whether to download Slither.io and Snake.io by looking at search results and app store listing pages, which contain significant amounts of information about the app in question, including app names, developer names, category descriptors, app screenshots, videos, ratings, reviews, etc. that distinguish the various apps:

**Slither.io Apple App Store App Listing**




**Snake.io Apple App Store App Listing**




*See* Butler Report, Ex. C.2; *see* Ex. 16.

But rather than show respondents those pages, they were presented only with a picture of the app logos, removing myriad information that dispels confusion. In short, Butler's survey

ignores how customers *actually* encounter the apps in the market when making download decisions. This diversion from market conditions renders the results of the Logo Survey unreliable.

*THOIP* is directly on point. In *THOIP*, plaintiff's expert conducted a survey to test whether there was any confusion between plaintiff's "Little Miss Disney" t-shirts and defendant's purportedly infringing "Miss Disney" t-shirts. 690 F. Supp. 2d at 222. But he removed from the test stimuli "the neck labels and hang tags that would have been attached to the shirts in the marketplace." *Id.* at 238. The court excluded the survey for failure to replicate market conditions, noting that "[l]abels are not unnoticed by consumers; rather, they serve as important sources of information, including brand identification" and that this "source information would have [likely] diminished confusion not only as to source but also as to association and permission." *Id.* at 238-39.

The Logo Survey suffers from the exact same error. The survey excluded important information consumers would have encountered in the marketplace that would have dispelled confusion, for example app and developer names, which are the equivalent of "neck labels and hang tags" because they serve as important sources of brand identification. That renders the survey unreliable and requires its exclusion. *See id.* at 238; *see also Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136, 1146-47 (10th Cir. 2013) (upholding exclusion of a likelihood of trademark confusion survey that did not show the parties' marks as they actually appeared on packaging in the marketplace); *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 593 (S.D.N.Y. 2007) (excluding survey that omitted critical information from the allegedly infringing mark "that was likely to have disabused the respondents of whatever confusion they may have experienced") (quoting *Am. Footwear*, 609 F.2d at 661 n.4 (observing that the district court properly rejected a survey that failed to replicate "actual marketing conditions")); *Valador*, 242 F. Supp. 3d at 462

(excluding survey that showed the plaintiff's and defendants' "Vive" word marks "without any other styling, words, symbols or images that typically accompany the word, "Vive" as either [plaintiff] or defendants use that term in the marketplace").

**2. Butler's Logo Survey Design Created Improper Demand Effects**

In addition to failing to replicate market conditions, the Logo Survey should be excluded because it impermissibly encourages respondents to find confusion—a phenomenon known as a "demand effect." "'Demand Effects' in a survey are produced when respondents use cues from the survey procedures and questions to infer the purpose of the survey and identify the 'correct' answers." 5 McCarthy on Trademarks & Unfair Competition § 32:172 (5th ed.) ("McCarthy"). Indeed, where a survey tests nothing more than respondents' ability to "pick the most obvious match," the survey is not probative of confusion and should be excluded. *Brighton Collectibles, Inc. v. RK Tex. Leather Mfg.*, 923 F. Supp. 2d 1245, 1257 (S.D. Cal. 2013).

In *Brighton*, survey respondents were first shown four handbags designed by the plaintiff. *Id*. Two bags were two-toned, and all four bags had large heart ornaments on them. *Id*. Respondents were then shown four other handbags, where only the defendants' handbag was two-toned with large heart ornaments. *Id*. They were asked to identify those that were "made, sponsored, or endorsed" by the same company that made the first set of handbags. *Id.* The court excluded the survey because, as designed, the survey was nothing more than a matching game and defendant's bag was the "most obvious match." *Id.*

The Logo Survey suffers from the same flaw. Butler chose "distractor" logos that share none of the same characteristics as the Slither.io *or* Snake.io logos:

**Slither.io Logo**






Butler Report ¶ 60, Ex. C.1. As demonstrated above, the Snake.io logo is the only logo with orange—one of the most prominent features of both the Snake.io and Slither.io logos. Further, the other logos utilize a completely different color scheme, background, and shape. Butler's slanted array is even more problematic when considering Butler's own search results include logos that appear more similar to both the Snake.io and Slither.io logos:

| **Little Big Snake** | **Snake Rivals** | **Snakes Zone .io: Battle Arena** | **Wormax.io** |
| --- | --- | --- | --- |
|  |  |  |  |

*See* Exs. 18-20; *see also* Butler Report, Ex. C.2.

Despite this, Butler selected an array of distinct logos, which made the Snake.io logo the obvious match. That renders the Logo Survey unreliable. *See THOIP v. Walt Disney Co.*, 788 F. Supp. 2d 168, 183-84 (S.D.N.Y. 2011) (excluding survey in part because the survey's selection of products that were as distinct as possible from the senior logo and test logo made it an unreliable indicator of consumer confusion); *see also Sunbeam Corp. v. Equity Indus. Corp.*, 635 F. Supp. 625, 634 (E.D. Va. 1986) (finding survey fatally flawed in part because the product at issue was "the only one without a distinctive chute," making it "[stand] out like a bearded man in a lineup

with four clean-shaven men”), *aff’d*, 811 F.2d 1505 (4th Cir. 1987).

Finally, this flaw is even more apparent when considering that 42.3% of respondents in the *control* group thought Kooapps’ 2016 logo (Butler Report ¶ 69) was confusingly similar to Slither.io’s logo, even though that logo is not accused and should by definition be non-infringing. *See Jackpocket, Inc. v. Lottomatrix NY LLC*, 645 F. Supp. 3d 185, 266 (S.D.N.Y. 2022) (noting that “[a] control that also infringes the senior mark must be disregarded”), *aff’d*, 2024 WL 1152520 (2d Cir. Mar. 18, 2024); *See also* Ex. 17 at 248 (“The general principle for choosing an appropriate control is easily stated: it should share as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed.”). This demonstrates that the Logo Survey was nothing more than a matching game and must be excluded.

**3. Butler’s Logo Survey Used Improper Leading Questions**

Not only did Butler utilize an improperly suggestive survey design, her questions also plainly led respondents to her desired answer. The use of leading questions to improperly steer respondents to a desired answer is antithetical to proper survey design. Indeed, “[i]t is important that responses are not skewed because cues suggest a ‘correct’ response. Of course, leading questions are the most obvious form of a method to steer the respondent to the desired response.” McCarthy § 32:172.

In her Logo Survey, Butler asked respondents:

- “Do you think any of **APPS B, C, D, or E** <u>are from the same company</u> that puts out **APP A**, the app you were shown first?”
- “Do you think any of **APPS B, C, D, or E** <u>are associated or affiliated with</u> **APP A’s** company, the app you were shown first?”
- “Do you think any of **APPS B, C, D, or E** <u>are licensed or approved by</u> **APP A’s** company, the app you were shown first?”

Butler Report, Ex. C.1 (Q3, Q4, Q5). These questions are impermissibly leading.

In *Jackpocket*, 645 F. Supp. 3d at 265, the Southern District of New York excluded a survey that used an almost identical set of questions. In that case, plaintiff's survey expert asked respondents:

- "Do you think that this website is owned, operated, or put out by Company A (i.e., Jackpocket)?"
- "Do you think that this website is affiliated with, or sponsored or approved by, Company A?" *Id.*

The court held that the survey produced impermissible demand effects in part through its use of leading questions. *Id.* The court held that "[b]oth questions lead a survey participant to search for similarities with Jackpocket's website, even if many of these similarities might be overlooked by consumers in the marketplace." *Id.* The same applies here. Each question in the Logo Survey suggests to respondents that the correct answer is "yes," and leads survey participants to hunt for similarities between the app icons when they otherwise may not have. This further renders Butler's results unreliable and unhelpful to a finder of fact. *See Scott Fetzer*, 381 F.3d at 488 (finding survey could not reasonably support a finding of infringement in part because the use of leading questions made the survey "so badly flawed that it cannot be used to demonstrate the existence of a question of fact on the likelihood of consumer confusion") (citation omitted); *Saxon Glass Techs., Inc. v. Apple Inc.*, 393 F. Supp. 3d 270, 288-89 (W.D.N.Y. 2019) ("[C]ourts have disapproved of the use of leading questions in the context of the *Squirt* survey method. … Plaintiff has not cited any cases in which a court found it appropriate for a survey using the *Squirt* method to employ leading questions."), *aff'd*, 824 F. App'x 75 (2d Cir. 2020).

#### 4. The Logo Survey Does Not Utilize a Proper Control

As Butler explains, a control is supposed to ensure survey results are "not impacted by 'noise.'" Butler Report ¶ 11. *See* McCarthy § 32:187 (defining noise as survey responses driven by pre-existing beliefs, "yes" people, and guesswork). Noise "must be filtered out

though control questions." *Id.* The generally accepted principle for a likelihood of confusion survey is that a control must be as close to the allegedly infringing mark as possible ***without itself being infringing***. *Tokidoki, LLC v. Fortune Dynamic, Inc.*, 2009 WL 2366439, at *8 (C.D. Cal. 2009) ("A control should be as close to the allegedly infringing design as possible without itself being infringing, so that one can accurately gauge the noise level—the people who are prone to guessing or yea-saying."); *see also infra* at 16-17. The control in the Logo Survey did not comply with these principles.

As her control in the Logo Survey, Butler used the 2016 version of the Snake.io logo:



Butler Report ¶ 62. Butler claims this allowed her to "[1] measure the extent to which the specific design elements of the current Kooapps' Snake.io logo are likely to cause confusion and [2] further provides a measure of the incremental increase in confusion caused by the progression to the most recent Snake.io logo." *Id.* The first is inaccurate. The second is beside the point.

First, Butler's selected control does not allow her to test the allegedly infringing design elements because it itself contains most of them. Plaintiff accuses Defendants of infringing the Slither.io logo based on "the orientation, segment pattern, gradient, smiley face, eyes, mouth, and color." First Amended Complaint ("FAC") ¶ 45. As demonstrated above, the 2016 Snake.io logo contains a segment pattern, gradient, smiley face, and an orange color. As the control logo contains infringing elements, it is improper. *See, e.g.*, *Tokidoki*, 2009 WL 2366439, at *8; McCarthy § 32:187 n.14 ("[T]he best control is one that comes as close as possible to the test stimulus without itself being subject to a claim that it is infringing or misleading."). Indeed, in her deposition, Butler

refused to confirm that the 2016 logo *did not* infringe on Slither.io's logo. *See* Butler Tr. 122:3-124:10, 135:4-137:9.

Second, it is irrelevant whether the change between the control and test logo caused "incremental increase in confusion." The Logo Survey is supposedly intended to answer whether consumers would believe that, based on the logo, Snake.io was an app put out by or associated with Lowtech's Slither.io. Butler Report ¶ 9. It cannot do that if the control would also cause a consumer to believe that Snake.io is associated with Slither.io. *See Maker's Mark Distillery, PBC v. Spalding Grp., Inc.*, 2024 WL 947475, at *5 (W.D. Ky. Mar. 5, 2024) (citations omitted).

### B. The Game Design Survey Should be Excluded as it is Unreliable, Fails to Adhere to Proper Survey Methodology and is Unhelpful to the Jury

As with Butler's Logo Survey, Butler's Game Design Survey suffers from similar flaws which require its exclusion.

#### 1. The Game Design Survey Failed to Replicate Marketplace Conditions

As set forth above, it is axiomatic in a likelihood of confusion survey to present the stimuli at issue in a manner that replicates marketplace conditions. *Supra* at 7-10. However, as with her Logo Survey, Butler removed all real-world conditions in her Game Design Survey, rendering her data irrelevant to the question of confusion.

First, Butler's test video is not used on any of the app store platforms where users download the relevant games. Indeed, the selected Snake.io video appears nowhere in Butler's search results. *See* Butler Report, Exs. D.1, D.2. Instead, Butler used a randomly selected YouTube video of a third-party playing Snake.io, which is from the web version of the game, rather than playable on any mobile device. *See id.* ¶ 96 n.70. This is a material distinction. The Snake.io videos that appear on the relevant app stores include additional information that would dispel any confusion. For example, Snake.io videos on the various app stores and on social media clearly label the exemplar

snake as "Snake.io" throughout the video. *See* Ex. 21. Butler's test stimuli omits this information, which critically, dispels confusion in the marketplace.

That is not the only information the Game Design Survey leaves out. Any user who sees a game on YouTube would have to then visit an app store to download the game. As discussed above, that visit to the app store would result in exposure to significant amounts of confusion-dispelling information, including the name of the games and their developers. *Supra* at 8. Butler omits this important market reality from the survey, rendering it unreliable.

*Juicy Couture, Inc. v. L'Oreal USA, Inc.*, 2006 WL 1012939, at *25 (S.D.N.Y. Apr. 19, 2006) is right on point. There, the likelihood of confusion survey did not show the cosmetic products as they normally appear, with "prominent signage" identifying the brand name of the seller. *Id*. The expert defended this decision by arguing that showing the products with the brand name and design would identify the source of the product. *Id*. The court excluded the survey for failure to replicate market conditions. *Id*. It found the expert's rationale to essentially be "an admission that someone viewing the actual Lancome product would not be confused as to source." *Id*. By omitting critical confusion-dispelling information from the stimuli, the Game Design Survey suffers from the same defects, and should be excluded.

**2. Butler's Game Design Survey Fails to Utilize a Proper Control**

As stated previously, a proper control should eliminate only the infringing elements of the alleged trade dress and otherwise keep the remaining look and feel of the allegedly infringing product. *See supra* at 13-14. The third-party game Paper.io 2, which Butler uses as the control, fails this test. Not only is Paper.io 2 a highly popular game in the industry with hundreds of millions of downloads (indicating many users may already have prior exposure to the game,

disproportionately dispelling confusion in the control group),[1] it retains several of the alleged trade dress elements, in violation of the black letter principle that a control should not contain the features that are being tested for infringement. *See supra* at 13-14.

Lowtech claims trade dress protection over an "expanding snakelike creature in a playfield along with other expanding snakelike creatures and brightly colored food particles." FAC ¶ 49; *see also* Ex. 22 at Response to Rog No. 13 and Ex. 23 at 93:1-94:14.[2] Paper.io 2 includes each of these elements. It has an expanding snakelike creature in a playfield with other snakelike creatures eating colorful particles. *See* Butler Report, Ex. D.2; *see also* Ex. 25. Because the control contains purportedly infringing trade dress elements, it is ineffective and renders the survey inadmissible. *See Maker's Mark*, 2024 WL 947475, at *5 (excluding survey, noting "[a]n appropriate control or controls in a trademark survey as in any experiment, should mimic the test stimulus without including features that are the focus of the infringement claim or are part of the message that is allegedly deceptive"). Indeed, because Lowtech does not claim the entire look and feel of Slither.io to be its alleged trade dress, Butler's failure to have the test and control stimuli differ only with respect to the specific elements of the alleged trade dress means that the survey does not test infringement of the alleged trade dress. It should be excluded on that basis.

### C. The Consumer Perception Survey Should be Excluded Because it Tests Irrelevant Subject Matter

Butler's consumer perception survey should be excluded because it does not test a question relevant to this lawsuit.

---

[1] Paper.io 2 has over 2.5M ratings on the Apple App Store and has been downloaded over 100M times on Google Play. Ex. 24.

[2] Ms. Butler never specifies what allegedly infringing elements she is aiming to control for, either in her survey or in her subsequent deposition testimony. *See* Butler Tr. at 141:9-143:13.

Lowtech's false advertising claim is about whether Kooapps falsely advertised that Snake.io is an "online multiplayer game." FAC ¶ 36. Butler's Consumer Perception Survey never defines the term "multiplayer." *See* Butler Report, Ex. E.1. Instead, the survey asks whether consumers believe they would play with "human players over the internet, in real time." But both sides agree that the definition of "multiplayer" is broader than that—for example, that it can include games in which human players play against each other, but not in real time. Expert Report of Garry Kitchen ¶¶ 90-91 (Ex. 26); Rebuttal Report of Jose Zagal at 7 (Ex. 27). Indeed, Lowtech's own expert on multiplayer admitted that any game that involves competition between human players is a multiplayer game. Zagal *Daubert* at 7.

Therefore, the question in the Consumer Perception Survey focuses on the incorrect definition of multiplayer. That means its results are not probative or even relevant to the issue at stake in Lowtech's false advertising claim. *See In re KIND LLC "Healthy & All Natural" Litig.*, 627 F. Supp. 3d 269, 288 (S.D.N.Y. 2022) ("Dr. Dennis asks only about one potential definition of 'All Natural'—the definition that plaintiffs selected for this case—and only allows survey participants to select from finite choices agreeing, disagreeing, or not having an expectation about this definition. This limited inquiry is insufficient to determine in any meaningful sense how reasonable consumers understand the 'All Natural' claim, or to test plaintiffs' theory."). "All [Lowtech] has done here is show that consumers, when provided with the definition of [multiplayer] that [Lowtech's] counsel constructed for this litigation, will click a check box saying that they agree to it." *See id.* at 290. That does not show whether consumers believe that Snake.io is an "online multiplayer game" under the different, broad definition agreed to by both parties. The survey should therefore be excluded.

The remaining questions in the Consumer Perception Survey fare no better. Butler never

tested the impact of the allegedly deceptive statements themselves (*i.e.*, "Dominate the Global Leaderboards," etc.) on consumers' download decisions. In Questions 3, 4, and 6 of the survey, Butler poses an unsupported hypothetical to respondents to gauge the impact and/or likelihood of downloading or playing the game upon discovering that "all of the other snakes in the game were bots." But that does not test the impact of Kooapps' actual statements (or its advertisement) and is irrelevant. *See Jones v. ConAgra Foods, Inc.*, 2014 WL 2702726, at *15 (N.D. Cal. June 13, 2014) (expert "did not explain how the challenged statements, together or alone, were a factor in any consumer's purchasing decisions," because "[s]he did not survey any customers to assess whether the challenged statements were in fact material to their purchases, as opposed to, or in addition to," other considerations). For this additional reason, the Consumer Perception Survey is unreliable and irrelevant, and should be excluded.

## V. CONCLUSION

For the reasons stated above, Kooapps respectfully requests that the Court exclude Ms. Butler's Logo and Game Design Surveys and all opinions based thereon.

Dated: October 10, 2025

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By: /s/ Eli B. Richlin

Eli B. Richlin (admitted *pro hac vice*)
New York State Bar No. 4861357
erichlin@wsgr.com
J. Ariel Jeong (admitted *pro hac vice*)
New York State Bar No. 5344122
ajeong@wsgr.com
**Wilson Sonsini Goodrich & Rosati, PC**
1301 Avenue of the Americas, 40th Floor
New York, NY 10019-6022
Telephone: (212) 999-5800

Joshua A. Baskin (admitted *pro hac vice*)

California State Bar No. 294971
jbaskin@wsgr.com
Chloe Delehanty (admitted *pro hac vice*)
California State Bar No. 333412
cdelehanty@wsgr.com
**Wilson Sonsini Goodrich & Rosati, PC**
Market Plaza, Spear Tower, Suite 3300
San Francisco, CA 94105-1126
Telephone: (415) 947-2000

Thomas A. Nesbitt
State Bar No. 24007738
tnesbitt@nesbittlegal.com
**Nesbitt Legal PLLC**
809 West Avenue
Austin, Texas 78701
Phone: (512) 617-5562

*Attorneys for Defendant and Counterclaim-Plaintiff Kooapps Inc., and Defendants Jonathan Chang and Chun-Kai Wang*

## CERTIFICATE OF CONFERENCE

The undersigned certifies that on October 8, 2025 counsel for the parties met and conferred regarding the issues that form the basis of this motion, but were unable to reach resolution.

*/s/ Eli B. Richlin*
Eli B. Richlin

*Attorneys for Defendant and Counterclaim-Plaintiff Kooapps Inc. and Defendants Jonathan Chang and Chun Kai Wang*

## CERTIFICATE OF SERVICE

The undersigned certifies that on October 10, 2025, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this motion and all supporting declarations through the Court's CM/ECF system.

*/s/ Eli B. Richlin*
Eli B. Richlin

*Attorneys for Defendant and Counterclaim-Plaintiff Kooapps Inc., and Defendants Jonathan Chang and Chun-Kai Wang*