# EXHIBIT 7

# LITIGATION SERVICES HANDBOOK

EXHIBIT
2

# Litigation Services Handbook

## *The Role of the Financial Expert*

Sixth Edition

*Edited by*
Roman L. Weil
Daniel G. Lentz
Elizabeth A. Evans

WILEY

Cover design: Wiley

Copyright © 2017 by John Wiley & Sons, Inc. All rights reserved.

Published by John Wiley & Sons, Inc., Hoboken, New Jersey.
Published simultaneously in Canada.

No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, scanning, or otherwise, except as permitted under Section 107 or 108 of the 1976 United States Copyright Act, without either the prior written permission of the Publisher, or authorization through payment of the appropriate per-copy fee to the Copyright Clearance Center, Inc., 222 Rosewood Drive, Danvers, MA 01923, (978) 750-8400, fax (978) 646-8600, or on the Web at www.copyright.com. Requests to the Publisher for permission should be addressed to the Permissions Department, John Wiley & Sons, Inc., 111 River Street, Hoboken, NJ 07030, (201) 748-6011, fax (201) 748-6008, or online at www.wiley.com/go/permissions.

Limit of Liability/Disclaimer of Warranty: While the publisher and author have used their best efforts in preparing this book, they make no representations or warranties with respect to the accuracy or completeness of the contents of this book and specifically disclaim any implied warranties of merchantability or fitness for a particular purpose. No warranty may be created or extended by sales representatives or written sales materials. The advice and strategies contained herein may not be suitable for your situation. You should consult with a professional where appropriate. Neither the publisher nor author shall be liable for any loss of profit or any other commercial damages, including but not limited to special, incidental, consequential, or other damages.

For general information on our other products and services or for technical support, please contact our Customer Care Department within the United States at (800) 762-2974, outside the United States at (317) 572-3993 or fax (317) 572-4002.

Wiley publishes in a variety of print and electronic formats and by print-on-demand. Some material included with standard print versions of this book may not be included in e-books or in print-on-demand. If this book refers to media such as a CD or DVD that is not included in the version you purchased, you may download this material at http://booksupport.wiley.com. For more information about Wiley products, visit www.wiley.com.

***Library of Congress Cataloging-in-Publication Data:***

ISBN 978-1-119-16632-0 (Hardcover)
ISBN 978-1-119-36316-3 (ePDF)
ISBN 978-1-119-36318-7 (ePub)

Printed in the United States of America

10 9 8 7 6 5 4 3 2 1

the audit function. Examples include investigation of fraudulent transactions and reconstruction of financial statements.

*(ii) Cost Accounting* The calculation of damages often requires cost accounting skills. For example, when the plaintiff is a multiline product manufacturer or service provider, the analysis requires allocation of common costs to each product line affected by the defendant's actions.

*(iii) Financial Analysis* Development and analysis of financial ratios and relations often aid in understanding the causes and symptoms of a litigant's business problems. The expert can also modify ratio analysis to derive assumptions about what would have happened but for the alleged unlawful action. The expert can apply financial analysis skills such as forecasting and discounting to perform present value or prejudgment interest analyses, capital market theory applications, and business valuations.

*(iv) Economic Analysis* Economists and accountants perform both macro- and microeconomic analyses in a litigation services engagement. Development of elasticity functions, analyzing market structure and market or pricing behavior, or assessing barriers to entry can prove important in claims for antitrust damages or for price erosion claims in a patent infringement matter.

*(v) Market Analysis* Market analysis often focuses on the collection of quantitative data about supply and demand, buyers and sellers, competitors, and other participants in a particular marketplace. Experts can help collect and assess the required data. Examples include the number or concentration of competitors in a particular market or computation of the market share of each participant, and trends driving changes to such market data.

*(vi) Statistics* Economists and many accountants understand statistical techniques such as sampling and regression analysis. An expert uses sampling when analysis of an entire population is too time-consuming or expensive for the case (Chapter 6 discusses sampling). Regression analysis can help to project sales or suggest cost relations. (See Chapters 8 and 9 for discussion on regression analysis.)

*(vii) Other Relevant Knowledge* Disputes often center on particular business practices or processes, many of which apply to a particular industry or sector. In addition to the functional skills described previously, experts often have such business or industry skills and knowledge to apply in their analyses.

## 2.4 PROFESSIONAL GUIDANCE AND STANDARDS

### (a) Guidelines for an Expert

The AICPA, through its standards and Code of Professional Conduct, has set criteria for its members to help maintain the integrity of the profession and its members. We discuss many of these here as prudent guidelines for *all* experts providing litigation services.

*(i) Competency* Experts should "undertake only those professional services that the member or the member's firm can reasonably expect to complete with

(goodwill) asset—as this reputation damage should manifest in lost profits and be recovered on that basis. In any event, supporting these claims can be challenging and will require ample documentation and a well-constructed analysis to prevail.

- **Management changes.** Experts should also consider the possible effects of normal changes in management as well as those that may have resulted from the acts of others. The expert should have gathered enough information about the company to establish critical management positions, personnel, and responsibilities that affect operating performance. For example, if the chief scientist on a key new product in development left the company, damages claims are appropriate if he was improperly recruited away by a competitor developing a similar product, but would not usually be expected if he went to teach in academia.
- **Other market issues.** A number of other market factors will bear on the performance of a specific company. These include the following:
  - Changes related to buyers and suppliers;
  - Changes in business lines and the market conditions that affect them;
  - The introduction of new products by the subject company and its competitors; and
  - The legal and regulatory environment in which the company operates.

Accounting for all other factors that can reduce profits for a company would be overwhelming. Few cases require such rigor. Experts can simplify the process by looking for the factors that *materially* affect business performance and focusing on those material factors where changes occurred or are anticipated. An expert who fails to explore key factors affecting company performance will be ill-equipped to assure the court that the defendant's actions have caused the damages suffered, thus weakening the causation argument and the damages case.

We next present a detailed analysis of constructing the revenues the plaintiff should have received but for the actions of the defendant, and the costs that an expert should apply to those revenues.

*(iv) Revenue Analysis* In a lost profits study, the expert must first compute the amount of lost revenues or sales units that the defendant's actions have caused. Experts use four common approaches to measure this amount:

1. **Before and after.** This approach compares the plaintiff's sales level before the defendant's wrongdoing with the plaintiff's sales level after the defendant's wrongdoing; the difference between the two levels represents the lost sales. This approach assumes that only the defendant's wrongdoing affected the plaintiff's business volume. It can underestimate lost sales for a plaintiff whose sales were increasing prior to the defendant's actions and overestimate lost sales if a plaintiff's business was in decline prior to the defendant's actions. To use such an approach effectively, experts often include a market analysis in the lost profits study. For example, if the target company's market is mature and stable during the period under question, the plaintiff's sales level probably would have remained unchanged but for the defendant's actions.

2. **Statistical forecast.** The expert forecasts but-for sales by using a variety of tools such as regression (or other statistical) analysis and then subtracting the actual sales to estimate the lost sales. With this approach, the expert's model (or equation) must adequately predict the sales and use a control period (over which the equation is estimated) that does not contain events that would bias the results; also, the regression equation must not contain biases such as heteroscedasticity, autocorrelation, or other similar factors (see Chapters 8 and 9). The model should also consider all important industry factors that affect the sales of the plaintiff's products. For example, the price of oil can affect the sale of products used in the construction of oil rigs. The omission of a significant factor can invalidate the expert's results or make these results seem less credible to a judge and jury. The expert should ensure that the damages study considers all relevant factors and that the model includes the significant ones.[104]
3. **Yardstick.** The expert identifies an index of firms similar to the plaintiff's firm and compares the plaintiff's performance with the index's performance. This approach assumes that, but for the defendant's actions, the plaintiff would have performed the same, relative to the index, as it had in the past. Underlying biases in the data, however, can invalidate this index approach. A plaintiff firm that is smaller or larger relative to the index firms can lead to inaccurate results. For example, if a large plaintiff firm lost market share because of the defendant's wrongful conduct, small firms that acquired those shares could appear to be growing even if the market size remained constant.
4. **Market share.** Experts consider the plaintiff's market share during the period prior to the defendant's wrongdoing. In addition to defining the relevant market, the expert must also ensure that the market remained somewhat stable during the relevant time period. Numerous entrances or exits of competitors could undermine the use of this measure. Also, the analysis should examine the trend of the plaintiff's market share, because if the plaintiff's market share varied greatly over the period before the defendant's actions, this measure can yield unreliable results.

*(v) Cost Analysis* After estimating the amount of lost sales, the expert must subtract the costs the firm would have incurred to achieve these revenues. Such an analysis will consider many different cost measures, depending on the nature of the harm:[105]

- *Marginal cost* is the cost of producing one additional unit.
- *Incremental cost* refers to the cost of an unspecified number of additional units or of a new product line.
- *Average cost* equals the total cost divided by the number of units produced.
- *Variable costs* change as the activity (or production) level changes.
- *Direct costs* are the costs of the direct material and direct labor incurred in producing a product.

The expert must decide which cost measure pertains to the particular case. For example, a variable cost estimate will apply only over a certain range of production (called the relevant range). If the estimated lost sales units would increase

the production level outside the relevant range, then the use of the variable cost estimate can be incorrect.

The relevant cost measure can vary, of course, depending on whether the business is expanding or contracting. If the business is expanding and the amount of lost sales units would take production beyond the plaintiff firm's present capacity, the expert should consider including the capital costs of investment in new capacity or new equipment as a cost in the lost profits analysis. The expert using incremental costs should include such costs and should also make reasonable assumptions concerning the timing of the investments.

An expert estimating costs for a firm that would have sold more units but for the defendant's actions should consider the possibility of economies (or diseconomies) of scale.[106] If the model projects a large number of lost units, the plaintiff could achieve large cost savings at that production level. A study using only current costs could underestimate the plaintiff's damages. Similarly, learning curve effects would lead to a higher cost structure in a start-up firm than in a firm in business for some time. Finally, although average variable cost analysis can be appropriate for a firm already in the market, it can be inappropriate for a new entrant that will have to engage in promotional pricing to gain customer loyalty, a capital asset that a longtime competitor already possesses.

Even when the expert has decided on the relevant cost measure, important aspects of the analysis remain. For example, if claims relate to a single division (or product) of a multidivision (multiproduct) firm, the expert needs to consider joint costs.[107] The time frame over which the expert analyzes the firm's costs as fixed or variable becomes important: the shorter the period, the fewer the variable costs. The expert should consider whether to analyze costs that vary as production rises and falls within some output range or whether to measure costs that vary as production falls to zero (going-concern versus shutdown analysis). For a firm that has large costs associated with producing one unit that do not increase with the production level (zero-one costs), the level over which one measures costs as variable could determine the outcome of the case.[108]

*(vi) Subtract Actual Results from the But-For Amount to Ascertain Lost Profits Damages* This step is basic arithmetic and does not require much discussion. Exhibit 4-5 illustrates the basic format for calculating the amount of damages from the but-for and actual balances. The expert only needs to match up but-for and actual cash flows so the expert can properly adjust for the time value of money.

*(vii) Adjustment for Time Value of Money* As noted in Section 4.5(d), courts differ on the dates for evaluating a lost profits analysis. Regardless of whether a court decides that the appropriate date is the date of the breach, the date of the trial, or some other date, the expert must value the lost profits occurring in multiple periods to a single period. That is, the expert must adjust lost profits for the time value of money.

Experts use a variety of discount rates (see Section 4.5(h)), but they use these discount rates to express the lost profits occurring in multiple years as if they occurred in a single year. For example, proper discounting allows the expert to appropriately offset the negative cash flows required in some years with positive cash flows that result in others because of those investments. Recall that lost profits

*(ii) Merger and Acquisition Method* This method develops price multiples from sales transactions of guideline companies, either privately owned or publicly registered. Most of the sales transactions represent controlling interests in the companies. Experts can obtain data on these types of transactions from proprietary databases[35] and a search of SEC filings. These transactions occur less frequently, and the information about them is less systematic than that used in the guideline public company method. While the transactions used in the guideline public company method typically occur close to the subject company valuation date, those used in the merger and acquisition method often do not. Accordingly, such transactions often require adjustments to account for differences in market conditions that could exist between the valuation dates. If sufficient transactions are available, the analysis can exclude those that occurred during significantly different economic conditions. If not, then the expert can make adjustments to the multiple based on changes in industry valuation multiples. Some of the sales transactions reflect strategic acquisitions that involve a premium sales price. In addition, the transactions can include undisclosed factors such as employment contracts and noncompete agreements. Nonetheless, the transactions reflect events in the marketplace even if they do not include all the underlying information. This method values a marketable interest that has less liquidity than that of public company securities transactions on an exchange. Past acquisitions made by the subject company can also provide useful transaction information.

### (c) Price Multiples

Price multiples of guideline companies can rely on many financial measures that appear on the income statement (e.g., revenues; net income; and earnings before interest, taxes, depreciation, and amortization [EBITDA]) or the balance sheet (e.g., book value and tangible assets). Practitioners also apply multiples against other factors unique to a certain industry (e.g., price per population or subscriber in the cell phone or satellite television industry).

Prices paid for guideline companies reflect the firms' expected growth. Companies with high expected earnings growth sell at higher prices and multiples, all else being equal. Thus, the anticipated growth of the guideline companies should comport with the growth expectations for the subject company, or the analysis should make an appropriate adjustment: increasing the multiple if the subject company is expected to grow more quickly than the guideline companies or decreasing the multiple if it is expected to grow more slowly.

Experts need to understand the components of price multiples obtained from proprietary databases. The multiples sometimes lack consistency across databases because their calculations can vary. In addition, some databases report sales transactions when the seller retains the cash or working capital. These differences often require adjustments in the valuation analysis.

Valuations using some multiples calculate the value of the firm, whereas other multiples calculate the value of the firm's equity. For example, a price-to-EBITDA multiple applied to the subject company's EBITDA calculates the value of the firm (i.e., equity and debt capital). A price-to-earnings multiple applied to the company's recurring net income calculates the value of the firm's equity.