# EXHIBIT 17


TRADEMARK and
DECEPTIVE
ADVERTISING
SURVEYS
SECOND EDITION
Law, Science, and Design
Shari Seidman Diamond
and Jerre B. Swann
Editors
ABA AMERICANBARASSOCIATION
Intellectual Property
Law Section

# TRADEMARK and DECEPTIVE ADVERTISING SURVEYS

SECOND EDITION

## Law, Science, and Design

**Shari Seidman Diamond**
and **Jerre B. Swann**
Editors

RECEIVED
LAW LIBRARY

MAR 15 2022

UNIV. OF WI
MADISON, WI 53706

AMERICAN BAR ASSOCIATION
Intellectual Property
Law Section

Cover design by Jill Tedhams/ABA Design

The materials contained herein represent the opinions of the authors and/or the editors and should not be construed to be the views or opinions of the law firms or companies with whom such persons are in partnership with, associated with, or employed by, nor of the American Bar Association or the Section of Intellectual Property Law, unless adopted pursuant to the bylaws of the Association.

Nothing contained in this book is to be considered as the rendering of legal advice for specific cases, and readers are responsible for obtaining such advice from their own legal counsel. This book is intended for educational and informational purposes only.

© 2022 American Bar Association. All rights reserved.

No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior written permission of the publisher. For permission, complete the request form at www.americanbar.org/reprint or email ABA Publishing at copyright@americanbar.org.

Printed in the United States of America.

26 25 24 23 22     5 4 3 2 1

A catalog record for this book is available from the Library of Congress.

Discounts are available for books ordered in bulk. Special consideration is given to state bars, CLE programs, and other bar-related organizations. Inquire at Book Publishing, ABA Publishing, American Bar Association, 321 N. Clark Street, Chicago, Illinois 60654-7598.

www.shopABA.org

This material may be protected by Copyright law (Title 17 U.S. Code) 

# Control Foundations: Rationales and Approaches 9

By Shari Seidman Diamond

## INTRODUCTION

The Lanham Act explicitly specifies that a trademark owner who is claiming infringement must prove that consumers are likely to be influenced by the actions of the alleged infringer. That is, the trademark owner must show that the infringer's use "is likely to cause confusion, or to cause mistake, or to deceive."[1] Similarly, the statute requires the plaintiff alleging deceptive advertising to show misrepresentation likely to damage the plaintiff.[2] Analogous language appears in the statute concerning dilution: the plaintiff must show that the use "is likely to cause dilution."[3] Thus, causation is an unambiguous requirement in each instance. It is perhaps surprising, therefore, that early trademark surveys did not recognize and address this statutory requirement.

It is not as if the methodology suitable for conducting survey-experiments that could assess causation was unknown, or even obscure or impossible to implement. The underpinnings of the method go back

1. 15 U.S.C. § 1125(a)(1)(A) (2018).
2. *Id.* § 1125(a)(1)(B)(2011). Assessing consumer reaction is necessary in determining whether misrepresentation has occurred, that is, that the consumer is likely to be deceived by the advertising message, unless the message is literally false or necessarily false by implication. B. Sanfield, Inc. v. Finlay Fine Jewelry Corp., 168 F.3d 967, 971 (7th Cir. 1999).
3. 15 U.S.C. § 1125(c)(1).

at least to the publication of *The Design of Experiments* in 1935.[4] Methods of experimental design have been the standard fare in both laboratory and field settings for many years, used in areas as diverse as medical research (does a drug or other medical treatment produce improvements in health?) and agricultural studies (is a fertilizer effective in promoting plant growth?). Yet parties and experts submitting surveys as evidence in trademark and deceptive advertising cases, perhaps failing to recognize that the relevant survey question was a causal one, regularly failed to include the controls that are crucial elements in experimental designs.[5] Courts in turn admitted and relied on results from those control-absent surveys. As trademark and deceptive advertising surveys evolved in the course of 20 years, and particularly in the wake of growing federal court sophistication about surveys, the tide turned.[6] Although a few courts in recent years have been willing to admit and rely on surveys lacking controls,[7] they more often recognize the absence of a control as a fatal weakness.[8] In this recognition, they are acknowledging that a survey testing a causal question requires a survey-experimental design.

A similar need for a standard for comparison in the form of a control cell or cells or in the form of a control stimulus or stimuli arises in surveys assessing genericism or secondary meaning. We need to assess whether consumer responses in the survey reflect the construct of interest (e.g., for secondary meaning, that the consumer believes that the mark indicates that the product comes from a single source; for genericism, that the consumer believes that the mark as applied to the product indicates that it is a brand rather than a "common" name) or whether they have been produced by noise due to guessing or some other source (e.g., a belief by some consumers that all vodka or tomato sauce is made or authorized by the same company).

The second section of this chapter begins by reviewing in detail the threats to valid inference posed when a control is absent. The third section then shows how including an appropriate control cell can eliminate nearly all competing explanations for the results from the test cell by providing a standard of comparison against which to gauge

4. The author was British statistician Ronald Fisher, called "the father of modern statistics and experimental design" by Richard Dawkins at www.edge.org (2010).

5. For an early discussion of this neglect in cases of deceptive advertising, *see* Shari Seidman Diamond, *Using Psychology to Control Law: From Deceptive Advertising to Criminal Sentencing*, 13 LAW & HUM. BEHAV. 239–52 (1989).

6. Shari Seidman Diamond, *Reference Guide on Survey Research 400*, in REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (3d ed., Fed. Jud. Ctr. 2011) (documenting growth of surveys with control groups in Lanham Act cases).

7. *See, e.g.*, Ironclad v. Poly-America, 2000 U.S. Dist. LEXIS 10728, at *23–25 (N.D. Tex. 2000) (although the court viewed the lack of a control as "the most significant challenge to the survey evidence" and discounted its weight, the court "yet still gives [the survey] results some consideration").

8. *See, e.g.*, Procter & Gamble Pharm., Inc. v. Hoffman-LaRoche, Inc. 2206 U.S. Dist. LEXIS 64363, at *25 (S.D.N.Y. 2006); Simon Prop. Grp. v. mySimon, Inc., 104 F. Supp. 2d 1003, 1045–51 (S.D. Ind. 2000); Nat'l Football League Props., Inc. v. ProStyle, Inc., 57 F. Supp. 2d 665, 668 (E.D. Wis. 1999); P&G v. Ultreo, Inc., 574 F. Supp. 2d 339, 351–52 (S.D.N.Y. 2008); Bracco Diagnostics, Inc. v. Amersham Health, Inc., 627 F. Supp. 2d 384, 448 (D.N.J. 2009); THOIP v. Walt Disney Col., 690 F. Supp. 2d 218, 240 (S.D.N.Y. 2010); Valador, Inc. v. HTC Corp., 242 F. Supp. 3d 448, 463 (E.D. Va. 2017), *aff'd*, 707 F. App'x 138 (4th Cir. 2017); Saxon Glass Techs., Inc. v. Apple Inc., 393 F. Supp. 3d 270, 287 (2019).

the interpretation of the answers that the consumers give in the test cell. This chapter uses the standard terminology from the research design literature to unpack the important link between random assignment control methodology and *internal validity*[9] (that is, to what extent is the measured response [e.g., level of consumer confusion] caused by exposure to the treatment [e.g., the allegedly infringing mark or the allegedly false advertising message]?), with examples from trademarks and deceptive advertising. It also considers how control questions as well as control cells can in some cases assist in ruling out competing explanations. The fourth section turns to the issues that arise in choosing an appropriate control. Although these choices tend to be highly case specific, some general patterns can be described. Note that the mere presence of a control cell does not guarantee an adequate test of the relevant causal proposition: the stimulus selected for the control cell must be appropriate, as described below. Finally, the fifth section of this chapter discusses situations in which multiple controls may be required.

## THREATS TO INTERNAL VALIDITY AND SOURCES OF MEASUREMENT ERROR

To answer the question, "Does the allegedly infringing mark mislead the consumer as to source?", it is natural to expose the consumer to the mark and then ask the consumer questions about the mark. If that is all we do, whatever response the consumer gives to our questions could be caused by the mark itself, but it could also be due to a variety of other sources. Courts have recognized many of these explanations that threaten the validity of the survey under the general category of noise,[10] an appropriate if general description. The noise interferes with the signal (e.g., actual percentage of consumers who are misled) that the consumer's answer to the question would provide in the absence of noise. Two general categories of noise can cause interference. The first is noise that *systematically* distorts the pattern of responses, as, for example, when consumers have preexisting views about the product and respond based on those views rather than responding to the content of the commercial being tested. The second category of noise is noise that adds a *random* component to a respondent's answers, as when the respondent who is presented with a choice of possible answers chooses one of them randomly—that is, offers a pure guess. Whether noise is the result of systematic or random distortion,[11] it can compromise the results of a survey. Following are the primary forms of noise that impair inference in the absence of controls. It

9. DONALD T. CAMPBELL & JULIAN C. STANLEY, EXPERIMENTAL AND QUASI-EXPERIMENTAL DESIGNS FOR RESEARCH (1966).

10. *See, e.g.*, Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co., 290 F.3d 578 (3d Cir. 2002); Winning Ways, Inc. v. Holloway Sportswear, Inc., 913 F. Supp. 1454, 1475 (D. Kan. 1996); Water Pik, Inc. v. Med-Systems, Inc., 726 F.3d 1136, 1148 (10th Cir. 2013).

11. Statisticians divide measurement error into two types: bias, which takes the form of systematic distortion, and sampling error, which results in random distortion. *See* David H. Kaye & David A. Freedman, *Reference Guide on Statistics* at 283, 296, in REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (3d ed., Fed. Jud. Ctr. 2011).

is important to recognize that although these forms of noise can seriously undermine the value of a survey, appropriate controls offer an effective way to overcome most of these threats.

## Preexisting Beliefs

All respondents answer questions against a background of preconceived notions. These may include general beliefs about the nature of trademarks (e.g., all products in a category are really made by the same company) and commercials (e.g., all commercials claim that their products have positive features). They may include specific beliefs about the particular characteristics of a mark or a product, such as an awareness of the name of the best-selling brand in a particular product category or a belief that a particular substance is harmful. These preconceived notions naturally condition how the respondents will interpret and answer questions about the trademark or commercial they are shown in the course of an interview. Some surveys attempt to reduce the impact of preexisting impressions on respondents' answers by instructing respondents to focus solely on the stimulus as a basis for their answers. Thus, the survey includes a preface (e.g., "based on the commercial you just saw") or directs the respondent's attention to the mark at issue (e.g., "these stripes on the package"). Such efforts are likely to be only partially successful. It is often difficult for respondents to identify accurately the source of their impressions.[12] The more routine the idea being examined in the survey, the more likely it is that the respondent's answer is influenced by preexisting impressions rather than by the actual content of the commercial message or trademark being evaluated. To know whether an allegedly infringing trademark or an allegedly deceptive commercial is the cause of the respondent's answer, it is necessary to rule out these preexisting notions as alternative explanations for the answer. That is, we need a control that will provide a measure of preexisting notions.

## Yea-Saying

Acquiescence bias occurs because subsets of individuals, often called yea-sayers, have a "tendency to endorse any assertion made in a question, regardless of its content."[13] This occasion for biased endorsement arises whenever a question is framed as a request for agreement or disagreement, as when the response choices are agree/disagree, true/false, or yes/no.[14] For example, questions like, "Have you ever heard of Mercury as a brand of automobile?" may attract agreement even from respondents who are actually unaware that Mercury is a brand of automobile. As courts have recognized, the presence of yea-sayers artificially inflates the rate of agreement.[15]

---

12. *See* Richard E. Nisbett & Timothy D. Wilson, *Telling More Than We Can Know: Verbal Reports on Mental Processes*, 84 PSYCHOL. REV. 231 (1977).

13. Jon A. Krosnick, *Survey Research*, 50 ANN. REV. PSYCHOL. 537, 552 (1999).

14. Diamond, *supra* note 6, at 394.

15. Pharmacia Corp. v. GlaxoSmithKline Consumer Healthcare, L.P., 292 F. Supp. 2d 594, 601 (D.N.J. 2003).

Moreover, the effect is not insignificant: the bias has produced an inflation effect of 10 percent across a number of studies.[16]

## Guessing That Produces Random Error

Trademark surveys typically instruct respondents to avoid guessing, but the survey setting itself invites respondents to provide answers to the questions they are being asked and, having agreed to participate in the survey, many respondents will make an effort to offer answers. Further, respondents want to appear knowledgeable, and thus "don't know" is generally a less attractive option if other choices are readily available. Either guessing or choosing "don't know" is likely to be stimulated if the question or the response options are challenging to understand, as occasionally occurs when the survey is testing the message that consumers received from an allegedly deceptive commercial. The respondent may guess or choose "don't know" rather than engage in carefully considering each of the alternative response choices about the message being conveyed by the commercial. It is difficult to know how much guessing is occurring in a particular survey without some additional evidence. One reason why surveys often include multiple questions aimed at measuring the same attitude or belief is that consistent responses by individuals across several questions on the same topic provide a more stable measure, as well as evidence that the answers are not simply a result of guessing.

Many of the questions asked in trademark surveys present respondents with two choices: Do you think X and Y are put out by the same or by different companies? Do you think that Z is put out by one company or by more than one company? If respondents were merely to guess, each of the two choices would attract roughly half of the responses. As a result, even if a "don't know" option is added to reduce guessing, the pattern of responses will be hard to interpret. That is, how many of those responding that Z is put out by one company were responding to the mark and how many were merely guessing? Without a control for guessing, we cannot tell.

## Guessing That Produces Systematic Error

This form of guessing can appropriately be characterized as "guided guessing." It occurs if questions or response choices contain cues that suggest a particular response. The extreme form of suggestion is the familiar leading question that makes it clear that a particular response is expected or preferred. For example, respondents in a survey were asked, "To the best of your knowledge, was the Donkey Kong game made with the approval or under the authority of the people who produce the King Kong movies?"[17] The court rejected the question as leading, observing that "[A] survey question which begs its answer cannot be a true indicator of the likelihood of consumer

16. Krosnick, *supra* note 13.
17. Universal City Studios, Inc. v. Nintendo Co., 746 F.2d 112, 118 (2d Cir. 1984).

confusion."[18] Questions can also provide more subtle cues as to "correct" or preferred answers. By providing a frame for responses, a question can direct the respondent to provide an answer that is consistent with the categories mentioned in that frame. For example, when Walmart claimed that Charles Smith infringed and diluted its trademarks through Smith's sale of T-shirts that Smith sold only on the web, Walmart's survey asked respondents, "What company or store puts out this product?"[19] As the court recognized, "the disputed questions improperly led respondents to limit their answers to companies or stores."[20]

Finally, earlier questions in a survey can provide a context for a question that influences the pattern of answers that respondents are likely to give to the questions that follow. For example, in *P&G v. Ultreo*, the plaintiff sued a competitor for allegedly deceptive advertising about the use of ultrasound technology in its new power toothbrush.[21] Ultreo had advertised its new power toothbrush in part based on the ultrasound feature of the toothbrush, and the plaintiff charged that the implied claims about the effects of the ultrasound feature were deceptive. The court pointed out that the plaintiff's survey questions asking respondents, "What does the ultrasound do?" and "What is the benefit of ultrasound?" focused the attention of the respondents on ultrasound.[22] The court concluded that these questions may have stimulated ultrasound responses not reflecting the message respondents took from the commercial.[23]

## A CLOSER LOOK AT SURVEY DESIGN WITHOUT AND WITH CONTROLS

### Without Controls

Suppose that we show the consumer a can that is the size and shape of most cans that contain carbonated beverages. The can is red with white block letters saying cola. We ask consumers, "Who do you believe puts out this product?" (the traditional Eveready approach).[24] Some percentage of respondents may assume that Coca-Cola is the source (or that the producer had to get permission from the makers of Coca-Cola). Although we may caution respondents not to guess, as well as give them the option of saying "I don't know," respondents in a survey want to be helpful and to appear knowledgeable. If 28 percent of respondents in a survey say Coke or Coca-Cola, should this result be viewed as sufficient evidence to support a claim of likely confusion? The problem is that a variety of legally irrelevant reasons may account for the Coke

18. *Id. See also* 1-800 Contacts, Inc. v. Lens.com, Inc., 2010 U.S. Dist. LEXIS 132948 at *22–23 (D. Utah 2010) ("the form of the question strongly suggested the response.").
19. Smith v. Wal-Mart Stores, Inc., 537 F. Supp. 2d 1302, 1319 (N.D. Ga. 2008).
20. *Id.* at 1332.
21. P&G v. Ultreo, Inc., 574 F. Supp. 2d 339 (S.D.N.Y. 2008).
22. *Id.* at 352.
23. *Id.*
24. Union Carbide Corp. v. Eveready, Inc., 531 F.2d 366 (7th Cir. 1976).

responses. For example, the untrademarked color red may have led some respondents to say Coke. Others may have chosen Coke because, as the product leader in the cola category, Coke was the brand name most available to respondents and thus the most likely brand to guess.

The evidence would be even further undermined if the question instead was, "Which of the following, if any, puts out this product: Coke, Pepsi, 7Up, other?" If a respondent had absolutely no idea and simply guessed, 25 percent of respondents would say Coke. Providing an explicit "don't know" option typically reduces guessing by 20 to 25 percent without substantially changing the distribution of the respondents selecting each of the listed choices.[25] Subtracting the expected responses that would be diverted to the "no opinion" option, we would expect to obtain 25 percent minus 6.25 percent (25 percent of 25 percent = 6.25 percent), that is, 18.75 percent Coke responses *if respondents were merely guessing*.[26] If we add to that the respondents who were more likely to choose Coke merely because of its large market share—that is, we take into account systematic as well as random guessing—the percentage selecting Coke would go higher even if no confusion due to trademark infringement was actually occurring. Finally, suppose the question was, "Is the product you just saw put out by the Coca-Cola Company or by some other company?" Reducing the number of choices to two (Coke or other) would inflate the base rate for guessing even further. Thus, the survey evidence of 28 percent Coke responses that, at first blush, might seem to reveal substantial evidence of likelihood of confusion, dissolves on closer examination.

This survey design—without a control—is what is referred to as a One-Group Posttest-Only Design.[27] Diagrammatically, it can be represented as follows:

$$X \quad O$$

This diagram depicts time moving from left to right; $X$ = the test stimulus or treatment (in this case the red cola can with white block lettering), and $O$ = the observation (in this case the responses to the questions asked in the survey about the source of the cola).[28]

To see how the weaknesses of this design also apply in a deceptive advertising context, consider $X$ as an allegedly deceptive commercial claiming the virtues of an antacid product and allegedly implying (although not explicitly stating) that the ingredient beryllium used in the product of its chief competitor is harmful. In fact, the competitor's product does contain beryllium, but there is no scientific evidence that beryllium in the quantities involved is in fact harmful. Consumers are shown the

25. HOWARD SCHUMAN & STANLEY PRESSER, QUESTIONS AND ANSWERS IN ATTITUDE SURVEYS: EXPERIMENTS ON QUESTION FORM, WORDING AND CONTEXT 113–46 (1981).

26. The court in an early case acknowledged the problem of accounting for guessing that would produce 20 percent of respondents endorsing each of five possible choices. Am. Home Prods. Corp. v. Johnson & Johnson, 654 F. Supp. 568 (S.D.N.Y. 1987).

27. THOMAS D. COOK & DONALD T. CAMPBELL, QUASI-EXPERIMENTS: NONEQUIVALENT CONTROL GROUP DESIGNS 96 (1979).

28. *Id.* at 95–96. The notation was originally developed by D.T. Campbell and J.C. Stanley in their classic monograph EXPERIMENTAL AND QUASI-EXPERIMENTAL DESIGNS FOR RESEARCH (1966).

commercial, and then—the observation *O* in the diagram above—the follow-up survey questions measure their beliefs about the competitor's product and its ingredients, based on the commercial. If 28 percent of respondents report that the beryllium in the competitor's product makes it dangerous, has the survey demonstrated, as the plaintiff is required to prove in a case of deceptive advertising based on implied falsity, that the commercial has caused this belief? The problems we saw in the earlier coca-cola example infect such an inference here as well.

Respondents come to products, trademarks, trade dress, and commercials with expectations and beliefs, and those expectations and beliefs influence their survey responses. Consumers who have previously been exposed to negative news stories on the dangers of beryllium and those who assume it is dangerous based only on the name "beryllium" (e.g., sounds like radium) view the commercial with a jaundiced eye. Even if the commercial merely listed the ingredients of the competitor's product with no further suggestion about beryllium dangers, on being questioned after viewing the commercial, those respondents may report negative feelings about the competitor's product due to its beryllium content. Neither the researcher using a research design that lacks a control nor the court evaluating the results can know how many of the responses reporting that beryllium in the competitor's product makes it dangerous are due to these preexisting beliefs, how many are due to spontaneous responses to the ingredient's name, and how many are due to a false implied message of dangerousness in the commercial, which is the allegation that must be proved to support the claim in this case. Note that although the survey question asks the respondents to answer "based on the commercial," it is difficult for respondents to follow this direction because it requires respondents to be able to accurately gauge the basis of beliefs that may have multiple sources, a standard problem of human inference.[29] Even highly motivated respondents may be unaware of what influences their response.[30]

Now suppose that we change the design. If preexisting attitudes and beliefs are a problem, can we simply measure those and then "net out" those responses in evaluating the postexposure survey results? The design, labeled a One-Group Pretest-Posttest Design,[31] becomes:

$$O_1 \quad X \quad O_2$$

That is, we measure at $O_1$ before the commercial is shown to respondents, and at $0_2$ after the commercial is shown. Can we then use $O_2$ minus $O_1$ to estimate the percentage of respondents deceived by the commercial, net of preexisting attitudes and beliefs? We have improved the ability to make valid inferences in one way by adding this pretest, but in doing so, we have introduced other threats to validity. The questions we have asked at $O_1$ have alerted respondents to the issues of interest (e.g., response to beryllium), potentially changing the way the respondents viewed the commercial,

29. Nisbett & Wilson, *supra* note 12.
30. *Id.*
31. COOK & CAMPBELL, *supra* note 27, at 99.

now sensitized to that issue. This priming that can affect how the respondent interacts with the commercial represents priming that can affect precisely the kind of distortion that courts often appropriately object to when they complain that a survey did not appropriately replicate what would occur in the marketplace. Of course, no survey completely replicates market conditions, but one introducing a change like the priming test in the One-Group Pretest-Posttest Design leaves a trail of threats to valid inference in its wake. The result is that no reliable causal inference about the impact of *X* can be obtained.

## With Controls

Fortunately, surveys in trademark and deceptive advertising litigation never need to rely on the weak preexperimental designs described above in order to test the relevant causal questions that arise in these cases. The primary solution is an experimental design in which survey respondents are randomly assigned either to the test cell or to a control cell (or one of a number of control cells).[32] The genius of Ronald Fisher[33] was to recognize that equivalent groups of plots of land (or sets of people) could be created by randomly assigning them to conditions, thereby producing two (or more) sets of plots or people that did not initially differ. By subjecting one group to a treatment (the test cell) and the other(s) to no treatment or to different treatments (the control cell(s)), the only explanation for any difference observed between the groups on the posttest measure would be the treatment. This design rules out the possibility that, for example, preexisting attitudes or beliefs or differences in the composition of various plots of land could be responsible, because the groups on average (before treatment) were equivalent as a result of the random assignment to the test and control conditions. Using the same notation we used earlier, the basic randomized experimental research design becomes:

$$\begin{array}{ccc} R & X & O \\ R & & O \end{array}$$

where the *Rs* indicate that units (people) are randomly assigned to either the test group (line 1) or the control group (line 2). Additional rows can be added to the design if additional control cells are added (e.g., one control group of respondents watches a commercial with the allegedly deceptive material removed, while a second control

32. Random assignment should not be confused with random selection. When respondents are assigned randomly to different treatment groups (*e.g.*, respondents in one group watch an allegedly deceptive commercial while those in a second group watch no commercial or an acknowledged nondeceptive commercial), the procedure ensures that within the limits of sampling error the two groups of respondents will be equivalent except for the different treatment they receive (*e.g.*, the different commercials they view). Respondents selected in a mall intercept study, as well as those selected in a probability sample, may be assigned randomly to different treatment groups. Random selection, in contrast, describes the method of selecting a sample of respondents in a probability sample. See Section III.C. in Diamond, *supra* note 6.

33. *See* text *supra* at note 4.

group of respondents watches no commercial at all). With this design, any differences in *O* become unambiguously attributable to the impact of the treatment. As we shall see below, precisely what it is about *X* that had the observed effect on the post-treatment measure is a different question, but random assignment and the use of a control enable us to conclude unambiguously[34] that there was something about *X* that caused the post-treatment difference between groups.

## CHOOSING APPROPRIATE CONTROLS

The general principle for choosing an appropriate control is easily stated: it should share as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed. The reason for this approach is that it peels away any confounding influences that threaten the inference that the experimental stimulus caused the differences between the test and control groups on the post-treatment measure. The devil is of course in the details. How much sharing is enough? On what dimensions? How much sharing is too much? Judge Posner once opined that survey research involves "black arts," suggesting that devious manipulation might explain the differences between survey designs when opposing experts present surveys that produce different results, each favoring the particular expert's client.[35] While survey designs are not always optimal and experts are not always pure of heart, an alternative explanation to pure partisan manipulation in many cases is that good survey design requires the employment of "analytic" rather than "black" arts. The key is to analyze what needs to be present in the control and what needs to be absent, and to identify a control stimulus or set of stimuli that meet both requirements.

We begin with a case involving a relatively simple example of a control group survey design. RE/MAX sued Trend Setter Realty for trademark infringement, alleging that the red, white, and blue yard sign used by Trend Setter was likely to cause confusion with RE/MAX's own red, white, and blue sign.[36] The RE/MAX sign consisted of three horizontal bars with red at the top, white in the middle, and blue on the bottom of the sign. The Trend Setter sign used a similar color scheme and horizontal approach to the use of the three colors, but the white bar protruded into the red bar at the top to form a roof-sloped image.

Survey respondents viewed either the Trend Setter sign or a control sign. The control sign was identical to the test sign except that the red and blue horizontal bars were modified so that they were white rather than red or blue.[37] The white roof silhouette

34. Within the limits of sampling error. *See* Kaye & Freedman, *supra* note 11, at 296.
35. Indianapolis Colts v. Metro Baltimore Football Club Ltd. P'ship, 34 F.3d 410, 416 (7th Cir. 1994).
36. RE/MAX Int'l, Inc. v. Trendsetter Realty, LLC, 655 F. Supp. 2d 679 (S.D. Tex. 2009).
37. The white print on the red and blue portions of the test sign was changed to red on the control sign so that it would be visible when the background of the red and blue portions became white (personal communication, Robert Peterson, April 28, 2012).

was preserved with a blue line outlining the roof. Over one-fourth (25.3 percent) of the individuals who viewed the test sign said either that RE/MAX was the company being promoted or advertised by the sign, or that the company being promoted or advertised by the Trend Setter Realty sign was affiliated or connected with RE/MAX or would have to get permission or approval from RE/MAX to use the sign. Only 2.7 percent of those who saw the control sign identified RE/MAX as the source. The net confusion rate was thus 25.3 percent minus 2.7 percent = 22.6 percent, and the court found that the survey evidence was "sufficient to support the conclusion that there is actual confusion."[38]

By removing the color of the red and blue bars from the color scheme of the Trend Setter sign and asking the same questions to respondents in the control cell, the control cell provided a way to estimate the extent to which respondents shown the test sign were answering with the name "RE/MAX" for reasons other than the RE/MAX trademark (e.g., merely because it was more familiar through its dominant standing in the real estate market). Although another version of the control sign might have been used (e.g., one with a different color scheme), the choice of the control image was reasonable and permitted an unambiguous inference that the difference in the color schemes used in a horizontal pattern on the two signs was responsible for the difference in the rate of RE/MAX responses.

The court was further impressed by the verbatim responses to the follow-up questions, which asked the respondents to explain why they gave their answers: "Why do you say that?" and "What other reasons?" Many of the respondents mentioned the colors on the sign. Several points are relevant here. First, even in this relatively straightforward case in which it was easy to indicate the characteristics of the mark being tested and there were few obvious competing characteristics on the stimulus that might have drawn the respondent's attention, responses to the "why?" questions tended to be incomplete. Here, 58 percent (22/38) of the respondents who said RE/MAX gave color as an explanation, while 42 percent (16/38) did not mention color in their responses.[39] Moreover, "reasons" can be misleading—that is, they may not be reasons at all. In the RE/MAX survey, some respondents gave "reasons" that did not relate to the RE/MAX logo (e.g., "because it had a house on the sign"[40]—in fact, there is no house on the RE/MAX logo) or otherwise did not make sense (e.g., "I remember seeing an R on the top right corner"[41]—in fact, there was no R in the top right corner of the sign). The reason why such pseudo-reasons may occur is that respondents who are questioned about their reasons for an answer will search for a plausible explanation that may or may not be the reason for that earlier response. Although people are often able to *justify* their positions when asked to explain their actions, such post-hoc

38. *RE/MAX*, 655 F. Supp. 2d at 706.

39. Computed from a review of verbatim responses in Expert's report, 2007 Misc. Filings 72426, 2009 Misc. Filings LEXIS 1632, at *13–18 (S.D. Tex. 2009).

40. *Id.* at *14.

41. *Id.* at *15.

explanations can only imperfectly capture the reasoning that actually produced their answers.[42] The best method for determining the cause of a confusion response is a survey-experimental design with a tight control that directly isolates the explanatory feature by showing that the answer changes when the feature is changed or is no longer present. That is precisely what the pattern of responses (that is, fewer RE/MAX responses) in the control cell supplied in the RE/MAX case. The net percentage of RE/MAX responses (test cell percentage minus the control cell percentage) supplied the most telling evidence of the level of confusion caused by the color pattern used by Trend Setter Realty on its yard sign. When the characteristics of a mark or the allegedly deceptive message in a commercial are more complex, the features of a good control or set of controls that will accomplish this purpose become more complex as well. I next describe four features that characterize a good control stimulus:

1. It shares features with the allegedly infringing mark or deceptive advertisement, other than those alleged to be infringing or deceptive, that might affect responses.
2. It does not contain cues that will artificially depress confusion responses by leading the respondent in another direction.
3. If it is a control for an allegedly infringing mark, it should appear to be a mark that would plausibly be used in the same product category.
4. If it is a control for an allegedly infringing mark, it should not itself be an infringing mark.

## Selecting a Control That Shares Features with the Test Stimulus That Are Not at Issue

The control stimulus should retain as many noninfringing characteristics of the test stimulus as possible.[43] In the RE/MAX example described earlier, the control sign shared crucial features with the test sign. The control sign preserved the roof image of the Trend Setter design that appeared in the test cell and that might have encouraged respondents to name a familiar real estate company. In addition, both the test and control signs included the Trend Setter name, so that the presence of the Trend Setter name could not explain different responses in the test and control cells. These consistencies between the test and control signs made it possible to isolate the effect of the colored bar scheme on responses.

When an advertisement contains an allegedly misleading claim about the virtues of its product as compared with the product of a competitor, consumers are likely to report that the commercial made a superiority claim, but that report may not be based on an implied message contained in the commercial about the actual characteristics

---

42. Nisbett & Wilson, *supra* note 12.

43. *See, e.g.*, Skechers USA, Inc. v. Vans, Inc., No. CV-07-01703, 2007 WL 4181677, at *8–9 (C.D. Cal. Nov. 20, 2007) (in trade dress infringement case, control stimulus should have retained design elements not at issue).

or performance of the product relative to competing products. Instead, it may simply reflect a generalized response to comparative advertising: in a comparative advertisement, consumers expect advertisers to extol the virtues of their products relative to those of competitors. Thus, respondents in a survey who are questioned about an advertisement for a pain reliever may agree that the advertisement conveys a message that it reduces pain longer than does the pain reliever of its major competitor simply based on their expectations that a comparative commercial is likely to be making a superiority claim. Under these circumstances, the appropriate control commercial would be a comparative commercial that does not focus on superior duration of pain relief. In *Pharmacia v. GlaxoSmithKline,* the claim was that the manufacturer of a nicotine patch was falsely implying that the patch produced superior quitting efficacy.[44] The control commercial was not comparative. Indeed, while 92 percent of the respondents who saw the test commercial rated it as comparative, only 10 percent who saw the control commercial said it was comparative.[45] The court concluded that the noncomparative control ad failed to control for preexisting beliefs and expectations.[46] Respondents asked whether the commercial mentioned a difference in quitting efficacy could have been inclined to say that the comparative ad did make that claim, not as a result of the specific content of the comparative ad, but because they assumed that a comparative ad for the product would make such a claim. Note that an appropriate control commercial may not have been readily available. In that situation, it might have been possible to produce one by excising the allegedly misleading portion of the test commercial, or it may have been necessary to create a mock comparative commercial to act as the control.[47]

## Avoiding Cues in the Control That Artificially Depress "Confusion" Responses

It is often appropriate to use other existing brands in a survey measuring likely confusion. The product or products must be chosen carefully to maximize similarity to the allegedly infringing product on all possible dimensions. The choice of a control brand should not artificially direct the respondent away from indicating that the control product is put out by the mark holder.[48] For example, the makers of NU FINISH car polish complained that FINISH 2001, a car polish put out by TURTLE WAX, infringed the NU FINISH trademark and trade dress.[49] The plaintiff's survey used an ARMOR ALL product as the control and found that few respondents said that it was put out by the

44. Pharmacia Corp. v. GlaxoSmithKline Consumer Healthcare, L.P., 292 F. Supp. 2d 594, 597 (D.N.J. 2003).
45. *Id.* at 603 n.4.
46. *Id.* at 604–05.
47. *Id.* at 604.
48. *See, e.g.*, Louis Vuitton Malletier v. Dooney & Bourke, Inc., 525 F. Supp. 2d 576, 595 (S.D.N.Y. 2007) (underreporting of background "noise" likely occurred because handbag used as control was quite dissimilar in shape and pattern to both plaintiff's and defendant's bags).
49. Reed-Union Corp. v. Turtle Wax, Inc., 869 F. Supp. 1304 (N.D. Ill. 1994).

company that made FINISH 2001; that is, there was little evidence of noise.[50] As the court recognized, the fact that ARMOR ALL, the maker's brand, was prominently displayed on the control product (unlike the way the small print name of the manufacturer appeared on the rear of the other bottles) made the ARMOR ALL product a choice that consumers would easily reject.[51] As the court said, the "control product could not measure inherent confusion in the marketplace because it prominently identified the maker."[52] It is perhaps not surprising that an opposing survey using PRISM as the control product, a polish that did not display the maker's name on its front label, produced substantially greater evidence of noise.[53]

## Selecting a Control Mark That Would Plausibly Be Used in the Same Product Category

Control products may exist that have the needed characteristics for the survey, or they may have to be created to have them. In either case, control marks should be plausible choices for the set of products at issue. For example, a survey was designed to test whether physicians were likely to believe that new glaucoma medication TRAVATAN was produced by the company that manufactured the existing medication XALATAN.[54] The control, used both by the plaintiff's expert in a dilution survey and by the defense expert in a likelihood-of-confusion survey,[55] was LUMIGAN, another recent entry into the glaucoma medication market. All respondents in the likelihood-of-confusion survey were shown a page that resembled a magazine advertisement and contained the same illustration, but that varied the name of the product being advertised.

In contrast, a survey designed to test whether a new perfume bottle infringed the trade dress of Calvin Klein's ETERNITY perfume used a control perfume bottle that failed to provide a plausible control.[56] According to the court, one reason for discounting the confusion survey was that it failed "to use a control that 'could plausibly emanate from Calvin Klein.'"[57]

## Avoiding a Control That Is Itself Infringing

To control for all noninfringing elements of a mark, a survey may select a control that is itself infringing.[58] If so, the "control" provides no control at all because any "confusion" responses in the control may be the result of noise or actual confusion or

---

50. *Id.* at 1311.
51. *Id.*
52. *Id.*
53. *Id.* at 1311–12.
54. Pharmacia Corp. v. Alcon Lab'ys, 201 F. Supp. 2d 335 (D.N.J. 2002).
55. The author was an expert for the defendant in this case.
56. Conopco, Inc. v. Cosmair, Inc., 49 F. Supp. 2d 242 (S.D.N.Y. 1999).
57. *Id.* at 254. *See also* THOIP v. Walt Disney Co., 788 F. Supp. 2d 168, 181 (S.D.N.Y. 2011); Intern'l IP Holdings, LLC v. Green Planet, Inc., 2016 U.S. Dist. LEXIS 41778, at *2–3, *27 (E.D. Mich. 2016).
58. *See e.g.,* the plaintiff's critique of the defense survey in *Classic Foods Int'l Corp. v. Kettle Foods, Inc.*, 2006 U.S. Dist. LEXIS 97200, at *19 (C.D. Cal. Mar. 2, 2006) (what was characterized as "noise" in response to defense control could in fact be actual consumer confusion caused by the control stimulus).

a combination of both: there is no way to tell. Indeed, in a case involving a claim of trade dress infringement of Little Golden Books, a series of children's storybooks, a control used in one of the surveys was, according to the court, "the one storybook on the market arguably more similar in trade dress to the Little Golden Book than [the defendant's] product!"[59] As a result, the survey received no weight.

Similarly, the defendant in a trade dress infringement case involving "Splenda" no-calorie sweetener produced a survey that purported to show an absence of confusion with the trade dress of the defendant, "Same," which was also packaged in a horizontal box with a yellow background and blue and white accents.[60] The defense survey used a "Sugar Twin" box as the control and found 22 percent minus 20.6 percent = 1.4 percent net confusion.[61] The court rejected the evidence from the control on the ground that the control was itself infringing.[62]

As these results reveal, before designing a survey and selecting a control or controls, the expert should be as clear as possible on the elements that are included in the claimed trademarks and those that are unambiguously noninfringing. In some instances, it may be possible to identify the boundaries of the claim from the complaint. In others, it may be possible to fill in if prior enforcement actions have resulted in agreements as to acceptable modified uses of the mark (e.g., the "Fit 24 Club" and "The 24 Hour Gym" were recognized as acceptable uses of the trademark "24 Hour Fitness" for fitness facilities[63]). To the extent judges can assist in getting the parties to clarify just where the boundaries to the claimed trademark rights are located before the parties undertake any survey work, the surveys that are conducted will be better constructed and more likely to provide results that can withstand scrutiny and avoid ambiguity in the value of the information they can offer. Although it might be desirable to encourage even closer pre-survey narrowing of issues, such consultation is hard to produce. It did occur at least once in the case of *Sunamerica Corp. v. Sun Life Assur. Co. of Canada.*[64] The court in *Sunamerica* worked with the parties, who then conducted a single survey. That level of collaboration has not, to this author's knowledge, been repeated.[65] The suggestion here is much narrower: encourage delineation of clear boundary information from the party claiming infringement, somewhat in the nature of an extended notice provision clarifying the scope of the claim.

59. Western Publ'g Co. v. Publications Int'l, 1995 U.S. Dist. LEXIS 5917, at *29 (N.D. Ill. 1995).
60. McNeil-PPC, Inc. v. Merisant Co., 2004 U.S. Dist. LEXIS 27733, at *11 (D.P.R. 2004).
61. *Id.* at *61.
62. *Id.* at *62. "Sugar Twin" had been marketed prior to the introduction of "Splenda" and thus was not subject to an infringement claim by the makers of "Splenda." *Id.* at *65.
63. 25 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC, 447 F. Supp. 2d 266, 280 (S.D.N.Y. 2006).
64. 890 F. Supp. 1559, 1570 (N.D. Ga. 1994).
65. Nor did agreement on the survey design prevent disagreement between the parties on the interpretation of the results. *Id.*

## THE ROLE OF MULTIPLE CONTROLS

To separate the effects of several factors or product features on likelihood of confusion, it may be advisable to use more than one control cell. This situation arose when the maker of M&M's chocolate candies alleged trade dress infringement based on the similar packaging of multicolored chocolate lentils used by the defendant on ROCKLETS candy packages.[66] The plaintiff's survey included more than one control cell, including one in which the candy lentils seen through the package window were multicolored, as they are on the M&M's packages, and a second in which the lentils were all white. Not surprisingly, fewer respondents who saw the second all-white lentils package answered that it was put out by the maker of M&M's than did respondents in the cell in which the visible lentils were multicolored. The two controls provided the court with a range of estimates of noise, a baseline range against which to gauge the effect of the defendant's packaging on likelihood of confusion.[67]

This chapter has focused primarily on control cell survey designs (that is, *between-group designs* that compare the responses of one set of survey participants with responses from another set). These are the strongest designs for causal inference because a respondent cannot be influenced by the content of material shown to respondents in other cells of the design. Of course, each additional cell in a between-group survey adds the expense of additional respondents. In contrast, minimal additional expense is entailed when the same respondents are asked to answer questions about multiple stimuli. These *within-group designs* are not suitable in some situations (e.g., in false advertising surveys), but are appropriate and standard fare in surveys assessing whether a mark is generic.[68] The other marks in the genericism survey provide a baseline of accepted brand and common names, so that the survey can reveal where the name at issue falls on the spectrum of tested names. A key threat to validity arising in within-group survey designs is the danger of order effects.[69] It is therefore crucial that the order of presentation of stimuli in a within-group design be rotated.

## CONCLUSION

Controls play a central role in enabling a survey to rule out threats to valid causal inference. A control group design that includes an appropriate control or controls is the best way to ensure that noise from preexisting beliefs, yea-saying, and guessing (both random and biased) cannot explain away or undermine evidence of confusion or

---

66. Masterfoods USA v. Arcor USA, Inc., 230 F. Supp. 2d 302 (W.D.N.Y. 2002).
67. *Id* at 311.
68. *See* Chapter 6, *infra*, by E. Deborah Jay
69. *See* HOWARD SCHUMAN & STANLEY PRESSER, QUESTIONS AND ANSWERS IN ATTITUDE SURVEYS: EXPERIMENTS ON QUESTION FORM, WORDING AND CONTEXT 23, 56–74 (1981); Jon A. Krosnick & Stanley Presser, *Questions and Questionnaire Design*, in HANDBOOK OF SURVEY RESEARCH 13 (James D. Wright & Peter V. Marsden eds., 2d ed. 2010) at 278–81.

deception reflected in the responses of survey participants. An appropriate control or controls in a trademark survey, as in any experiment, should mimic the test stimulus as closely as possible without including features that are the focus of the infringement claim or are part of the message that is allegedly deceptive. A control should not be so different that it artificially lures respondents away from revealing the effect of noise. In an infringement case, the control should be a plausible instance of a mark that would be used in the same product class but not so similar to the mark holder's mark that it is itself infringing. Designing an appropriate control is thus an analytic rather than a mechanical task, one that is crucial in a valid trademark or deceptive advertising survey.

# THE *DAUBERT* REVOLUTION AND LANHAM ACT SURVEYS 14

By G. Kip Edwards and J. David Mayberry

*"No survey is beyond criticism, especially in the context of litigation. Courts therefore recognize that many criticisms of surveys used in litigation are appropriate topics of cross-examination and contrary evidence to reduce the weight of the survey without requiring that it be excluded. There are limits, however. The court need not and should not respond reflexively to every criticism by saying it merely 'goes to the weight' of the survey rather than to its admissibility."*[1]

## INTRODUCTION

The standards and pretrial procedures by which expert testimony is admitted or excluded in federal court Lanham Act trials were the subject of a not-so-quiet revolution as a result of the Supreme Court's 1993 *Daubert* decision.[2] Gone was the so-called *Frye*[3] test, controlling but controversial in federal courts for over 70 years, under which expert opinion testimony was inadmissible unless based upon "generally accepted" scientific techniques in the relevant scientific community.[4]

The authors acknowledge with appreciation the helpful comments of Dr. AnnaBelle Sartore and Dr. Gerald L. Ford, partners of Ford Bubala & Associates, and Dr. E. Deborah Jay, principal and founder of Jay Survey Strategies L.L.C.

1. Simon Prop. Grp. L.P. v. mySimon, Inc., 104 F. Supp. 2d 1033, 1039 (S.D. Ind. 2000) (citations omitted).

2. Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993).

3. Frye v. United States, 293 F. 1013 (D.C. Cir. 1923).

4. The *Frye* test originated in what the *Daubert* Court called a "short and citation free" decision in which the court stated that "while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the

The admissibility of expert testimony, post-*Daubert*, is now based upon the Federal Rules of Evidence, effective in 1973, which contain detailed provisions governing expert testimony, and specifically Rule 702.[5]

*Daubert* requires district courts to discharge a "gatekeeping" function when faced with expert testimony, almost always during pretrial proceedings. The primary *Daubert* issues to be ruled upon are two: is the proposed expert testimony "relevant" to the issues in the case? This issue, summarized as whether the expert's testimony "fits" with the case issues, is to be resolved by asking whether the expert's testimony, if admitted, speaks directly to a disputed issue in the case. If so, the district court then must determine whether the proposed testimony is "reliable,"—that is, whether the expert's proposed testimony is based upon principles and methodology based upon "scientific knowledge."[6]

*Daubert* dealt with "scientific" evidence[7] and the Court expressly limited its decision to "the scientific context because that is the nature of the expertise offered here."[8] Six years later, the Court held that *Daubert* applied to all "expert" testimony described in Rule 702—not only to testimony based upon "scientific" knowledge but also to testimony based upon "technical" and "other specialized" knowledge.[9]

*Kumho* removed any doubt about the applicability of *Daubert* to Lanham Act survey evidence. As discussed below, challenges to the admissibility of surveys in Lanham Act cases before *Daubert* almost always resulted in a decision to admit the evidence; "defects" in the survey methodology, universe definitions, questions, stimulus presentation, or interpretation of results rarely led to a decision to exclude that evidence but instead were said to be issues that went to the weight or credibility to be given to the evidence by the trier of fact, judge, or jury. *Daubert* changed all that.

*Daubert* motions seeking to exclude survey evidence are now routine in Lanham Act litigation. This does not mean, however, that such motions should routinely be filed. As discussed in detail below, the case law dealing with survey experts in Lanham Act cases strongly suggests that *Daubert* motions, if filed at all, should be "surgical strikes," rather than "all-out war." The latter rarely succeeds. This chapter will hopefully assist Lanham Act lawyers in deciding whether to make *Daubert* motions and in determining the scope of those motions.

---

thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." *Frye*, 293 F. at 1014.

5. At the time of the *Daubert* decision, Rule 702 provided that "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Rule 702 was amended in 2000 to reflect *Daubert* and subsequent decisions. *See infra* p. 343.

6. There is a third issue—whether the expert is qualified. While this is rarely a seriously litigated issue, it does come up from time to time when a party seeks to "extend" an expert's true expertise into areas where the proffered opinions lack any foundation. *See infra* pp. 366–70.

7. The issue in *Daubert* was whether the plaintiffs' children had birth defects caused by the mothers' pre-birth ingestion of Bendectin, a prescription anti-nausea drug marketed by Merrell Dow.

8. *Daubert*, 509 U.S. at 590 n.8.

9. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999).



After a review of the Supreme Court decisions, this chapter provides examples of and citations to cases where survey evidence was challenged under *Daubert*, with an emphasis on those cases where the evidence was excluded or given little or no weight. The discussion is organized by the primary elements of surveys. The chapter then discusses the cases where an expert sought to testify without benefit of a survey, either on substantive elements of the case or as an expert critiquing the other side's survey evidence.

## THE SUPREME COURT AND EXPERT EVIDENCE

### The *Daubert* Decision

*Daubert* was brought by the parents of children born with serious birth defects allegedly caused by the mothers' taking of Bendectin, an anti-nausea drug. In response to the defendant's motion for summary judgment, plaintiffs offered the testimony of eight experts with "impressive credentials," each of whom opined that Bendectin could cause birth defects. None of these opinions was based on epidemiological studies but instead on animal-cell studies, pharmacological studies of Bendectin's chemical structure, and a "reanalysis" of earlier epidemiological studies. The district court granted the defendant's motion, holding the plaintiffs' expert evidence inadmissible. Applying the *Frye* standard (scientific evidence is admissible only if the principle on which it is based was "sufficiently established to have general acceptance in the field to which it belongs"),[10] the court concluded that evidence not based on epidemiological studies was inadmissible to establish causation.

The Ninth Circuit affirmed. That court stated that expert opinion testimony based on a scientific technique is inadmissible unless that technique is generally accepted as reliable.[11] Opinion testimony based upon a methodology that diverges "significantly from the procedures accepted by recognized authorities in the field . . . cannot be shown to be 'generally accepted as a reliable technique.'"[12]

The Supreme Court acknowledged that while the *Frye* formulation had been the "dominant standard" to determine the admissibility of scientific evidence for 70 years, it had been the subject of serious and substantial debate, both on its proper scope and wisdom and, more importantly, on whether the *Frye* formulation had survived adoption of the Federal Rules of Evidence.[13] The Court held that while the common law

---

10. Daubert v. Merrell Dow Pharm., Inc., 727 F. Supp. 570, 572 (S.D. Cal. 1989) (quoting United States v. Kilgus, 571 F.2d 508, 510 (9th Cir. 1978)).

11. Daubert v. Merrell Dow Pharm., Inc., 951 F.2d 1128, 1129–30 (9th Cir. 1991).

12. *Id.* at 1130. Other courts of appeal had refused to admit expert evidence based on reanalyses of Bendectin because those studies had not been published or subjected to peer review, contrasted with the "massive" weight of published studies showing no causation that had received "full scrutiny" from the scientific community.

13. Hereinafter "the Rules." *Daubert*, 509 U.S. at 586–87 & nn.4–5.

rules of evidence could continue to serve as an aid to the interpretation of the Rules,[14] Rule 702 spoke directly to the issue of expert evidence. Nothing in the text or drafting history of Rule 702 suggested that the "general acceptance" test continued to be the requirement for admissibility:

> Given the Rules' permissive backdrop and their inclusion of a specific rule on expert testimony that does not mention "general acceptance," the assertion that the Rules somehow assimilated *Frye* is unconvincing. *Frye* made "general acceptance" the exclusive test for admitting expert scientific testimony. That austere standard, absent from, and incompatible with, the Federal Rules of Evidence, should not be applied in federal trials.[15]

With the *Frye* test now discarded, the Court discussed the requirements imposed by Rule 702 and the trial court's role in ensuring that those requirements have been satisfied before allowing the expert to testify. Parsing the language of the Rule, the Court held that the word "scientific" "implies a grounding in the methods and procedures of science."[16] Similarly, "the word 'knowledge' connotes more than subjective belief or unsupported speculation."[17] Taken together, Rule 702's requirement that expert testimony must be based on "scientific knowledge" requires a showing of evidentiary reliability.[18]

Rule 702 also requires that the proposed evidence "assist the trier of fact to understand the evidence or to determine a fact in issue." Thus, expert testimony that fails to relate to any issue in the case is not relevant and thus not helpful. This requirement is often referred to as "fit"—that is, whether the proposed testimony is sufficiently tied to the facts of the particular case that it will assist the trier of fact in resolving a question of fact.

Accordingly, faced with a proffer of expert testimony, trial courts were directed to undertake a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."[19] These twin requirements—

14. The Court had held nine years earlier that while the Rules occupied the field, common law nevertheless could continue to act as an aid to interpretation. United States v. Abel, 469 U.S. 45, 51–52 (1984).

15. *Daubert*, 509 U.S. at 589.

16. *Id.* at 590. As noted above, the Court limited its discussion in *Daubert* to the "scientific context" because that was the nature of the expertise in that case. *Id.* at 590 n.8. As discussed below, *Daubert* was extended to experts with the "technical or other specialized knowledge" contemplated by Rule 702 in the *Kumho* decision.

17. *Id.* at 590.

18. That the testimony must be "reliable" does not mean that the trial court must conclude that the expert is correct, or that it can exclude the proposed testimony because the trial court disagrees with the expert's conclusions. The *Daubert* Court described the Rule 702 inquiry as one that focuses "solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595. As the Ninth Circuit stated in the *Daubert* decision on remand, "[o]ur task, then, is to analyze not what the experts say, but what basis they have for saying it." Daubert v. Merrell Dow Pharm., Inc., 43 F.3d 1311, 1316 (9th Cir. 1995).

19. *Daubert*, 509 U.S. at 592–93.



reliability and relevance—were to be determined pursuant to Rule 104(a) of the Rules as preliminary admissibility questions decided by the court.[20]

Over the objections of Chief Justice Rehnquist and Justice Stevens,[21] the *Daubert* Court offered some "general observations" on the factors the district courts should consider in discharging their obligation to ensure reliability and relevance. These factors, reflecting the "scientific" nature of the evidence at issue, are themselves "scientific," in that they lend themselves to the "scientific knowledge" prong of Rule 702 but do not fit as well when evaluating technical or other specialized knowledge-based testimony. As discussed in detail below, the *Daubert* factors, after an initial false start by the courts to utilize them, do not help at all in evaluating challenges to expert testimony based upon surveys in Lanham Act cases.

The *Daubert* factors described by the Court are (1) whether the theory or technique underlying the testimony can be or has been tested; (2) whether the theory or technique has been subjected to peer review; (3) the technique's known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and, despite the Court's rejection of the *Frye* test, (4) whether the theory or technique is "generally accepted."[22] And, portending its use in nonscientific evidence cases, the Court cautioned that the district courts must be especially careful in admitting expert evidence because of its persuasiveness and the difficulty in evaluating it. Thus, in weighing prejudice against probative value under Rule 403, district courts should exercise more control over experts than over lay witnesses.[23]

## *Kumho*

Six years after *Daubert*, the Court took up the two issues of whether *Daubert* applied more broadly to all expert evidence covered by Rule 702 and whether the so-called *Daubert* factors were limiting or merely illustrative.[24] As predicted in the *Daubert* opinion itself, the Court held that Rule 702 applied to all expert testimony and that the district courts had broad discretion under that Rule in deciding how to determine reliability.

20. *Id.* at 592 & n.10. As later cases would hold, a party is not entitled as a matter of right to a hearing where the *Daubert* issues are heard and resolved. *In re* Hanford Nuclear Reservation Litig., 292 F.3d 1124, 1138 (9th Cir. 2002); United States v. Alatorre, 222 F.3d 1098, 1100 (9th Cir. 2000). In the authors' experience, *Daubert* hearings are usually held before trial and are typically handled like other motions—briefing followed by oral argument. The court can but rarely does hear testimony from the expert witnesses at such hearings. On occasion, the district court has referred the *Daubert* issues to special masters under Rule 53 of the Federal Rules of Civil Procedure. *See* Malletier v. Dooney & Bourke, Inc., 561 F. Supp. 2d 368 (S.D.N.Y. 2008) (granting summary judgment for defendant); Malletier v. Dooney & Bourke, Inc., 525 F. Supp. 2d 558 (S.D.N.Y. 2007) (adopting with modifications report and recommendation of special masters).

21. *Daubert*, 509 U.S. at 598–601 (Rehnquist, C.J., concurring in part and dissenting in part).

22. *Id.* at 593–95.

23. *Id.* at 595 (citing Jack B. Weinstein, *Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended*, 138 F.R.D. 631, 632 (1991)).

24. Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999).

*Kumho* involved claims of personal injury and wrongful death arising from the right rear tire blowout of a minivan driven by the plaintiff. The plaintiff's case rested largely on the testimony of an expert in tire failure who was prepared to testify that a defect in the tire's manufacture or design caused the blowout. The defendants moved to exclude this testimony, arguing that application of the *Daubert* factors demonstrated that the expert's methodology in reaching his conclusion was faulty. After initially granting the motion,[25] the district court agreed to reconsider its decision in light of the plaintiff's argument that the *Daubert* factors were "inflexible" as applied to this area of testimony. On reconsideration, the court agreed with the plaintiff that *Daubert* should be applied flexibly, that the four *Daubert* factors were merely illustrative, and that other factors argued in favor of admissibility.[26] The court nonetheless affirmed its earlier ruling because the expert's analysis—visual inspection and the data he obtained—had no scientific basis. The Eleventh Circuit reversed the grant of summary judgment, holding that *Daubert* applied only where the expert relies on "scientific principles" and that the expert's testimony, relying on experience, was outside the scope of *Daubert*.[27]

The Supreme Court had little difficulty concluding that Rule 702 imposed on district courts a gatekeeping obligation when faced with all expert testimony, not just the "scientific" testimony at issue in *Daubert*. Rule 702, said the Court, "makes no relevant distinction between 'scientific' knowledge and 'technical' or 'other specialized' knowledge."[28] Moreover, a contrary rule would impose a "difficult, if not impossible" burden on district courts to make the distinction between "scientific" knowledge and "technical" or "other specialized" knowledge to determine whether the gatekeeping obligation applied.[29] Because expert testimony often rests on experience foreign to the jury, "[t]he trial judge's effort to assure that the specialized testimony is reliable and relevant can help the jury evaluate that foreign experience, whether the testimony reflects scientific, technical, or other specialized knowledge."[30]

Far more sweeping was the Court's holding that the *Daubert* factors were not a "definitive checklist or test." Given the trial court's discretion in making the determinations required by *Daubert*,

> The trial court must have the same kind of latitude in deciding *how* to test an expert's reliability, and to decide whether or when special briefing or other procedures are needed to investigate reliability, as it enjoys when it decides *whether or not* that expert's relevant testimony is reliable.[31]

25. Carmichael v. Samyang Tires, Inc., 923 F. Supp. 1514 (S.D. Ala. 1996).
26. Carmichael v. Samyang Tires, Inc., 1996 U.S. Dist. LEXIS 22431 (S.D. Ala. 1996).
27. Carmichael v. Samyang Tires, Inc., 131 F.3d 1433 (11th Cir. 1997).
28. *Kumho Tire*, 526 U.S. at 147.
29. *Id.* at 148.
30. *Id.* at 149.
31. *Id.* at 152 (emphasis in original).



Thus, Rule 702 grants to district courts the discretionary authority to determine relevance and reliability in light of the specific facts of the particular case.

As discussed in detail below, *Kumho* authorized district courts faced with *Daubert* challenges to Lanham Act survey evidence to determine relevance and reliability without a forced application of the *Daubert* factors.

## The Amendments to Rule 702

In response to *Daubert* and *Kumho*, Rule 702 was amended in 2000 as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles or methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.[32]

The Advisory Committee Notes to Rule 702 as amended, citing cases before and after *Daubert*, described other "factors" trial courts may consider in discharging the "gatekeeping" obligation.[33] These include whether the expert is proposing to testify about matters growing directly from research done independent of the litigation,[34] whether the expert has unjustifiably extrapolated "from an accepted premise to an unfounded conclusion,"[35] whether the expert has accounted for obvious alternative explanations,[36] whether the expert is being as careful as he would be in his regular professional work,[37] and whether the expert's field of expertise is known to reach reliable results.[38]

The Advisory Committee Notes further state that a review of the post-*Daubert* case law "shows that the rejection of expert testimony is the exception rather than the rule."[39] As the one case cited by the committee put it, *Daubert* did not effect a "seachange over federal evidence law" and the trial court's gatekeeping function "is not intended to serve as a replacement for the adversary system."[40]

32. FED. R. EVID. 702.
33. *See* FED. R. EVID. 702 advisory committee's note to 2000 amendment. The Notes are also reprinted in the annual FEDERAL CIVIL JUDICIAL PROCEDURE AND RULES published by West and are recommended reading.
34. *Id.*(citing *Daubert*, 43 F.3d at 1317).
35. *Id.* (citing Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)).
36. *Id.* (citing Claar v. Burlington N. R.R. Co., 29 F.3d 499 (9th Cir. 1994)).
37. *Id.* (citing Sheehan v. Daily Racing Form, Inc., 104 F.3d 940, 942 (7th Cir. 1997); *Kumho*, 119 S. Ct. at 1176).
38. *Id.* (citing *Kumho*, 119 S. Ct. at 1175; Moore v. Ashland Chem., Inc., 151 F.3d 269 (5th Cir. 1998) (en banc); Sterling v. Velsicol Chem. Corp., 855 F.2d 1188 (6th Cir. 1988)).
39. *Id.*
40. *Id.* (quoting United States v. 14.38 Acres of Land, More or Less Situated in Leflore Cty., Miss., 80 F.3d 1074, 1078 (5th Cir. 1996)).

## PROCEDURAL ASPECTS OF *DAUBERT*

Counsel involved in *Daubert* issues should be aware of two Supreme Court decisions involving the scope of appellate review of district court decisions to admit or exclude expert evidence challenged under *Daubert*. Taken together, the two cases make clear that, like most evidentiary rulings, the *Daubert* battle is largely won or lost in the district court.

In *General Electric Company v. Joiner*,[41] the issue was the appropriate standard of review on appeal of trial court decisions to admit or exclude expert evidence. The plaintiff, an electrician whose work involved contact with electrical transformers, was diagnosed with lung cancer and sued several companies that manufactured transformers and polychlorinated biphenyls (PCBs).[42] Ruling on the defendants' summary judgment motion, the district court had held that the evidence created a genuine issue of fact on whether the plaintiff had been exposed to PCBs but granted the motion because the plaintiff's experts had failed to establish a causal connection between PCBs and small cell lung cancer. According to the district court, the expert testimony was nothing more than "subjective belief or unsupported speculation" and was therefore inadmissible.[43]

On appeal, the Eleventh Circuit reversed. It held that "[b]ecause the Federal Rules of Evidence governing expert testimony display a preference for admissibility, we apply a particularly stringent standard of review to the trial judge's exclusion of expert testimony."[44] The court held that the district court had improperly excluded the experts' testimony because it had disagreed with the conclusions drawn by the experts and because the record created a genuine issue of fact on whether the plaintiff had been exposed to cancer-causing chemicals.

The Supreme Court reversed that holding by the Eleventh Circuit. The Court held that while *Daubert* and the Rules permit district courts to admit a broader range of expert evidence than was permitted under the *Frye* test, the district court nonetheless was required to discharge its gatekeeping role in reviewing such evidence for relevance and reliability.[45] The standard of review for the trial court's decisions was an abuse of discretion standard, regardless of whether the decision was to admit or exclude the evidence, or whether the decision was "outcome determinative."[46]

*Daubert* had made clear that the district court's role in discharging its gatekeeping function was to examine the bases for the opinion, not the soundness of the opinion itself. The *Joiner* district court excluded the experts' testimony after examining the reports on which they were based and reached different conclusions from those reports. The Eleventh Circuit had held that this was error under *Daubert*, leaving the

41. 522 U.S. 136 (1997).
42. PCBs had been banned since 1978.
43. Joiner v. Gen. Elec. Co., 864 F. Supp. 1310, 1326 (N.D. Ga. 1994).
44. Joiner v. Gen. Elec. Co., 78 F.3d 524, 529 (11th Cir. 1996).
45. Gen. Elec. Co. v. Joiner, 522 U.S. 136, 142 (1997).
46. *Id.* at 142–43.



Supreme Court with both a problem and the opportunity to explain *Daubert's* reliability requirement:

> But conclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered. That is what the District Court did here, and we hold that it did not abuse its discretion in so doing.[47]

In summing up its holding on this issue, the Court stated that "it was within the District Court's discretion to conclude that the studies upon which the experts relied were not sufficient, whether individually or in combination, to support their conclusions . . . ."[48] In the typical Lanham Act case, the ultimate opinion of the survey expert is that the survey evidence does (or does not) support a finding of likelihood of confusion, a finding of secondary meaning of the plaintiff's mark, and so on, based upon the expert's survey. In the authors' view, *Joiner* is the authority for trial courts to look beyond the expert's opinion, dissect the survey itself (often by considering the opposing expert's criticisms of the survey), and exclude the ultimate opinion because the survey is defective in one or more respects.[49] As discussed below, that is exactly what the trial courts have done in response to *Daubert* motions directed at survey evidence.

The other "procedural" Supreme Court decision is *Weisgram v. Marley Co.*[50] While not a Lanham Act case, the Court's decision represents a strong admonition to both counsel and experts that survey evidence should be developed in a truly "objective" manner, rather than to reach a desired conclusion. *Weisgram* makes clear that parties will not have a second chance.

The plaintiff in *Weisgram* sued for wrongful death of his mother after a fire in her home resulted in her death from carbon monoxide poisoning. The fire was alleged to have been caused by a defective baseboard heater manufactured by the defendant. At trial, and over the defendant's objections, the plaintiff introduced the testimony of three experts to prove that the heater was defective and had caused the fire. After the jury returned a verdict for the plaintiff, and after the defendant moved for judgment as a matter of law and a new trial because the expert testimony was unreliable and therefore inadmissible, the defendant appealed to the Eighth Circuit.

The Eighth Circuit held that the district court should have granted the defendant's motion for judgment as a matter of law because the expert evidence was speculative and not scientifically sound and that, without it, the remaining evidence was

47. *Id.* at 146 (internal citation omitted).
48. *Id.* at 146–47.
49. Or, as seems to be the boilerplate of critiquing experts, the survey is "fatally flawed."
50. 528 U.S. 440 (2000).

insufficient to support the jury verdict in favor of Weisgram.[51] The court then directed the entry of judgment in favor of the defendant, rejecting the argument that it was required to remand for a new trial.[52] The decision was a 2-1 result, with the dissenting judge arguing that the expert evidence was properly admitted and, assuming it was not, the proper remedy for improper admission of expert testimony was remand for a new trial.[53]

Acknowledging the split among the circuits, the Supreme Court sided with the Eighth Circuit. The grant of certiorari was limited to the issue of the Eighth Circuit's authority to direct the entry of judgment as a matter of law, and thus there was no review of the Eighth Circuit's determination that the expert evidence was unreliable and therefore inadmissible under *Daubert*. In a decision based almost entirely on an interpretation of the Federal Rules of Civil Procedure, the Court held that a court of appeals, after deciding that expert evidence was improperly admitted at trial, may determine that the remaining evidence is insufficient to uphold the jury's verdict and end the case.[54]

After a discussion of the procedural fairness of an appellate direction of judgment in favor of the verdict loser, the Court stated as follows:

> Since *Daubert*, moreover, parties relying on expert testimony have had notice of the exacting standards of reliability such evidence must meet. It is implausible to suggest, post-*Daubert*, that parties will initially present less than their best expert evidence in the expectation of a second chance should their first try fail. We therefore find unconvincing Weisgram's fears that allowing courts of appeals to direct the entry of judgment for defendants will punish plaintiffs who could have shored up their cases by other means had they known their expert testimony would be found inadmissible.[55]

Forewarned is forearmed.

## *DAUBERT* CHALLENGES TO LANHAM ACT SURVEY EVIDENCE

The elements of a properly designed survey are dealt with extensively in other chapters and will not be discussed here. What follows is a discussion of *Daubert* challenges to survey evidence, organized by the elements of surveys. As will become clear, counsel

51. Weisgram v. Marley Co., 169 F.3d 514, 516–17, 518–22 (8th Cir. 1999).
52. *Id.* at 517 n.2.
53. *Id.* at 522, 525 (Bright, J., dissenting).
54. Weisgram v. Marley Co., 528 U.S. 440, 456–57 (2000).
55. *Id.* at 455–56 (citing Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 897 (1990) ("[A] litigant's failure to buttress its position because of confidence in the strength of that position is always indulged in at the litigant's own risk.")).



eager to use the authority of *Daubert* have challenged literally every such element, with mixed results.[56]

Two preliminary comments: In the early years following the *Daubert* decision, motions to exclude survey evidence became routine—indeed, one could say almost knee-jerk. The application of the *Daubert* factors to survey evidence proved troublesome, primarily because Lanham Act surveys are developed exclusively for litigation and their acceptance at trial is governed primarily by court-made rules.[57] The early experience with *Daubert* led the author to conclude (and recommend) that *Daubert* motions be approached with caution and care, lest the *Daubert* exercise simply waste the client's money and the court's time, with the only result being that the opposing survey expert receives a preview of the trial cross-examination and perhaps the opportunity to cure problems with the survey.[58] At the risk of stating the obvious, some "errors" are more important to the survey's results than others; serious problems with the survey universe, lack of a control, and blatantly leading and ambiguous questions, for example, will more likely affect relevance, reliability, and objectivity than purely "technical" problems such as, for example, a claim that a few responses were miscoded.

While counsel should always consider the costs and risks associated with *Daubert* motions, subsequent developments suggest that courts are more willing than earlier to exclude survey evidence. A study of reported cases for the period 1997 to 2004 showed that of the 44 cases in which survey evidence was challenged, the proposed survey evidence was excluded in its entirety in 14 cases.[59] As the study notes, courts are far more likely to exclude questionable evidence when the trier of fact is a jury.

A second development concerns the increased use of Rule 403 when challenging survey evidence. This rule confers on the court the discretion to exclude evidence,

56. The cases discussed and cited below are primarily those where the survey evidence was excluded or given little or no weight. However, this should not be understood to suggest that *Daubert* motions are routinely granted; indeed, a review of the cases and the authors' experience make clear that a successful *Daubert* motion is the exception. *See* Fed. R. Evid. 702 advisory committee's note to 2000 amendment ("rejection of expert testimony is the exception rather than the rule"). Literally hundreds of opinions reject *Daubert* challenges to survey evidence. These cases are well worth the time spent in reviewing them, if for no other reason than to assist in identifying a survey expert whose work has been accepted and endorsed by the courts. For a discussion of the application of the *Daubert* principles to survey evidence as of 2002, including a useful checklist of the issues to be considered, see Richard J. Leighton, *Using Daubert-Kumho Gatekeeping to Admit and Exclude Surveys in Lanham Act Advertising and Trademark Cases*, 92 Trademark Rep. 743 (2002).

57. *See, e.g.*, Learning Network, Inc. v. Discovery Commc'ns, Inc., 153 F. Supp. 2d 785, 789 (D. Md. 2001) ("The instant motion relates to survey evidence which is intrinsically different from the types of evidence most frequently encountered in a *Daubert* or *Kumho* context."); Bacardi & Co. v. N.Y. Lighter Co., No. 97-CV-7140, 2000 WL 298915, at *5 n.3 (E.D.N.Y. Mar. 15, 2000) ("The Court doubts that a 'typical' or 'traditional' *Daubert* analysis can be conducted in assessing evidence of the type challenged here.").

58. *See* G. Kip Edwards, *Making and Defending* Daubert *Motions-Maximizing Your Chances of Success*, 721 PLI/Pat 349 (2002); G. Kip Edwards, *Lanham Act Surveys After Daubert: Lessons Learned So Far*, 677 PLI/Pat 421 (2001).

59. Kenneth A. Plevan, *Daubert's Impact on Survey Experts in Lanham Act Litigation*, 95 Trademark Rep. 596 (2005). In the authors' opinion, there are far more cases where survey evidence has been challenged but admitted, without a reported decision.

even if it is relevant, where its probative value is substantially outweighed by the risk of unfair prejudice, confusion, waste of time, and so on.[60] As applied to survey evidence, a *Daubert* challenge should be made under both Rule 702 and Rule 403 to permit the court to conclude that while the defects in the survey are not so serious as to exclude the survey under Rule 702, the defects taken together warrant exclusion under Rule 403, especially in a jury trial.[61]

## Survey Universe

The survey "universe" is "that segment of the population whose perceptions and state of mind are relevant to the issues in th[e] case."[62] Determining the correct universe is dealt with in detail in this treatise.[63] For *Daubert* purposes, a challenge to the universe selected by the survey expert is a relevance challenge. Generally, a survey that provides information about a wholly irrelevant universe of respondents is irrelevant and should not be admitted into evidence.[64] As two commentators put it, "[e]rrors in this stage [universe definition] are more likely to prove fatal than errors in the content of the questions, for there is some value in a slanted question asked of the right witness, but no value in asking the right question of the wrong witness."[65] Not surprisingly, *Daubert* challenges to the universe determination are common.

For example, in one case,[66] survey respondents were screened by questions designed to establish their familiarity with the defendant's mark and products (in the first survey) or with the plaintiff's mark and products (in the second survey). The court found both surveys flawed because "[b]oth surveys failed to establish that the interviewees were potential consumers of the clothing in question."[67] Together with other flaws, the faulty universe led the court to exclude the survey evidence under Rule 403.

60. Rule 403 provides as follows: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

61. *See, e.g., Malletier*, 525 F. Supp. 2d at 563–64.

62. J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 32:159, at 32-319 (5th ed. 2017) [hereinafter McCarthy].

63. *See supra* Chapter 3.

64. Citizens Fin. Grp, Inc. v. Citizens Nat'l Bank of Evans City, 383 F.3d 110, 118–19 (3d Cir. 2004).

65. Lawrence E. Evans, Jr. & David M. Gunn, *Trademark Surveys*, 79 Trademark Rep. 1, 31 (1989); *see also* Shari Seidman Diamond, *Reference Guide on Survey Research*, *in* Reference Manual on Scientific Evidence 378–79 (3d ed. 2011) [hereinafter Diamond].

66. Trouble v. Wet Seal, Inc., 179 F. Supp. 2d 291 (S.D.N.Y. 2001).

67. *Id.* at 307; *see also* Scott Fetzer Co. v. House of Vacuums Inc., 381 F.3d 477 (5th Cir. 2004) (universe of past purchasers of plaintiff's products, rather than prospective purchasers of defendant's goods and services); Powerhouse Marks LLC v. Chi Hsin Impex, Inc., 2006 WL 897254 (E.D. Mich. April 5, 2006) (universe of individuals who had worked out in a fitness center, interviewed within 12 miles of plaintiff's fitness centers, held improper because it failed to survey potential buyers of defendant's exercise equipment; survey excluded). The law varies among the circuits on the issue of whether a confusion survey universe should include both past and prospective purchasers or only prospective purchasers. *Compare, e.g.*, Am. Footwear Corp. v. Gen. Footwear Co., 609 F.2d 655, 660 n.4 (2d Cir. 1979) (only prospective purchasers), Cumberland Packing Corp. v. Monsanto Co., 32 F. Supp. 2d 561, 572 (E.D.N.Y. 1999) (same), and Jordache Enters., Inc. v. Levi Strauss & Co., 841 F. Supp. 506, 518–19 (S.D.N.Y. 1993) (survey must rely on responses of potential purchasers), *with* Brunswick Corp. v. Spinit Reel Co., 832 F.2d 513, 523 n.6 (10th Cir. 1987) (persons over 14 who had fished in the past 12 months), Brooks Shoe Mfg.



Universes may be objectionable as overinclusive or underinclusive. If the universe is overinclusive, the answers of some survey respondents are irrelevant; on the other hand, an underinclusive universe fails to consider the perceptions and state of mind of a segment of the population whose views are relevant. An underinclusive survey universe resulted in the exclusion of the evidence in a case alleging trade dress infringement.[68] The plaintiff sold apparel in college bookstores, resorts, and corporate identity markets. The defendant sold similar apparel in the same channels but also sold its products in sporting goods stores. The plaintiff's survey expert designed a survey to determine whether the plaintiff's jacket had obtained secondary meaning and whether the defendant's jacket created a likelihood of confusion.[69] The survey was conducted at college bookstores and country club and resort pro shops.

The court concluded that the expert's definition of the consumer market was "fatally underinclusive."[70] The evidence at trial[71] established that college bookstores and sporting goods stores competed for the same customers and that there were 3,200 college bookstores in the United States and over 6,000 sporting goods stores. Thus, "[the expert's] failure to survey consumers at sporting goods stores extinguishes the probative value of the survey in gauging the perceptions of consumers in this market. A survey should sample 'the full range of potential [consumers] for whom plaintiff and defendants' compete."[72] Because there was no way to know how unrepresented members of the universe would have responded, the survey evidence was inadmissible.[73]

Determining the proper survey universe may also have a geographical component. In a case alleging reverse confusion, the proper universe was held to be the senior

Co. v. Suave Shoe Corp., 716 F.2d 854, 861 n.16 (11th Cir. 1983) (purchasers of athletic shoes in past 12 months), U.S. Surgical Corp v. Orris, Inc., 5 F. Supp. 2d 1201, 1210 (D. Kan. 1998) ("[T]he inquiry generally will turn on whether actual or potential 'purchasers' are confused . . ."), *aff'd*, 185 F.3d 885 (Fed. Cir. 1999), and Pebble Beach Co. v. Tour 18 I Ltd., 942 F. Supp. 1513, 1549 (S.D. Tex. 1996) ("[C]ourts have validated universes with past customers where the purchasers are likely to be repeat customers."), *aff'd as modified*, 155 F.3d 526 (5th Cir. 1998). In the authors' experience, both past *and* prospective purchasers are usually defined as the proper universe, on the assumption that past purchasers are likely to also be prospective purchasers.

68. Winning Ways, Inc. v. Holloway Sportswear, Inc., 913 F. Supp. 1454 (D. Kan. 1996).

69. The screener questionnaire qualified respondents if they had purchased or shopped for clothing in a college bookstore in the past 12 months.

70. *Id.* at 1467.

71. The *Daubert* motion was apparently made during a court trial, and the court took defendant's objections to the survey evidence under advisement.

72. *Id.* (citing Am. Home Prods. Corp. v. Barr Lab, 656 F. Supp. 1058 (D.N.J.), *aff'd*, 834 F.2d 368 (3d Cir. 1987)).

73. *See also* Hain BluePrint, Inc. v. Blueprint Coffee, LLC, No. 4:16-cv-1758, 2018 WL 6246984, at *3 (E.D. Mo. Nov. 29, 2018) (where defendant's primary business was a coffee shop with limited online and retail sales, survey limited to products sold in grocery stores that featured natural and healthy foods too narrow to be sufficiently relevant to defendant's primary business and excluded). *But see* Koninklijke Philips Elecs. N.V. v. Hunt Control Sys., Inc., No. 11-3684, 2016 WL 3545529, at *6–7 (D.N.J. June 29, 2016) (although relevant universe included business, government, and institutional entities, not simply individual consumers, on summary judgment motion, court did not exclude survey because underinclusive survey did not exclude the entire relevant population but included a relevant portion of individual consumers).

user's customer base.[74] The evidence was undisputed that the senior user did business almost entirely in one county. The junior user's survey expert, however, conducted his survey in two shopping malls in the adjoining county. A question in the screener questionnaire asked potential respondents if they lived "in this general area" or were just visiting, and no definition of "general area" was provided. The court concluded that the survey was conducted in the wrong geographic area and necessarily excluded individuals who were customers or potential customers of the senior user. Consequently, "the [expert] survey is not simply ill-tailored (so as to go to the weight), but is fatally flawed due to an irrelevant and improper universe, such that it must be excluded from evidence at trial."[75] The court also held in the alternative that if it did not exclude the survey under *Daubert* and Rule 702, it would exclude it under Rule 403, noting that the case was scheduled for a jury trial and citing the earlier decision in *Simon Property Group*[76] that had recognized the difference between bench trials and jury trials in deciding whether to exclude expert evidence.

Another universe definition was found overinclusive in a case where a famous female tennis player sued *Penthouse* when it published nude photos of another woman and claimed they were photos of the tennis celebrity.[77] On her claim for false endorsement under Section 43(a) of the Lanham Act,[78] the court applied the Ninth Circuit's restatement of the confusion factors to a false endorsement case,[79] one of which is actual confusion. The plaintiff offered the results of a survey showing that a "substantial portion" of the survey respondents thought that the plaintiff consented to or cooperated with *Penthouse* in the publication of the photos.[80] The survey universe was the general public over 18, but the evidence showed that less than 10 percent of the sample population bought *Penthouse* and less than 25 percent purchased *Playboy*. The court concluded that the survey "did not sample the correct group" and this, together with other defects discussed below, led the court to hold that the survey was inadmissible.[81]

74. Citizens Fin. Grp., Inc. v. Citizens Nat'l Bank of Evans City, 2003 WL 24010950 (W.D. Pa. April 23, 2003), *aff'd on survey exclusion, vacated and remanded on other grounds*, 383 F.3d 110 (3d Cir. 2004).

75. *Id.* at *5.

76. Simon Prop. Grp. L.P. v. mySimon, Inc., 104 F. Supp. 2d 1033 (S.D. Ind. 2000); *see also* Victoria's Secret Stores Brand Mgmt. v. Sexy Hair Concepts, 2009 WL 959775, at *11 (S.D.N.Y. 2009) ("Further, in a bench trial context, there is negligible, if any, risk of prejudice resulting from confusion of the trier of fact by admitting survey evidence, even if the probative value is low.") (citing Verizon Directories Corp. v. Yellow Book USA, Inc., 331 F. Supp. 2d 134 (E.D.N.Y. 2004)); Bracco Diagnostics, Inc. v. Amersham Health, Inc., 627 F. Supp. 2d 384 (D.N.J. 2009) (case was tried to the court, so the court heard the testimony of the parties' experts, reserving decision on the *Daubert* motions until after trial).

77. Kournikova v. Gen. Media Comme'ns, Inc., 278 F. Supp. 2d 1111 (C.D. Cal. 2003).

78. 15 U.S.C. § 1125(a).

79. Downing v. Abercrombie & Fitch, 265 F.3d 994, 1007–09 (9th Cir. 2001).

80. *Kournikova*, 278 F. Supp. 2d at 1124–25.

81. *Id.* at 1125–26; *see also* Kars 4 Kids, Inc. v. Am. Can!, Nos. 3:14-cv-7770, 3:16-cv-4232, 2019 WL 1755912, at *8–9 (D.N.J. Apr. 18, 2019) (survey of general public rather than donors rendered universe "overly broad" and together with other flaws rendered it inadmissible); Nationwide Mut. Ins. Co. v. Nationwide Realty, LLC, No. 92056432, 2016 WL 7368697, at *6 (T.T.A.B. Nov. 14, 2016) (de facto universe of "a wide range of people" not limited to prospective purchasers of either party's services was defective and inadmissible).



An infringement case involving the wine industry underscores the critical need to determine how the defendant's products are sold if the purpose of the survey is to determine likelihood of confusion.[82] The plaintiff and the defendant both produced wine from the Leelanau Peninsula of Michigan. The plaintiff sued for trademark infringement, thus making potential purchasers of the defendant's products the proper universe. The plaintiff sold its wines primarily through retail stores, while the defendant sold primarily through its tasting room and via the internet. The plaintiff's survey expert defined the universe to be Michigan consumers over 21 who had either purchased a bottle of wine in the $5 to $14 price range in the past three months or who expected to do so in the next three months. There was no limitation on how or where respondents purchased wine.

The court held that the universe chosen for the plaintiff's confusion survey was overbroad. Because the defendant's wine was available through only its tasting room and the internet, the court found that "only a tiny percentage" of the survey universe would be potential purchasers of the defendant's products.[83] Along with others discussed below, this defect, led the court to conclude that while it was a "close case," the survey was admitted, with the defects going to the weight."[84]

## Sample Size and Related Issues

There are no hard-and-fast rules dictating the minimum number of survey respondents, other than to be derived from the cases. In the authors' experience, each cell of a survey (test and control) usually has at least 200 validated responses, although surveys with fewer numbers in each cell have been admitted and received weight.

An interesting example of survey size and related issues is found in a trademark dispute involving the SMART ONE and ONESMART marks for so-called "smart cards."[85] MasterCard, the declaratory judgment plaintiff, was accused of infringing a bank's SMART ONE mark by the use of a ONESMART mark for smart card services. To test this proposition, the bank engaged a survey expert who defined the relevant universe as "decision makers with respect to card programs at the bank's existing or potential agent banks." The expert received a list of 914 agent banks, together with the name of a person at each who was involved in the decision-making process of evaluating debit, credit, and chip card programs to be offered to customers.

82. Leelanau Wine Cellars, Ltd. v. Black & Red, Inc., 452 F. Supp. 2d 772 (W.D. Mich. 2006), *aff'd*, 502 F.3d 504 (6th Cir. 2007).

83. *Id.* at 781–83. The court relied on similar overbroad survey universes in *Weight Watchers International, Inc. v. Stouffer Corp.*, 744 F. Supp. 1259 (S.D.N.Y. 1990), *Schieffelin & Co. v. Jack Co. of Boca, Inc.*, 850 F. Supp. 232 (S.D.N.Y. 1994), and *Franklin Res., Inc. v. Franklin Credit Mgmt. Corp.*, 1997 WL 543086 (S.D.N.Y. Sept. 4, 1997).

84. For additional examples of cases rejecting a *Daubert* challenge to the survey universe definition, *see* Nightlight Sys., Inc. v. NiteLites Franchise Sys., Inc., No. 1:04-CV-2112-CAP, 2007 WL 4563873 (N.D. Ga. July 17, 2007); KIS, S.A. v. Foto Fantasy, Inc., 204 F. Supp. 2d 968 (N.D. Tex. 2001); A&M Records, Inc. v. Napster, Inc., 2000 WL 1170106 (N.D. Cal. Aug. 10, 2000).

85. Mastercard Int'l Inc. v. First Nat'l Bank of Omaha, 2004 WL 326708 (S.D.N.Y. Feb. 23, 2004).

Each such person was contacted by telephone and asked three screening questions: "Do you work for a bank?," "Are you involved in the decision-making process of evaluating card programs?," and "How long have you been working in this capacity?" Qualified persons were offered $25 to $35 in exchange for participating in an internet survey within 24 hours.[86]

Unfortunately for the survey expert, over half (510) of those contacted by telephone refused to participate from the outset, 82 of the phone numbers had been disconnected, and 78 did not pass the screening questions, leaving 192 potential respondents. Of these who were directed to a website to participate in the survey, only 52 actually completed it.

The 52 respondents were first shown screens relating to MasterCard's ONE-SMART program and, following some "distracter" questions,[87] were assigned to either the test cell, where they were shown SMART ONE materials, or a control cell that saw materials relating to a FUSION smart card. Of the 27 persons in the test cell, 16 (59.3 percent) stated that the bank had obtained approval from the company in the first set of materials shown (MasterCard); in the control cell, 11 of the 25 (44 percent) stated that the company behind the FUSION smart card had obtained approval. This, according to the expert, reflected a net confusion level of 15.3 percent.[88] Only one person in the test cell and one person in the control cell mentioned the name as the reason for their "obtained approval" response.

In response to MasterCard's *Daubert* motion, the survey was excluded. The principal defect was the small sample size: only 27 persons reviewed the test cell materials, only 25 saw the control cell materials, and "the level of confusion allegedly measured is a difference of only five individuals' responses to the question of approval posed by the Survey."[89] The court concluded that it was "misleading to assert that a figure based on a difference of so few respondents provides an accurate measure of any confusion."[90]

The small sample size was compounded by the failure of the survey to address the issue of "nonresponse bias," or "whether the 52 individuals who chose to complete the Survey were representative of the group of qualified respondents."[91] The survey did not elicit any information, other than the three screening questions, about the sophistication of the respondents, their positions within the bank, or their actual role in evaluating card programs. The fact that survey respondents were required to take the time to participate in exchange for a small amount of money led the court to conclude

86. *Id.* at *8.
87. "Distracter" questions, inquiries during the survey about subjects unrelated to the survey, are sometimes used to eliminate the short-term memory effects from earlier questions or from having viewed a stimulus.
88. *Id.* at *9.
89. *Id.*
90. *Id.*
91. *Id.*



that those who chose to participate may not have been the high-level professionals who made the decisions regarding smart card programs.[92]

Small sample size has been noted in other cases as a basis for excluding the survey results or as a factor going to the weight.[93]

## DEFINITIONS

Occasionally the survey format selected by the expert will make it necessary to define a word or words before asking survey respondents the questions relevant to the specific issues at which the survey is directed. The so-called Teflon Survey format for testing genericness is an example.[94] As the case law discussed below makes clear, if the word defined is a legal term or has legal implications, getting the definition wrong will likely render the survey results irrelevant.

One of the surveys involved in *Icon Enterprises*[95] sought to determine whether respondents believed that the name "Icon-TV" was self-laudatory or suggestive. Potential respondents received definitions and examples of self-laudatory names (called "praise names" in the survey) and suggestive names. The definition provided of a suggestive name, however, was legally incorrect; respondents were told that "another way that companies can name their products is to suggest how the product can be used or to say something about what the product is or does or who the product is for."[96] This, of course, is a wordy but more-or-less accurate definition of a *descriptive* mark.

This failure to define the word correctly led to the survey's exclusion: "This is no mere technical flaw. By inaccurately or at the very least misleadingly defining the key terms, [the expert] rendered the survey's findings of dubious probative value."[97]

92. *Id.* The court also was critical of the survey because it believed that the decision on smart card programs would be made with far more information and care than was provided by the survey.
93. Yellowfin Yachts, Inc. v. Barker Boatworks, LLC, 237 F. Supp. 3d 1230, 1240 (M.D. Fla. 2017) (sample of 265 persons taken from all attendees of boat show too small a sample where only 181 responded to one critical question and only 149 responded to another critical question, which increased margin of error), *aff'd*, 898 F.3d 1279 (11th Cir. 2018); Bracco Diagnostics, Inc. v. Amersham Health, Inc., 627 F. Supp. 2d 384 (D.N.J. 2009) (survey of 80 cardiologists "too small to meet prospectively defined reliability requirements."); Powerhouse Marks LLC v. Chi Hsin Impex, Inc., No. 04-73923, 2006 WL 897254, at *4 (D.N.J. April 5, 2006) (150 respondents may be statistically insignificant (citing Autozone, Inc. v. Tandy Corp., 373 F.3d 786, 789 (6th Cir. 2004)); Procter & Gamble Pharm., Inc. v. Hoffman-La Roche Inc., No. 06 Civ. 0034(PAC), 2006 U.S. Dist. LEXIS 64363, at *93 (S.D.N.Y. 2006) (false advertising case; sample of 63 physicians: "the sample size here is too small to be reliable"); Vista Food Exch., Inc. v. Vistar Corp., No. 03-CV-5203DRHWDW, 2005 WL 2371958, at *7 (E.D.N.Y. Sept. 27, 2005) (trademark infringement case involving VISTA and VISTAR; 75 survey respondents at one location: along with other defects, "75 is too small a sample to be representative of the universe of potential consumers of Defendant's products, which are distributed nationwide"); Casa Editrice Bonechi, S.R.L. v. Irving Weisdorf & Co., No. 95 Civ. 4008 (AGS), 1995 WL 731633, at *8 (S.D.N.Y. Dec. 8, 1995) (trade dress case; sample of 69 is "too small a sample to be representative of the universe of potential consumers").
94. *See supra* Chapter 6.
95. Icon Enters. Int'l, Inc. v. Am. Prods. Co., No. CV 04-1240 SVW (PLAx), 2004 WL 5644805 (C.D. Cal. Oct. 7, 2004).
96. *Id.* at *19.
97. *Id.* at *28.

Admitting the survey, the court concluded, would invariably embroil the jury in a comparison of the survey's definition with the jury instruction on this issue, a result that would only confuse and confound.[98] Exercising its discretion under Rule 403, the court excluded the survey.

A substantively identical situation was presented in the *Earthgrains* case,[99] where the survey expert defined a descriptive mark as one that "bring[s] to mind a specific product, but [is] not the common way of referring to the product category." The court had earlier issued an opinion that provided the correct definition of a descriptive mark and made clear that the critical issue was whether the plaintiff's mark was descriptive and, if so, whether it had acquired secondary meaning. The expert did not use the court's definition but instead came up with his own. The survey was excluded, the court stating that "[b]ecause the classifications [descriptive or suggestive] were not properly-defined, the survey has no bearing on the issue it was submitted for."[100]

## PRESENTING THE STIMULUS AND REPLICATING MARKET CONDITIONS

Most Lanham Act surveys involve showing survey respondents something—the defendant's mark or trade dress, the plaintiff's mark or trade dress, or so on. While the survey setting is necessarily artificial, the survey expert must make every reasonable effort to duplicate the marketplace conditions under which consumers are likely to encounter the mark at issue.[101] At a minimum, this requires the survey expert to find out how the allegedly infringing product is typically encountered in the marketplace. The failure to discharge this obligation will often result in the exclusion of the survey. Not surprisingly, the failure to simulate marketplace conditions is a frequent basis for a *Daubert* challenge.

A common defect is a side-by-side or back-to-back display of the plaintiff's and defendant's products. An example is found in the *Kargo* case.[102] The plaintiff was a distributor of online content to providers of wireless devices under the KARGO mark.

98. *Id.*
99. J & J Snack Foods, Corp. v. Earthgrains Co., 220 F. Supp. 2d 358, 370 (D.N.J. 2002).
100. *Id.*
101. Am. Footwear Corp. v. Gen. Footwear Co., 609 F.2d 655, 660 n.4 (2d Cir. 1979) (affirming trial court determination that survey was defective for "failure to conduct it under actual marketing conditions"); Vista Food Exch. v. Vistar Corp., No. 03-CV-5203DRHWDW, 2005 WL 2371958, at *5 (E.D.N.Y. Sept. 27, 2005) (significant reduction in survey's probative value where it failed to replicate actual marketing conditions); WE Media, Inc. v. Gen. Elec. Co., 218 F. Supp. 2d 463, 474 (S.D.N.Y. 2002) ("Germane survey evidence should make some effort to compare the impressions the marks have on potential customers under marketplace conditions."), *aff'd*, 94 F. App'x 29 (2d Cir. 2004). The rule in TTAB proceedings involving confusion surveys is quite different: the survey stimulus consists of a blank card with the mark at issue printed on it in plain type. Meier's Wine Cellars, Inc. v. Meyer Intellectual Props. Ltd., No. 92044883, 2008 WL 902837, at *4–5 (T.T.A.B. Mar. 4, 2008); OMS Invs., Inc. v. Cent. Garden & Pet Co., No. 91156249, 2006 WL 2066583, at *9–10 (T.T.A.B. July 10, 2006); Miles Lab'ys v. Naturally Vitamin Supplements, Inc., 1 U.S.P.Q.2d 1445, 1457 (T.T.A.B. 1986).
102. Kargo Global, Inc. v. Advance Magazine Publ'rs, Inc., 2007 WL 2258688 (S.D.N.Y. Aug. 6, 2007).



Defendant (dba Conde Nast) launched a magazine called CARGO with a companion website, cargomag.com. The magazine was targeted at men ages 20 to 45 and occasionally carried articles about wireless goods and services. The plaintiff sued for trademark infringement and related claims.

The plaintiff's survey expert conducted a confusion survey using an internet survey firm. After qualifying each respondent, each was first shown materials from the CARGO magazine that displayed the CARGO logo and the CARGO website, both of which featured cell phones and advertised the website's service of permitting visitors to download content from the magazine. After three "distracter" questions, each respondent was then shown materials that contained the KARGO mark. After reviewing both sets of materials, each respondent was asked a series of multiple-choice questions designed to discover source, relationship, and sponsorship confusion. Finally, the same survey was administered to a group of "control" respondents who were shown the identical sets of materials with the word "CARRY" substituted for "CARGO."

In response to the defendant's *Daubert* motion, the court excluded the survey. A key vice of the survey was its back-to-back display of the parties' marks:

> Here, the back-to-back, or seriatim, display of the Cargo and Kargo marks did not approximate conditions that consumers would encounter in the marketplace. The products at issue (Kargo's wireless services and Advance's men's shopping magazine, respectively) were not competing. Although some overlap existed in the demographic makeup of both Kargo's and Cargo's target audiences, the companies were engaged in different businesses . . . . As Advance points out, Kargo has offered no data or other evidence to support the proposition that prospective consumers were likely to encounter Kargo's trademark a short time after seeing Cargo magazine . . . . The back-to-back display of parties' products has been characterized as a "major flaw" in survey methodology . . . . Here, the [expert] Survey's artificial, seriatim presentation of non-competing marks bears so little resemblance to the actual experience of consumers, that the confusion the survey purports to show has very little probative value.[103]

The court also faulted the stimuli used in the survey. "To be probative of actual confusion, a survey must use stimuli 'that approximate what a potential customer would encounter in making' purchasing decisions."[104] "A survey that uses stimuli that

103. *Id.* at *7. The court also found that the back-to-back format was leading, in that the questions likely generated demand effects by suggesting the existence of a connection that respondents would not have made on their own. *Id.* (citing Simon Prop. Grp. L.P. v. mySimon, Inc., 104 F. Supp. 2d 1033, 1048 (D. Ind. 2000); Gov't Emps. Ins. Co. v. Google, Inc., No. 06 Civ. 550(JFK), 2005 WL 1903128, at *7 (E.D. Va. Aug. 8, 2005)). In the Ninth Circuit, however, this and other defects go to the weight of the survey, not its admissibility. For an extreme example of the Ninth Circuit's willingness to admit survey evidence despite substantial defects, see *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Management, Inc.*, 618 F.3d 1025, 1035–38 (9th Cir. 2010).
104. *Kargo*, 2007 WL 2258688, at *10 (citing *WE Media*, 218 F. Supp. 2d at 474).

differ from what a consumer is actually likely to see in the marketplace does not accurately test for actual consumer confusion and thus lacks probative value."[105]

Respondents viewed what purported to be an advertisement depicting a blowup of a Blackberry cell phone prominently depicting the KARGO logo. The ad, however, was not an actual ad that prospective end users, the universe chosen for the survey, would ever see, and thus the mark was not shown as it was used in commerce.[106] The materials showing the CARGO mark were also found to be unrepresentative. In light of the survey's diminished probative value, and because the case would be heard by a jury, the court exercised its discretion under Rule 403 and excluded the survey.

Whether characterized as the display of an improper stimulus or as the failure to replicate marketplace conditions, a false advertising survey showing survey respondents only part of the product in question led one court to find that the survey "sheds no light" on the question at issue.[107] The plaintiff sued for false advertising, claiming that defendant's crabgrass product conveyed to consumers a false message that it would kill mature crabgrass. The Fourth Circuit reversed the grant of a preliminary injunction, finding that the survey evidence offered to show consumer confusion was insufficient to establish what it sought to prove.[108]

The court first concluded that the survey question and the responses to it failed to provide any evidence of whether the survey respondents believed the defendant's product packaging conveyed the message that the product killed mature crabgrass—the very message the plaintiff alleged to be implicitly false. The problem with the question was its use of the word "prevent," injecting into the question an ambiguity not cured by the responses to the "Why" question that followed.

The survey's failure to offer a "Not sure" option as a possible response compounded the problem with the core question. But surely the most inexplicable survey decision was the choice of what to show the survey respondents. Respondents were shown an empty bag of the defendant's product, folded into quarters so that only the illustration of the crabgrass was visible, and concealing that part of the package that emphasized the product's focus on stopping crabgrass before it started. As the Fourth Circuit stated, "[t]he survey thus elicited information about the consumer's reaction to

105. *Id.* (citing Conopco, Inc. v. Cosmair, 49 F. Supp. 2d 242, 253 (S.D.N.Y. 1999)); Saxon Glass Techs., Inc. v. Apple, Inc., 393 F. Supp. 3d 270, 289 (survey that "did not use a standardized visual stimulus" but instead instructed participants to "write on a piece of paper" the letters tested excluded under Rules 403 and 702); *Yellowfin Yachts*, 237 F. Supp. 3d at 1240 (survey excluded where respondents were shown "cartoon drawings" that failed "to approximate a boat's trade dress in the market")).

106. *Kargo*, 2007 WL 2258688, at *11 (citing *Vista Food Exch.*, 2005 U.S. Dist. LEXIS 42541, at *15).

107. Scotts Co. v. United Indus. Corp., 315 F.3d 264, 280 (4th Cir. 2002).

108. Plaintiff also offered the results of a focus group and the results of a survey of 40 do-it-yourself lawn care customers. The Fourth Circuit concluded that the manner in which the focus group was conducted prevented the results from being a reliable indicator of whether the allegedly false product packaging conveyed misleading messages to consumers. *Id.* at 277–78. Survey evidence from focus groups, an AOL survey, and an Internet survey, all conducted by third parties, were excluded in *Merisant Co. v. McNeil Nutritionals, LLC*, 242 F.R.D. 315, 326–32 (E.D. Pa. 2007). A motion in limine to exclude focus group studies was denied in *Sam's Wine & Liquors, Inc. v. Wal-Mart Stores, Inc.*, 1994 WL 529331 (N.D. Ill. Sept. 27, 1994).



an isolated part of the packaging, when the relevant issue in a false advertising case is the consumer's reaction to the advertisement as a whole and in context."[109] The survey's combined defects led the Fourth Circuit to hold the district court had abused its discretion in relying on the survey to issue a preliminary injunction.[110]

## PROBLEMS WITH THE SURVEY QUESTIONS

Surveys have been used in Lanham Act cases long enough that courts have repeatedly approved questions in survey formats modeled after *Eveready* and *Squirt* for confusion surveys[111] and the "one company or more than one company" in secondary meaning surveys.[112] Nonetheless, survey experts continue to use variations of accepted survey formats or unique question formats, sometimes for good reasons but not always with good results. It is a rare series of questions that, together with how the stimulus is presented, cannot be challenged as suggestive and ambiguous. Such criticisms almost always are held to be issues going to the weight of the survey results, but there are exceptions.

In a case where the National Football League challenged defendants' sale of unauthorized merchandise relating to the Green Bay Packers, defendants sought to exclude the plaintiffs' confusion survey.[113] The challenged question was as follows: "Do you think that, in order to put out this shirt, the company that put it out did need to get permission, did not need to get permission, or you have no thoughts about this?" The same survey expert had earlier used a similar question and the survey had been "discarded" because the court concluded that the question asked about legal requirements ("had to" get permission), rather than asking whether respondents thought the company "did get" authorization.[114] The survey in the NFL case met the same fate.[115]

109. *Scotts*, 315 F.3d at 280.

110. For additional opinions challenging the stimulus presented, see *Trouble*, 179 F. Supp. 2d at 308 (failure to use stimuli to test for confusion; survey excluded); *Winning Ways*, 913 F. Supp. at 1469–70 (failure to show overall look of product; survey excluded); *Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 452–53 (D.N.J. 2009) (survey used cropped and out-of-context "snippets," and thus it "withheld from the respondents large amounts of other essential visual, contextual and informational portions from the two documents that directly relate to the survey questions"; stimulus also presented orally, making it difficult to understand and other methods were available but not used); *Kinetic Concepts, Inc. v. Bluesky Medical Corp.*, No. SA-03-CA-0832, 2006 WL 6505346, at *5 (W.D. Tex. Aug. 11, 2006) (false advertising: two advertisements shown simultaneously; argument not a bar to admissibility but instead appropriate for jury argument); *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co.*, 129 F. Supp. 2d 351, 366 (D.N.J. 2000) (stimulus left in view of survey respondents during entire interview; court rejected argument that this made the survey simply a "reading" test), *aff'd*, 290 F.3d 578 (3d Cir. 2002).

111. *See generally* Jerre B. Swann, Likelihood-of-Confusion Surveys, Chapter 4 of this volume.

112. *See generally* Susan Schwartz McDonald, Secondary Meaning Surveys, Chapter 5 of this volume.

113. Nat'l Football League Props., Inc. v. Prostyle, Inc., 16 F. Supp. 2d 1012 (E.D. Wis. 1998).

114. Novo Nordisk of N. Am., Inc. v. Eli Lilly & Co., No. 96 Civ. 5787 (BSJ), 1996 WL 497018 (S.D.N.Y. Aug. 30, 1996).

115. *Nat'l Football League Props.*, 16 F. Supp. 2d at 1019. The survey expert later sought to use the same survey data to establish dilution; this time the survey was excluded for its failure to use any controls. The latter case is discussed in the next section.

Straying from court-approved questions led to the exclusion of the survey in a case alleging infringement, dilution, and related claims.[116] The plaintiff and the defendant both supplied gunpowder to the shooting sports industry. The plaintiff claimed that the defendant's use of a CLAY DOT mark infringed on its CLAY mark. The survey was conducted at the plaintiff's booth at the event, and the employees conducting it wore the plaintiff's T-shirts and hats. The plaintiff's expert filed a report in which he concluded that the survey supported the opinion that a large number of buyers were buying CLAY DOT gunpowder in the false belief that the plaintiff manufactured it. While the court found that the survey suffered from other defects (which it is hoped are by now obvious), it also found the question was confusing: "It implies that the survey is asking about gunpowder manufacturers, but the 'correct' answers include companies that only sell, not manufacture, gunpowder. The phrasing of the question could have skewed the results."[117]

In one of the early decisions on Lanham Act surveys, the Seventh Circuit spoke favorably of the procedure by which a party seeks the court's approval of the survey questions before the survey is conducted.[118] The plaintiff in the *Simon* litigation did exactly that, after a failed attempt to obtain the defendant's agreement on a proposed survey.[119] It was not a success: as the court stated, "[t]he *Union Carbide* procedure assumes that one party will make a reasonable initial proposal. That has not happened here."[120]

The plaintiff in *Simon* was a builder, owner, and operator of shopping malls throughout the United States. It launched a series of internet websites designed to provide information about its malls and their tenants. The defendant operated only on the internet and offered a free comparative shopping service. In its suit for infringement, the plaintiff asked the court for approval of three mall-intercept surveys using three separate formats. The so-called homepage survey would show qualified respondents a card depicting the mySimon homepage and ask, "What services, if any, might you be interested in that are offered on this website?" After recording the response and taking away the card, the interviewer would then show the respondent a card depicting the plaintiff's homepage and ask the same question. The response would be recorded, both cards would be placed out of sight, and the respondent would then be asked, "Do

116. Hodgdon Powder Co. v. Alliant Techsystems, Inc., 512 F. Supp. 2d 1178 (D. Kan. 2007).

117. *Id.* at 1182; *cf.* Hilsinger Co. v. Kleen Concepts, LLC, No. 14-14714-FDS, 2017 WL 3841468, at *11 (D. Mass. Sept. 1, 2017) (additional question at end of *Squirt* study concerning likelihood of confusion, "what is your main consideration when choosing which [product] to purchase," was "untested" and not supported by "academic consensus"; therefore, expert opinion regarding "primary purchasing consideration" was excluded).

118. Union Carbide Corp. v. Eveready Inc., 531 F.2d 366, 386 (7th Cir. 1976). This is the case that lent its name to a very common survey format used to test for likelihood of confusion. *See generally* Jerre B. Swann, Likelihood-of-Confusion Surveys, Chapter 4 of this volume. The court also suggested that a more desirable procedure would be for the parties to attempt in good faith to agree on the survey questions to be used.

119. Simon Prop. Grp. L.P. v. mySimon, Inc., 104 F. Supp. 2d 1033 (S.D. Ind. 2000).

120. *Id.* at 1035 n.2. For a successful application of a pre-survey motion seeking court approval of a proposed survey, see *Piper Aircraft Corp. v. Wag-Aero, Inc.*, 741 F.2d 925, 929 (7th Cir. 1984).



you believe that the two web pages just shown to you are put out by (a) Two unrelated sources, companies, or organizations; (b) The same source, company, or organization; (c) Related but different sources, companies, or organizations; or (d) Don't know?" Any respondent who answered with anything other than "Don't know" would then be asked, "Why do you say that?"[121]

As related to the survey questions, the court concluded that the survey format was "designed to create 'demand effects' that will appear to exaggerate unfairly any possible confusion about affiliation" between the plaintiff and the defendant.[122]

The challenged survey format was an adaptation of the so-called *Squirt* format,[123] where respondents are shown two stimuli and then asked whether they think the products shown were put out by the same company or different companies, or whether they don't know. Here, however, the plaintiff's expert added a fourth possibility: that the two webpages were put out by related but different companies. The court agreed with the defendant's survey expert that this question was likely to create a bias in favor of finding confusion:

> The question about whether the two items are put out by the same or a related source is likely to generate so-called "demand effects" that bias the survey by suggesting to respondents, at least implicitly, that they should believe there is at least some sort of relationship between the different items when the possibility might not even have occurred to the vast majority of consumers who see the items.[124]

The court recognized that potential demand effects are inherent in the *Squirt* survey format in the absence of a proper control. Moreover, the additional question added by the expert was thought by the court to be an extension unwarranted by any case law. The flaw in the question, standing alone, was not serious enough to require exclusion of the survey, but together with other defects resulted in its exclusion.[125]

121. *Simon Prop. Grp.*, 104 F. Supp. 2d at 1041.

122. *Id.*

123. *See* SquirtCo v. Seven-Up Co., 628 F.2d 1086 (8th Cir. 1980). For a detailed discussion of the *Squirt* format, *see generally* Jerre B. Swann, Likelihood-of-Confusion Surveys, Chapter 4 of this volume.

124. *Simon Prop. Grp.*, 104 F. Supp. 2d at 1048. For other opinions criticizing survey questions for suggesting a connection, see *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 488 (5th Cir. 2004); *Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 118 (2d Cir. 1984); *Powerhouse Marks LLC v. Chi Hsin Impex, Inc.*, No. 04-73923, 2006 WL 897254, at *4 (D.N.J. April 5, 2006); *Beneficial Corp. v. Beneficial Capital Corp.*, 529 F. Supp. 445, 450–51 (S.D.N.Y. 1982); *Wuv's Int'l, Inc. v. Love's Enters.*, No. 78-F-107, 1980 WL 30296, at *25 (D. Colo. Nov. 4, 1980); *Marshall Field & Co. v. Mrs. Fields Cookies*, 25 U.S.P.Q.2d 1321, 1326 (T.T.A.B. 1992). The use of a control cell may eliminate any improper influence from questions suggesting an association or claimed to be leading. *See* KIS, S.A. v. Foto Fantasy, Inc., 204 F. Supp. 2d 968, 973–74 (N.D. Tex. 2001); *Novartis Consumer Health*, 129 F. Supp. 2d at 365–66. For an excellent discussion of demand, order, and context effects in survey questions, see Diamond, *supra* note 65, at 387–96.

125. Similarly, the leading nature of the initial survey question "to the best of your recollection, have you or haven't you heard this organization's jingle," which preceded the approved secondary meaning question "do you associate the term you just heard with one particular organization or more than one organization" together with other defects persuaded the court to refuse to admit the survey in a jury case. *Kars 4 Kids*, 2019 WL 1755912, at *7.

A similar suggestiveness problem arose in the confusion survey in the *Leelanau* case, discussed earlier in connection with universe definition.[126] The survey was designed to determine whether consumers seeing the Chateau de Leelanau name on wine believed it to be from the same or a related source as wine from Leelanau Wine Cellars (LWC). Participants in both the test and control cells were first shown an advertisement for LWC Chardonnay wines. The advertisement was taken away, and respondents were then shown a display of five bottles of Chardonnay wines, all from Michigan wineries. Four of the wines displayed were the same in both cells. In the test cell, the fifth bottle, was the defendant's Chateau de Leelanau; in the control cell the fifth bottle was Bel Lago, another winery that, like the parties, was located in the Leelanau Peninsula of Michigan. Respondents were then asked, "Do you believe there is OR is not a bottle of wine in this display that is the same as, or comes from the same source, that is, the same winery that puts out the wine in the advertisement that you just looked at?" Those who responded "No" or "Don't know" were then asked, "And, do you believe there is OR is not a relationship, sponsorship, or association between the winery that puts out any of the bottles of wine in this display and the winery that puts out the bottle of wine in the advertisement you just looked at?"[127]

The court found the entire survey suggestive. By virtue of being shown first the advertisement for Leelanau Wine Cellars wine and then a display of wines, only one of which had the word "Leelanau" on it, the survey

> not only suggested that participants should find a connection between the wine in the display and some other product, but specifically LWC's wine. Of course, a much less suggestive format that would have provided a more reliable indication of likelihood of confusion would have been to simply show participants a bottle of Chateau de Leelanau wine and ask them what company they believed makes the wine.[128]

The failure to consider the evidentiary requirements of the underlying claims sometimes leads survey experts to falter on the questions in the survey, not for what is asked but for what is not asked. For example, Sears sued a retailer for infringement, claiming that defendant's use of the phrase "WHERE ELSE?" in radio and television advertisements infringed Sears's service marks "SEARS. WHERE ELSE?" and "WHERE ELSE?"[129] Sears's survey expert exposed respondents to 8–9-second "clips" taken from 30-second television commercials and 10-second radio advertisements that contained the phrase "WHERE ELSE?"[130] Respondents were then asked

126. *See supra* p. 351.
127. *Leelanau Wine Cellars*, 452 F. Supp. 2d at 779–80.
128. *Id.* at 785 (internal citation omitted); *see also* MPS Entm't, LLC v. Abercrombie & Fitch Stores, Inc., No. 11-24110-CIV., 2013 WL 3288039, at *11 n.12 (S.D. Fla. June 28, 2013) (survey that used "closed-ended questioning without any directive not to speculate" held unreliable by "planting the notion of infringement").
129. Sears, Roebuck & Co. v. Menard, Inc., 72 U.S.P.Q.2d 1221 (N.D. Ill. 2003).
130. The court found that exposing respondents to "clips," rather than entire commercials, failed to mirror the real-world setting and deleted verbal and visual references to defendant's name. "In other words,



who they believed sponsored each of the two commercials; whether, having heard the commercials, they believed the two sponsors were associated, affiliated, or connected with each other; and finally, "Does it appear to you that one company borrowed the slogan 'Where Else?' from the other?"[131]

The major flaw in the survey was that, having asked whether respondents thought the two sponsors were associated, affiliated, or connected with each other, the survey failed to ask the follow-up question, "Why do you say that?" Citing Professor McCarthy's treatise for the importance of this question, the court noted that any alleged confusion would be relevant only if it were caused by the defendant's use of the "Where Else?" phrase.[132] Because the survey failed to determine the reason for the confusion, it was excluded under *Daubert* and Rule 403.

Another example of failing to ask a question that would produce evidence required by the applicable legal standard is found in a false advertising case involving premium dog food.[133] The plaintiff sued based upon the defendant's use of a sticker on bags of its lamb-meal-and-rice dog food containing "# 1" and the words "Natural Choice, # 1 in America's Pet Stores." The bag already contained the statement "America's # 1 Selling Lamb Meal & Rice Formula dog food," a statement that was true and not challenged by the plaintiff. The plaintiff's theory was that putting the sticker on bags of lamb-meal-and-rice dog food conveyed the meaning to consumers that all of the defendant's dog food products were the best-selling dog food in America, not simply the lamb-meal-and-rice product.

The plaintiff's survey was subject to a number of criticisms, and the court ultimately concluded that it was invalid.[134] Among the major flaws was the failure of the "key" question to establish that, assuming consumers were deceived, the "# 1" sticker was the cause of the deception, inasmuch as survey respondents were directed to both the sticker (allegedly false and misleading) and the statement that defendant's lamb-meal-and-rice product was the "# 1" selling product in America (admittedly true). Because the survey "made no attempt to distinguish whether the true statement or the allegedly false statement caused the respondent's opinion, the survey is useless to show the cause of any deception."[135]

important cues regarding affiliation or lack of affiliation between the parties were removed from the commercials. There was no reason *not* to show respondents the entire commercials, each of which was less than a minute long." *Id.* at 1223.
131. *Id.* The court concluded that the last question suggested similarity to respondents, rather than testing whether respondents perceived it themselves. *Id.* (citing *Simon Prop. Grp.*).
132. *Id.* at 1224 (citing McCARTHY, *supra* note 62, § 32:175, at 32-287); *see also* ConAgra, Inc. v. George A. Hormel & Co., 784 F. Supp. 700, 725 (D. Neb. 1992) (the "what makes you say that" question "is designed to determine whether a person is confused for relevant trademark reasons or for some other unrelated and therefore irrelevant reason"), *aff'd*, 990 F.2d 368 (8th Cir. 1993). *But see* AstraZeneca LP v. Tap Pharm. Prods., Inc., 444 F. Supp. 2d 278, 291 (D. Del. 2006) (citing *ConAgra* but holding that the failure to ask a "Why" question went to weight, not admissibility).
133. Hill's Pet Nutrition, Inc. v. Nutro Prods., Inc., 258 F. Supp. 2d 1197 (D. Kan. 2003).
134. *Id.* at 1210.
135. *Id.* at 1204.

With respect to the failure to ask important questions, the case was before the court on the plaintiff's motion for a preliminary injunction, a motion that required the court to determine whether the threatened injury to the plaintiff outweighs the harm to the defendant if relief is granted. Amazingly, the plaintiff's evidence contained no showing of any threatened injury to it from the allegedly false advertising. While survey evidence could have been used to establish the plaintiff's injury, the survey done by the plaintiff did not do so:

> The survey did not purport to show any relation between the falsity, if any, of defendant's advertising, and any decision to purchase by any consumer. No questions were asked about whether the # 1 [sticker] would make the consumer more or less likely to buy that product or any of defendant's products, instead of plaintiff's products. For this court to assume that plaintiff has suffered or will suffer any injury whatsoever from the # 1 [sticker] would be mere speculation.[136]

Finally, the survey in an infringement case failed to ask respondents what the stimulus was that they had been shown, and this omission led to the survey's exclusion.[137] The plaintiff alleged that its "Learning Network" mark was infringed by the defendant's "The Learning Channel." Respondents were shown what was described as several actual pages from a website, printed out and put into a portfolio. The "portfolio" in the test cell was a first page containing "www.learningnetwork.com" in large type in the center of the page. The next four pages were what was represented to be actual pages from a website, but the portfolio page did not include the title bar at the top of the website page and did not include the "address" of "www.learningnetwork.com."[138] After respondents had finished looking at the portfolio, it was taken away and respondents were then asked a series of questions designed to test whether they knew the website they had seen by any other name (and, if so, what), whether the company sponsoring the website was engaged in any activity or business other than what was shown on the website (and, if so, what), and whether the website received or needed to receive permission from anyone else for any reason (and, if so, who and why). Finally, respondents were asked the name of the website and if they had seen it before.[139]

The plaintiff's survey expert opined that the survey showed no confusion: none of the respondents knew the Learning Network by any other name, and it was not known to be engaged in television or cable broadcasting; a substantial number thought that the Learning Network had received permission from someone else but none thought that such permission was required from The Learning Channel; and only 6 percent

136. *Id.* at 1207.
137. Learning Network, Inc. v. Discovery Commc'ns, Inc., 153 F. Supp. 2d 785 (D. Md. 2001).
138. A control cell was identical, except that "Learning Network" was replaced with "Learning.com." Approximately half of the total respondents were in the test cell and half were in the control cell.
139. *Id.* at 788.



thought they had seen the Learning Network website before but none said the website they had seen previously was called "The Learning Channel."[140]

Under a heading in the opinion "What Website Did the Subjects Think They Saw?," the court found that "the survey is defectively designed in that it does not engender reasonable confidence that all, a majority, or even a substantial number, of the [respondents] were answering the questions posed with the understanding that the stimulus was the website of, or presented by, 'Learning Network.' If [respondents] did not have this understanding, their responses to the 'substantive' questions would be meaningless."[141] Recall that the "portfolio" shown to respondents contained as the first page the designation "www.learningnetwork.com" in large type in the center of the page. After noting that a real-world user of the internet would get to the website by using the Learning Network name, the website's URL, a search engine, or a link from another site, the court concluded that printing the URL on the first page of the stimulus was not "remotely equivalent to the route by which the consumer gets to the site."[142] This problem was compounded by the omission of "significant location information that would be available to a real-world consumer, i.e., the website pages omitted the title bar that included the statement "Welcome to the Learning Network-your educational resource" and the tool bars that would have shown the user was connected to www.learningnetwork.com. Thus, the court found that "the survey was severely defective by virtue of its failure to ask any question that would test the critical question of what website it is that the [respondent] thought they had seen."[143]

## THE NEED FOR CONTROLS

Anyone who has ever reviewed the completed raw questionnaires from a survey knows that there are always responses that make no sense: the respondent did not understand the question; was guessing; was trying to be cooperative and provide the answer that the respondent thought (mistakenly) was the correct response; answered based upon a dominant market share; brought to the survey concealed preexisting beliefs; or, to

140. *Id.*
141. *Id.* at 790.
142. *Id.*
143. *Id.* at 791. Additional examples of cases involving defective questions are *Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 447 (D.N.J. 2009) (closed-ended questions did not account for respondents who might have had no opinion); *Straumann Co. v. Lifecore Biomedical Inc.*, 278 F. Supp. 2d 130, 137–38 (D. Mass. 2003) (trade dress survey to establish secondary meaning failed to distinguish between functional and nonfunctional features and the "What company" question assumed the critical issue to be tested—that is, association with a single source); *Trouble v. Wet Seal, Inc.*, 179 F. Supp. 2d 291, 308 n.12 (S.D.N.Y. 2001) ("Rather than test a consumer's confusion, these questions test their awareness of other lines of clothing and company affiliation."). For examples of cases rejecting *Daubert* challenges to the survey questions, see *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 590–93 (3d Cir. 2002); *Beacon Mut. Ins. Co. v. Onebeacon Ins. Grp.*, 253 F. Supp. 2d 221 (D.R.I. 2003).

put it charitably, was "misinformed."[144] To put it differently, even a perfectly designed and executed survey will generate noise, guessing, lack of understanding, so-called yea-saying, and other responses that are extraneous to what the survey is attempting to test. This problem can be exacerbated in surveys that use closed-end questions, such as the so-called *Squirt* format for confusion, where respondents are given two or three choices plus a "Don't know" option and, fearful of appearing uninformed, choose one of the substantive choices (e.g., "same company" or "different company"). The use of controls may lessen or eliminate the effect of leading questions, assuming the same questions are asked to both the test and control cells.[145] For these reasons, confusion survey evidence produced from a survey that does not have some control mechanism is increasingly viewed as suspect by the courts.[146]

Despite the well-recognized need for controls in surveys, surveys without controls are still conducted, and opinions based upon them are offered into evidence. The *Daubert* motion has proved very useful in challenging survey evidence produced without some control mechanism. It has also been useful in challenging the more difficult problem where a survey uses a control but the control selected is believed to be defective.

The easier cases are those involving surveys without controls. For example, in the NFL case, discussed earlier in connection with survey questions, the use of the survey to prove confusion was excluded.[147] Without conducting a new survey, the plaintiff's survey expert sought to use the survey data to prove dilution.[148] After having shown respondents several of the defendants' products, the survey asked, "What, if anything, do you think of when you see this shirt?"

The survey was excluded. The court found that the "main problem" with the survey was that it asked only a single question, without any further probing and without showing respondents any control shirt or asking any control questions. The court cited a number of cases and secondary authorities establishing the need for controls,[149] but

144. For example, in a survey with which the first author was involved where respondents were asked about the source of two obviously different wines and said they came from the same company, the response to the "Why do you say that?" question was that "all wines in the U.S. are made by the same company."

145. *Novartis Consumer Health*, 129 F. Supp. 2d at 365 ("[B]ias that may have resulted from any leading questions was eliminated by use of the control group." (citing Volkswagen Aktiengesellschaft v. Uptown Motors, No. 91 CIV. 3447(DLC), 1995 U.S. Dist. LEXIS 13869, at *16 (S.D.N.Y. May 11, 1995)). Note that the Third Circuit refrained from adopting this position in the context of the false advertising survey at issue "because we are uncertain whether the effects of asking leading questions without proper filtering may be greater on the MNTS test cell than the control cell." *Novartis Consumer Health*, 290 F.3d at 593 n.10.

146. As Professor McCarthy puts it, the use of controls in surveys "serves much the same purpose . . . as use of a placebo does in drug testing and putting the suspect in a lineup of others does in criminal detection." McCARTHY, *supra* note 62, § 32:187, at 32-398 (citing Michael Rappeport, *Litigation Surveys-Social "Science" as Evidence*, 92 TRADEMARK REP. 957, 986 (2002)); *see also* Diamond, *supra* note 65, at 397–401. For an article on the selection of controls, see Jacob Jacoby, *Experimental Design and the Selection of Controls in Trademark and Deceptive Advertising Surveys*, 92 TRADEMARK REP. 890 (2002).

147. *See supra* p. 357.

148. Nat'l Football League Props., Inc. v. ProStyle, Inc., 57 F. Supp. 2d 665 (E.D. Wis. 1999).

149. McCARTHY, *supra* note 62, § 32:187; Major League Baseball Props., Inc. v. Sed Non Olet Denarius, Ltd., 817 F. Supp. 1103, 1123–24 (S.D.N.Y. 1993), *vacated by settlement*, 859 F. Supp. 80



there was another and perhaps more important reason why controls were required: the survey was conducted shortly before the Green Bay Packers' first Super Bowl appearance in nearly 30 years. As the court put it, in Wisconsin and at a time of Packers-related frenzy, "the questioners could have shown the survey respondents a green and gold Blarney stone (an example of a nondiluting use) and more than half of them would have thought of the Packers."[150]

The more difficult issue in dealing with controls is the selection of the control cell stimulus. Selecting a proper control sounds fairly easy in the abstract: Professor Diamond states that "[i]n designing a survey-experiment, the expert should select a stimulus for the control group that shares as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed."[151] The application of this definition can sometimes prove challenging.

In the *Simon* litigation,[152] for example, the experts sought to test for confusion by showing respondents a card depicting the mySimon homepage and asking what services were offered on the website. They were then shown the Simon homepage and asked the same question. With both cards taken away, respondents were then given the "same company-different companies-related but different companies" options along with a "Don't know" option and, for other than the last response, were asked, "Why do you say that?"[153] As discussed above, the court was quite critical of the proposed survey on a number of grounds and ultimately refused to approve it.

The lack of controls received extended discussion by the court. The lack of controls in the proposed survey, said the court, did not "take into account the fact that the name 'Simon' is used extensively on the Internet for commercial purposes."[154] Given this fact, the court was understandably concerned that these other uses of "Simon" that were not alleged to be infringing may well confuse consumers in the same fashion as the defendant's website, and thus without controls the "proposed survey amounts to little more than a meaningless word association or memory exercise."[155]

Because the survey evidence was before the court on a motion for presurvey court approval, the court asked plaintiff's experts whether the survey should include a control with one or more webpages, real or fictional, that used "simon" as a major part

(S.D.N.Y. 1994); Diamond, *supra* note 65, at 249–52.

150. *Nat'l Football League Props.*, 57 F. Supp. 2d at 669. The failure to include a control group was exacerbated by the fact that the survey expert had written scholarly articles stating that a control group in surveys was "absolutely necessary," had criticized other experts for their failure to use controls, and had used controls in other surveys. *Id.* For other examples of survey evidence criticized for lack of a control test, see *Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 446 (D.N.J. 2009); *Nightlight Sys., Inc. v. Nite-Lites Franchise Sys.*, No. 1:04-CV-2112-CAP, 2007 WL 4563873, at *8 (N.D. Ga. July 27, 2007); *Vista Food Exch., Inc. v. Vistar Corp.*, No. 03-CV-5203DRHWDW, 2005 WL 2371958, at *6 (E.D.N.Y. Sept. 27, 2005); *Hill's Pet Nutrition*, 258 F. Supp. 2d at 1203–04.

151. Diamond, *supra* note 65, at 399. For the results of Professor Diamond's Lexis search for Lanham Act cases containing the words "control group" since the first edition of the REFERENCE MANUAL ON SCIENTIFIC EVIDENCE in 1994, *see id.* at 400.

152. *See supra* note 76.

153. *Simon Prop. Grp.*, 104 F. Supp. 2d at 1041.

154. *Id.* at 1045.

155. *Id.*

of the address or name, for example, simonschuster, simononline, simon.net, simon.org, and so on. Both experts argued against the use of such a control, but on different grounds. The court was not persuaded and concluded that the lack of a control left the proposed survey as nothing more than a word association exercise.[156] The lack of a control meant that the survey could not distinguish between confusion based upon a close proximity between the services of the parties and the mere similarity in names, and thus did not test for "truly relevant consumer confusion."[157]

Selecting a proper control is difficult at best and quite clearly warrants the best and exacting efforts of counsel and the expert.[158]

## EXPERT TESTIMONY UNSUPPORTED BY SURVEY EVIDENCE

Because of the importance of survey evidence in Lanham Act cases, trials often become a "battle of the experts," with each side's experts earnestly contending for their opinions to be accepted by the court or the jury. It is not uncommon for one side or the other to use experts to opine on issues such as likelihood of confusion, secondary meaning, and related issues where such opinions are not based on an underlying survey. In general, such attempts after *Daubert* have proved unsuccessful. Conversely, if one side has a survey expert, the other side almost automatically will seek to use one or more survey experts as "critiquing experts"—that is, they seek to testify about the countless "fatal flaws" present in the opposing side's survey. While the use of critiquing experts is very common, recent cases suggest that such experts must have more than simply their opinion (e.g., some "facts or data" Rule 702 requires) to support admissible criticisms of the other side's survey.

Rule 702 requires, among other things, that a proposed expert's testimony be based upon scientific, technical, or other specialized knowledge that will assist the trier of fact to understand the evidence or determine a fact at issue in the case. This principle has proved to be the downfall of those experts who proposed to testify about likelihood of confusion, similarity of the parties' marks, and other matters equally within the capabilities of a jury.

In the *Patsy's Restaurant* case,[159] for example, the plaintiff sought to use at a jury trial the testimony of an expert in brand marketing to opine on the similarity of the marks at issue as bearing on likelihood of confusion. The defendant challenged the testimony in a *Daubert* motion, arguing that the testimony was merely speculative

156. *Id.* at 1046.
157. *Id.* at 1047.
158. For other examples of problems with controls, see *Urban Outfitters, Inc. v. BCBG Max Azria Grp.*, 511 F. Supp. 2d 482 (E.D. Pa. 2007); *24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC*, 447 F. Supp. 2d 266 (S.D.N.Y. 2006), *aff'd*, 247 F. App'x 232 (2d Cir. 2007); *Gov't Emps. Ins. Co. v. Google, Inc.*, No. 1:04CV507, 2005 WL 1903128 (E.D. Va. Aug. 8, 2005). While there may not be a "perfect" control for any given set of facts, "a survey with an imperfect control group may provide better information than a survey with no control group at all . . . ." Diamond, *supra* note 65, at 399.
159. Patsy's Italian Rest., Inc. v. Banas, 531 F. Supp. 2d 483 (E.D.N.Y. 2008).



conjecture and that the jury could perform the comparison of the marks just as well as the proposed expert. The plaintiff relied on a similar case in the Third Circuit, where the expert's testimony was admitted and affirmed on appeal, the Third Circuit noting that trial courts have considerable discretion to admit or reject expert testimony and that, in any event, any error in admitting the testimony was harmless.[160] The court concluded that the plaintiff had failed to show why the expert's testimony would help the jury on the likelihood-of-confusion issue "when they can just as easily make a comparison between the parties' marks. This approach is consistent with that taken by other courts in this circuit."[161]

The court also found that the expert's opinions were based on no more than subjective belief or unsupported speculation, and, as such, those opinions "should not be permitted because it would usurp the jury's role in making fact determinations."[162] Finally, because the case would be tried to a jury, the court excluded the proposed testimony under Rule 403.

A similar but more egregious example is the infringement action involving competing uses of the "New Century" mark.[163] The plaintiff proposed to call an expert in marketing and advertising to testify about likelihood of confusion, dilution, and damages, as well as a proposed corrective advertising campaign that would cost over $8 million to be conducted after trial by—you guessed it—the expert. It turned out that the expert's opinion on confusion was based upon reading the pleadings, speaking with the plaintiff's president and plaintiff's counsel, talking to an escrow officer involved in closing the purchase of the expert's house, and talking with a mortgage broker whose son was on the same baseball team as the expert's son.

Applying the *Daubert* factors, the court found that the proposed testimony on confusion met none of those factors. The expert's proposed testimony on damages met a similar fate; because the expert did not know the extent of the assumed confusion in the market, had conducted no study or survey, and had apparently conceded at

160. Betterbox Commc'ns, Ltd. v. BB Techs., Inc., 300 F.3d 325 (3d Cir. 2002). Interestingly, the *Patsy's* court rejected plaintiff's reliance on *T.V. Land, L.P. v. Viacom International, Inc.*, 908 F. Supp. 543 (N.D. Ill. 1995), and *Acxiom Corp. v. Axiom, Inc.*, 27 F. Supp. 2d 478 (D. Del. 1998), because these cases "did not involve jury trials and are therefore inapposite." 531 F. Supp. 2d at 485 n.3.
161. *Patsy's*, 531 F. Supp. 2d at 485 (citing Malletier v. Dooney & Bourke, Inc., 525 F. Supp. 2d 558 (S.D.N.Y. 2007); Price v. Fox Entm't Grp., Inc., 499 F. Supp. 2d 382 (S.D.N.Y. 2007); Trouble v. Wet Seal, Inc., 179 F. Supp. 2d 291 (S.D.N.Y. 2001); New Colt Holding Corp. v. RJG Holding of Fla., Inc., 2003 U.S. Dist. LEXIS 25309 (D. Conn. 2003); Andrews v. Metro N. Commuter R.R. Co., 882 F.2d 705 (2d Cir. 1989)).
162. *Id.* at 485–86. The court noted that plaintiffs alleging trademark infringement usually offer evidence of confusion by way of a well-designed survey and that, while survey evidence is not necessary to prove likelihood of confusion, "the lack of survey evidence weighs against any finding of actual confusion between the parties' marks." *Id.* at 486 (citing Merriam-Webster, Inc. v. Random House, Inc., 35 F.3d 65, 72 (2d Cir. 1994)).
163. New Century Fin., Inc. v. New Century Fin. Corp., No. C-04-43, 2005 WL 5976552 (S.D. Tex. Nov. 29, 2005).

the *Daubert* hearing that his opinions as to damages were speculative and lacked any factual foundation, the testimony was excluded in its entirety.[164]

It is black-letter *Daubert* law that an expert's opinion must rest on a reliable foundation, that the proposed testimony be more than subjective belief, and that opinions connected to data only by the ipse dixit of the expert will not pass muster.[165] While the courts were quick to apply the rules to proposed survey evidence following *Daubert* and *Kumho*, they were less diligent in applying them to the proposed testimony of critiquing experts—experts in survey research who review the other side's survey and propose to offer the fact-finder their opinions on the defects in that survey. It appears that this situation is changing, and that courts will ignore or give little weight to survey criticisms offered by a qualified survey expert absent a showing that using the "correct" approach would have led to a different result.

In the *Whirlpool* case,[166] a suit for infringement, the plaintiffs sought to exclude the testimony of defendants' two survey experts, each of whom had conducted a survey. The plaintiffs relied on the declarations of a third survey expert who had conducted over 500 surveys but did not conduct one here, instead opining that each survey was riddled with serious errors and should be excluded. The court, in a passage faithful to *Daubert*, commented on the fact that none of the criticisms were supported by anything other than the critiquing expert's opinions:

> [T]he absence of competing survey evidence from [the expert] showing divergent results significantly undermines the efficacy of plaintiffs' arguments that defendants' evidence is so unreliable that it must be excluded. In other words, plaintiffs' criticisms of the methodology used by the defense experts would have been substantially aided by proof that the "correct" methodology would have led to a different result.[167]

The court then considered each of the criticisms of both surveys and concluded that there was no evidence before the court to substantiate the criticisms—that is, that substituting each criticism for what was actually done would have produced different or more accurate results. The court denied the motion to exclude the surveys.

164. *Id.* at *4. For additional recent examples of experts seeking to testify based only on their own unsupported opinions, see *Trilink Saw Chain, LLC v. Blount, Inc.*, 583 F. Supp. 2d 1293 (N.D. Ga. 2008); *Brighton Collectibles, Inc. v. Renaissance Grp. Int'l*, No. 06-CV-1115 H(POR), 2008 WL 5500659 (S.D. Cal. May 13, 2008); *Cerveceria Modelo, S.A. de C.V. v. USPA Accessories LLC*, No. 07 Civ. 7998(HB), 2008 WL 3919186 (S.D.N.Y. Aug. 25, 2008); *Wallach v. Longevity Network, Ltd.*, No. CV 04-2404 SJO (RZx), 2006 WL 5106206 (C.D. Cal. April 26, 2006); *Wallach v. Longevity Network, Ltd.*, No. CV 04-2404 SJO (RZx), 2006 U.S. Dist. LEXIS 97120 (C.D. Cal. 2006); Smith v. Ames Dep't Stores, Inc., 988 F. Supp. 827 (D.N.J. 1997), *aff'd*, 172 F.3d 860 (3d Cir. 1998).

165. Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 590 (1993); Joiner v. Gen. Elec. Co., 522 U.S. 136, 146 (1997).

166. Whirlpool Props., Inc. v. LG Elecs. U.S.A., Inc., No. 1:03 CV 414, 2006 WL 62846 (W.D. Mich. Jan. 10, 2006).

167. *Id.* at *3.



A similar situation arose in an infringement case involving the "Great Minds" mark used on audio-/video-taped lectures.[168] The plaintiff's survey expert conducted a confusion survey that showed an actionable level of confusion. The defendant presented a survey expert whose primary criticism was that the survey's key question was leading. The court rejected the argument but commented further on the lack of any factual foundation for the criticism:

> Although Defendant presented an expert to challenge Dr. Jacoby's results, [the expert] acknowledged that the best way to determine whether the alleged design flaws he identified had any effect on the outcome would be to conduct an alternate survey. However, Unapix did not present any alternative survey. When questioned about Unapix's failure to conduct its own survey, [the expert] suggested that time and financial limitations did not permit it. However, Unapix had ample opportunity to conduct a "proper" survey on likelihood of confusion, since it had completed a survey purportedly addressing secondary meaning. . . .[169]

Finally, in a case in which the owner of the "Bud" mark challenged the use of "Billy Bud" on ales,[170] the plaintiff's confusion survey showed actionable confusion. In connection with the plaintiff's motion for summary judgment, the defendant's survey expert proffered a number of criticisms of the survey. The court held that the "fact that [defendant] has procured an expert affidavit which purports to contradict that of [plaintiff's] expert, however, does not necessarily render summary judgment inappropriate."[171] With respect to the opinion about the defects, the court found that it was only that—an opinion without any foundation: the expert "does not present the conflicting results of a consumer study . . . or provide any other basis for his opinion."[172] The plaintiff's summary judgment motion was granted.[173]

The issues raised by a critiquing expert may perhaps be illustrated by the following two hypothetical situations. A critiquing expert proposes to testify that the survey conducted by the opposing expert does not establish actual confusion because the survey used leading questions or a methodology suggesting particular answers to respondents or failed to include a "don't know" option. The critiquing expert cites research articles in the academic literature on the demand effect from use of such suggestive questions that create a bias and produce invalid results. Or the survey failed to

168. Teaching Co. Ltd. P'ship v. Unapix Entm't, Inc., 87 F. Supp. 2d 567 (E.D. Va. 2000).

169. *Id.* at 584.

170. Anheuser-Busch, Inc. v. Caught-on-Bleu, Inc., 288 F. Supp. 2d 105 (D.N.H. 2003), *aff'd*, 105 F. App'x 285 (1st Cir. 2004).

171. *Id.* at 122.

172. *Id.* at 123.

173. *See also* F.T.C. v. Stefanchik, 559 F.3d 924, 929 (9th Cir. 2009) ("Here, [defendants] contest the methodology of the FTC's survey and assert that issues of fact exist, but they do not contest the truth or validity of the individual responses reported in the survey. They offered no competent evidence of their own, either in the form of survey results, contrary consumer declarations, sworn affidavits, or testimony, to identify consumers who were able to make substantial amounts of money using the [defendant's] method as claimed in the marketing materials.").

include a "why do you say that" question in response to open-ended questions, and the critiquing survey expert cites research articles that support inclusion of such a probing question. On these facts alone, a *Daubert* motion should not succeed in challenging the admissibility of the expert and, in the authors' opinion, would be a waste of time and money.

Contrast this with the situation where a critiquing expert proposes to testify that the proffered survey does not contain any control stimulus. The critiquing expert cites research articles showing that without a control stimulus, the survey cannot remove the influence of preexisting beliefs and other background noise that may account for the responses to the survey questions. In that situation, the failure to use a control is a fatal flaw that should be a ground for exclusion of the survey as unreliable, even in the absence of a contra survey.

The case law on this issue remains sparse but may signal a trend toward requiring more rigor of critiquing experts.[174] If *Daubert* and its progeny require a reliable foundation for opinions based on survey research, it does not seem unfair to require something more than the critiquing expert's opinion that the other guy "got it wrong."

## CONCLUSION

The *Daubert* revolution is alive and well in the federal courts. Although aimed originally at "junk" science and its prejudicial effect in jury trials, the courts have fully embraced the *Daubert* concepts in Lanham Act cases. However, unlike other areas of expert testimony where concepts of peer review, error rates, and the like hold sway, the *Daubert* law on survey evidence is almost entirely developed by the courts (e.g., universe definition, questions, controls, etc.), and the rules on what will or will not pass muster are not found in academic books and journals on marketing research but instead in the decisions of the federal courts. Different circuits have their own variations on the proper methodology, and some are more inclined than others to hold that defects go to the weight, rather than to admissibility.

Lanham Act cases are fact intensive, and the survey evidence presented is often outcome determinative. Accordingly, counsel must know what the courts have done and keep up with trends and changes. Whatever the future brings, *Daubert* will certainly continue to play a significant role in making sure that only reliable survey evidence gets before the trier of fact.

---

174. See J. Swann, *Survey Critiques*, Chapter 15 of this volume.