# EXHIBIT 11

Jacob Jacoby

# TRADEMARK SURVEYS Volume I

*Designing, Implementing, and Evaluating Surveys*

RECEIVED
LAW LIBRARY

SEP 0 3 2013

UNIV. OF WI.
Madison, WI 53706

Section of Intellectual Property Law
AMERICAN BAR ASSOCIATION

Cover by Jill Tedhams/ABA Publishing.

The materials contained herein represent the opinions of the authors and editors, and should not be construed to be the views or opinions of the law firms or companies with whom such persons are in partnership with, associated with, or employed by, nor of the American Bar Association or the Section of Intellectual Property Law unless adopted pursuant to the bylaws of the Association.

Nothing contained in this book is to be considered as the rendering of legal advice for specific cases, and readers are responsible for obtaining such advice from their own legal counsel. This book is intended for educational and informational purposes only.

© 2013 American Bar Association. All rights reserved.

No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior written permission of the publisher. For permission, contact the ABA Copyrights and Contracts Department by e-mail at copyright @americanbar.org or fax at 312-988-6030, or complete the online request form at http://www.americanbar.org/utility/reprint.

Printed in the United States of America

17 16 15 14 13     5 4 3 2 1

**Library of Congress Cataloging-in-Publication Data**

Trademark surveys / Edited By Jacob Jacoby. — First edition.
pages cm
Includes bibliographical references and index.
ISBN 978-1-62722-265-5 (print : alk. paper)
1. Trademarks—Law and legislation—United States. 2. Market surveys—Law and legislation—United States. I. Jacoby, Jacob, (Researcher in economics), editor.
KF3193.T74 2013
346.7304'88—dc23

2013030535

Discounts are available for books ordered in bulk. Special consideration is given to state bars, CLE programs, and other bar-related organizations. Inquire at Book Publishing, ABA Publishing, American Bar Association, 321 North Clark Street, Chicago, Illinois 60654-7598.

www.ShopABA.org

This material may be protected by Copyright law (Title 17 U.S. Code)

# chapter 7

# Settings, Stimuli, and Tasks

## 7.01 Chapter Introduction

Surveys are not conducted in a void, but occur in a context. The principal components of the context consist of a *setting*, the *stimuli* and other items the researcher introduces into the setting, and the *tasks* the respondents are asked to perform. This chapter considers the settings, stimuli, and tasks.

Note that products, marks, advertisements, and so on are not the only stimuli researchers introduce into the setting. Respondents also are exposed to a measuring instrument: in self-administered form, this is the questionnaire; in interviewer-administered formats, it includes the interviewer. Given that questionnaires and interviewers are not normally encountered by consumers as they go about purchasing and experiencing products in the course of their daily lives, the questions asked of respondents and the people doing the questioning are just as much stimuli as are the marks, products, or advertising the respondents are asked to review. The questions and questionnaire are the focus of chapter 8. Discussion of interviewers is reserved for chapter 9.

The present chapter considers the research setting (section 7.10), the stimuli introduced into the setting (sections 7.20 through 7.53.2), commonly used protocols for testing (the *Thermos*, *Teflon*, *Eveready*, and *Squirt* protocols, section 7.50), and the tasks respondents are asked to perform (sections 7.60 through 7.62.2). When survey evidence is gathered to prove the state of mind of (prospective) purchasers, the overriding consideration for settings, stimuli, and tasks is "the closer the survey methods mirror the situation in which the ordinary person would encounter the trademark, the greater the evidentiary weight of the survey results."[1]

---

1. J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 32:163 (4th ed. 2006); *see also* Am. Footwear Corp. v. Gen. Footwear Co., 609 F.2d 655, 660 n.4 (2d Cir. 1979).

## 7.10 Settings

Trademark surveys have been conducted in various settings, including in shopping mall test facilities, in shopping mall corridors, inside retail establishment, outside retail establishments, on street corners, at the respondent's place of work or home, and at conferences, conventions, trade shows, and similar gatherings. Given the wireless revolution, it may not be long before phone and Internet surveys reach people in settings other than work or home environments.

One thing is clear regarding all the settings in which trademark surveys are conducted. Regardless of where they may take place, by virtue of the fact that respondents have been approached, agreed to participate in a survey, and are aware they will be asked questions, especially regarding any items they will be shown during the course of the interview, the settings used for conducting trademark and deceptive advertising surveys can, at best, only approximate the state of mind consumers experience in the marketplace. Knowing they will be asked questions about what they are shown or experience during the interview may increase the respondents' vigilance and attentiveness, as compared to consumers making purchase decisions in the marketplace. That said, consumers in the real-world marketplace reach purchase decisions for themselves or their significant others that involve spending money and have actual consequences, and this may also make greater attention and vigilance more likely.

The settings in which trademark surveys take place are partially dictated by the stimuli to which respondents are exposed. Although attempted, it is not advisable to conduct a phone survey when testing a stimulus that needs to be viewed. The settings may also be dictated by the type of respondent that needs to be interviewed; certain categories or types of respondents may be reachable only at work, others only at home. And settings may also be determined by the mode of survey administration, a topic more fully covered in chapter 9.

Occasionally, one finds surveys criticized because the settings are deemed to be "artificial." For example, defendant's expert in *Anheuser-Busch v. Caught-on-Bleu* contended plaintiff's "survey [was] 'problematic' because the interviews occurred in the 'artificial environment' of a shopping mall, rather than in a bar, restaurant, or store. [The expert opined] that in such a 'realistic purchase environment, the chances that a beer purchaser would be confused between Billy Budd and Budweiser are quite remote.'"[2] Addressing this criticism, the court noted this "testimony runs

2. Anheuser-Busch, Inc. v. Caught-on-Bleu, Inc., 288 F. Supp. 2d 105, 124 (D.N.H. 2003).

afoul of settled law that mall-intercept surveys . . . [provide] acceptable proof of actual confusion."[3]

At the other end of the artificial-authentic continuum, conducting surveys in actual marketplace settings—specifically, retail outlets—can be detrimental to gathering valid and reliable data. A survey based on interviews conducted inside a retail grocer was thrown out because the interviewees could see the labeled products bearing the marks subject of the survey on nearby shelves.[4] A case on the secondary meaning of guitar shapes provides additional perspective. When the surveyor "reported that 58%, 50% and 21% of respondents identified the Telecaster, Stratocaster, and Precision Bass shapes, respectively, and 65%, 64%, and 64% of respondents identified applicant as the manufacturer of guitars known as the Telecaster, Stratocaster and Precision Bass, respectively,"[5] noting that "[t]he survey was conducted in front of the display windows of six different retail musical instrument stores,"[6] the tribunal commented: "[T]he probative value of the survey is weakened inasmuch as it was conducted with the interviewees facing the display windows of stores selling electric guitars, two of which (Guitar Center stores) are known to carry a significant number of applicant's guitars."[7]

An in-store survey was accepted when it was claimed to have been conducted away from the counter where the goods were displayed.[8] In another matter, despite the presence of prominent and potentially biasing stimuli, the court saw no problem approving a survey conducted inside a retail outlet:

> Plaintiff's expert conducted his secondary meaning survey by intercepting individuals while they were shopping for watches in Tourneau Watch Company stores. . . . Tourneau is an authorized dealer of Cartier watches. In light of this relationship, the Tourneau stores feature prominent posters of Cartier watches as well as display cases with Cartier watches. . . . Defendants' principal objection to [plaintiff's survey] report is that in light of the Cartier Posters at Tourneau and the fact that its watches are among those

3. *Id.*

4. Marcalus Mfg. Co. v. Watson, 156 F. Supp. 161, 115 U.S.P.Q. 232 (D.D.C. 1927); *aff'd*, 258 F.2d 151, 118 U.S.P.Q. 7 (D.C. Cir. 1958).

5. Stuart Spector Designs, Ltd. v. Fender Musical Instruments Corp. 2009 WL 1017284, at *19 (T.T.A.B.).

6. *Id.*

7. *Id.* at *20.

8. La Maur, Inc. v. Revlon, Inc., 245 F. Supp. 839, 146 U.S.P.Q. 654 (D. Minn. 1965).

displayed in Tourneau's cases, the results of the study are biased. The court, however, disagrees.[9]

> Under the circumstances described, it is not possible to determine whether the claimed finding of secondary meaning was due to the respondents' appraisal of the stimulus being tested (the question at issue) or to the respondents' having seen the prominent posters and displays of Cartier watches present in the setting where the stimulus was tested (which is not the question at issue). Moreover, as discussed below, other reasons remain for avoiding in-store retail settings as interview locations.

Regardless of the specific setting in which the respondent is interviewed, some general desiderata can be identified. To the extent possible:

1. Settings should be free of distractions. For example, when conducting a mall-intercept interview, respondents who qualify for the survey should be escorted to and interviewed in a shielded testing area or facility where the comings and goings of passersby cannot be heard or seen. Although the respondent may be with other people when approached, these others should not be present during the interview.
2. Settings should be avoided where passersby, who may see or overhear what is going on, may not only be distractions, but may themselves later be invited (by that interviewer or another) to participate in the survey.
3. Settings should be avoided where the setting's contents are not under the control of the researcher, and those contents can influence or determine the respondent's answers in biasing ways. For example, respondents should not be interviewed anywhere (e.g., in mall corridors, inside stores) where products or displays visible to the respondent could influence his or her responses. The same applies to interviewing respondents at conventions, exhibits and in similar settings.

As indicated, these guidelines are not hard and fast requirements, but intended as desiderata likely to improve data quality. There are limits on what researchers can control in telephone interview settings or where interviews are self-administered, as they are in Internet surveys.

9. Cartier, Inc., v. Four Star Jewelry Creations, Inc., 348 F. Supp. 2d 217, 230 (S.D.N.Y. 2004).

## 7.20 Stimuli

Although a stimulus can be almost anything (e.g., the color of the walls in the testing room, the current state of the respondent's stomach—whether she is hungry, is taking medication, or has acid reflux, etc.), as used here, a *stimulus* is something the researcher introduces into the setting for the purpose of eliciting a response from the respondent. "Typically, trademark infringement surveys use stimuli, such as pictures, advertisements or clothing, that directly expose potential consumers to the products or the marks in question."[10]

The stimuli used in trademark surveys can take many forms. These include actual marks and products, photographs of marks or products, brochures, business cards, circulars and pamphlets describing products or services, disclaimers, information provided on product labels, TV or radio commercials, print advertisements, other printed matter used by one of the parties during their normal course of business or extracted from newspapers or magazines, content from the Internet, sounds (such as the sound of a motorcycle[11] or the chirp of a push-to-talk phone signal[12]), and so on. The stimuli in a survey also include the questions asked and, where applicable, the interviewers who ask the questions; these latter types of stimuli are considered in chapters 8 and 9, respectively.

Depending upon the different functions they serve, the items used as stimuli can be organized into four principal categories: test stimuli, distracter stimuli, comparison stimuli, and control stimuli. Forethought should be given to how stimuli shown to respondents are labeled, as the labels may affect how they are perceived and interpreted by interviewers and respondents. It is normally good practice to avoid using letters that are the first letter of the wordmark stimulus they represent. One should also avoid using the letters C, E, and T, which may be interpreted by knowledgeable interviewers and respondents as representing control, experimental and test, respectively. Because they may subtly convey meanings of preference or superiority, it is also best to avoid using the letter A and number 1.

---

10. Trouble v. Wet Seal, Inc., 179 F. Supp. 2d 291, 308 (S.D.N.Y. 2001).
11. Honda AG v. Harley-Davidson, Inc., 108 F.3d 1393 (Fed. Cir. 1997).
12. Nextel Commc'ns, Inc., v. Motorola, Inc., 91 U.S.P.Q.2d 1393, 2009 WL 1719598 (T.T.A.B. 2009).

## 7.21 Test Stimuli

*Test stimuli* are the focus of the inquiry.[13] They may take the form of products, advertising regarding products, colors, sounds, and so on. The test stimulus used in a survey varies depending upon the legal issue being addressed. In most instances, they will be as follows.

| Legal Issue | Test Stimulus |
|---|---|
| Genericism | Mark at issue |
| Secondary meaning | Mark at issue; often plaintiff's |
| Likely confusion | Allegedly confusing mark |
| Fame | First comer's mark |
| Blurring | Plaintiff's mark, impact of second comer's mark on |
| Tarnishment | Plaintiff's mark, impact of second comer's mark on |

Test stimuli provided to respondents as a basis for their responding to the survey's questions need to conform to what is found in the real-world marketplace. Defining what constitutes the appropriate test stimulus may not always be as easy as it seems. For example, commenting on the survey in *Friesland Brands v. Vietnam National Milk*, the court wrote:

> A central problem with the survey, however, is that it compared the Longevity can and label to Vinamilk's can and label rather than comparing the Vinamilk *trademark* to defendants' label. Thus, the results of the survey are geared to a trade dress infringement claim (which encompasses the entire packaging of the goods) rather than to a trademark infringement claim (which focuses on the actual mark). Given this problem, the survey does not provide evidence of actual confusion between the Longevity trademark and the defendants' products.[14]

This suggests that both researcher and attorney need to agree on what constitutes the proper test stimulus, preferably doing so as early as

---

13. When used in experiments, the term *test stimulus* is sometimes referred to as the *experimental stimulus*. However, most experiments also use control stimuli and this may lead some to consider them experimental stimuli as well. Since the term *test stimulus* has broader applicability, applying to experimental as well as nonexperimental research, to avoid potential confusion, the term *test stimulus* is used throughout to refer to the stimulus that is the focus of the inquiry. Using the terminology discussed in chapter 4 (see section 4.24), test stimuli are representations of the independent variable.

14. Friesland Brands, B.V. v. Vietnam Nat'l Milk Co., 228 F. Supp. 2d 399, 409 (S.D.N.Y. 2002).

possible, as how the test stimulus is defined can have considerable impact on how the survey is designed.

A concrete test stimulus exemplifying the item at issue must be provided to respondents as a basis for their answering the researcher's questions. Further, the test stimulus should faithfully represent the item *as it appears in the marketplace*.[15] Although exceptions are discussed below,[16] examination of case law suggests the following general guideline: *The test stimulus, including the mark that appears on the test stimulus, should not be diminished or supplemented in any way that would change how it appears in the marketplace.*

### 7.21.1 Diminishing How the Mark Appears in the Marketplace

Whether testing for genericism, secondary meaning, likely confusion, fame, blurring, or tarnishment, it seems well accepted that, because the product or item on which the mark appears may contain other information bearing *cues*[17] as to its source, test stimuli should not separate marks from the items upon which they appear in the marketplace.[18] The caution

15. Conopco, Inc. v. Cosmair, Inc., 49 F. Supp. 2d 242, 253 (S.D.N.Y. 1999) ("To have substantial probative value, a survey . . . must . . . be designed to examine the impression presented to the consumer by the accused product. Therefore, a survey must use the proper stimulus, one that tests for confusion by replicating marketplace conditions."). A survey that fails to adequately replicate market conditions is entitled to little weight, if any. *See, e.g.,* We Media, Inc. v. Gen. Elec. Co., 218 F. Supp. 2d 463, 474 (S.D.N.Y. 2002); Nat'l Distillers Prod. Co. v. Refreshment Brands, Inc., 198 F. Supp. 2d 474, 484 (S.D.N.Y. 2002); Cumberland Packing Corp. v. Monsanto Co., 32 F. Supp. 2d 561, 575 (E.D.N.Y. 1999); Coherent, Inc. v. Coherent Tech., Inc., 935 F.2d 1122, 1126 (10th Cir. 1991).

16. As discussed later on in this section, the only permissible exceptions surface (1) when testing the secondary meaning of trade dress where the survey results will be proffered in a U.S. district court, or (2) when conducting secondary meaning or likely confusion surveys to be proffered before the Trademark Trial and Appeals Board (see section 7.21.4).

17. Psychologists use the term "cue" to mean any information bearing stimulus that can be apprehended, perceived, and interpreted by the individual. Virtually anything on a product (e.g., its marks, labels, information regarding the source's place of origin, its weight, design, colors, shape or other trade dress elements, etc.), including the product as a whole, can serve as a cue that might cause confusion or assist in preventing confusion.

18. In a survey where respondents were asked by telephone: "Do you think that there may or may not be a business connection between Beneficial Capital Corp. and the Beneficial Finance System Companies?" the court wrote:

> The survey establishes no more than that the names are similar, a factor as to which there can be little genuine dispute in any event, and that portions of the general public will make the reasonable assumption that, *in the absence of any other information,* two companies with similar names are likely to have a business connection. However, this proposition provides no indication of public reaction under actual market conditions, and we conclude that there is no meaningful evidence of actual confusion.

Beneficial Corp. v. Beneficial Capital Corp., 529 F. Supp. 445, 450 (S.D.N.Y. 1982) (emphasis added).

against dissembling the components of a real-world stimulus applies not only to marks and goods, but to tests of deceptive advertising[19] or packaging[20] as well.

---

As a more recent example, consider the following Sixth Circuit commentary:

> We find that, based on the entirety of the record, the district court did not commit clear error in minimizing the weight given to the survey evidence. In addition to the flaws explicitly noted by the district court, the surveys also failed to mimic the purchase conditions associated with bank customers. . . . As the district court made clear elsewhere in its opinion, bank customers make their purchase decisions after extensive research. The surveys, in contrast, were only five minutes long and *did not provide the respondents the kinds of information typically relied on by bank customers.*

Citizens Banking Corp. v. Citizens Fin. Group, 320 F. App'x 341, 349 n.4 (6th Cir. 2009) (emphasis added).

There are exceptions:

> Marianna cites to a survey conducted by its expert. . . . The survey reports that out of 180 participants, twelve individuals, or 6.7 percent of the sample, believed that GENERIX and Generic Value Products were manufactured by the same company based solely on similarities in their names. The participants, however, were not shown the trademarks separately from the packaging and bottles. [The expert] admitted that the survey was not designed to test confusion over the trademarks separate from the trade dress.

Sally Beauty Co. v. Beautyco, Inc., 304 F.3d 964, 975 (10th Cir. 2002).

*But see, e.g.*, Ironclad, L.P. v. Poly-Am., Inc., 2000 WL 1400762, at *8 (N.D. Tex. 2000):

> The Court also finds no fatal error in the presentation of the trash bags or the alteration of the boxes for the purpose of the survey. The expert testified that he removed the size designation of 33 and 39 gallons from both the Iron Sak® and Ironman® boxes. He also removed a promotional offer from the Iron Sak® box. According to his testimony, he removed these items in order to direct the consumer's attention to the product names and prevent them from being distracted by the advertising minutia. The slight alterations, including the removal of the bags' sizes, would not necessarily have significantly altered the results of the survey.

19.

> [The]survey respondents were given an empty Vigoro bag folded into quarters so that only the quadrant with the crabgrass illustration was visible, thus obscuring the parts of the Vigoro packaging that emphasized its focus on stopping crabgrass before it started, and the respondents were asked to review only that portion of the bag. The survey thus elicited information about the consumer's reaction to an isolated part of the packaging, when the relevant issue in a false advertising case is the consumer's reaction to the advertisement as a whole and in context. We believe that these deficiencies . . . weaken the relevance and credibility of the survey evidence to the point that it sheds no light on the critical question in this case.

Scotts Co. v. United Indus. Corp., 315 F.3d 264, 281 (4th Cir. 2002).

20.

> [The expert] used a photograph [of the front panel of the package, but not the back panel of the package] instead of the actual product despite the ease of transporting the 5 pound bag. This was done in derogation of the general rule that one uses the original, real world stimulus where possible, to enable the consumer to handle the product as they would under normal conditions, and to permit them to view all the information on the package.

Hill's Pet Nutrition, Inc. v. Nutro Prods., Inc., 258 F. Supp. 2d 1197, 1204 (D. Kan. 2003).

In one of the earliest trademark survey cases, the court discounted the results of survey in which the defendant's name on a knife and sales display were not visible, as they normally would be at point of sale.[21] In another matter, respondents' confusion about named companies' headquarters was deemed meaningless when respondents were not given additional information, such as the address and telephone number, that was present in the challenged advertising.[22] The court in *Pilot Corp. v. Fisher-Price* agreed with defendant that "the survey did not use the entire trademarked logo for the Magna Doodle. [The expert] left out two potentially distinguishing markers—the words 'The Original' and the Magna Doodle slogan—even though those items have consistently been present on the actual Magna Doodle products."[23]

In another matter, survey evidence was disregarded where the manufacturer's identity was removed from an exercise bicycle before the bicycle was photographed for a likelihood-of-confusion survey. "This is because the photograph, with the identity of the manufacturer deleted, does not depict the Ross exercise bicycle under the marketing conditions that it would be offered for sale to purchasers."[24] The court in *Pilot Corp. v. Fisher-Price* wrote that another "significant problem" with the survey was that "consumers were never shown any products. Instead, the survey was designed to determine whether the two logos were, in the abstract, confusingly similar. That two logos may be confusing when viewed in isolation, does not show that their use on two separate products is also confusing."[25] In marked contrast, although no wine retailer sells wine bottle neck seals but rather bottles of wine bearing such seals (as well as other source-identifying indicia affixed to labels on the front and back of the bottles), the court in *Gallo v. Gallo Nero* accorded considerable weight to plaintiff's survey, which involved showing respondents only a representation of the neck seal on defendant's wine bottles, not the bottle as sold with all its other indicia.[26]

Researchers conducting tests of stimuli appearing on the Internet need to be especially careful not to diminish the number and nature of cues associated with the test stimulus in the marketplace. As a case in point, consider the court's commentary in *Learning Network v. Discovery Communications*:

21. W.E. Bassett Co. v. H.C. Cook Co., 164 F. Supp. 278, 285 (D. Conn. 1958).

22. Coherent, Inc. v. Coherent Techs., Inc., 935 F.2d 1122, 1126 19 U.S.P.Q.2d 1146 (10th Cir. 1991).

23. Pilot Corp. of Am. v. Fisher-Price, Inc., 344 F. Supp. 2d 349, 359 (D. Conn. 2004).

24. Schwinn Bicycle Co. v. Ross Bicycles, Inc., 678 F. Supp. 1336, 1343, 6 U.S.P.Q.2d 1321, 1326 (N.D. Ill. 1988).

25. *Pilot Corp.*, 344 F. Supp. 2d at 359. See section 7.41.1 for a more detailed discussion of this case.

26. E. & J. Gallo Winery v. Consorzio del Gallo Nero, 782 F. Supp. 457, 20 U.S.P.Q.2d 1579 (N.D. Cal. 1991).

e 1:23-cv-01437-DAE Document 163-11 Filed 10/24/25 Page 13 of 138



> The Court finds that the survey is defectively designed in that it does not engender reasonable confidence that all, a majority, or even a substantial number, of the subjects were answering the questions posed with the understanding that the stimulus was the website of, or presented by, "Learning Network." If subjects did not have this understanding, their responses to the "substantive" questions would be meaningless.
>
> In the real world or, better put, the "virtual" world of the internet, . . . . [t]he consumer can get to the website by typing in the Uniform Resource Locator (hereinafter "URL") "*www.learningnetwork.com*", by using a search engine, or through a link to the site which would typically, if not necessarily, have a reference to the Learning Network or, at least, "learning." The only other way to get to the website would be if the consumer had "bookmarked" the website which means that the consumer had gotten there previously by way of the URL, a search engine, or a link. . . . Further, once the subject reached the portfolio pages purportedly depicting the website, he was denied significant location information that would be available to a real world consumer. Subjects were provided with a picture of the website which omitted the "title bar" at the very top of each website page. The "title bar" for the Learning Network home page includes the statement "Welcome to the Learning Network—your educational resource." Other pages within the website also carry equivalent identification notice in the title bar.
>
> Moreover, the portfolio website pictures omitted the "tool bars" that would likely appear on a real world consumer's monitor stimulus, including the location tool bar which would tell the consumer that he was connected to *http://www.learningnetwork.com*.
>
> In sum, the subject looking at the portfolio website arrived at the site without the real world affirmative action that would reinforce the identity of the location and viewed a purported picture of a computer monitor screen without the "title bar" and location information that reinforces the "Learning Network" or at least "learning" route used to get there.[27]

In many instances, trademark surveys use photographs of test marks and products rather than the actual marks and products. This is most justified when the items to be tested are too large or too expensive, or pose other problems either in transporting[28] or displaying them.

27. Learning Network, Inc. v. Discovery Commc'ns, Inc., 153 F. Supp. 2d 785, 791 (D. Md. 2001).

28. For example, transporting firearms across state lines.

Regardless, photographs represent a form of diminution by converting a three-dimensional item into two-dimensional form. Photographs of the mark or item of interest are rarely the item available for sale in the marketplace. However, practical considerations often render the use of photographs acceptable. This is especially likely to be so when the respondent is presented with a set of photographs that adequately represent the three-dimensional features of the item of interest. Photographs that in any way distort or ignore important aspects of the stimulus are likely to garner criticism.[29] Since appropriate photographs are generally considered acceptable, it seems that the same acceptance is likely to extend to images provided over the Internet, especially given that the Internet offers the advantage of presenting dynamic stimuli and can be programmed to enable the respondent to view the item from different perspectives.

Perhaps the ultimate form of diminishing a mark is placing it onto a card, sometimes in plain block letters that ignore completely the distinctive trade dress features that consistently appear with that mark. With rare exception,[30] district courts have inveighed against extracting marks from products, placing them onto cards, then using these cards as test stimuli. On the other hand, cards are generally preferred as stimuli at the T.T.A.B.; see section 7.21.5, *infra*.

---

29. *See* Ferrari S.p.A. v. McBurnie, 11 U.S.P.Q.2d 1843, 1847 (S.D. Cal. 1989) ("The credibility of defendants' survey was also placed into question because. . . . the photograph of the Ferrari Dayton Spyder was of poor quality and shadowy in certain areas, which could have affected the degree of recognition.").

30. In *Tri-Star Pictures, Inc. v. Unger*, 14 F. Supp. 2d 339, 351 (S.D.N.Y. 1998), defendants objected to plaintiff's survey arguing that it was not conducted under actual marketing conditions. Holding "[t]his argument is without merit," the court wrote that plaintiff conducted

> a survey which directed respondents to look at cards with words printed on them. [Such procedures] are regularly used by professionals who conduct surveys. . . . Additionally, both surveys replicate the real world conditions in which a potential motion picture viewer is likely to encounter a film's title, *i.e.*, by word of mouth or by seeing billboards or listings in newspapers and magazines.

While it is true that marketing, advertising, and consumer researchers occasionally do provide test stimuli on cards, this is not their "regular" practice, nor is it done in research intended to replicate marketplace conditions. In *Gucci v. Gucci Shops*, 688 F. Supp. 916, 926, 7 U.S.P.Q.2d 1833, 1841 (S.D.N.Y. 1988), the likelihood of confusion between the names PAOLO GUCCI and GUCCI for high quality leather goods and other fashion accessories and gift items was measured by showing respondents eight cards. Six were comparison stimuli, each bearing the name of a different well-known designer, one was a fictitious control name, and the last was the test name, Paolo Gucci. Respondents were asked a series of questions with regard to each card. An exceptionally large proportion of survey respondents, 87 percent, claimed they had heard of Paolo Gucci handbags even though only a limited number of the bags had been sold in the United States. A large majority of these same respondents said the Paolo Gucci handbags could be purchased at locations or stores at which Gucci handbags were sold, thereby exhibiting confusion.

Rejecting an index card survey because it failed to display products as they are "presented and packaged," the court in *Playtex v. Georgia-Pacific* noted that plaintiffs "rely heavily on a survey. . . . That survey, however, did not use any Georgia-Pacific packaging, but rather used index cards with the words 'Moist-Ones' and 'Wet Ones' placed out of context. Moreover, the index cards did not contain the words 'Quilted Northern.' The survey therefore cannot be offered as evidence that the mark 'Quilted Northern Moist-Ones,' as it is presented and packaged, has actually diluted the mark 'Wet Ones.' . . . [Another] expert['s] testimony suffered from the same flaw, for he analyzed the effects of 'Moist-Ones' alone and drew no conclusions on whether 'Quilted Northern Moist-Ones,' as presented on the packaging, actually diluted the 'Wet Ones' mark."[31]

In a survey where the test stimuli consisted of three 8 1/2" × 11" laminated cards bearing the words Juicy, Juicy Wear, or Glossy Wear, the court, saying it did not "replicate the marketplace conditions," wrote: "The . . . survey has no value on the issue of actual confusion because of fundamental flaws in its design. . . . Essentially, the survey was a word association test, in which respondents were shown a card with the word Juicy and repeatedly asked questions in which the word Juicy appeared, often not just once but twice in the same question."[32]

In another matter, rather than showing the mark as it would appear on a bottle in the marketplace, showing the mark on a card was identified as "methodological error that prevented [the survey] from replicating actual marketplace conditions."[33] Other examples include the following:

> Germane survey evidence should make some effort to compare the impressions the marks have on potential customers under marketplace conditions. . . . By contrast, [the expert] did not use pictures or advertisements that approximate what a potential customer would encounter in making her television-viewing choices. Thus, by presenting respondents with word lists, [the expert] essentially measured respondents' word associations devoid of context. Accordingly, the information within [the expert's] Report does not go to the issue at bar.[34]

+++++++++++

31. Playtex Prods., Inc. v. Georgia-Pacific Corp., 390 F.3d 158, 169 (2d Cir. 2004).
32. Juicy Couture, Inc. v. L'Oreal USA, Inc., 2006 WL 1012939, at *26 (S.D.N.Y. Apr. 19, 2006).
33. Nat'l Distillers Prods. Co. v. Refreshment Brands, Inc., 198 F. Supp. 2d 474, 484 (S.D.N.Y. 2002).
34. WE Media, Inc. v. Gen. Elec. Co., 218 F. Supp. 2d 463, 475 (S.D.N.Y. 2002).

[T]here were other methodological errors that prevented [the survey] from replicating actual market conditions. First, the respondents were shown the Teton Glacier label on a card, rather on a bottle, as they would encounter the label in the marketplace. [Further:] This problem is exacerbated by the fact that Teton Glacier is often sold in a distinctive decanter. Furthermore, this problem rendered the . . . Survey wholly inapplicable to the issue of trade dress infringement.[35]

+++++++++++++++

The stimuli in Wet Seal's survey were weak at best. They were comprised of the nearby "Arden B." store-fronts and the use of cards with "Agnès b." printed on them.

Regardless of the value of the survey's stimuli, Wet Seal's survey never actually used the stimuli to test for confusion. Rather, they were used to screen the interviewees to determine if they were familiar with a line of clothing.[36]

### 7.21.2 Supplementing How the Mark Appears in the Marketplace

Since the test stimulus should reflect the way the mark is displayed in the marketplace, adding something to the way in which the mark appears to be as much a fault as subtracting something from the way the mark appears. In a matter involving liquors, the court wrote: "In the Court's view, the study and its conclusions were flawed in several significant ways. . . . [O]ne of these ways was that the expert] showed the respondents pictures of various liquors with the brand name listed below each product, which would tend to suggest that the products were not affiliated."[37] Regarding a survey of defendant's women's handbags, the court commented: "We note that the respondents were not reading the Dooney & Bourke Multicolor Monogram Mark itself. Rather, they were reading a sign that stated the provenance of the bag. The survey thus could not have been more flawed if the interviewer had said, 'Now, look at the Dooney & Bourke bag and tell me who you think makes that bag.'"[38]

In a contrasting opinion, another court wrote: "Defendants also object to the study because the Tom Cruise and Marilyn Monroe sketches were given to the participants *along with an accompanying description that*

35. *Nat'l Distillers Prods. Co., LLC*, 198 F. Supp. 2d 474, 485 & n.14 (S.D.N.Y. 2002).
36. Trouble v. Wet Seal, Inc., 179 F. Supp. 2d 291, 309 (S.D.N.Y. 2001).
37. Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc., 703 F. Supp. 2d 671, 694 (W.D. Ky. 2010).
38. Malletier v. Dooney & Bourke, Inc., 525 F. Supp. 2d 558, 629 (S.D.N.Y. 2007).

*named the celebrities*, whereas nothing on the photo booths themselves names the celebrities in the sketches."[39] Holding that "Defendants' arguments that [the expert] impermissibly identified Tom Cruise and Marilyn Monroe are also inapposite,"[40] the court apparently did not appreciate that doing so amounted to adding something to the mark, so that testing it did not correspond to the way in which it was conveyed to consumers in the marketplace. If the celebrities were so well known from their sketches that everyone would know who was being represented, then there should be no need to augment the sketches by providing the names. As it cannot be assumed that everyone will know who is being represented, supplying the names provides additional information to respondents who, when coming upon the sketches in the marketplace, would not know who these sketches were intended to represent. By adding the names to the sketches, the researcher tested something other than what was in the marketplace.

### 7.21.3 Using Marks or Communications Not Found in the Marketplace

As a general rule, however, the test stimulus needs to be something found in the marketplace. A criticism offered in *Bach v. Forever Living* was that "the survey design used images that were not seen in actual commerce and some of the images were never used by Defendants."[41] When plaintiff's survey in *GEICO v. Google* used screen shots of images no longer in the marketplace, the court faulted the survey because "the overall appearance of the outdated screen shot shown to survey participants differed markedly from the Google results page that a user would encounter in running a real search."[42]

The court in another matter wrote:

> Here, the . . . Survey displayed to respondents a purported "ad" for Kargo, in the form of a blown-up photo of a Blackberry cellphone that prominently featured the KARGO logo. That "ad", however, was not an actual advertisement that a prospective user of Kargo's products would ever encounter but rather was a page prepared by Kargo as promotional material, designed for viewing by Kargo's direct, business-to-business customers. . . . Although Kargo insists that the "ad" was "an authentic page taken from Kargo's

39. KIS, S.A. v. Foto Fantasy, Inc., 204 F. Supp. 2d 968, 972 ( N.D. Tex. 2001) (emphasis added).

40. *Id.*

41. Bach v. Forever Living Prods. U.S., Inc., 473 F. Supp. 2d 1110, 1116 (W.D. Wash. 2007).

42. Gov't Emps. Ins. Co. v. Google, Inc., 77 U.S.P.Q.2d 1841, 2005 WL 1903128, at *7 (E.D. Va. 2005).

promotional materials," it is undisputed that the "ad" would never be encountered by Kargo's prospective end users, who were the respondents of the . . . Survey.[43]

Occasions arise when a plaintiff needs to test a product not yet available in the marketplace. Under such circumstances, it has been held permissible to test stimuli that "approximate the marketplace conditions at issue" for marks that have not yet appeared in the marketplace, regardless of whether the marketplace is the country as a whole[44] or a city.[45] "MLI submits . . . a survey of 350 consumers in an effort to determine whether they were likely to confuse the parties' marks. . . . Because MNB has not yet entered the marketplace, the issue of *actual confusion* has limited bearing on my consideration of this motion. Nevertheless, the . . . study supports the conclusion that there is a *likelihood of consumer confusion*."[46] Similarly, "The USPA Parties' criticisms that the . . . study did not screen for price are meritless. USPA was not marketing the product at the time and its price was unknown . . . it was proper . . . not to screen for price."[47]

It is also acceptable to test a product not yet in portions of the marketplace when the actions of one of the parties to the dispute prevent the other from marketing its product nationwide.[48]

### 7.21.4 Some Desiderata

As suggested above, the test stimulus, including the mark that appears on the test stimulus, should not be diminished or supplemented in any way that would change how it appears in the marketplace. Other desiderata can be derived from this general guideline.

First, all other things being equal, it probably is best to provide respondents with an actual physical exemplar of the test stimulus. Unfortunately,

---

43. Kargo Global, Inc. v. Advance Magazine Publishers, Inc., 2007 WL 2258688, at *12 (S.D.N.Y. 2007).

44. Patterned after defendant's brochures in Europe, brochures containing the mark at issue were made up for a product not yet introduced in the United States and tested on physicians and pharmacists. The court concluded that "Both surveys are, however, very persuasive evidence of the tendency to abbreviate the Schering names and persuasive evidence of confusion." Schering Corp. v. Schering AG, 667 F. Supp. 175, 190 (D.N.J. 1987).

45. Issue was whether the mark Atlantis used by plaintiff for a resort hotel and casino in the Bahamas and also used by defendant for a hotel and casino in Reno, Nevada, would be confused with plaintiff if used by defendant for a hotel and casino in Las Vegas. Kerzner Int'l Ltd. v. Monarch Casino & Resort, Inc., 675 F. Supp. 2d 1029, 1044 (D. Nev. 2009).

46. MetLife, Inc. v. Metro. Nat'l Bank, 388 F. Supp. 2d 223 (S.D.N.Y. 2005) (emphasis added).

47. U.S. Polo Ass'n Inc. v. PRL USA Holdings Inc., 101 U.S.P.Q.2d 1487, 1503 (S.D.N.Y. 2011).

48. Sands, Taylor & Wood Co. v. Quaker Oats Co., 978 F.2d 947, 24 U.S.P.Q.2d 1001, 1012 (7th Cir. 1992), *cert. denied*, 507 U.S. 1042 (1993).

all things are not always equal. Sometimes, the item upon which the mark appears is too rare, too large (as examples, tall service station signs[49] or cars[50]), cannot be transported across state lines (as is the case with handguns[51]), or needs to be kept under special environmental conditions (e.g., in a refrigerated cabinet[52]). When other things, such as those just mentioned, are "not equal," providing suitable photographs of the test product is often deemed appropriate. In doing so, it is advisable that the photographs be sufficient in number and orientation so that the views presented to respondents represent all aspects of the photographed item or items (e.g., the product and its packaging). When the physical item is larger than 8 1/2" × 11" inches and respondents are provided with hardcopies, care should be taken not to provide photographs that make it difficult to see the details in question. Where it would not give create undue attention to the stimulus, consideration should be given to including photographs of details that provide "actual size" representations.

Internet surveys do not permit providing physical exemplars of test stimuli for respondents to hold. In other respects, Internet presentations represent an improvement over static photographs. In addition to being able to show dynamic images, sophisticated programming enables Internet respondents to manipulate and view products and packages from a great variety of angles. Limitations of the Internet result from the fact that different viewers see the stimuli on different size monitors and different monitors may be calibrated in a way that display colors differently.

Another consideration is whether, when sold, the product is seen only in packaged form or also outside its package (see chapter 3, section 3.61.3).[53] Of course, this consideration will not apply to most postsale confusion surveys, where products are generally seen outside of their packaging. In these latter instances, the operative question is: How is the

49. Exxon Corp. v. Tex. Motor Exch. of Hous., 628 F.2d 500 (5th Cir. 1980).

50. Ferrari S.p.A. v. Roberts, 739 F. Supp. 1138 (E.D. Tenn. 1990), *aff'd*, 944 F.2d 1235 (6th Cir. 1991); Ford Motor Co. v. Factory Five Racing, Inc., 2002 WL 32155850 (D. Mass. 2002).

51. Sturm, Ruger & Co. v. Arcadia Mach. & Tool, Inc., 10 U.S.P.Q.2d 1522, 1524 (C.D. Cal. 1988).

52. Fresh Del Monte Produce, Inc. v. Del Monte Foods Co., No. 08-Cv-8718 (S.D.N.Y. filed Mar. 28, 2013).

53. Unless one is testing for postsale confusion (see section 7.21.5, *infra*), when a product always seen in actual purchasing conditions in its distinctive packaging is tested outside its packaging, the survey findings will be considered irrelevant, Original Appalachian Artworks, Inc. v. Blue Box Factory (USA), Ltd., 577 F. Supp. 625, 222 U.S.P.Q. 593 (S.D.N.Y. 1983). *See also* Am. Luggage Works, Inc. v. U.S. Trunk Co., 158 F. Supp. 50, 116 U.S.P.Q. 188 (D. Mass.), *supplemental op.*, 161 F. Supp. 893, 117 U.S.P.Q. 83 (D. Mass. 1957), *aff'd*, 259 F.2d 69, 118 U.S.P.Q. 424 (1st Cir. 1958); Scotts Co. v. United Indus. Corp., 315 F.3d 264 (4th Cir. 2002).

product or mark at issue likely to be seen and experienced by others? In some instances, thoughtful analysis of the real-world marketplace may suggest that a product be shown both inside and outside of it package. Some in-person studies have handed products to respondents inside their package, then invited (or instructed) the respondent to remove the package from its packaging.[54]

Occasions arise when a plaintiff needs to test a product not yet available in the marketplace. Under such circumstances, stimuli that approximate the anticipated marketplace conditions at issue are likely to be found acceptable (see section 3.61.5). It is also acceptable to test a product not yet in portions of the marketplace when the actions of one of the parties to the dispute prevents the other from marketing its product nationwide.[55]

### 7.21.5 Exceptions to the General Guideline

The admonition against modifying, obscuring, or removing portions of a product does not apply to all test stimuli[56] used in trademark surveys. For example, it is permissible to modify, obscure, or remove portions of a product when testing postsale confusion. In doing so, the guiding question must be: How are prospective purchasers likely to experience the product in postsale environments? What marks would they be likely to see and what marks are not likely to be visible? Clearly, they won't be able to see tags and labels that appear inside the goods, and these may have to be removed.

Product modifications are also acceptable—indeed, often necessary—when testing whether trade dress has acquired secondary meaning.[57] If one did not remove or obscure the brand and company names and other source-identifying indicia (such as slogans), the fact that consumers associated the product with a single source would more likely be due to respondents viewing these other indicia than to the product's trade dress.

Plaintiff in *Hershey's v. M&M Mars*[58] conducted two surveys, one testing whether the juxtaposition of particular colors and shades in the wrapper of plaintiff's Reese's Peanut Butter Cups had acquired secondary

54. Respondents in defendant's survey in *Juicy Couture, Inc. v. L'Oreal* "were shown an array of six Lancôme products from the Juicy line in their Lancôme boxes and. . . . invited to handle the boxes and examine the products if they wished to do so." Juicy Couture, Inc. v. L'Oreal USA, Inc., 2006 WL 1012939, at *28 (S.D.N.Y. Apr. 19, 2006).

55. Sands, Taylor & Wood Co. v. Quaker Oats Co., 978 F.2d 947, 24 U.S.P.Q.2d 1001, 1012 (7th Cir. 1992), *cert. denied*, 507 U.S. 1042 (1993).

56. The focus here is on test stimuli, not control stimuli; it is permissible to modify the mark on a product already in the marketplace when doing so is done for the purpose of creating a "control" stimulus (see *infra* sections 7.30 through 7.33.3).

57. *See* Vincent N. Palladino, *Surveying Secondary Meaning*, 84 TRADEMARK REP. 155 (1994).

58. Hershey Foods Corp. v. Mars, Inc., 998 F. Supp. 500 (M.D. Pa. 1998).

meaning, and the other testing whether virtually identical colors and shades used for the wrapper of defendant's Peanut Butter M&M's caused dilution. Consideration of the test stimuli in these studies is instructive regarding conditions under which it is permissible for the test stimulus to consist of less than what is found in the marketplace and when it is not.

> To conduct the survey, [the expert] created two [test] stimuli, a representation of the abbreviated Reese's trade dress [to use for testing secondary meaning] and a representation of the M&M's peanut butter trade dress at issue [to use for testing dilution]. The stimuli depicted their respective colors, as well as the proportion, arrangement and juxtaposition of those colors. The trade name "Reese's" was deleted and the saw-toothed top of the peanut butter cup shape which appears below the word mark was modified to a rectangular shape. The "M&M's" logo and the design mark consisting of "lentils" or "cascading M&M's" were deleted from the M&M's peanut butter stimulus. The lozenge beneath the "M&M's" logo was retained in the representation of the M&M's peanut butter package. One group was shown the Reese's stimulus and the other the M&M's stimulus.
>
> Both groups were also shown representations of six other brands; specifically, Snickers, Butterfingers, Nestle' Crunch, Skor, Goldenberg's Peanut Chews and Milka. Milka is sold only in Europe. As a control, the two groups were also shown a representation of an "inverted Snickers" package, a package with all the design elements of a Snickers but with different colors than the actual Snickers package.[59]

Clearly, being color-faithful cards, not actual packages of the products at issue, the test stimuli were nowhere to be found in the marketplace. Moreover, as the objective was to test whether the juxtaposition of the particular colors and shades of plaintiff's trade dress conveyed secondary meaning, and whether the juxtaposition of particular colors and shades of defendant's product caused dilution, they did not contain all the trade dress elements of either plaintiff's or defendant's "as sold in the marketplace" products.

> Mars has attacked [plaintiff's] survey on the following grounds. First, it is fatally flawed because it does not compare the real trade dresses as they appear in commerce. Mars argues that since the statutory language only allows a trademark holder to equitable relief against "another person's commercial use in commerce" of a

59. *Id.* at 511.

> diluting mark, 15 U.S.C. § 1125(c), it must be the marks that are used in commerce that are compared, not a fabricated representation that omits crucial elements of the trade dress. Thus, [the] survey is useless.
>
> We reject this argument. First, we have already decided that a trademark holder can seek to protect a combination of elements making up less than the complete trade dress if, for whatever reason, the holder believes that combination has acquired secondary meaning. . . .[60]
>
> We accept for the purposes of this motion that [the] survey has established the renown of the plaintiff's mark, defined by the plaintiff as its trade dress in the colors of the Reese's package in a certain juxtaposition, and that this factor favors plaintiff.[61]

When testing whether trade dress had acquired secondary meaning, previous surveys had established that it was permissible—indeed, necessary—to remove the brand name, company name and all other non-trade dress source-identifying indicia (which, in this instance, included the distinctive saw tooth buttercup logo) from the item as it appears in the marketplace. The court in this matter seemed to extend this to instances where a trademark holder sought "to protect a combination of elements making up less than the complete trade dress." However, the court deemed it impermissible to make similar modifications—including removing the M&M's mark and depiction of cascading M&M's—to create the stimulus used to test dilution. There, the court held for defendant and the argument that testing for dilution requires testing the mark as it appears on the product as sold in commerce.

Test stimuli used in surveys proffered as evidence in U.S. district courts need to closely approximate what consumers would experience in the marketplace. In marked contrast, given its focus on marks, not the contextual factors associated with their appearance in the marketplace, test stimuli used for surveys proffered as evidence before the Trademark Trial and Appeal Board need to ignore these contextual factors and focus on the mark. Consider the following.

> [I]n the instant case, to have used, for example, a labeled VIT-A-DAY multivitamin tablets jar would have introduced irrelevant matter, thereby destroying any probative value of the survey for our purposes. There is no question that, in order to be probative, a survey must be directed to the relevant issues in the case. . . . In the case before us, we have already held that the issue we have to

60. *Id.* at 519.
61. *Id.* at 522.

decide concerns only the likelihood of confusion of the terms VIT-A-DAY and SUPER VIT-A-DAY with ONE A DAY, without regard to any special form of lettering or design features which may, in fact, be currently associated with either of those word marks in the marketplace. Accordingly, using the card on which the mark is displayed in block letters was the only appropriate stimulus available to the survey designer.[62]

+++++

First, there is a problem with the stimulus, in that the survey respondents were shown respondent's entire wine bottle, including the full label, rather than just the mark. The Board has held that surveys, such as respondent's, which embellish the stimulus with features that are not directly involved in the determination of likelihood of confusion, have limited probative value.[63]

+++++

We find that the survey is flawed in that the stimulus used is one not suited for Board proceedings where the issue in question is the registrability of the mark depicted in the drawing. . . . Applicant's mark is in standard character form, thus the stimulus should also have been in standard character form. Applicant's methodology was better suited for a survey for trademark infringement litigation. Therefore, the survey has extremely limited probative value in determining whether there is a likelihood of confusion in this case.[64]

That said, as discussed in *Karcher Enterprises Inc. v. Stars Restaurants*, there are instances where the Trademark Trial and Appeal Board will accept stimuli that contain more than the mark at issue.

62. Miles Labs. Inc. v. Naturally Vitamin Supplements Inc., 1 U.S.P.Q.2d 1445, 1460–61 (T.T.A.B. 1986).

63. Meier's Wine Cellars, Inc. v. Meyer Intellectual Props. Ltd., 2008 WL 902837 (T.T.A.B.) (citing Carl Karcher Enters. Inc. v. Stars Rests. Corp., 35 U.S.P.Q.2d 1125, 1132 n.19 (T.T.A.B. 1995); Marshall Field & Co. v. Mrs. Fields Cookies, 25 U.S.P.Q.2d 1321, 1334 (T.T.A.B. 1992); Miles Labs., Inc. v. Naturally Vitamin Supplements, Inc., 1 U.S.P.Q.2d 1445, 1459 (T.T.A.B. 1986) ("a labeled . . . multivitamin tablets jar would have introduced irrelevant matter, thereby destroying any probative value of the survey for our purposes")).

64. OMS Invs., Inc. v. Cent. Garden & Pet Co., 2006 WL 2066583, at *15 (citing *Miles Labs. Inc.*, 1 U.S.P.Q.2d 1445 ("In the case before us, we have already held that the issue we have to decide concerns only the likelihood of confusion of the terms VIT-A-DAY and SUPER VIT-A-DAY with ONE A DAY, without regard to any special form of lettering or design features which may, in fact, be currently associated with either of those word marks in the marketplace. Accordingly, using the card on which the mark is displayed in block letters was the only appropriate stimulus available to the survey designer."); Carl Karcher Enters., Inc. v. Stars Rests. Corp., 35 U.S.P.Q.2d 1125 (T.T.A.B. 1995)).

> As is apparent, [the expert], in administering the survey, added the word "restaurant" to the specific marks sought to be registered by applicant. [He] testified that the term was added "[t]o place the stimulus in context so the respondent could address the questions in context of how the registrations are used. It basically focuses the respondent on a segment of the marketplace for which the registrations are sought." When asked about this point on cross-examination, [he] indicated that the results "may be different" if the word "restaurant" were not added to the marks. He went on to reiterate, however, that he believed it necessary to give a context to the marks sought to be registered. Suffice it to say that we do not view the addition of "restaurant" to the applied-for marks as undermining the survey results; rather, the word "presents the mark in the context of a particular segment of market, enabling respondents to focus upon that segment."[65]

### 7.21.6 Test Stimuli Need to Be Issue Specific

As the above discussion of *Hershey Foods Corp. v. Mars* indicates, test stimuli appropriate for testing one legal concept (e.g., secondary meaning) may not be appropriate for testing another legal concept (e.g., dilution). In another matter where the issue was a likelihood of confusion between marks, the survey tested advertisements containing these marks, not the products themselves. While this might have been appropriate if the issue before the bar was deceptive advertising, the court found it inappropriate for testing likely confusion.

> The court finds that plaintiff's methodology was flawed. . . . Plaintiffs' study used advertisements of the products, instead of the actual products, which could have lead to unreliable results. Both "Ice Breakers" and "Dentyne Ice" use similar advertising themes that play off the cool, breath freshening qualities of their gums. Plaintiffs' study did not control for this unintended consequence. Plaintiffs' study . . . ignored this potential problem.[66]

### 7.21.7 Comparing Apples to Apples

When plaintiff's and defendant's goods appear in the marketplace in different sizes or varieties, a question researchers and counsel face is whether is it acceptable to compare different sizes or varieties of the disputants' goods. The answer to this question may be case specific. Commenting in one matter, the court wrote:

65. *Carl Karcher Enters. Inc.*, 35 U.S.P.Q.2d at 1133 n.19.
66. Nabisco v. Warner-Lambert Co., 32 F. Supp. 2d 690, 701 (S.D.N.Y. 1999).

> Poly–America complains that Ironclad chose to compare two different sized bags, a 33 gallon bag and a 39 gallon bag, because their packaging was the same color and the most similar. Poly–America contends the choice was made in an effort to maximize the chance of confusion. This case is not a trade dress action. Both parties use red, green, and yellow in their packaging, presumably because the bright colors catch the consumer's eye. Using different colors for different sizes would not remove the probability of confusion associated with the two names. These changes do not render the survey unreliable.[67]

### 7.21.8 Exempt "Fair Use" Reproductions

For various reasons, some surveys require that one party's survey expert prepare and use reproductions of the adverse party's products or advertising. In a trademark matter where defendant's survey reproduced and used as a test stimulus a promotional letter sent out by plaintiff, the latter amended its complaint to sue for copyright infringement. The court held that the reproduction and use by defendant of plaintiff's promotional materials represented exempt "fair use" of plaintiff's copyrighted materials.[68]

## *7.28 Distracter or Filler Stimuli*

Sometimes called filler stimuli, *distracter stimuli* are stimuli used either for diluting the respondents' attention with the expectation that this will lessen the chances they will be able to discern (or prematurely discern) the test stimulus that is the focus of the investigation, for generating a level of distraction more comparable to the marketplace experience, or for clearing short-term memory between two phases of the same survey. As an example: The expert "conducted a two-room 'sequential array' survey in which respondents were shown, in room one, a THOIP shirt, and, in room two, an array of five shirts including an allegedly infringing Disney shirt (or control shirt) and four non-infringing 'filler' shirts."[69] As the answers given to questions regarding distracter stimuli are irrelevant, they sometimes are not recorded or, if recorded, not analyzed. The key consideration in using distracter stimuli is that they should in no way be expected to exert a biasing effect upon the responses given to the test or control stimuli.

---

67. Ironclad, L.P. v. Poly-Am., Inc., 2000 WL 1400762, at *8 (N.D. Tex. 2000).

68. Lucent Info. Mgmt., Inc. v. Lucent Techs., Inc., 5 F. Supp. 2d 238, 48 U.S.P.Q.2d 1041 (D. Del. 1998).

69. THOIP v. Walt Disney Co., 690 F. Supp. 2d 218, 220 (S.D.N.Y. 2010).

Another example of how distracter stimuli are used comes from *Innovation Ventures v. N.V.E. Pharmaceuticals*,[70] where plaintiff's survey involved showing respondents TV commercials for its product (5-Hour Energy) as well as for several other distracter products (Tide, Mercedes, Hefty, Zantac, and Nicorette). After viewing these commercials, the respondents were shown two products (the test stimulus; defendant's allegedly infringing product, 6 Hour Power; and a control stimulus, Rock On), and asked several questions regarding each of these products (e.g., "Was this energy drink advertised in any of the TV ads you saw, or not?"). No questions were asked about any of the other advertised products or TV commercials and none needed to be; they were distracters.

### *7.29 Comparison Stimuli*

Stimuli incorporated to serve as a frame of reference or benchmark against which to interpret the findings obtained with test or control stimuli are called *comparison stimuli*. A prime example is the *Teflon* protocol used to measure genericness. Along with being given the test stimulus and asked to classify it either as a common name or brand name, the same respondent is also given several other names, half of which are common generic names and the other half of which are source-identifying brand or company names, and asked to classify these as well. The findings obtained with the comparison stimuli thus provide a frame of reference for interpreting the findings obtained with the test stimulus.

Comparison stimuli should not be confused with control stimuli, the latter being a special type of comparison stimulus. As explained in section 7.31, "In designing a control . . . the expert should select a stimulus for the control . . . that shares as many characteristics with the experimental [i.e., test] stimulus as possible, with the key exception of the characteristic whose influence is being assessed."[71] In contrast, a comparison stimulus need not share any but the most trivial of characteristics with the test stimulus; for example, it may be another brand (with a completely different name and trade dress) in the same product category. Further, one does not subtract the findings obtained with comparison stimuli from the findings obtained with the test stimulus. The answers to the comparison stimuli simply provide a frame of reference useful in interpreting the findings for the test stimulus.

70. Innovation Ventures, LLC v. N.V.E. Pharms., No. 08-11867 (E.D. Mich. filed Sept. 15, 2010).

71. Shari S. Diamond, *Reference Guide on Survey Research*, *in* Fed. Judicial Ctr., Reference Manual on Scientific Evidence 258 (2d ed. 2000).

Note that the same stimuli may serve as both distracter and comparison stimuli at different points in the same survey. In *Kerzner v. Monarch*,[72] stimuli that served as comparison stimuli in the first (mark awareness) portion of the survey then served as distracter stimuli in the second (likely confusion) portion of that survey.

## 7.30 Control Stimuli

A *control stimulus*[73] is a special type of comparison stimulus used to assist in ruling out plausible alternative explanations for a study's findings. While control stimuli are a type of comparison stimuli, the difference between control stimuli and other comparison stimuli is fundamental. The findings obtained with other comparison stimuli are not subtracted from the findings obtained with the test stimulus. In contrast, because they are taken to represent "noise" or other plausible alternative explanations, the findings obtained with control stimuli are intended to be subtracted from the findings obtained with the test stimulus so as to arrive at an estimate of the "net effect."

Controls address an item identified in the Federal Rule of Evidence 702 Advisory Committee notes (amended 2000), namely:

> "Whether the expert has accounted for *obvious* alternative explanations." *Ambrosini v. Labarraque* (101 F.3d 129, 141 (D.C. Cir 1996)) is cited for the proposition that "*the possibility of some uneliminated causes presents a question of weight, so long as the most obvious causes have been considered and reasonably ruled out by the expert.*"[74]

Failure to use a control when testing a causal proposition can be a reason for a court declining to admit a survey[75] or according it scant weight.[76]

72. Kerzner Int'l Ltd. v. Monarch Casino & Resort, Inc., 675 F. Supp. 2d 1029 (D. Nev. 2009).

73. *See generally* Shari S. Diamond, *Control Fundamentals: Rationales & Approaches*, *in* TRADEMARK AND DECEPTIVE ADVERTISING SURVEYS (S.S. Diamond & J.B. Swann eds., 2012).

74. FED. R. EVID. 702 Advisory Committee Notes (2000) (emphasis added).

75. Vista Food Exch., Inc. v. Vistar Corp., No. 03-CV-5203DRHWDW, 2005 WL 2371958, at *7 (E.D.N.Y. Sept. 27, 2005). ConAgra, Inc. v. George A. Hormel & Co., 784 F. Supp. 700, 728 (D. Neb. 1992); Major League Baseball Props. Inc. v. Sed Non Olet Denarius Ltd., 817 F. Supp. 1103, 1123–24 (S.D.N.Y. 1993) (holding that "both surveys contain a complete lack of controls rendering the data meaningless and having no evidentiary value"), *vacated pursuant to settlement agreement*, 859 F. Supp. 80 (S.D.N.Y. 1994). Failure to use a control even when not testing a causal proposition can be a reason for a court declining to admit a survey; *see* National Football League Props., Inc. v. ProStyle, Inc., 57 F. Supp. 2d 665, 668 (E.D. Wis. 1999).

76. Greenpoint Fin. Corp. v. Sperry & Hutchinson Co., 116 F. Supp. 2d 405, 410 (S.D.N.Y. 2000) ("[T]he flaws in the survey . . . [which include] lack of a control group . . .

Using a control judged to be inadequate can also lead to a survey's rejection.[77]

Failing to use a control when one is required may provide an unusual opportunity for the opposing party. Although disregarded for other reasons, consider plaintiff's survey in *American Olean Tile v. American Marazzi Tile*.[78] The lack of a control group in plaintiff's survey enabled the defendant to supply what appeared to the court to be control data that could be used to diminish the impact of plaintiff's survey findings.

> [P]laintiff introduced survey evidence that showed 16% of the persons surveyed confused "American Olean" and "American Marazzi." Each person surveyed was first shown an American Olean advertisement for 15 seconds, then shown an American Marazzi advertisement and was asked if the two advertisements were from the same company. Defendant conducted its own survey with a substantially similar data collection technique; persons were first shown an American Olean advertisement, then an advertisement for Belmondo tile. Of those surveyed by *defendant, 19%* said that the two advertisements were from the same company.[79]

The unexpected similarity in findings probably contributed to the court's conclusion that: "The data collection techniques used in these surveys do not accurately reflect the careful consideration and investigation residential consumers undertake in purchasing or directing the purchase of tile."

What is it that needs to be controlled? Evidencing researcher and/or counsel confusion over which stimulus needs to be controlled for, some likelihood-of-confusion surveys control for plaintiff's mark rather than

cast serious doubts on the value of the survey and any conclusion the Plaintiff seeks to draw therefrom."); Juicy Couture, Inc. v. L'Oreal USA, Inc., 2006 WL 1012939, at *27 (S.D.N.Y. Apr. 19, 2006) ("It is particularly remarkable that [plaintiff's survey] included no control for testing the word Juicy alone."); Hill's Pet Nutrition, Inc. v. Nutro Prods., Inc., 258 F. Supp. 2d 1197, 1204 (D. Kan. 2003) (The expert "failed to use a control group. . . . A control group would have determined whether the meaning extracted by the respondents after viewing the package was in fact due to their having viewed the message on the package, instead of being due to 'noise' or . . . other experiences, misunderstandings or other non-package factors."); U.S. Polo Ass'n Inc. v. PRL USA Holdings Inc., 101 U.S.P.Q.2d 1487, 1501 (S.D.N.Y. 2011) ("The most significant error in the . . . study was its choice of control variables. Without a proper control, there is no benchmark for determining whether a likelihood of confusion estimate is significant or merely reflects flaws in the survey methodology[.]").

77. THOIP v. Walt Disney Co., 690 F. Supp. 2d 218, 242 (S.D.N.Y. 2010) ("Because the . . . Survey failed to replicate actual marketplace conditions in which consumers encountered the products at issue here and failed to use an adequate control, it is not a reliable indicator of consumer confusion. Accordingly, the . . . Survey is inadmissible.").

78. Am. Olean Tile Co. v. Am. Marazzi Tile, Inc., 9 U.S.P.Q.2d 1145, 1149 (E.D. Pa. 1988).

79. *Id.*

defendant's mark. Indisputably, defendant's mark or goods represent the test stimulus—that which is being tested to see if it causes confusion. It follows that defendant's mark or goods, not plaintiff's mark or goods, is what needs to be controlled for. This consideration comes to the fore when respondents are shown both plaintiff's and defendant's marks or goods. In those situations, it is irrelevant if the control stimulus is similar to plaintiff's mark or goods; it needs to be similar (preferably in appearance, sound and/or meaning) to, and used as a control for, defendant's mark or goods.

Consider plaintiff's survey in *Miller International, Inc. v. Clinch Gear*, which involved showing half the respondents one of plaintiff's commercials for its Cinch line of clothing, followed by showing them photographs of caps and T-shirts from four other manufacturers.[80] One cap and T-shirt were defendant's "Clinch Gear" goods; the other caps and T-shirts were from three other sources—Craft, Diesel, and Smet. The respondents assigned to the control group were first shown a commercial for a third party's goods (Dodge Rodeo clothing), then saw the same photographs as were seen by the test group. Yet there was nothing in the Dodge clothing commercial that served to control for the name Clinch, the allegedly confusing mark. Hence, the fact that virtually none of the respondents in the control group said defendant's Clinch Gear came from the same company as Dodge Rodeo clothing, while approximately half of those in the test group said defendant's Clinch Gear came from the same company whose clothing was featured in the Cinch commercial, is irrelevant. An appropriate control would have had all respondents first see plaintiff's commercial for its Cinch line of clothing, then allocate half the respondents to a test group exposed to the Clinch Gear clothing with the other half being allocated to a control group exposed to a control name that was similar to Clinch either in appearance, sound, or meaning (e.g., Klinch Gear). The control stimulus needs to serve as a control for the test stimulus that, in a likelihood-of-confusion survey, is defendant's mark, not plaintiff's mark.

Discussion in chapter 4 (section 4.24) noted that controls are of two basic varieties—*control by (methodological) design* and *control by measurement or analysis*.[81] The more common approach, control by design, involves developing controls and building them into a study's research design in advance, then implementing these during the study's data gathering

80. C.A. 10-CV-01167 (D. Colo. Aug. 20, 2010).

81. "The major alternative to control via design is control via measurement and statistical adjustment." Thomas D. Cook, Donald T. Campbell & Laura Peracchio, *Quasi Experimentation*, *in* THE HANDBOOK OF INDUSTRIAL AND ORGANIZATIONAL PSYCHOLOGY 491, 570 (Marvin D. Dunnette & Leaetta M. Hough eds., 2d ed. 1990).

phase.[82] Such controls involve either (1) testing the same respondents at *different points in time*; (2) exposing different respondents to *different stimuli* or *different treatments*, then asking the *same questions* of those exposed to the test and control stimuli or treatments;[83] or (3) asking *different* (test and control) *questions* regarding the *same* stimulus. The following sections focus on the second of these approaches, namely, exposing respondents to different stimuli or different treatments.

### 7.31 Basic Considerations in Selecting and/or Devising Controls

There is no universal control, no one size fits all. As noted by courts[84] and discussed in the Federal Judicial Center's *Reference Manual on Scientific Evidence*,[85] controls must be *appropriate* to the situation. If not, they cannot serve their intended function. A number of considerations go into selecting or devising appropriate controls.

---

82. While no reports of control by measurement or analysis were found described in case law, an example of how such an analysis was applied to a dilution survey is found in Jacob Jacoby, *Experimental Design and the Selection of Controls in Trademark and Deceptive Advertising Surveys*, 92(4) TRADEMARK REP. 890, 937–53 (2002).

83. A *control stimulus* is a specific item or object, e.g., a specific mark, product, dress, advertisement, and so on. In contrast, a *control treatment* involves using the same stimulus with the control group as used with the test group, but treating the stimulus or those exposed to the stimulus differently in the control condition than in the test condition. For example, plaintiff's survey in *Fresh Del Monte Produce, Inc. v. Del Monte Foods Co.*, No. 08-Cv-8718 (S.D.N.Y. filed Mar. 28, 2013), involved having test group respondents view a video of a cut-fruit product in its flexible see-through plastic container displayed in chilled cases situated in the fresh produce section of a supermarket, after which they were handed a chilled exemplar of the product before being asked questions beginning with "If you can tell, does this cut fruit product contain preserved fruit or fresh fruit?" In contrast, control group respondents viewed a video showing the same cut fruit product in its flexible see-through plastic container, but this time the product was shown situated on shelves in the canned goods section of the same supermarket, after which respondents were handed an room temperature exemplar of the product before being asked the same questions asked of those in the test group. Thus, respondents in the test and control group saw the same product and were asked the same questions as those in the control group. The difference between test and control conditions is how the product was *treated*, for the test group, being shown in a refrigerated case in the fresh foods section of the supermarket and for the control group, being shown on a shelf in the canned foods section of the same supermarket.

84. Cumberland Packing Corp. v. Monsanto Co., 32 F. Supp. 2d 561, 1999 U.S. Dist. LEXIS 262 (E.D.N.Y. 1999) ("In a test of a causal proposition the *appropriate* use of controls is crucial.") (emphasis added).

85. Under the rubric "If the Survey Was Designed to Test a Causal Proposition, Did the Survey Include an Appropriate Control Group or Question?," Prof. Diamond writes: "It is possible to adjust many survey designs so that causal inferences . . . become clear and unambiguous. . . . By adding an *appropriate* control group. . . ." Shari S. Diamond, *Reference Guide on Survey Research*, *in* FED. JUDICIAL CTR., REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 256–57 (2d ed. 2000) (emphasis added).

### 7.31.1 Strong Controls, Weak Controls, and Bogus Controls

Controls can vary in stringency. *Strong controls* are those that maximize the similarity between the control stimulus and the test stimulus. The reason they are strong is because, when the results for the control stimulus are subtracted from the results of the test stimulus, because there are fewer differences between the test and control stimulus that might explain the obtained findings, the findings provide reasonably conservative estimates of likely confusion or likely dilution.

In contrast, *weak controls* are those that minimize the critical similarities between the test and control stimuli. When the results for a weak control stimulus are subtracted from the results of the test stimulus, because there are many more differences between the test and control stimulus that might explain the obtained findings, it becomes more difficult to claim that the confusion being claimed was caused by the allegedly confusing element rather than by the other differences between the test and control stimulus. Given the greater number of differences between test and a weaker control stimulus, fewer respondents exposed to the control stimulus are likely to be confused, thereby providing artificially inflated estimates of likely confusion. A second form of weak control derives from using control stimuli that are well known among the relevant universe, so that the possibility of finding confusion with the control is diminished.

*Bogus control stimuli* come in at least four forms. In one form, the critical similarities[86] between the test and control stimulus are negligible to nonexistent. Consider *Indianapolis Colts v. Metropolitan Baltimore Football Club*, where the issue was whether using the nickname "Colts" for a Canadian Football League professional football team in Baltimore, Maryland (as in "Baltimore CFL Colts"), was likely to cause confusion with "Baltimore Colts," a National Football League team that formerly played in Baltimore and changed its name to Indianapolis Colts after moving to Indianapolis.[87] Since defendants' garments used a horse-head logo and virtually the same color blue as did the NFL's Baltimore Colts (and now the Indianapolis Colts), a bogus control would be a football replica jersey representing a college or high school football team that used a horse-head logo set against a different color scheme. While the test stimulus (defendant's "Baltimore CFL Colts" garments with a horse-head logo) would have several elements in common with such a control stimulus, few, if any, prospective purchasers of NFL (Indianapolis or Baltimore) "Colts"

86. More often than not, a critical similarity has to do with the sight, sound, or meaning of the stimulus.

87. Indianapolis Colts v. Metro. Balt. Football Club, 31 U.S.P.Q.2d 1801 (Ind.), *aff'd*, 34 F.3d 410, 416 (7th Cir. 1994).

paraphernalia would be confused into thinking the control replica jerseys came from or were sponsored by the NFL or any of its teams. In this way, the control would be a bogus control. A more egregious example of a bogus control would be using a plain white jersey with a horse-head logo as a control.

Whether done intentionally or unintentionally, the second form of bogus control involves devising a situation so there actually is no way respondents exposed to the control stimulus could give an answer that would be construed as having been confused or deceived. As one example, because the researcher "only counted as confused those respondents who made some reference to words or the style of the lettering on the shirt, and because none of the control shirts featured any lettering, 'it was . . . impossible under [the] methodology for someone to have selected the control shirt in a way that . . . would have counted as confused.'"[88] Thus, when the "percent confused" for a bogus control are subtracted from the "percent confused" obtained with the test stimulus, the "test minus control" findings are essentially meaningless.

As discussed in section 4.25.6, a third type of bogus control would be using a "soft ball" control question that virtually all consumers are likely to answer correctly, then comparing the answers obtained to that question to the answers obtained to another question asked about a different topic that consumers are much less likely to understand or answer correctly.[89]

A fourth type of bogus control involves selecting and/or devising a control for plaintiff's mark or goods when it is defendant's mark or goods that need to be controlled for. Since the survey can legitimately claim it used a control, the uninformed may be persuaded that the survey has controlled for what needed to be controlled for, when that actually is not the case. An example of this problem is discussed in section 7.30.1, *supra*, in regard to Cinch versus Clinch Gear clothing.

It is preferable to use strong controls, especially when designing a likelihood-of-confusion survey for plaintiff's where the use of strong controls would, if they cut in any direction, cut against plaintiff's interests. Under these circumstances, if the findings end up favoring plaintiff, one can be more confident in the validity of one's arguments. Where controls are so well known that few are likely to be confused, they are weak controls.

### 7.31.2 Natural versus Devised Controls

If there is a typical likelihood-of-confusion matter, it probably is the situation where a single aspect of the allegedly infringing item is identified

88. THOIP v. Walt Disney Co., 690 F. Supp. 2d 218, 226 (S.D.N.Y. 2010).

89. See section 8.36.

e 1:23-cv-01437-DAE Document 163-11 Filed 10/24/25 Page 33 of 138



as the factor likely to cause confusion. Perhaps it's the defendant's name, design, color combination, or logo that is alleged likely to cause confusion. Under such circumstances, it tends to be easy, relatively speaking, to select or devise an appropriate control. If one exists in the marketplace, the researcher selects an item that shares "as many characteristics with the experimental [test] stimulus as possible, with the key exception of the characteristic whose influence is being assessed." When none of the items available in the real-world marketplace provide such a *natural control*, one sets about developing a *devised control* that satisfies the same criteria.

When the marketplace contains many alternative offerings to the test stimulus (e.g., many brands of breakfast cereal or energy drinks), some may wonder why is there any need to develop and use a devised control. The answer has to do with the need for the control stimulus to share "as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed." Unless the test and control stimuli share every other characteristic except for "the characteristic whose influence is being assessed," there may be difficulty concluding that findings of confusion are due to the single factor alleged to be confusing, rather than being due to one or more of the other factor(s) common to both the test and control stimuli. For example, in a survey where the expert chose to use a natural control, the court commented, "While the . . . survey's control could have perhaps shared more features with the test product in terms of the shape and material of the fragrance box, the Court gives some weight to its results."[90]

While the real world rarely contains other third-party items that differ from the test item only the single factor alleged to be confusing, controls generally can be devised that satisfy this critical requirement. The difficulty of coming up with satisfactory real-world controls is illustrated by how the court in *THOIP II v. Disney* evaluated the natural controls selected for the plaintiff's survey versus the apparently devised controls used for the defendant's survey.

> THOIP argues that the French bulldog shirts were proper controls because they "share all but the infringing characteristics" with the Disney shirts—namely, they "have a cartoon character (but not one of the parties' characters)" and "wording," but not (1) the words "LITTLE MISS," (2) not words describing a characteristic of the character, and (3) not words in block letters. I disagree. [The] control—t-shirts bearing an image of a French bulldog and no descriptive term with hearts, splattered paint, or stars—shared

90. U.S. Polo Ass'n Inc. v. PRL USA Holdings Inc., 101 U.S.P.Q.2d 1487, 1503 (S.D.N.Y. 2011).

very few similarities with the THOIP or Disney shirts. Not only did the font, typeface, layout and size of the character in relation to the wording on the control shirts differ, but the control shirts were cluttered, giving them a very different overall look and feel from the THOIP or Disney shirts. . . . [Defendant's] "Got Green" and "Berry Sweet" control shirts, by contrast, "were as similar as possible to the test shirts without the protectible elements." For these reasons, even controlling for confusion based on protectible elements, "fewer respondents were likely to 'match' the control shirts with the Disney shirts [than were likely to 'match' the Little Miss THOIP shirts with the Disney shirts], improperly inflating the results."[91]

As an example of a different kind of problem that can surface when selecting or devising controls, consider *Westchester Media v. PRL USA*:

Westchester attacks PRL's survey principally on grounds that it used a faulty control. . . . Westchester argues that the survey should have used the Old POLO Magazine as a control rather than Polo Players Edition. This would have effectively isolated the variable at issue here, which is the change in the look of the relaunched magazine, not the name. By using Polo Players Edition as a control, another variable was admitted—the name of the magazine—*which meant that the one variable at issue, the magazine's new look, could not be isolated*, and the incremental confusion attributable solely to the magazine's new look could not be determined. In other words, some of the incremental confusion could have been attributed to the different names, Polo Players Edition and POLO [and not to the look of the magazine].

Westchester's argument makes sense. . . . It would have been preferable for the PRL survey to use the Old POLO Magazine as a control.[92]

91. THOIP v. Walt Disney Co., 788 F. Supp. 2d 168, 182–83 (S.D.N.Y. 2011).

92. Westchester Media v. PRL USA Holdings, Inc., 214 F.3d 658, 668 (5th Cir. 2000) (emphasis added). Writing that the control problem was "not so compelling as to produce clear error in the [district] court's reliance on PRL's survey for evidence of incremental confusion," the Fifth Circuit pointed to special circumstances that made relying on the faulty control less problematic in this matter. "[T]he magistrate judge found that Polo Players Edition is the continuation of Old POLO Magazine. . . . Polo Players Edition is not so different from the Old POLO Magazine as to make it clearly erroneous to rely on PRL's survey. In addition, trademark law is concerned with the level of actual confusion in the current marketplace. Consumers today are exposed to Polo Players Edition, not the Old POLO Magazine. These two magazines now define the difference between permissible and actionable confusion."

As another example, consider the following from the opinion in *Pilot Corp. of America v. Fisher-Price:*

> [T]he survey's "internal control" seems inadequate. It does not account for the possibility that respondents could have relied on non-protected similarities such as similar colors [a plausible alternative explanation for finding confusion]. Both the Doodle Pro and Magna Doodle logos shown to respondents consisted of purple writing on a yellow background. No other logos used in the survey contained this color scheme, and no two other corresponding logos had the same color scheme as each other (unless it was simply the same logo shown twice).[93]

Nothing in the *Pilot Corp.* opinion indicates whether there were third-party drawing products in the marketplace that contained logos with the same color scheme as plaintiff's and defendant's products. Assuming there were none, then the only way to control for defendant's and the court's plausible alternative explanation would have been to have developed and tested a devised control. Stated somewhat differently, though sometimes difficult to create, because only the element at issue need be changed, devised controls have the potential to be stronger controls than using products available in the marketplace, thereby enabling a scientifically cleaner interpretation of a survey's findings. While it is important that *test* stimuli faithfully represent the mark as it appears in the marketplace, no such requirement applies to *devised control* stimuli. Although devised controls should have the look and feel of goods in the marketplace, they need not ever have been available or be likely to be made available in the marketplace.

The failure to develop and use devised controls when these are called for may be a factor in a court's decision to discount a survey. Consider:

> [Plaintiff's expert] testified that he did not have access to any other commercials comparing NicoDerm to another product, so he could not have used one even if he had thought it appropriate. The Court disregards this excuse. [Defendant's expert] testified that experts conducting consumer surveys often create new ads or alter existing ones. If Pharmacia wishes the Court to credit its survey evidence, that evidence must conform to generally accepted survey principles. Nothing prevented Pharmacia from designing its own mock comparative commercial for the purposes of the . . . Survey.[94]

93. Pilot Corp. of Am. v. Fisher-Price, Inc., 344 F. Supp. 2d 349 (D. Conn. 2004).
94. Pharmacia Corp. v. GlaxoSmithKline, 292 F. Supp. 2d 594, 605 n.5 (D.N.J. 2003).

The reason why the control stimulus should not share with the test stimulus "the characteristic whose influence is being assessed" is well illustrated by the court's discussion in *GEICO v. Google*.

> [Plaintiff's survey] attempted to measure initial interest confusion experienced by potential customers by asking them to enter 'GEICO' into the Google search engine and then view a results page that showed five Sponsored Links alongside the organic listings. The survey also tested a 'control group,' the members of which also searched on 'GEICO' but then saw a results page on which the Sponsored Links had been changed from advertisements for car insurance quotes, most of which mentioned GEICO, to advertisements regarding NIKE athletic apparel. . . .
>
> The Court found that defendant's cross examination . . . revealed a number of weaknesses in GEICO's survey evidence. First, the control did not successfully demonstrate the source of the test group's confusion. As the survey expert admitted, an effective control should have removed from the page viewed by the test group the allegedly infringing elements for which GEICO wanted to measure confusion, such as the Sponsored Links mentioning GEICO, while keeping the other elements as constant as possible. This would have allowed the evaluator to subtract any degree of confusion expressed by the control group from that expressed by the test group, with the resulting difference representing the confusion attributable to the eliminated elements-similar to the manner in which medical researchers subtract out the "placebo effect" of a drug or procedure under examination. However, the survey's control, which replaced the insurance-related Sponsored Links that appeared when respondents searched on "GEICO" with Sponsored Links related to NIKE athletic apparel, did not function as an accurate measure of the confusion caused by non-infringing elements of the screen shot. As a threshold matter, the control retained the use of "GEICO" as a keyword, which itself was alleged to be a source of confusion.
>
> Further, instead of removing only the references to GEICO in the Sponsored Links, which would have measured whether the use of the trademarked keyword to place relevant Sponsored Links or the appearance of the mark in the ads was responsible for respondents' confusion, the survey removed all references to car insurance and replaced them with clearly unrelated NIKE ads. Thus, the control did not reveal which aspects of the insurance-related Sponsored Links caused respondents' confusion-the use of GEICO's mark in the ads or the ads' mere reference to insurance.

> By not examining this more subtle distinction, the survey did not produce evidence that the use of "GEICO" as a keyword, without more, causes respondents to be confused by the appearance of the Sponsored Links.[95]

So as to ensure that the control stimulus did not share with the test stimulus "the characteristic whose influence is being assessed," defendant's survey differed from plaintiff's survey in several respects, two of which are key. First, instead of typing GEICO, respondents in one control group typed NIKE into the search engine. This way, one could compare the level of initial interest confusion allegedly attributable to respondents typing in the name GEICO. Second, while the results page that appeared on-screen contained the organic listings for NIKE, the sponsored links section that appeared along with these organic listings contained three insurance sites, none of contained the name GEICO. The findings revealed that respondents who experienced these control conditions (namely, typed in NIKE, then saw sponsored links offering auto insurance, but not mentioning GEICO) exhibited virtually the same level of confusion as did respondents in the test group who had typed in GEICO and saw sponsored links that did mention GEICO. When the control group findings were subtracted from the test group findings, the net effect revealed a de minimis (below five percent) level of confusion.

The solution to the problems inherent in selecting an appropriate noninfringing product or service as a control stimulus is the creation of a true experimental design where the only variable between what one group of survey respondents sees and what a second group of respondents sees is the trademark at issue. The difference in results obtained from each group of respondents reflects essentially only the effect of the trademark upon the respondents. When products in the marketplace differ from the allegedly infringing product in more than a single way, which is most of the time, creating a true experimental design requires developing and using a devised control rather than a natural control. However, when developing devised controls, one need to ensure that they retain the nonprotectable elements of the test stimulus. As the court in *THOIP I v. Disney* noted: "the control underestimates the 'noise' in the survey as it only contained a cartoon character and lacked other key unprotectable elements of the test shirts, such as a descriptive term. Thus, respondents were less likely to pick the control shirt or give a response that [the expert] would code as confusion."[96]

95. Gov't Emps. Ins. Co. v. Google, Inc., 77 U.S.P.Q.2d 1841, 2005 WL 1903128 (E.D. Va. 2005).

96. *THOIP*, 690 F. Supp. 2d at 240.

### 7.31.3 Controlling for Sight, Sound, or Meaning

Trademark infringement involves allegations of defendant's mark being likely to cause confusion as a result of its being unacceptably similar in visual appearance, sound, or meaning to plaintiff's mark.[97] When the allegation concerns one of these three factors, it is best to keep the other two factors constant (that is, the same or virtually the same across both test and control) and modify only the third factor. For example: "In the . . . Survey, the subjects were shown either a bottle and four-pack of Glacier Bay, or a bottle and four-pack of a fictitious 'Arctic Bay' product as a control. The Arctic Bay product was created by modifying the Glacier Bay product by changing the word 'Glacier' to 'Arctic,' the abbreviation 'GB' to 'AB,' and by removing the mountains from the Glacier Bay label."[98] In this way, other than the presumably inconsequential removal of the mountains from the label, the control (Arctic Bay) maintained both the look and meaning of the test (Glacier Bay), although not the sound.

Sometimes it is possible to devise a control that comes close to being similar to the test stimulus in all three factors, sight, sound, and meaning. For example, "The 'control' survey was identical to the survey described above, except that everywhere the word 'CARGO' appeared on the cover page and interior magazine page, it was replaced by the word 'CARRY.'"[99] Like the test stimulus, the control is a two-syllable word consisting of five letters, the first three of which are CAR; further, it has a meaning that overlaps somewhat with the test stimulus.

In the examples just cited, the controls (Arctic Bay, Carry) were devised controls. The problem inherent in using a natural control caused the court in *Nabisco v. Warner-Lambert*, where the issue was a likelihood of confusion between the marks "Ice Breakers" and "Dentyne Ice," to opine as follows:

> Plaintiffs also failed to use a proper "control product." . . . Plaintiffs' control product was Trident gum. Although Trident is a gum product, it fails to capture the essence of the allegedly confusing quality at issue, namely the "Ice" term or some variation of that theme. Trident, therefore, does not represent a suitable "control product" for this type of survey. Thus, plaintiffs' results cannot be sufficient as proof of meaningful actual confusion between the products.[100]

---

97. *See* McCarthy, *supra* note 1, § 23:21 ("Sound, sight, and meaning" trilogy).

98. Nat'l Distillers Prods. Co., LLC v. Refreshment Brands, Inc., 198 F. Supp. 2d 474, 484 (S.D.N.Y. 2002).

99. Kargo Global, Inc. v. Advance Magazine Publishers, 2007 WL2258688, at *6 (S.D.N.Y. 2007). The survey had other flaws that resulted in the court assigning it no weight.

100. Nabisco v. Warner-Lambert Co., 32 F. Supp. 2d 690, 701 (S.D.N.Y. 1999).

Although the control stimulus (Trident) also was a chewing gum product, it was not similar to the test stimulus either in sight, sound, or meaning. As such, it was not an appropriate control for the issue before the court.

### 7.31.4 Assessing a Single Alleged Causal Factor

When only a single factor is alleged to cause confusion, the key to selecting or devising an appropriate control is to change that one factor and nothing else. Consider *Indianapolis Colts v. Metropolitan Baltimore Football Club*.[101] For 31 years, plaintiffs operated a professional football team in Baltimore, Maryland, under the name the "Baltimore Colts." The team used a horseshoe as its logo and its predominant uniform color was a shade of medium to light blue. In 1984, the team moved to Indianapolis, Indiana, and began playing under the name "Indianapolis Colts," retaining both the horseshoe logo and blue color.

The Canadian Football League is a completely independent entity composed of Canadian football teams. In 1993, the CFL expanded into the United States with a team based in Sacramento, California. During 1994, the CFL expanded into Shreveport, Louisiana; Las Vegas, Nevada; and Baltimore, Maryland, with the latter team adopting the names "Baltimore Colts" and "Baltimore CFL Colts." Prior to its first scheduled game, merchandise bearing these names was available for purchase at retail outlets in and around Baltimore. This merchandise included three different versions of a T-shirt and one baseball-type cap. These items used a shade of blue virtually identical to that of the NFL's "Colts" and displayed the phrase "Baltimore Colts" or "Baltimore CFL Colts." Instead of a horseshoe, these items used a stylized horse's head as a logo.

Alleging that the names "Baltimore Colts" and "Baltimore CFL Colts" would cause confusion among the relevant public as to affiliation or authorization, plaintiffs conducted a study to determine whether (and, if so, the extent to which) there was likely to be such confusion. Since plaintiffs could not preclude the CFL expansion team from using the name "Baltimore," the color blue, or a horse-head logo, the single element at issue was defendant's use of the term "Colts" to describe a professional football team located in Baltimore, Maryland. Given these circumstances, what would be an appropriate control?

From a scientific perspective, the cleanest and most defensible control involved deleting the single allegedly infringing element (the term "Colts"), replacing it with an equivalent term signifying a horse that would

101. Indianapolis Colts v. Metro. Balt. Football Club, 31 U.S.P.Q.2d 1801 (Ind.), *aff'd*, 34 F.3d 410, 416 (7th Cir. 1994).

be compatible with using the horse-head logo,[102] and leaving everything else intact. This way, the level of confusion, if any, found with this devised control could be said to reflect "noise" (such as might be caused by the question wording, other aspects of the measuring instrument, the interviewer, the test protocol, respondent guessing, and other forms of error). Subtracting the noise level obtained with the control shirts from the corresponding level found with T-shirts containing the allegedly confusing "Colts" term would yield a fair estimate of likely confusion arising from the use of "Colts" in this context.[103]

Since the Baltimore CFL Colts' horse-head logo was never at issue, there was no justification for modifying or removing it from the control garments. Had the horse-head logo been modified or removed, one could expect defendants' counsel to have argued that, since the NFL's Indianapolis (nee Baltimore) Colts used a horseshoe logo, the name "Baltimore CFL Colts," especially when seen in the context of its dramatically different horse-head logo, would not be confused with plaintiff's well known horseshoe logo. Hence, whatever confusion surfaced in plaintiff's survey would simply be a function of plaintiff having separated the "Baltimore CFL Colts" name from its real-world horse-head logo context. At that point, instead of having a survey that assisted it in its deliberations, the trier of fact would have been left with trying to resolve a fundamental methodological and interpretive ambiguity (which, in scientific parlance, is termed a "confound"[104]). Thus, the horse-head logo (measuring 14" × 8") emblazoned on the test group garments had to be retained on the corresponding control garments as well.

More importantly, since there now would have been two features that differed between test and control garments ("Colts" and a horse-head logo on the infringing garment versus a different nickname and a different logo on the control garment), replacing the both the term "Colts" and the horse-head logo would have left no way to trace unambiguously the impact

---

102. As there was nothing about the type font or style, or the sound of the name that could be protected, this was not a matter involving either visual or acoustic equivalence. In this instance, the fact that the control had to be compatible with the horse-head logo, which was not at issue, dictated that it be semantically equivalent.

103. Recognize that the most important percentage is not the percent confusion found with the allegedly confusing test item, nor the percent confusion found with the control item. Rather, it is the difference between the two or, in the parlance of the field, the "net confusion" that remains after subtracting the percent of confusion obtained with the control stimulus (which is assumed to represent an amalgam of different forms of "noise") from the percent of confusion found with the test stimulus. As employed in trademark litigation surveys, the formula is basic: Net effect due to the putative cause equals [level of effect found in the test group] minus [level of effect found with the control group].

104. *See* David H. Kaye & David A. Freedman, *Reference Guide on Statistics*, *in* FED. JUDICIAL CTR., REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, sec. II.C.2.

attributable solely to the word "Colts," the single element at issue. In other words, to determine whether the name "Colts" (and nothing else) was responsible for causing confusion in this context, tight scientific assessment required that it be the only element replaced, that is, that the horse-head logo continue to appear on the control garments. This requirement prevented using any non-horse-related name—something later suggested by the appellate court.[105] Given the formula applied to determine confusion (Net effect due to the putative cause equals [level of effect found in the test group] minus [level of effect found with the control group]), to have done so only would have *reduced* the level of confusion obtained with the control garments, thereby *increasing* the difference between it and the level of confusion obtained with defendant's garments. The net result would have been a higher estimate of likely confusion—which would have favored plaintiffs, not defendants. At that point, defendants would have been justified in claiming that the use of another name (e.g., Leopards) constituted a trick.

If, to use the language of the Seventh Circuit opinion, the nickname Horses is "unappealing" or not "attractive," consider the other semantically equivalent equine terms that could have been employed in conjunction with a horse-head logo, namely, Broncos, Chargers, Mustangs, Fillies, Mares, Ponies, Stallions, Steeds. As the terms Broncos and Chargers were already in use as the names of other National Football League teams, they could not be used. Most are likely to agree that fillies, mares, and ponies would be considered too effete to serve as names for a professional football team. By virtue of it having been the name of another defunct professional football team ("Birmingham [Alabama] Stallions"), the term Stallions had been "contaminated." Mustangs, the nickname for a college (Southern Methodist

105. "We don't like the name 'Baltimore Horses,' as we have said, but we doubt whether a more attractive 'Baltimore' name, the 'Baltimore Leopards' for example, would have generated the same level of confusion that the 'Baltimore CFL Colts' did." Indianapolis Colts v. Metro. Balt. Football Club, 34 F.3d 410, 416 (7th Cir. 1994). Had the name Colts been replaced with Leopards, with the latter now appearing above the horse-head logo, not only would this appear bizarre, but respondents would have readily understood that the garment was inauthentic and unlikely to be something offered for sale to the public. It might be noted that the Seventh Circuit, which considered consider Horses to be "unappealing," sits in Chicago where major sports teams are named Bulls and Bears. Over the centuries, bulls and bears never have been considered as suitable as have horses when it comes to serving as a perch for honoring emperors, kings, and generals. Bulls and Bears may run amok on Wall Street, but for a disciplined assault, the U.S. Cavalry charges on horses. In chess and elsewhere, knights and noblemen ride horses, not bulls or bears. Horse racing (or polo) is considered "the sport of kings" and no other four-legged animal participates in the Olympics. Neither bulls nor bears are credited with having the combination of agility, grace, and intelligence associated with Lipizzans. No bull, the horse is a noble animal. As a measure of power, industry relies on horsepower, not bull- or bear-power. Since "horse" possesses numerous strong, positive masculine connotations, one is left to wonder what it was about "horses" that made that noun so unappealing as a nickname for a professional football team.

University) football team, might have been another possibility. However, it also was the nickname used by the California team in the National Women's Football League and is less similar in number of letters and appearance to Colts than are "horses" and "steeds." While "steeds," like "colts," is a single syllable, it seemed too archaic and less likely to have a ring of authenticity as the nickname of a contemporary football team. All things considered, given that the horse-head logo had to be retained, the term "Horses" seemed the best choice, as it has nearly the same number of letters as "colts," has an "o" as its second letter, and ends with an "s," thereby being visually similar to Colts. Notwithstanding its concern over "Horses" being unappealing, the circuit court, as well as the district court, relied on the survey's findings.[106]

### 7.31.5 Assessing a Combination of Alleged Causal Factors

While a single noninfringing feature of defendant's goods may not be likely to cause confusion, sometimes the combination of two or more features may be sufficient to do so. To illustrate, suppose a consumer shopping for a football replica jersey circa 2011 comes across a number of such jerseys, each of which can be described in terms of a number of attributes. The attributes of one jersey include its colors (particular shades of yellow and green), the name ("Green Bay") appearing in large letters across the front, the outline of a football appearing on a sleeve, a large numeral (12) in the center on the back, a surname (Rodgers) above the numeral, various labels to indicate size, type of material, care instructions, price, name of the manufacturer, and so on. While all these attributes are objectively visible, consumers typically pay attention to only a few of these.[107]

---

106. "This Court has accepted the plaintiffs' survey as being a helpful indicator of the degree of similarity of the parties' marks." "This Court finds this survey helpful in assessing whether the marks are so similar in appearance and suggestion as to cause confusion even though defendants have opined differently." "The survey shows that there is confusion in any case." Indianapolis Colts v. Metro. Balt. Football Club, 31 U.S.P.Q.2d 1801 (Ind.), *aff'd*, 34 F.3d 410 (7th Cir. 1994). Notwithstanding its misgivings regarding the term Horses, the Seventh Circuit upheld the district court "crediting the major findings from the . . . study and inferring from it and the other evidence in the record that defendants' use of the name 'Baltimore CFL Colts' whether for the team or merchandise was likely to confuse a substantial number of consumers." *Id.*, 34 F.3d at 416.

107. A considerable body of empirical findings reveals that, in part to avoid being overloaded with information, consumers typically attend to only a few of the many features associated with products they purchase. As but a few examples, see J. Jacoby, R.W. Chestnut, K.C. Weigl & W. Fisher, *Pre-purchase Information Acquisition: Description of a Process Methodology, Research Paradigm, and Pilot Investigation*, *in* 3 ADVANCES IN CONSUMER RESEARCH 306 (B.B. Anderson ed., 1976); J. Jacoby, R.W. Chestnut & W. Silberman, *Consumer Use and Comprehension of Nutrition Information*, 4(2) J. CONSUMER RESEARCH 119 (1977); J. Jacoby, G.J. Szybillo & J. Busato-Schach, *Information Acquisition Behavior in Brand Choice Situations*, 3(4) J. CONSUMER RESEARCH 209 (1977).

Assume that the features catching this consumer's attention are that the jersey comes in particular shades of green and yellow and bears the name "Green Bay." For many, placing these three features (football replica jersey + particular shades of green and yellow and no other colors + the name Green Bay) into their cognitive workspace[108] would be sufficient to evoke "Green Bay Packers" from their memory, with a substantial proportion of these people now thinking what they were seeing was somehow associated with the Green Bay Packers. Though perhaps not individually sufficient, when seen in combination, these three features would be sufficient to confuse some consumers into believing that the merchandise was associated with or sponsored by the Green Bay Packers or the National Football League.

> Two basic variables influence the likelihood that some stored knowledge [e.g., our stored memory associated with the Green Bay Packers] will be activated—[one of which is] *the fit between the stored knowledge and the presented stimulus*. . . . The greater the overlap between the features of some stored knowledge and the attended features of a stimulus, . . . the greater is the likelihood that the knowledge will be activated in the presence of the stimulus. . . .[109]

In part to avoid information overload, more often than not we do not pay attention to every single aspect of an external object (e.g., information on a product package) before using the information stored in our memory to interpret and identify that object. When interpreting the outside world, we generally rely on a process called *pattern recognition*.[110] When a sufficient number of features represented in the incoming information match the pattern of features of a preexisting cognitive network we have stored in our memories, we tend to fill in the details and interpret the object as an exemplar of that network.[111] While relying on pattern recognition results

---

108. *Cognitive workspace* is a term used by cognitive scientists to refer to an individual's consciousness of the moment. *See* Jacob Jacoby, *The Psychological Foundations of Trademark Law: Secondary Meaning, Acquired Distinctiveness, Genericism, Fame, Confusion and Dilution*, 91(5) TRADEMARK REP. 1013 (2001).

109. E.T. Higgins, *Knowledge Activation: Accessibility, Applicability and Salience*, *in* SOCIAL PSYCHOLOGY: HANDBOOK OF BASIC PRINCIPLES 133, 135 (E.T. Higgins & A.W. Kruglanski eds., 1996) (emphasis added).

110. *See, e.g.*, R.R. HUNT & H.C. ELLIS, FUNDAMENTALS OF COGNITIVE PSYCHOLOGY 51 (2003).

111. Pattern recognition by humans is comparable to employing an optical character recognition (OCR) program to scan and recognize individual letters in a document. Just as the OCR software examines the features of each letter and seeks to match it with a known pattern already stored in the computer's memory, the cognitive workspace of the mind seeks to match the features of the information incoming from the outside world with information already stored in the consumer's memory. And just as the OCR reader may misidentify a particular item (for example, misreading a capital "I" as a lower case "l"), the human information processor will make comparable errors.

Case 1:23-cv-01437-DAE Document 163-11 Filed 10/24/25 Page 4



in correct identification and interpretation most of the time, sometimes what we already know may lead us to misinterpret and misidentify what we see in the world around us. This is precisely the kind of phenomenon noted by Judge McKinney in *Indianapolis Colts v. Metropolitan Baltimore Football Club*:

> Most people can probably recall a time when a return trip to the store was necessary because a word on a label triggered a memory *that filled in the rest of the label*, and caused them to select the wrong product. One's intention may be clear and still the wrong product was purchased.[112]

The greater the similarity between the pattern of information attended to regarding the object in the outside world and the pattern of information stored in a person's mind, the greater the likelihood that one will be confused into thinking that the latter is an exemplar of the former.[113]

This "multiple non-infringing factors combining to cause confusion" may surface in a number of ways.[114] Not infrequently, it applies to trade dress matters, as was the situation in *NFL Properties. v. ProStyle*.[115] Because this problem of developing an appropriate survey for this case provides an excellent foundation for elucidating many important issues that need to be considered when developing appropriate controls for trademark surveys, this section and the one that follows uses this case as a springboard for discussion. While the discussion also applies to situations where one needs to develop a control when a single factor is alleged to cause confusion, counsel and researchers faced with the problem of developing an appropriate control in situations where multiple noninfringing factors are believed to combine to cause confusion should find this discussion especially helpful.

---

112. 31 U.S.P.Q.2d 1801 (S.D. Ind. 1994) (emphasis added).

113. For a more detailed discussion of the psychological processes underlying confusion, see Jacob Jacoby, *The Psychological Foundations of Trademark Law: Secondary Meaning, Acquired Distinctiveness, Genericism, Fame, Confusion and Dilution*, 91(5) TRADEMARK REP. 1013, 1034–42 (2001).

114. Plaintiff's survey in *Fresh Del Monte Produce, Inc. v. Del Monte Foods Co.*, No. 08-Cv-8718 (S.D.N.Y. filed Mar 28. 2013), studied whether the combination of three factors (whether the product was sold in the fresh food section of supermarkets versus on shelves in the canned food section of supermarkets, whether the product was chilled or at room temperature, and type of packaging—thin clear, flexible plastic versus thick, solid inflexible plastic) caused consumers to be confused into thinking the fruit inside the container was fresh fruit.

115. Unpublished Decision and Order, Nat'l Football League Props., Inc. v. ProStyle, Inc., No. 96-C-1404 (E.D. Wis. July 25, 1997); Nat'l Football League Props., Inc. v. ProStyle, Inc., 16 F. Supp. 2d 1012 (E.D. Wis. 1998); National Football League Props., Inc. v. ProStyle, Inc., 57 F. Supp. 2d 665 (E.D. Wis. 1999).

While developing a control is relatively easy when there is only a single putative cause, selecting or devising an appropriate control becomes considerably more complicated when the effect is alleged to be caused by a combination of several trademark and/or trade dress elements. Consider how the court described the matter in *NFL Properties*:

> Defendants, through ProStyle, have recently and without plaintiffs' consent commenced selling in interstate commerce merchandise, including shirts, sweatshirts, dresses, swimsuits, caps and jackets, bearing the designations "PACK," "GREEN BAY P," with a player's name and number, "GBP CENTRAL DIVISION CHAMPIONS" AND "DIVISION CHAMPIONS GREEN BAY." Defendants' merchandise often display the Packers' team colors, which are dark green and yellow, or variations thereof. Certain articles of defendants' merchandise also bear football indicia, including football helmets, in the Packers team colors or variations thereof, which are displayed in conjunction with the aforementioned designations or with the names of various Packers' players and the respective numerals worn by those players. Defendants' products are often interspersed in the marketplace with products officially licensed by plaintiffs. Defendants have advertised their products in interstate commerce through a mail-order catalog. . . . In the catalog, pictures of defendants' products are interspersed throughout defendants' catalog with color photographs of team members of the Packers in team uniforms and team helmets.[116]

Necessarily limited in their treatments, the contributions to the Federal Judicial Center's *Reference Manual on Scientific Evidence* that discuss assessing causal propositions do not provide guidance regarding what should be done when, instead of a single factor, a combination of factors are alleged to cause either confusion or dilution. The author of the Guide on Survey Research writes: "In designing a control group study, the expert should select a stimulus for the control group that shares as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed."[117] Recognize that the reference here is to a single "characteristic," not to a combination of "characteristics." That author goes on to state: "Nor should the control stimulus share with the experimental stimulus the feature whose impact is being assessed."[118] Again, recognize that the reference is to a single

116. Unpublished Decision and Order at 6–7, Nat'l Football League Props., Inc. v. ProStyle, Inc., No. 96-C-1404 (E.D. Wis. July 25, 1997).

117. Shari S. Diamond, *Reference Guide on Survey Research*, *in* Reference Manual on Scientific Evidence, *supra* note 85, at 258.

118. *Id.* at 258.

"feature," not a combination of "features." If one were to follow these guidelines and remove all allegedly confusing features, then any control developed for use in the present matter would have none of the allegedly confusing features characteristic of defendant's garments. Think of what such a control would look like. In *NFL Properties*, where the plaintiffs alleged that confusion and/or dilution would be caused by some *combination* of trademark and trade dress elements when these appeared on a football replica jersey or sweatshirt, devising a control by deleting all of the contested features would generate a shirt that would bear no resemblance whatever to the contested merchandise.

Deleting all the contested features at once would have generated a bogus control,[119] one for which there would be little or no chance that a prospective purchaser of a Green Bay Packer football replica jersey would be confused into believing such a control garment came from, was associated with, or was sponsored by the Green Bay Packers. Since the formula for calculating confusion is "(level of effect found in the test group) minus (level of effect found with the control group) equals level of confusion likely in the marketplace," a control garment getting a percentage of zero or close to it could only *increase* the estimated level of confusion likely in the marketplace, as compared to the estimate that likely would be obtained had a fair and appropriate control been used. The fundamental question is thus: How does one go about constructing an appropriate control when confusion is alleged to be caused by a combination of factors? The approach is discussed next.

### 7.31.6 Selecting/Devising Controls from a Universe of Possibilities

In virtually every situation, there exists a universe of potential controls. This universe may consist of a single possibility or, when the many variations and permutations for devised controls are included, hundreds or even thousands of possibilities. Clearly, no litigant would expend the time, funds, or other resources to conduct research using all controls within this universe of possibilities. Being realistic, the researcher thus is forced to be selective and use good judgment in selecting or devising appropriate controls. Using *NFL Properties* as a basis for illustration, the following describes this process and the various considerations that go into designing strong controls.

119. Such control garments would (1) not bear any of the contested names ("Green Bay," "Green Bay P," or "Pack"), (2) come in completely different colors (e.g., purple and red), (3) contain no indicia designed to evoke an association to football (e.g., a football logo, a football helmet, goal posts, a gridiron, large player numerals on the back), (4) contain the name of no football players associated with the Green Bay Packers, and (5) contain no designations such as "GBP Central Division Champions" and "Division Champions Green Bay."

Suppose that, from the universe of possible controls, nine types of shirts and shirt designs had been selected for use as possible controls. These are designated as numbers 1 through 9 below. For purposes of comparison, three additional shirts are also described. Shirts #10 and #11 represent two of defendants' garments while Shirt #12 represents one of plaintiffs' authorized garments.

| Shirt | Type | Color(s) | Indicia on Front | Other Indicia |
|---|---|---|---|---|
| 1 | Dress | white | none | none |
| 2 | T-shirt | white | none | none |
| 3 | T-shirt | white | "Ponies" | "Mumford H.S."+ numerals on back |
| 4 | Replica jersey | green & white | "New York" | "Jets" + numerals on back |
| 5 | Replica jersey | white & blue | football logo | "Ellison Bay" + numerals on back |
| 6 | Replica jersey | brown & yellow | "Ellison baby" | Football helmet logo on front + numerals on back |
| 7 | Replica jersey | green & yellow | "Ellison Bay" | Football helmet logo on front + numerals on back |
| 8 | Replica jersey | green & yellow | "Groin Bay" | Football helmet logo on front + numerals on back |
| 9 | Replica jersey | green & yellow | "Groan Bay" | Football helmet logo on front + numerals on back |
| 10 | Replica jersey | green & yellow | "Green Bay" | Football helmet logo on front + numerals on back |
| 11 | Replica jersey | green & yellow | large "P" | "Green Bay" + numerals on back |
| 12 | Replica jersey | green & yellow | "Packers" | "Green Bay" + numerals on back |

All of the items qualify as shirts, not any other kind of garment (e.g., a tie) or product (a can of motor oil). Based on what has been offered as controls in some litigated matters, it appears that some researchers would hold that any of these shirts could serve as an acceptable control. Most, however, would recognize that some are more appropriate and more rigorous than others. Let us examine this limited universe of nine possibilities.

Shirt #1 is a plain white dress shirt having one left breast pocket, long sleeves with standard single button cuffs, and a button-down collar. Although it is a "shirt," it looks completely different from a T-shirt and

is generally worn for a different purpose. Upon being shown Shirt #1 and asked "What, if anything, do you think of when you see this shirt?," it could reasonably be predicted that no prospective purchaser of Green Bay Packer football replica jerseys would be likely to associate this plain white shirt with the Green Bay Packers. Even the most die-hard fan does not walk around with the Green Bay Packers uppermost in his mind at all times so that, upon being shown any object (e.g., a dress shirt, a toothbrush, a coffee cup, a candy bar) and asked "What, if anything, do you think of when you see this ____?," he is likely to answer "the Green Bay Packers." Thus, when the "zero percent association" to Green Bay Packers evoked by Shirt #1 is subtracted from the "percent association" found with the allegedly infringing test shirt, the "net" association would remain at a maximum. Although it enables one to make a comparison (a core necessity for a control), it is unlikely that such a bogus control would be able to tease out anything but the most trivial type of "noise" (e.g., random guessing) or other error.

Now consider Shirt #2, a plain white T-shirt having no graphic design elements whatever, and Shirt #3, a white T-shirt containing the nickname "Ponies" on the front and the name Mumford H.S. on the back, but also having no design features that would make it look like a football replica jersey. Upon being shown either Shirt #2 or #3 and asked "What, if anything, do you think of when you see this shirt?," the likelihood that prospective purchasers would answer "Green Bay Packers" is so small that, for all practical purposes, it can be assumed to be zero. Some might argue that, because the Federal Judicial Center's Reference Guide on Survey Research states "Nor should the control stimulus share with the experimental stimulus the feature whose impact is being assessed,"[120] Shirts #2 and #3 qualify as appropriate controls because they share no contested elements in common with defendants' infringing shirts (#10 and #11). However, because they share none of the noncontested attributes of defendant's shirts, at best, they would be exceptionally weak controls likely to yield artifactually inflated estimates of "net" confusion.

Shirt #4 is an NFL-authorized football replica jersey representing the New York Jets. This shirt—which has the appeal and advantage of being a real-world, natural control—also has a number of elements in common with defendants' shirts. It uses a dark green color, displays a geographical name that consists of two monosyllabic terms, and contains large player

120. Shari S. Diamond, *Reference Guide on Survey Research*, *in* Reference Manual on Scientific Evidence, *supra* note 85, at 258.

numerals on the back.[121] Moreover, it is likely to trigger thoughts of football generally, and the National Football League specifically, among most respondents, which, if anything, should increase the tendency for them to think of the Green Bay Packers. Suppose respondents shown Shirt #4 were asked "What, if anything, do you think of when you see this shirt?" If some were prompted to say that that Shirt #4 made them think of the Green Bay Packers, would this be taken as evidence of dilution? Given that Shirt #4 possesses so few of the elements considered to represent the Green Bay Packers, of course not. Suppose some respondents shown Shirt #4 and asked "Do you think that in order to put out this shirt, the company that put it out did need to get permission, did *not* need to get permission, or you have no thoughts about this?" then answered "did need to get permission," causing them to be asked "From whom did they need to get permission?" The likelihood of respondents answering "Green Bay Packers" to this "from whom?" question remains negligible, probably close to zero. Although more reasonable as a control than Shirts #1, #2, and #3, despite having the appeal and advantage of real-world authenticity, Shirt #4 would be a weak control.

Designed to look like a football replica jersey, Shirt #5 moves closer to possessing elements characteristic of defendants' shirts. Although it contains neither green nor yellow, it does bear a football logo on the front, large player numerals on the back, and the name "Ellison Bay"—a two-word geographical name that has the word "Bay" in common with the name "Green Bay" on defendants' shirts. (As is Green Bay, Ellison Bay is the name of a body of water off the coast of northern Wisconsin.) Suppose respondents shown Shirt #5 were asked "What, if anything, do you think of when you see this shirt?" Given the few similarities between Shirt #5 and authorized Green Bay Packers merchandise, some might be prompted to think of the Green Bay Packers. On the other hand, given the many dissimilarities—the fact that Shirt #5 was white and blue, not green and yellow, did not use the word "Green"—the number of such individuals likely would be small. However, because it possessed several features in common with defendants' shirts (Shirts # 10 and #11), it could be argued that Shirt #5 would be a reasonable control.

Designed to look like a football replica jersey, Shirt #6 bears a football helmet logo, one of the Packers team colors (yellow), and a geographical name consisting of "Ellison Bay." Because it contains more elements in

121. Because it also contains the word "bay," the Tampa Bay Buccaneers might have been used for illustrative purposes as well. However, although it contains the word "bay," the name Tampa contains two syllables and, other than generic black or white and unlike the green of the New York Jets, the team does not use any colors in common with the Green Bay Packers.

common with defendants' shirts than does Shirt #5, Shirt #6 represents a more stringent control than does Shirt #5. For this reason, one might hold that Shirt #6 was well suited to serve as a control for assessing likely confusion of defendants' merchandise.

Except for substituting the single word "Ellison" for "Green," Shirt #7 is identical in *all* other respects to one of defendants' garments (#10). Both use precisely the same graphics and designs; both use the same shades of green and yellow found on Green Bay Packers merchandise; both use the same yellow football helmet; both use a name consisting of two words, the second of which is Bay; both bear the same large player numerals on back; and so on. The only difference is that one shirt uses the word "Green" in its name while the other uses the word "Ellison." This may be summarized via the following nine-point comparison:[122]

| **Defendant's Garment #10** | **Control Garment #7** |
|---|---|
| designed to look like football jersey | uses identical football jersey design |
| uses green as primary color | uses identical green as primary color |
| uses yellow as secondary color | uses identical yellow as secondary color |
| uses no other trim colors | uses no other trim colors |
| uses yellow football helmet | uses identical yellow football helmet |
| uses large player numeral on back | uses identical large numeral on back |
| uses a two-word name | uses a two-word name |
| uses "Green" as first part of name | uses "Ellison" as first part of name |
| uses "Bay" as second part of name | uses "Bay" as second part of name |

As confusion was alleged to derive from *a combination of* several allegedly infringing elements, to use Shirt #7 *as a control* when it contains *all but one of these elements* renders Shirt #7 an exceptionally strong control—one

122. The defendants' and corresponding control shirts also were identical in many other respects as well. As examples: Instead of them having different neck treatments (circular, v-neck or oval), both had circular necks. Instead of being made of different types of fabric, both were 100 percent cotton. Instead of being fabricated so that one appeared solid and another had a perforated mesh "tear-away" appearance, both appeared solid. Instead of one containing a single numeral while the other consisted of two or three numerals, both shirts consisted of the same two-digit numeral. Instead of one shirt using one style or font for this two-digit numeral and the other using a different style or font, both shirts used the same style/font.

likely to produce a very conservative estimate of "net confusion." Since it was possible to use as controls shirts having a fewer number of elements in common with defendant's shirts (e.g., Shirt #6), some would say that using Shirt #7 as a control amounts to stacking the deck against plaintiff. Not appreciating that the guidelines in the FJC's *Reference Manual on Scientific Evidence* are necessarily limited in their coverage and could not cover all situations, others might contend that Shirt #7 could not and should not be used as a control because it does not satisfy those guidelines, namely, that a control should *not* share with the experimental stimulus the feature whose impact is being assessed.[123] Yet, precisely because it contains all but one of the contested elements of defendants' shirts, Shirt #7 serves as a strong control for assessing confusion in this matter. By having so many features in common with both plaintiffs' and defendants' shirt, it increases the likelihood that it, too, will be confusing. In this way, when the estimate of likely confusion obtained with the control is subtracted from the estimate of likely confusion obtained with defendants' shirt, the "net confusion" estimate can only be reduced, thereby favoring defendant.

### 7.31.7 Avoiding Controls That Are Too Similar to the Test Stimulus

It is generally understood that the closer a second comer's mark, dress, or other indicia come to those of a first comer, the greater is the likelihood that the second comer's use of these marks would cause confusion and, hence, be actionable. This has direct implications for selecting natural controls from among the offerings that exist in the marketplace. There seems to be widespread agreement that one should not select as a natural control a third party's offering when that offering might itself be actionable.

What about devised controls—those not found in the marketplace, but developed by the researcher? Although strong controls enable one to have greater confidence in the causal relationships identified, problems may arise when devising controls that are "too" strong. The challenge for researchers is to avoid devising controls that cross the threshold separating what would be nonactionable from what, if present in the real world, would be actionable. This is particularly important when confusion is alleged to be caused by a combination of factors. For example, Shirt #7 in the illustration above was identical to defendants' garment in all respects but one. Being a devised control, Shirt #7 never existed in the marketplace. Had there been a shirt in the marketplace with these features, it is

123. Shari S. Diamond, *Reference Guide on Survey Research*, *in* Reference Manual on Scientific Evidence, *supra* note 85, at 258.

more likely that it would have become the subject of a lawsuit than it is that it would have been used as a control.[124]

If a strong devised control does yield a high level of confusion—say, above 20 percent or even above 50 percent—how should that be interpreted? In evaluating the findings from likely confusion and deceptive advertising surveys, percentages of net confusion or net deception above 15 percent are typically considered actionable and those falling below 15 percent typically not considered actionable (unless they involve matters of health or safety, where a lower threshold may apply). For these reasons, it seems preferable that controls not yield confusion or deception estimates that exceed 10 percent or perhaps 12 percent.

It must be stressed that *preferable* does not mean *necessary*; a control that produces a confusion or deception level exceeding 10 percent or 12 percent does not necessarily mean something was amiss with the control. The control may be serving perfectly its intended function of estimating the error rate due to guessing, respondent acquiescence, problems with the question itself, and so forth. One should not to lose sight of the fact that the more important—indeed, essential—consideration is whether, when the control estimate is subtracted from the test estimate, the "net" exceeds 15 percent (or whatever value the court considers to be appropriate). This situation is akin to one of the Drug X scenarios discussed in chapter 4 in which 65 percent of those receiving Drug X containing the active ingredients said it lessened their pain while 35 percent of those receiving a placebo not containing the ingredients identified as ameliorating pain said it lessened their pain. It would be nonsensical to hold that because 35 percent of the patients in the control group said it lessened their pain, the study's findings were flawed and should be ignored.[125] A difference of 30 percentage points in pain amelioration is substantial, highly significant with sample sizes of more than 100, and evidence that Drug X successfully caused a lessening of pain for a not-insubstantial proportion of the population. The same logic applies to interpreting control group findings of confusion or deception that exceed 15 percent. Recognize that one cannot predict in advance the level of confusion or deception likely to be obtained by a rigorous control, especially a devised control, something not present

124. As another example, consider *Roederer v. J. Garcia Carrion*, where "a bottle of 'Courtalino' cava [was] created as a control for the survey. The Courtalino bottle was virtually identical to a Cristalino bottle except that the front and neck labels read 'Courtalino' rather than 'Cristalino.' [The researcher] chose the name 'Courtalino' because he thought it was as similar to 'Cristalino' as possible without infringing the Cristal marks." Roederer v. J. Garcia Carrion, S.A., 732 F. Supp. 2d 836, 862 (D. Minn. 2010).

125. As one example, defendant's survey expert in *Star Markets, Ltd. v. Texaco, Inc.*, 950 F. Supp. 1030 (D. Haw. 1996) "testified that in his opinion the [Plaintiff's] survey was not reliable because of the excessive degree of 'noise' [27 percent] in Plaintiff's control survey."

in the real world. If, when that percentage obtained with the control is subtracted from the percentage obtained with the test, the net difference exceeds 15 percent (or whatever the threshold the trier of fact deems appropriate), then the findings merit being accorded their proper weight.

As noted, whether selecting or devising a control, the control should have as many characteristics as possible in common with the test stimulus, with the key exception being the characteristic whose influence is being assessed. Determining "what is the characteristic whose influence is being assessed?" is principally the attorney's job. Nevertheless, the expert would do well to confirm this by reading the complaint and related pleadings. Both should check each other's assessment. Doing so may help avoid a situation where the court comments that the "controls were improper in that they included the very elements being assessed, namely, the word mark 'POLO' and, in the case of the Beverly Hills Polo Club control, also a mounted polo player image."[126]

### 7.35 Controls for Testing Advertising

If there is a typical trademark matter, it likely entails a focus upon a single mark, symbol, or limited phrase (such as a slogan) as it appears on a package or product label. A more complicated situation may arise when the matter concerns print, radio, television, or Internet advertising, given the amount of textual and graphic content that may be present, all of which may communicate meaning. The types of controls generally used when testing whether or not advertising is deceptive include the following.

#### 7.35.1 External Control Group Not Exposed to a Control Stimulus

While those in the experimental group are exposed to the contested ad (brochure, periodical, package, etc.), those in the control group are not exposed to any stimulus, and the "effects" are assessed for both groups at approximately the same time. Note that this "post-only" design (Design 5, as discussed in section 4.24.3) is capable of accommodating the issue of "preexisting beliefs."[127] Inasmuch as subjects randomly assigned to the control group could be assumed to have, on average, the same "preexisting beliefs" as those assigned to the experimental group, this will balance out when the findings from the control group are subtracted from those for the experimental group. A problem sometimes created with a "no stimulus" control is that the questions asked of respondents may have to be worded differently

126. U.S. Polo Ass'n Inc. v. PRL USA Holdings Inc., 101 U.S.P.Q.2d 1487, 1502 (S.D.N.Y. 2011).

127. Cases discussing "preexisting beliefs" include Am. Home Prods. v. Procter & Gamble Co., 871 F. Supp. 739 (D.N.J. 1994); Johnson & Johnson-Merck Consumer Pharms. Co. v. SmithKline Beecham Corp., 960 F.2d 294, 301 (2d Cir. 1992).

for those exposed to the advertisement versus those not exposed to anything at all (see example at end of section 4.25.6), thereby making the experiences across the two groups at the point of measurement somewhat less standardized (see discussion of standardized questions in Chapter 8, Section 8.11).

### 7.35.2 External Control Group Exposed to a Control Stimulus

This also involves using Design 5, and exposing those in the control group to some communication (ad, brochure, periodical, package, etc.). Depending upon what is at issue, the control communication may be a natural or devised control.

At least two types of natural controls often are possible. In many instances, the control communication may come from the same source and be for the same product and brand, but be a version that does not contain the allegedly deceptive or confusing verbiage. Another less frequent (and generally less preferred) alternative is to have the control be a comparable ad, package, and the like for the same product, but from a competing source. The reason it is less preferable is that it generally permits more than a single factor to change and, as such, increases ambiguity in interpreting the findings. Hence, this author's preference for devised controls.

Insofar as print media are concerned, a great number of possibilities exist with regard to developing devised controls. At one end of the continuum, a devised control might involve making minimal changes in an existing communication. For example, if a name, word, or brief phrase is at issue, the same ad might be used, but with the allegedly deceptive or confusing term replaced with a different term or perhaps no term at all. At the other extreme, one might create a control ad from scratch. Two in between options are using a "tombstone" ad, essentially an ad containing nothing other than the name of the source and possibly the brand name of the product, or a "purged" control. A purged control is a more extreme form of the first type of devised control described at the beginning of this paragraph, except that the verbal and/or graphic content at issue is removed and nothing inserted to take its place.

Although this author advocated "purged controls" when he developed the Food and Drug Administration's definition and approach to measuring misleading prescription drug advertising,[128] there are limits to purged controls. While they can be effective in instances where just one or a few words are at issue, they becomes problematic when more textual material,

128. Jacob Jacoby, Defining and Measuring Misleading Advertising, final report to the Div. of Drug Advertising, Food & Drug Admin. (1974). For a condensed version, see Jacob Jacoby & Constance B. Small, *The FDA Approach to Defining Misleading Advertising*, 39 J. MKTG. 65 (1975), *reprinted in* ADVERTISING LAW IN THE NEW MEDIA AGE 223 (Jeffrey S. Edelstein ed., Practicing Law Inst. 1999).

and especially when more than one concept, is involved. For example, in *FTC v. Kraft* the FTC alleged that approximately 30 percent of the verbal content of the Kraft communications was in some way responsible for creating the alleged deception.[129] Hence, simply removing the word "calcium" from these ads would have not been sufficient.

As an illustration of the problem, suppose 30 percent of the verbiage that was to be purged contained three distinct message components—labeled A, B, and C—and it was unclear just which one, *or combination*, of these components was responsible for causing the alleged deception. Given three factors, definitively addressing the question of causality would require a "factorial" experiment involving seven separate test groups (each exposed to a different combination of these message components: A+B+C; A+B; A+C; B+C; only A; only B; only C). Also useful would be an eighth group exposed to a version that contained none of these potentially misleading components. Not many advertisers would be willing or able to fund such research. Because they are dynamic media, constructing devised controls for use with allegedly deceptive broadcast (TV or radio) or dynamic Internet advertising generally raises many more practical and conceptual difficulties than is the case with print advertising.

### 7.35.3 Relying on Internal Control Stimuli

When neither natural nor devised external (or "between group") controls are practical, an alternative is to rely on internal (or "within group") controls. When possible, this may involve exposing test respondents to both test and control communications. A frequently used alternative is to show the single test stimulus, but rely on asking control questions:

> Both open-ended and closed-ended questions that are properly constructed represent reliable and valid methods by which to test consumer comprehension of advertising. Because answers to closed-ended questions can reflect some level of "noise" (i.e., misunderstanding that is attributable not to the advertisement but to the communication process in general), a "control" question was used in each of the three . . . communication studies to try to determine the level of "noise" present. In the control questions, respondents were asked whether they received one or more additional meanings from the communication. As in the closed-ended "test" questions, the response options included a meaning that the communication expressly contained (a correct answer), as well as one or more meanings that the communication did not contain (an obviously incorrect answer). The percentage of incorrect answers to

129. Fed. Trade Comm'n v. Kraft, Inc., 970 F.2d 311 (7th Cir. 1992).

> a properly constructed control question can be used as a surrogate for misunderstanding inherent in the communication process. The level of advertising not necessarily attributable to the advertiser can be eliminated from the results by subtracting the percentage of incorrect answers to the control question from the level of miscommunication found in the closed-ended test question. The court finds this is an appropriate procedure to assist in making the determination whether a not insubstantial number of consumers are being confused by something attributable to the advertiser.[130]

Such a within-group design (see chapter 4, section 4.24.11) involves comparing the respondents' answers to test questions with their answers to control questions. There are two ways of developing control questions. One approach is to develop separate questions. For example, suppose the issue was whether consumers extracted a deceptive meaning regarding calorie content from a TV commercial for Beer X. The control and test questions, respectively, might be: "If you have any thoughts about it, did the commercial for Beer X say anything about the number of carbohydrates in a 12-ounce serving, or did it not say anything about the number of carbohydrates in a 12-ounce serving?" and "If you have any thoughts about it, did the commercial for Beer X say anything about the number of calories in a 12-ounce serving, or did it not say anything about the number of calories in a 12-ounce serving?"

A second approach is to incorporate both test and control statements into a single question, as was done in *Gillette v. Wilkinson Sword*, where there were two such questions. To illustrate, one question was:

> These cards contain different meanings that someone might take away after looking at the package and seeing what it shows and says.
>
> The first card says "Wilkinson Sword's new Ultra Glide Blue Strip will give you a shave that's six times smoother than the shave you get using razor blades with ordinary white strips."
>
> The second card says "Wilkinson Sword's new Ultra Glide Blue Strip is six times smoother than ordinary white strips."[131]
>
> Which, if either, of these cards describes a meaning that the package either shows or says? You can tell me that you got either one of these meanings, both of these meanings, or neither of these meanings from looking at the package.

130. Gillette v. Wilkinson Sword, 1991, U.S. Dist. LEXIS 21006, *21–*22 (S.D.N.Y. Jan 9, 1991).

131. *Id.*

When developing internal control questions for within-group designs, care must be taken to satisfy two requirements. First, the control question or option should be parallel in form, plausibility, and difficulty to the test question. Second, regardless of whether the experimental or control question is presented first, one needs to be reasonably certain that little to no chance exists it will influence how the subject interprets and reacts to the question asked second. (Internal control questions are discussed in detail in chapter 4, section 4.25.4.)

Reflecting a belt and suspenders approach, studies can incorporate both between-group (separate control group) and within-group (control questions) controls. Consider the defendants' survey in *Pennington v. Scotts*[132], which tested whether grass seed consumers would be misled by a Pennington's commercial into thinking that using Scotts' grass seed product would not produce grass with strong, healthy roots. Respondents in the test group saw the commercial as broadcast. Respondents in a control group were shown the same commercial, except for the fact that the commercial had been imperceptibly modified to remove the few seconds of allegedly deceptive audio and video content. Additionally, respondents in both groups were asked the same set of five questions, four of which concerned the alleged deception and one of which was a control question (on whether the commercial said or suggested that, as compared to the other product, the advertised product contained fewer chemicals harmful to pets). These two approaches to using controls produced different error estimates: respondents in the control group provided appreciably higher error estimates on the four target questions than did test group respondents on the control question. How should findings be calculated and interpreted when such divergent error estimates are obtained? The plaintiff's expert argued that the proper approach is to add the two different noise estimates and then subtract the combined error estimate from the test group findings. The flaw with such an approach is that all a party accused of deceptive advertising needs to do to "demonstrate" its advertising is not deceptive is incorporate several controls then add the findings together so that the combined error estimate reaches or exceeds the level of the test findings. Such an approach virtually guarantees that after the combined control estimate is subtracted from the corresponding test estimate, one is unlikely to find an actionable level of deception. A second, more conservative approach is to calculate the arithmetic average of the within and between controls, then use this average as the single

132. Pennington Seeds, Inc. v. The Scotts Miracle-Gro Co., Inc. and The Scotts Co. LLC, No. 3:12-cv-254 (E.D. July 2013). The plaintiff was also the cross-defendant and the defendant was also the cross-plaintiff. The study described was conducted for Scotts.

best estimate of noise. Because it cuts against the plaintiff in the typical deceptive advertising matter, the third and most conservative approach of all is to use whichever noise estimate is higher and then subtract that from the corresponding test group estimate.

### 7.35.4 Controlling for Preexisting Beliefs

An issue that surfaces in some deceptive advertising matters is whether respondents who participated in the survey had the deceptive beliefs prior to being exposed to the allegedly deceptive advertising.[133] If so, both defendants and plaintiffs can argue that this cuts in their favor. If those exposed to the allegedly deceptive advertising have no appreciably higher level of being misled than control group respondents not exposed to the allegedly deceptive advertising, defendant can argue that it was *not* the advertising that caused the respondents' erroneous beliefs. Plaintiff, on the other hand, may have grounds for arguing that, as a matter of public policy, the advertiser should not engage in any actions that play upon or take advantage of consumers' preexisting beliefs.

Alleging that defendant's commercial impliedly claimed the superior efficacy of its analgesic, and that such claim was false, plaintiff in *American Home Products v. Procter & Gamble* proffered a survey showing that a substantial number of consumers found the commercial claimed that the defendant's analgesic had superior efficacy relative to plaintiff's product. The court, however, refused to enjoin the defendant's commercial because it concluded that the plaintiff's survey failed to control "for the individual participant's preconceived notions concerning OTC analgesics and how those notions may have influenced her responses."[134]

A similar situation arose in *Pharmacia v. GlaxoSmithKline* where the issue concerned whether advertising regarding defendant's nicotine patch caused consumers to extract a superiority meaning. Prior to discussing the survey findings, the court noted: "It is clear that in a false advertising action survey . . . controls are an essential feature of reliable survey evidence because they enable the surveyor to separate the wheat (the effect of the advertisement, alone, on the participant) from the chaff (the effect of

133. Though not generally raised in the context of trademark surveys, the issue of preexisting beliefs may also apply to testing for likely confusion. "Defendants also object that plaintiff did not use a control group to take account of those respondents who are confused 'regardless of the stimuli present.'" Mattel, Inc. v. MCA Records, Inc., 28 F. Supp. 2d 1120, 1136 (C.D. Cal. 1998), *aff'd*, 296 F.3d 894 (9th Cir. 2002). Describing what must be one of the more ludicrous replies, Footnote 13 reads: "Plaintiff responds in a supplemental declaration that, to counter "noise" in the survey, the . . . survey-takers made follow-up calls to twenty-five percent of respondents to verify that they had participated in the survey."

134. Am. Home Prods. Corp. v. Procter & Gamble Co., 871 F. Supp. 739, 749 (D.N.J. 1994).

'the participant's prior knowledge and/or prior (mis)conceptions')."[135] With specific regard to plaintiff's survey, the court commented:

> The Court finds that due to this failure to control for preexisting beliefs the . . . Survey does not establish that "Revised Smart Choice" conveys an implied message of superior quitting efficacy. The survey's results are compromised by the possible influence of the respondents' pre-existing beliefs that comparative commercials convey superior efficacy claims. Put differently, because of this control failure the Court cannot determine if consumers actually perceived a superior quitting efficacy claim in "Revised Smart Choice," or if they were led to perceive one that was not there as a result of their pre-existing biases. . . .
>
> Failure to control for this possibility renders the . . . Survey unreliable.[136]

As noted, advertisers can be faulted for engaging in actions that take advantage of or prey upon consumers' preexisting beliefs. Plaintiff in *Fresh Del Monte Produce v. Del Monte Foods Co.*[137] alleged that, by placing its cut-fruit product in flexible see-through plastic container displayed in chilled cases situated in the fresh produce section of a supermarket, defendant deceived consumers by taking advantage of their preexisting beliefs. Plaintiff's survey showed that more than 50 percent of prospective purchasers shown defendant's red grapefruit sections product in flexible see-through plastic containers displayed in chilled cases situated in the fresh produce section of a supermarket thought the product contained fresh fruit. In contrast, when the same fruit product in flexible see-through plastic containers was shown situated on a shelf in the canned goods section of the same supermarket, approximately 30 percent of prospective purchasers thought the product consisted of fresh fruit.[138] Questions asked afterward of the 600 respondents in all six test groups revealed consumers held the following beliefs.

135. Pharmacia Corp. v. GlaxoSmithKline, 292 F. Supp. 2d 594, 605 (D.N.J. 2003) (citing *Am. Home Prods. Corp.*, 871 F. Supp. 739 at 761–62).

136. *Id.* at 606.

137. Fresh Del Monte Produce, Inc. v. Del Monte Foods Co., No. 08-Cv-8718 (S.D.N.Y. filed Mar. 28, 2013).

138. The data described are from two of six groups tested in the study. The survey also tested four other groups of respondents, some of whom were shown the red grapefruit sections in cylindrical containers made of hard see-through plastic situated either in refrigerated cabinets in the fresh produce section or on a shelf in the canned goods section of the same supermarket; others of whom saw a red grapefruit sections product in cans.

**"If cut-fruit product is sold . . . , it means or suggests it is fresh fruit."**

| | |
|---|---|
| in same section as whole fruit, vegetables, and produce | 69.8% |
| on a refrigerated shelf or in a refrigerated cabinet | 68.5% |
| in a thin, flexible, see-through plastic package with a resealable snap-top lid | 61.6% |
| in a package that says "Must be refrigerated" | 60.2% |
| in a clear, see-through plastic package with a resealable snap-top lid | 48.9% |
| in a sealed, screw-top jar | 28.7% |
| in a can | 10.5% |

What these findings suggest is that consumers arrive at the shopping environment with preexisting beliefs that they rely on when judging whether a product contains fresh fruit or preserved fruit. Packaging fruit in thin, flexible, see-through plastic packages with a resealable snap-top lids, which are containers typically used for fresh fruit, and placing those containers in same section as whole fruit, fresh vegetables, and produce are likely to cause consumers to believe those packages contain fresh fruit.

At least three approaches can be used for measuring preexisting beliefs. When there is no need to relate the possession of these beliefs to any given advertisement or advertising campaign, one can do a survey with prospective purchasers who are not exposed to any advertising stimulus during the survey. Second, one can use Design 5 discussed in section 4.24.2 of chapter 4.[139] Third, under certain circumstances, one can test for preexisting beliefs after having tested the stimuli at issue. These circumstances apply when, as was the situation in *Fresh Del Monte Produce v. Del Monte Foods*, different groups exposed to different stimuli were tested and, regardless of the stimulus upon which they were tested, the respondents in the different groups provided virtually the same answers to the questions used to assess preexisting beliefs.

139. *E.g.*, Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck, 129 F. Supp. 2d 351, 366 n.10, (D.N.J. 2000) ("The control cell is supposed to 'control' extraneous factors (known as 'noise') that do not reflect on any messages conveyed by the name or labeling of MNTS. 'Specifically, the control cell functions as a baseline and provides a measure of the degree to which respondents are likely to give an answer indicating a time period of relief, not as a result of the name or labeling, but because of other factors, such as the survey's questions, the survey's procedures, the nature of the product, or some other potential influence on a respondent's answer such as pre-existing beliefs.'").

## 7.40 Variations in Presenting Stimuli

Trademark surveys may involve testing a single test stimulus (as is generally the case in the classic *Eveready* approach for testing likely confusion; see section 7.53.1, *infra*) or two or more stimuli (as is the case in the *Squirt* approach for testing likely confusion; see section 7.53.2, *infra*) where, in addition to the test stimulus, control, comparison, or distracter stimuli might be employed as well.

In instances where two or more stimuli—typically a test and a control stimulus—are involved, the simplest protocol involves exposing each respondent to just one stimulus, with each of the stimuli being tested *using a different set of respondents*.[140] However, as the number of stimuli increases, this approach can lead to large-scale, unduly expensive surveys. For example, given two test stimuli and a corresponding control stimuli for each, testing 250 respondents per stimulus would require testing 1,000 respondents.

Other trademark survey protocols involve exposing *the same respondent* to two or more stimuli, such as test and control(s), test and comparison(s), test and distracter(s), control and comparison(s), control and distracter(s), test and control(s) and distracters, and so on. As examples, to determine whether the mark at issue is generic, the Teflon approach to studying genericism (see section 7.51.2, *infra*) involves having the same respondents tested on the test stimulus as well as on a number of other comparison stimuli, of which some are generic and others are brands or source identifiers. Testing whether a mark or trade dress has acquired secondary meaning may involve having the same respondent answer the same questions asked about filler, comparison, or control stimuli as are asked about the test stimulus. Assessing likely confusion generally involves exposing respondents to test and control stimuli, with the same respondent sometimes being exposed to both.[141]

When two or more stimuli are to be presented to the same respondent, how should this be implemented? Section 7.41 discusses situations where plaintiff's and defendant's stimuli are presented to the same respondent; section 7.42 discusses situations where either plaintiff's or defendant's mark, but not both, are presented to the same respondent.

140. Testing respondents on a single stimulus is called a *monadic* testing. Marketing researchers also use other variations termed *sequential monadic* and *protomonadic*, though these not concern us here.

141. See discussion of within (internal) versus between (external) controls in section 4.24.1 of chapter 4.

## *7.41 When Presenting Plaintiff's and Defendant's Stimuli to the Same Respondent*

Protocols for testing whether a likelihood of confusion exists between the two marks may involve testing only defendant's mark.[142] Other survey protocols involve exposing respondents to both plaintiff's and defendant's offerings. When presenting both plaintiff's and defendant's marks to the same respondent, a question is whether to present these stimuli side-by-side or sequentially.

### 7.41.1 Simultaneous Side-by-Side Presentation

Exposing respondent to marks needs to be done "in the light of what occurs in the marketplace."[143] Since retail outlets rarely carry but a single brand of a consumer product and competing brands (of shirts, bottles of wine, etc.) often appear shelved or hung side by side (or even interspersed) in the marketplace, presenting both disputants' marks to a respondent at the same time might seem to be reflective of many marketplace circumstances. Yet presenting respondents plaintiff's and defendant's marks side-by-side is likely to elicit criticism from the court.

---

142. Elizabeth Taylor Cosmetics Co. v. Annick Goutal, S.A.R.L., 673 F. Supp. 1238, 1248 (S.D.N.Y. 1987) ("The proper test for likelihood of confusion is . . . whether confusion is likely when a consumer, familiar to some extent with the one party's mark, is presented with the other party's goods alone."). *See also* E. & J. Gallo Winery v. Consorzio del Gallo Nero, 782 F. Supp. 457, 20 U.S.P.Q.2d 1579 (N.D. Cal. 1991) (citing *Elizabeth Taylor Cosmetics Co.*, 673 F. Supp. at 1248); Levi Strauss & Co. v. Blue Bell, Inc., 632 F.2d 817, 822, 208 U.S.P.Q. 713 (9th Cir. 1980); James Burrough, Ltd. v. Sign of the Beefeater, Inc., 540 F.2d 266, 275, 192 U.S.P.Q. 555 (7th Cir. 1976); Hartford House Ltd. v. Hallmark Cards, Inc., 647 F. Supp. 1533, 1544, 1 U.S.P.Q.2d 1030, 1038 (D. Colo. 1986) (citing Beer Nuts, Inc. v. Clover Club Foods Co., 711 F.2d 934, 941, 221 U.S.P.Q. 209 (10th Cir. 1983)). Other courts have advanced a conflicting point of view; *see* Ambrit, Inc. v. Kraft, Inc., 805 F.2d 974, 1 U.S.P.Q.2d 1161 (11th Cir. 1986) ("Individuals interviewed in their homes were shown defendant's ice cream bar package and asked the name of the company making the product. The court said the fatal flaw in the survey was providing the respondents the opportunity to read defendant's label while never showing them plaintiff's product."). Swann considers the *Eveready* test (which requires that respondents only be exposed to defendant's goods) to be the gold standard for testing likely confusion of a second comer's goods when the first comer's goods are well known; *see* Jerre Swann, *Likelihood of Confusion Studies and the Straightened Scope of Squirt*, 98 TRADEMARK REP. 739 (2008); Jerre Swann, *Likelihood of Confusion*, in TRADEMARK AND DECEPTIVE ADVERTISING SURVEYS (S.S. Diamond & J.B. Swann eds., 2012).

143. *Beer Nuts, Inc.*, 711 F.2d at 941 (citing *James Burrough, Ltd.*, 540 F.2d at 275). As noted in chapter 3, in confronting and appraising goods in the marketplace, consumers are not *tabulae rasae*, but arrive with stored memories regarding products, their trade dress, and so on. Hence, in a great many instances, a side-by-side comparison actually is being made—between what the consumer has stored in memory and remembers, and the item the consumer sees in the marketplace. That said, as Prof. McCarthy notes: "The ordinary purchaser is not required to carry in memory, at all times, the exact details of the package and its trademark." MCCARTHY, *supra* note 1, § 23:59. *See* Distillerie Flli Ramazzotti v. Banfi Prods. Corp., 52 Misc. 2d 593, 276 N.Y.S.2d 413, 151 U.S.P.Q. 551 (1966), *aff'd*, 27 A.D.2d 905, 280 N.Y.S.2d 892 (1st Dep't 1967).

With rare exception,[144] courts have held that surveys should not present plaintiff's and defendant's offerings side-by-side.[145] This applies not only to instances where the marks never appear side-by-side in the marketplace, but also to situations where the marks do in fact appear side-by-side (and sometimes actually interspersed) in the marketplace. For example, even though it can be shown that consumers purchasing clothing in retail outlets will take items from one location to another location in the same store so as to make direct comparisons, courts have faulted placing the items side-by-side in the survey.[146]

The rationale for avoiding side-by-side presentation makes sense in light of the following. Even when plaintiff's and defendant's items do appear side-by-side in the marketplace, since not all retailers necessarily carry both products (or, when they do, there are times when one of the items is out of stock), it can be argued that these stimuli should not be provided side-by-side to respondents in a trademark survey. Another argument—more an assumption in need of empirical test—is that side-by-side presentations in the context of a survey is likely to generate greater respondent attention to the trademarks than occurs in the marketplace, thereby enabling respondents to make comparisons that would reduce confusion. An alternative assumption is that, under some circumstances, side-by-side presentations may increase confusion.[147]

In *Berkshire Fashions, Inc. v. Sara Lee Corp.*,[148] a side-by-side display of slippers and pantyhose was rejected because it was "not in accordance with the more common single exposure reality in the marketplace." In *Edison Bros. v. Cosmair*, where women's clothing and perfumes were presented side-by-side, the court commented that this was "a somewhat unrealistic simulation of actual market condition."[149] A similar appraisal

144. *E.g.*, Winner Int'l LLC v. Omori Enters., Inc., 60 F. Supp. 2d 62, 72 (E.D. N.Y. 1999) ("The survey is also unreliable, among other reasons, because the manner in which it was conducted did not resemble actual market conditions. Although The Club products are not sold on the same shelf as the Global America products, they are nearby. In an actual store that sells both The Club and Global America, a consumer could view both trade dresses before making a buying decision. Given the prominence of the trademarks on both packages, the well-known name The Club, and the up to thirty-dollar price difference, it is unlikely that confusion would arise.").

145. *Side-by-side* refers to stimuli actually being presented contemporaneously. When stimuli are presented one immediately after the other, the presentation format is termed *sequential* (see section 7.41.2).

146. THOIP v. Walt Disney Co., 690 F. Supp. 2d 218 (S.D.N.Y. 2010).

147. *See, e.g.*, Hills Bros. Coffee, Inc. v. Hills Supermarkets, Inc., 428 F.2d 379, 166 U.S.P.Q. 2 (2d Cir. 1970).

148. Berkshire Fashions, Inc. v. Sara Lee Corp., 724 F. Supp. 790, 14 U.S.P.Q.2d 1124 (S.D.N.Y. 1989).

149. Edison Bros. Stores, Inc. v. Cosmair, Inc., 651 F. Supp. 1547, 2 U.S.P.Q.2d 1013 (S.D.N.Y. 1987).

was made in another case involving perfume.[150] Side-by-side presentation was cited as one of many factors that caused the court in *Sports Authority Inc. v. Abercrombie & Fitch*[151] to accord plaintiff's survey "little weight" in evaluating confusion.

In *Jordache v. Hogg Wyld*, a side-by-side presentation comparison of jeans was said to bear "little resemblance to the actual workings of the marketplace," a position affirmed by the Tenth Circuit.[152] In a matter involving greetings cards, a product that often appears side-by-side with other greetings cards in the marketplace, as justification for disregarding a survey, the district court in *Hartford House. v. Hallmark* cited the Tenth Circuit position stated in *Beer Nuts, Inc. v. Clover Club Foods*:

> In evaluating similarity, "[i]t is axiomatic in trademark law that 'side-by-side' comparison is not the test." The marks "must be compared in the light of what occurs in the marketplace, not in the courtroom. A prospective purchaser does not ordinarily carry a sample or specimen of the article he knows well enough to call by its trade name, he necessarily depends upon the mental picture of that which symbolizes origin and ownership of the thing desired." Therefore, the court must determine whether the alleged infringing mark will be confusing to the public when singly presented.[153]

The observation that "[i]t is axiomatic in trademark law that 'side-by-side' comparison is not the test" can be traced back to a Ninth Circuit ruling in *Levi Strauss v. Blue Bell*.[154] In *Fortune Dynamic v. Victoria's Secret*, however, the Ninth Circuit clarified that "that statement, far from setting forth a standard for admitting survey evidence, merely provided support for our recognition of the possibility of post-sale confusion."[155] The Ninth Circuit went on to explain that "survey evidence should be admitted 'as long as [it is] conducted according to accepted principles and is

150. Elizabeth Taylor Cosmetics Co. v. Annick Goutal, S.A.R.L., 673 F. Supp. 1238, 1248, 5 U.S.P.Q.2d 1305, 1313 (S.D.N.Y. 1987).

151. Sports Auth. Inc. v. Abercrombie & Fitch, Inc., 965 F. Supp. 925, 42 U.S.P.Q.2d 1662, 1666–68, 1671–72 (E.D. Mich. 1997).

152. Jordache Enters., Inc. v. Hogg Wyld, Ltd., 625 F. Supp. 48, 227 U.S.P.Q. 794 (D.N.M. 1985), *aff'd*, 828 F.2d 1482, 4 U.S.P.Q.2d 1216 (10th Cir. 1987).

153. Hartford House Ltd. v. Hallmark Cards, Inc., 647 F. Supp. 1533, 1 U.S.P.Q.2d 1030 (D. Colo. 1986) (quoting Beer Nuts, Inc. v. Clover Club Foods Co., 711 F.2d 934, 221 U.S.P.Q. 209 (10th Cir. 1983)).

154. Levi Strauss & Co. v. Blue Bell, Inc., 632 F.2d 817, 822 (9th Cir. 1980).

155. Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc., 2010 WL 3258703, at *9 (9th Cir.) (citing *Levi Strauss & Co.*, 632 F.2d at 822 ("Wrangler's use of its projecting label is likely to cause confusion among prospective purchasers who carry even an imperfect recollection of Strauss's mark and who observe Wrangler's projecting label *after the point of sale*. It is axiomatic in trademark law that 'side-by-side' comparison is not the test.") (emphasis added)).

relevant.'"[156] This seems to open the door to side-by-side presentations in surveys proffered within the Ninth Circuit, providing the marks actually do appear side by side in the marketplace. Research inevitably involves making tradeoffs. Perhaps the lesson from the Ninth Circuit's ruling in *Fortune Dynamic v. Victoria's Secret* is that simulating the marketplace and/or the findings from a relevant survey conducted according to accepted principles trump an absolute prohibition against side-by-side presentation.

The same guidelines may apply in the Second Circuit. Consider use of the phrase "in lieu of" in the following: "In remanding for further proceedings, we emphasized that to determine whether two products are confusingly similar it is improper to conduct a side-by-side *comparison in lieu of* focusing on actual market conditions and the type of confusion alleged."[157] Although plaintiff's survey did not include side-by-side presentations, the court conducted a side-by-side examination of its own, leading the appellate court to write:

> The similarity of the marks is a key factor in determining likelihood of confusion.
>
> The district court here noted that there were "obvious similarities" between the Louis Vuitton and Dooney & Bourke handbags . . . [when] it determined that despite the similarities, the two marks were not confusingly similar.
>
> It appears the trial court made the same mistake that we criticized in *Burlington Coat Factory*: inappropriately focusing on the similarity of the marks in a side-by-side comparison instead of when viewed sequentially in the context of the marketplace. . . .
>
> Utilizing a side-by-side comparison can be a useful "heuristic means of investigating similarities and differences in . . . respective designs," so long as a court maintains a "focus on the ultimate issue of the likelihood of consumer confusion." . . .
>
> The district court erred because it based its determination that confusion between the Vuitton and Dooney & Bourke marks was unlikely at least in part on an overemphasized side-by-side comparison. This is suggested by the district court's comment that "no amount of expert opinion, legal analysis, or demonstrative evidence can overcome the clarity that comes from direct observation."[158]

The prohibition against side-by-side presentation even applies when, to better simulate what does occurs in the marketplace, plaintiff's and

156. *Id.*
157. Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d 108, 113 (2d Cir. 2006).
158. *Id.* at 118 (citing Louis Vuitton Malletier v. Burlington Coat Factory, 426 F.3d 532, 537–38 (2d Cir. 2005); Malletier v. Dooney & Bourke, 340 F. Supp. 2d 415, 421, 440 (S.D.N.Y. 2004)).

defendant's offerings are provided in the context of not one but a number of other competing offerings. Consider *E. & J. Gallo v. Consorzio del Gallo Nero*,[159] where defendant, an Italian trade association based in Italy that promotes Chianti Classico wine produced by its individual members in the Chianti region of Italy, was poised to sell wine in the United States in bottles bearing neck seals that said "Gallo Nero" in approximately 6-point type. Though wine retailers do not sell neck seals, but bottles of wine (bearing not only a neck seal, but other source-identifying indicia, including on larger labels on the front and back of the bottles), plaintiff's survey involved showing 512 respondents only a neck seal with the "Consorzio del Gallo Nero" designation. Emphasized in this manner, the "Consorzio del Gallo Nero" neck seal was associated with E&J Gallo by 43 percent of the respondents.

In contrast, defendant's survey involved showing 216 respondents an array of eight bottles of red wine, two of which were E&J Gallo wines and two of which were Gallo Nero wines bearing their neck seals. These four bottles were never literally shown side-by-side, but separated by at least two of the four distracter offerings. Defendant's survey found 1.4 percent confusion. Writing "that the proper survey evidence is that which attempts to most closely replicate the marketplace setting in which consumers will typically encounter the competing marks,"[160] but without commenting upon the appropriateness of using of neck seals removed from their bottles as the test stimulus, the court found defendant's side-by-side presentation of the eight bottles of wine to be a serious flaw, concluding: "On summary judgment, drawing all inferences in the non-movant's favor, the Court finds nonetheless that there is some evidence of a likelihood of confusion under both surveys, even if [defendant's] Survey results in only a 'trivial' showing."[161] Thus, side-by-side presentation of real-world products can be deemed a more serious flaw than using stimuli (in this instance, only wine bottle neck seals) not for sale in the marketplace.

Having focused the better part of this section on instances where courts have been highly critical of side-by-side presentations, it should be noted that the original *Squirt* protocol (see section 7.53.2, *infra*)[162] relies directly upon a side-by-side presentation. Using this procedure, a line-up of products (see section 7.41.2) is presented to respondents, including both

159. E. & J. Gallo Winery v. Consorzio del Gallo Nero, 782 F. Supp. 457, 20 U.S.P.Q.2d 1579 (N.D. Cal. 1991).

160. *Id.* at 467.

161. *Id.*

162. SquirtCo. v. Seven-Up Co., 628 F.2d 1086, 1092 (8th Cir.1980); Big O Tires, Inc. v. Bigfoot 4X4, Inc. 167 F. Supp. 2d 1216 (D. Colo., 2001).

litigants' marks, and the respondents are asked whether any of the items in the array come from the same company.[163] In one matter, a pilot study conducted for the purpose of being offered as evidence at a preliminary injunction hearing, tested confusion by having plaintiff's and defendant's marks first presented *monadically* (that is, one at a time), then presented side-by-side.[164] At issue was "Heartwise," a mark used mark by plaintiff on a line of breakfast meat products and by defendant on a new breakfast cereal. Respondents first saw Worthington's Breakfast Strips (which bore the mark Heartwise), Kellogg's Heartwise cereal, and four other products, one at a time in random order. After being shown each product, the respondents were asked to say the name of the product and which company produced it. Next, all the products were shown together and the respondents were asked whether any were made or sponsored by the same company. This approach yielded zero percent confusion when the marks were tested individually, and zero percent confusion when they were tested side-by-side.[165]

Although researchers have been rebuked for side-by-side presentations, courts have made such comparisons on their own[166] and, on appeal, have found themselves admonished for doing so.[167] One suspects courts will continue making side-by-side comparisons but, to avoid potential criticism from appellate courts, make no mention of having done so.

Discussion thus far of side-by-side presentations applies to showing products (or representations of products, e.g., photographs). However, like products and photographs of products, the questions asked of respondents also qualify as stimuli. Given that most courts seem not to favor side-by-side presentation of marks and products, it might be argued that mentioning both plaintiff's and defendant's marks in questions asked of respondents should also be discouraged. Consider the following example from *Beneficial Corp.* where respondents were asked by telephone: "Do you

163. A variation of the traditional *Squirt* format involves sequential presentation of the stimuli; see chapter 14 in Volume II.

164. Worthington Foods, Inc. v. Kellogg Co., 732 F. Supp. 1417, 14 U.S.P.Q.2d 1577 (S.D. Ohio 1990).

165. Although only a pilot test involving 50 respondents, when zero out of 50 (0 percent) are confused, it is highly improbable that confusion levels above 5 percent would be obtained with a full survey.

166. Am. Home Prods. Corp. v. Barr Labs., Inc., 656 F. Supp. 1058, 1065 (D.N.J. 1987) ("Defendants' tablet is manufactured in a color similar to the brown color of Advil. When the tablets are examined side-by-side, the defendants' tablet appears to bear the same hue as Advil, in a slightly lighter shade.").

167. Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d 108, 118 (2d Cir. 2006) ("It appears the trial court made the same mistake that we criticized in *Burlington Coat Factory* inappropriately focusing on the similarity of the marks in a side-by-side comparison instead of when viewed sequentially in the context of the marketplace.").

think that there may or may not be a business connection between Beneficial Capital Corp. and the Beneficial Finance System Companies?"[168]

### 7.41.2 Sequential Presentation

As the term suggests, a sequential presentation is one in which the respondent sees the marks in sequence. In the simplest of instances, the marks are presented one at a time, first presenting one, removing it from view, then presenting the second, and so on. In other instances, the respondent may see a set of marks at one time, after which these are removed from view and the respondent is exposed to a another set of marks. Sequential presentations are sometimes implemented by placing one party's goods in one room, the other party's goods in a second room, and having the respondent physically move from one room to the other. This has been referred to as a *two-room* protocol. It probably is more often the case that both parties' goods appear in the same room, with both parties' goods being hidden from view at the outset. One party's goods are first shown to the respondent, then hidden from view, followed by exposure to the second party's goods. When plaintiff's and defendant's marks are presented sequentially, the respondent may be asked questions about each mark, or only about the mark shown second. In many instances of sequential presentation, plaintiff's and/or defendant's marks are presented in the context of other distracter or comparison marks. Such multiple stimuli presentations are referred to as *lineups*[169] or *arrays*.[170]

Trademark surveys seek to simulate real world purchasing as best as possible. However, many aspects of the real world cannot be incorporated in surveys either at all or exactly as they appear or occur in the real world. While sequential exposure often occurs in the real world—as

---

168. Beneficial Corp. v. Beneficial Capital Corp., 529 F. Supp. 445, 450 (S.D.N.Y. 1982). Other examples include "Do you think Squirt and Quirst are put out by the same company or by different companies?" (Squirtco v. Seven-Up Co., 628 F.2d 1086, 1089 n.4 (8th Cir. 1980)) and "Do you think the weight loss products 'Sweet Success' and 'Success Rice' are more likely made by the same company or more likely made by different companies?" (Riviana Foods, Inc. v. Societe des Produits Nestle S.A., 33 U.S.P.Q.2d 1669, 1671 (S.D. Tex. 1994)).

169. "[R]espondents are shown the plaintiff's trade dress, and then, after a short delay, shown a line-up of other brands, including the accused product. Respondents are asked if any of them are made by the same company as makes the product initially seen." *See* McCarthy, *supra* note 1, § 32:177 (Survey Formats—Product "line-up" survey methods). Readers are advised to consult this section of McCarthy for additional perspective on sequential presentation.

170. The term "array" is also used to describe the situation where one disputant has a number of offerings bearing the same mark and some or all of these are displayed at the same time, but not in the context of the other party's marks, distracter marks, or control marks. *See, e.g.*, Juicy Couture, Inc. v. L'Oreal USA, Inc., 2006 WL 1012939, at *28 (S.D.N.Y. Apr. 19, 2006) (respondents in defendant's survey were shown an array of six products).

when a consumer walks down an aisle and is exposed to different cereals, OTC pharmaceuticals, shirts from different manufactures hanging on the same rack, and so on—in many instances, consumers experience marks sequentially only after a period of time amounting to hours, days, week or perhaps even months has elapsed. Unfortunately, survey respondents cannot be expected to participate in surveys that go on for months, weeks, days, or hours. Surveys are necessarily truncated in time so that, in many instances, sequential presentation represents a compromise with what occurs in the real world. But courts have criticized the use of sequential presentation when it fails to reflect the amount of time that might be expected to intervene between exposure to plaintiff's mark and exposure to defendant's mark in the marketplace.[171] One court has criticized the use of sequential presentation when it departs from exposure in the marketplace,[172] and criticized other surveys when sequential exposure is characteristic of the marketplace, so that a sequential protocol is appropriate, but was not used.[173]

Because many court opinions provide only a thumbnail description of a survey's protocol, many more trademark surveys likely have employed sequential presentations than may be gleaned from reviewing case law. Examples of sequential presentations where plaintiff's product was shown first, then removed, after which defendant's product appeared in arrays containing one or more control products along with other products, include plaintiffs' surveys in *Red Bull v. Matador Concepts*[174] and *Louis Vuitton v. Dooney & Bourke*.[175] As another example of sequential arrays, consider the following.

> Defendant's barbecue sauce and nine other products were arranged horizontally on a shelf. Respondents were instructed to look at

171. Kargo Global, Inc. v. Advance Magazine Publishers, Inc., 2007 WL 2258688, at *8–9. (S.D.N.Y. 2007) ("Here, the back-to-back, or seriatum, display of the *Cargo* and Kargo marks did not approximate conditions that consumers would encounter in the marketplace. . . . [T]he Court doubts that a non-negligible number of prospective consumers of Kargo's products would see *Cargo* magazine, followed a minute or less later, by the KARGO logo. . . . Although the . . . Survey's seriatum display of the non-competing marks does not alone render the survey inadmissible, it does substantially detract from the survey's capacity to prove a likelihood of consumer confusion.").

172. THOIP v. Walt Disney Co., 690 F. Supp. 2d 218, 240 (S.D.N.Y. 2010) ("I conclude that the [sequential showing] Survey failed to sufficiently replicate the manner in which consumers encountered the parties' products in the marketplace. . . .").

173. Malletier v. Dooney & Bourke, Inc., 525 F. Supp. 2d 558, 575 (S.D.N.Y. 2007) (criticizing a survey for "the failure to employ a methodology involving sequential presentation or 'line-up' of stimuli which better approximates marketplace conditions.").

174. Red Bull GmbH v. Matador Concepts, Inc., 2006 WL 4749923 (C.D. Cal. Jan. 13, 2006).

175. Louis Vuitton Malletier v. Dooney & Bourke, Inc., 340 F. Supp. 2d 415 (S.D.N.Y. 2004).

each product as if they were considering buying it. Products could be picked up and examined if the respondent wanted to do so. Upon completion of the examination of products, the products were removed and each respondent was shown five products, one at a time, and asked for each product whether the product was the same brand or made by the same company as the comparable product type contained in the nine-product display. One of the five products was plaintiff's product.[176]

At least one court has held that exposure to weak marks before exposure to an allegedly infringing mark is inappropriate. "[E]very respondent was exposed to the Teton Glacier product in the first room, thus acquainting them with a product that they would almost certainly have been unfamiliar with otherwise, due to Teton Glacier's very limited distribution network and weak sales. Thus, the . . . Survey cannot be relied upon to establish that consumers would mistakenly believe that Glacier Bay was affiliated with Teton Glacier."[177] While applicable to tests of forward confusion, this rationale may be less applicable to tests of reverse confusion, where the question is whether, upon exposure to a weak first comer's mark, consumers would be confused into believing it emanated from, was connected with, or received authorization from the better-known second comer.[178]

At least one survey has been faulted for not rotating the order in which stimuli were presented to the respondents.[179] Although no case law was found to support or refute the following suggestions, they seem to make sense. When both plaintiff's and defendant's marks are presented to the same respondent, to parallel the temporal sequence generally occurring in the marketplace, the sounder rationale for tests of forward confusion would appear to be to present the first comer's goods first and the second comer's goods second. Similarly, to parallel the temporal sequence generally occurring in the marketplace, the sounder rationale for tests of reverse confusion might be to present the second comer's goods first and the first comer's goods second.

In any survey where both plaintiff and defendant's marks are to be sequentially presented to respondents, it is suggested that the presentation

176. Kraft Gen. Foods, Inc. v. Allied Old English, Inc., 831 F. Supp. 123, 31 U.S.P.Q.2d 1094 (S.D.N.Y. 1993).

177. Nat'l Distillers Prods. Co., LLC v. Refreshment Brands, Inc., 198 F. Supp. 2d 474, 485 (S.D.N.Y. 2002).

178. Throughout this chapter, the plaintiff is assumed to be the first-comer and defendant the second-comer.

179. Winning Ways, Inc. v. Holloway Sportswear, Inc., 913 F. Supp. 1454, 1465–67 (D. Kan. 1996).

not be temporally contiguous, but separated by the insertion of "distracter" questions or activities designed to occupy the respondent's attention for at least 10 to 15 seconds. Scholarly research indicates that having respondents distracted for five to ten seconds is sufficient to remove contents from immediate or short-term memory, although not from long-term memory. Short-term memories are brief, generally lasting only a few seconds, so that distracter questions or other activities function much like salt crackers eaten between wine samplings, serving to clean the cognitive palette of immediate memories.

As noted, surveys are not the typical marketplace reality, and an aspect of the marketplace that may not easily be accommodated by surveys is the amount of time that elapses between when the consumer in the marketplace is exposed to plaintiff's and defendant's goods. In a matter where plaintiff's survey used a series of distracter questions between exposure to the plaintiff's product and mark and the defendant's product and mark, defendant's expert "testified that the survey format did not approximate market conditions because it was unlikely that a consumer would inspect a bottle of CRISTAL champagne immediately before looking at a bottle of CRISTALINO cava [defendant's wine]. He opined that the failure to approximate market conditions turned the survey into a 'matching game' where respondents looked for the 'right' answer."[180] However, given (1) that liquor stores often have wines placed in close proximity to champagnes, (2) the use of a series of distracter questions, and (3) that an appreciable proportion of respondents answered "no" and "I don't know," criticisms such as the one described here appear unwarranted.

## 7.42 When Presenting Test and Other (Control, Comparison, or Distracter) Stimuli

The majority of trademark surveys involve testing two or more stimuli. Sometimes these are tested using the same respondent, sometimes using different respondents. Section 7.41 discusses situations where the same respondent is presented with *both* plaintiff's and defendant's marks. The present section discusses situations where the same respondent is presented with either plaintiff's or defendant's mark, but *not both*, and one or more control, distracter, or comparison stimuli.[181]

180. Roederer v. J. Garcia Carrion, S.A., 732 F. Supp. 2d 836, 863 (D. Minn. 2010).

181. See section 7.20 through 7.29 for definitions of these terms. Also, to facilitate communication, the discussion is written as if the respondent is shown a single test stimulus. In some instances, however, the same respondent may be exposed to more than a single test stimulus. *See, e.g.*, Juicy Couture, Inc. v. L'Oreal USA, Inc., 2006 WL 1012939, at *28 (S.D.N.Y. Apr. 19, 2006) (respondents were "invited to handle the boxes and examine the products if they wished to do so").

The researcher has a number of options for presenting test and control stimuli to the same respondent, especially when comparison or distracter stimuli are presented as well. One obvious but, for reasons to be explained shortly, unwise choice would be to ignore the order in which these stimuli are presented. More intelligent choices would be to present the stimuli in randomized order (where the various stimuli appear in different orders, depending upon the results of randomization), rotated order (where the various stimuli appear in different orders depending upon prespecified rotation patterns), or standardized (fixed) order.

Consider the situation where there is but one test stimulus, one control stimulus, and no distracter or comparison stimuli. Under these circumstances, the two stimuli can be presented either concurrently (side by side[182]) or sequentially (the first stimulus is removed before the second is shown). Though basic, this situation is not simple, but requires that the surveyor control the interviewing procedure so as to avoid or adjust for potentially biasing *order effects*.

It is axiomatic in survey research that whatever is first presented to or asked of the respondent has the potential to establish a mindset for interpreting and responding to items shown or asked about afterward. Social scientists have identified specific order effects that may arise from the sequencing of two or more stimuli. One, termed a *primacy effect*, refers to the tendency of that item or option presented first being more often remembered or selected. Another, termed a *recency effect*, refers to the tendency of the item or option presented last being more often remembered or selected. Stimuli placed in the middle of a set tend to be less well remembered or selected. A good illustration of this effect comes from observing how children learn the alphabet. When they begin, most children are able to remember and repeat "A, B, C" and "X, Y, Z," but have difficulty remembering and playing back letters in the middle of the alphabet.

The procedure for canceling out potentially biasing order effects involves rotating the order in which the test and control stimuli are provided. For concurrent (side by side) testing, this means presenting one stimulus on the left and the other on the right for half the respondents, and using the reverse order with the other respondents. For sequential testing, this means presenting one stimulus first and the other second half the time, and using the reverse order the other half of the time. (These procedures also apply to presenting a test stimulus and either a single comparison stimulus or distracter stimulus.) In the majority of instances,

182. As contrasted with presenting defendant's and plaintiff's marks at the same time, examination of case law suggests that presenting a test stimulus along with a control stimulus does not constitute a side-by-side presentation deemed impermissible by courts.

this *counterbalancing* procedure ensures that, when the findings are averaged across all respondents, whatever primacy or recency biases might exist have canceled each other out.

The situation becomes somewhat more complicated when the protocol involves a test stimulus and a number of other (control, comparison, and/or distracter) stimuli. Consider the *Teflon* protocol[183] used to measure genericness where, along with being given the test stimulus and asked to classify it either as a common name or brand name, the same respondent is also given several other names, half of which are common names and the other half of which are brand names, and asked to classify these as well. For purpose of illustration, suppose the list contained the test name and eight comparison names, four of which were brand names and four of which were generic product names.

One way to handle this situation would be to randomize the presentation order of the nine names across respondents. While complete randomization is relatively easy to accomplish via programming for computer-assisted telephone interviewing or Internet surveys, it is considerably more difficult to accomplish when using paper-and-pencil questionnaires, as is common with in-person mall-intercept interviewing.[184] As an example of randomization, consider plaintiff's survey in *Hershey's v. M&M Mars*,[185] which sought to determine whether the juxtaposition of particular colors and shades in the wrapper of plaintiff's Reese's Peanut Butter Cups had acquired secondary meaning. The stimuli consisted of seven same-sized rectangular cards onto which had been placed color-faithful representations of the critical color features of the test stimulus, five comparison stimuli and one control stimulus. Before being presented to each respondent, the seven cards were shuffled, thereby creating a randomized order.

Recognize that randomization does not guarantee that the test stimulus would appear in the first, last, or any other position the same proportion of times as other stimuli. This may be of trivial importance in some situations (such as in the *Hershey's v. M&M Mars* survey), but considerable importance in others (such as when measuring genericism). Randomization does not ensure that an equal number of brand names and product names will be presented to the respondent before he or she is asked the critical question regarding the test name. Randomization could

183. E.I. du Pont de Nemours & Co. v. Yoshida Int'l, Inc. 393 F. Supp. 502, 525–27, 185 U.S.P.Q. 597, 615–16 (E.D.N.Y. 1975).

184. Using standard in-person mall intercept interviewing, the best one could do is develop several randomized forms of the list of names, then randomize the starting point on each list, beginning different respondents at different points on the list.

185. Hershey Foods Corp. v. Mars, Inc., 998 F. Supp. 500 (M.D. Pa. 1998). See discussion in section 7.21.5.

conceivably create a situation where the four comparison brand names were presented first, followed by the test name, then the four generic product names. Under this scenario, the respondent might be more inclined to say that the test name is a brand name than a product name. An easy way to handle this possibility is to place the test stimulus in the fifth, seventh, or ninth position, making sure that an equal number of brand and generic product names (the comparison stimuli) were presented before asking the question regarding the test name.[186] This represents standardization. Just which brand and product names came before the test name could also be standardized; however, if considered important to do so, these could also be randomized or rotated.

Standardization can take many forms. One interesting example comes from plaintiff's survey in *Sturm, Ruger & Co. v. Arcadia Machine & Tool*, where the same protocol was used to test for both secondary meaning and confusion regarding the external configuration of a .22 automatic pistol.[187] Respondents were shown close-up color photographs of five different .22 caliber handguns. There were two sets of photos, one for testing secondary meaning and the other for testing likely confusion. Photos one through four, which were the same in both sets, showed comparison stimuli, with the one of the four being a well-known pistol and three being lesser known. The test stimulus was presented in the fifth slot. As the fifth photo, the respondents used for testing secondary meaning saw a photo of plaintiff's handgun while the respondents used for testing likely confusion saw a photo of defendant's handgun. This protocol may be described as follows.

| **Secondary Meaning** | **Likely Confusion** |
|---|---|
| Photos 1 through 4 | Photos 1 through 4 |
| Photo 5: Ruger | Photo 5: AMT Lightning |

The findings were that "the appearance of the Ruger pistol had a very strong secondary meaning. Forty-six percent of those shown the photograph of the Ruger pistol correctly identified it as being a Ruger. Only the Colt ACE (the .22 caliber version of the Colt .45 automatic used by the U.S. Armed Services) [one of photos 1 through 4] had a higher recognition score. It had a score of fifty-three percent. None of the other three guns scored higher than sixteen percent. . . ."[188] The findings for likely confusion were

186. As a measure to avoid guessing, immediately before having the respondent classify each name as either a brand or product name, this author has taken to asking "Before today, had you ever heard of or used the word ____?"

187. Sturm, Ruger & Co. v. Arcadia Mach. & Tool, Inc., 10 U.S.P.Q.2d 1522, 1524 (C.D. Cal. 1988).

188. *Id.*

that "there is a high level of confusion among handgun buyers between the AMT and Ruger pistols. . . . Only three percent of [the likely confusion] group identified [the AMT pistol] correctly and thirty-nine percent made the mistake of thinking it was a Ruger. On the other hand, only one percent mistook the Ruger for the AMT. Since forty-six percent of the [group shown only the Ruger] correctly identified the Ruger as a Ruger, the survey shows that approximately the same percentage of interviewees believed they were looking at Ruger whether they were actually looking at a photograph of the Ruger or of the AMT."[189]

Discussion thus far has considered situations where (1) there are only two stimuli, and these are presented either concurrently or sequentially, and (2) there are several stimuli and these are presented either concurrently (as a single array) or sequentially. Obviously, the situation becomes more complicated when respondents are exposed to two arrays, say, an array of five stimuli (one of which is plaintiff's mark) in phase 1, and an array of five different stimuli (one of which is defendant's mark) in phase 2. Here, the options include presenting the items within the first array, the second array, or both arrays concurrently or sequentially, and then using either randomization, rotation, or standardization of the sequence in which the particular items in each array are presented. Regardless of the specific presentation order used, the researcher needs to be attuned to the possible biasing consequences that may occur as a result.

### *7.43 A Potential Bias When Using Simultaneous Arrays to Test Likely Confusion*

A commonly used procedure in likelihood-of-confusion surveys is to expose respondents to plaintiff's mark, remove the mark from view, present respondents with an array consisting of defendant's mark and a number of control and/or distracter stimuli, and ask a question such as "Which, if any, of these items comes from the same company as the item you looked at earlier?"[190] Although previously instructed not to guess and informed by the "if any" phrase that none of the stimuli may come from the same company as the item they looked at earlier, research in a parallel realm suggests that respondents may be inclined to select the stimulus they think looks closest to the item they had looked at earlier—regardless of whether or not they think that item actually comes from the same company. By

189. *Id.* at 1526.

190. By including the phrase "if any," this question is a quasi-filtered question, which may increase guessing. A more conservative approach is to ask "Do any of these items comes from the same company as the item you looked at earlier?", with a "yes" answer being followed up with "Which of these items comes from the same company as the item you looked at earlier?" See chapter 8, section 8.34.

doing so, their answer is a "false positive," which biases the estimate of likely confusion.

The false positives problem has received considerable attention in criminal cases. Scores of studies have been conducted on situations where eyewitnesses, looking at a lineup consisting of a *suspect* (who might or might not be the *culprit*) and a number of other individuals (the latter being called *fillers*, *distracters*, or *foils*), are asked "Which, if any, of these individuals, is the one you saw?"[191] In the traditional format, the eyewitness sees all persons in the lineup simultaneously, either in the flesh or via photographs. In contrast, sequential lineups involve exposing the witness to one person from the lineup at a time and requiring the witness to come up with a Yes or No with respect to that person before being shown the next person in the lineup. The findings from these well-controlled investigations (in some instances, the lineup consists of the known culprit; in other instances they are deliberately formed to contain only innocent fillers) are striking and have been referred to in several Seventh Circuit cases.[192] Two findings particularly germane to testing product arrays are the following.

First, when reviewing a lineup, many witnesses appear to operate using a "relative judgment" process. "[E]ye-witnesses tend to identify the person from a lineup who most closely resembles the eyewitness's memory of the person of the perpetrator *relative* to the other members of the lineup. This process of identification works reasonably well as long as the actual perpetrator is in the lineup. When the perpetrator is not in the lineup, however, there is still someone who looks more like the perpetrator than do the other lineup members, and eye-witnesses have a propensity to identify that person."[193] Based on a meta-analysis of the data from 72 tests of simultaneous and sequential lineups involving 13,143 witnesses, the overall finding is that sequential lineups yield 22 percent fewer "false positive" errors than simultaneous lineups do.[194]

---

191. For discussions of this body of research, see Gary L. Wells & Elizabeth A. Olson, *Eyewitness Identification*, 54 Ann. Rev. Psych. 277 (2003); Gary L. Wells, Eyewitness Identification: A System Handbook (1988); Elizabeth F. Loftus & James M. Doyle, Eyewitness Testimony: Civil and Criminal (3d ed. 1997); Elizabeth F. Loftus, Eyewitness Testimony (1979; rev. ed. 1996); G. L. Wells & E. F. Loftus, *Eyewitness Memory for People and Events*, *in* 11 Comprehensive Handbook of Psychology (A. Goldstein ed., 2003).

192. Newsome v. McCabe, 319 F.3d 301, 306–07 (7th Cir. 2003); Krist v. Eli Lilly & Co., 897 F.2d 293, 296–97 (7th Cir. 1990); United States v. Hall, 165 F.3d 1095, 1118–20 (7th Cir. 1999).

193. G. L. Wells & E. F. Loftus, *Eyewitness Memory for People and Events*, *in* 11 Comprehensive Handbook of Psychology 157 (A. Goldstein ed., 2003).

194. Nancy K. Steblay, Jennifer E. Dysart & Gary L. Wells, *Seventy-Two Tests of the Sequential Lineup Superiority Effect: A Meta-Analysis and Policy Discussion*, 17 Psychology, Pub. Policy & Law 99 (2011).

These well-established findings have a direct implication for likelihood-of-confusion surveys that test confusion using arrays with independent test and control groups. The simultaneous presentation of items works reasonably well as long as the allegedly infringing product is in the array, a situation that describes the test condition. In contrast, though the arrays do not contain the allegedly infringing mark, the arrays used for the control condition do contain at least one other mark that was intentionally selected or devised to closely approximate the test mark in look, sound or meaning. Given an item in the array that appears more like the allegedly infringing mark than do the other marks in the lineup, one can expect a propensity for control group respondents to identify that "innocent" control mark as coming from, being associated with, or authorized by the source of the allegedly confusing mark, when such is not the case. This propensity would serve to increase the percent confused in the control group. Placing this increased percentage into the traditional formula ("percent confused in the test group" minus "percent confused in the control group" equals best estimate of likely confusion) could only serve to artificially reduce the level of estimated confusion by an amount that might be critical in close cases. To avoid such biases, surveys using arrays with separate test and control groups for testing likelihood of confusion might be better to employ a sequential rather than simultaneous presentation format.

Evidence introduced in the trademark arena indicates that the suggestion of sequential rather than concurrent exposure has merit. Consider *Storck v. Farley*, where plaintiff introduced two likelihood-of-confusion surveys, the first using the traditional concurrent exposure approach and the second using a sequential exposure approach.

> In Storck's [first] candy package confusion survey, respondents were shown a 7–ounce package of Werther's Original and, in a second room, were asked to compare packages of four brands of candy, one of which was Farley's Butter Toffee, to the Werther's Original package seen in the first room. For each of the four packages, the respondent was asked, "Do you think candy number ___ is made by the same company as the candy I showed you a minute or two ago in the other room, or do you think it is made by a different company?" Whenever a respondent thought a brand of candy was made by the same company as the candy seen in the first room, the respondent was asked, "What is it that makes you think candy number ___ is made by the same company as the candy I showed you in the other room?"
>
> In [this] first Storck package confusion survey, 48 percent of the respondents said they thought Farley's Butter Toffee was made

by the same company as Werther's Original. No more than sixteen percent of the respondents believed any one of the other three brands was made by the same company as Werther's Original. Farley contends that Storck's survey is biased because its methodology of displaying the four brands simultaneously suggests to the respondent that one of the four is the "right" answer, and the Farley's package is most likely to be selected as the "right" answer because it appears most similar to the Werther's Original package and most dissimilar to the other three packages. . . .

In response to Farley's criticism of the survey, Storck performed a supplementary candy package confusion survey. In this survey, the respondent, after viewing the Werther's Original package, viewed each of three brands separately, i.e., not simultaneously. Moreover, in addition to Farley Butter Toffee, one other brand used in the survey was a butter toffee candy. This methodology eliminated the "right answer" bias and the arguable distinctiveness of Farley's product. Thirty-four percent of the respondents said they thought Farley's Butter Toffee was made by the same company as Werther's Original. No more than ten percent of respondents believed any one of the other two brands was made by the same company as Werther's Original. Thus, while some bias may have existed from simultaneously showing the four packages in the first package confusion survey, that bias could not account for the fact that Farley's package was selected by more respondents than the packages of the other three brands in total. The court finds Storck's package confusion surveys probative of whether the trade dress of Farley's Butter Toffee is sufficiently similar to the trade dress of Werther's Original to create a likelihood of confusion.[195]

A second important finding from lineup research having implications for trademark surveys is that, regardless of whether the lineup is presented simultaneously or sequentially, a meta-analysis[196] shows that explicitly instructing respondents that the lineup "might or might not contain the culprit" exerts a dramatic (42 percent) effect on reducing false positive identifications in "culprit-absent" lineups, while having virtually no effect (2 percent) on accurate identification in "culprit-present" lineups. Based on this compelling research, the U.S. Department of Justice

195. Storck USA, L.P. v. Farley Candy Co., 797 F. Supp. 1399, 1409–10 25 U.S.P.Q.2d 1927, 1932 (N.D. Ill. 1992).

196. N.M. Steblay, *Social Influence in Eyewitness Recall: A Meta-Analytic Review of Lineup Instruction Effects*, 21 LAW HUM. BEHAV. 283 (1997). *Meta-analysis* is a statistical technique for examining the findings yielded by all the empirical studies of a particular phenomenon and estimating a general effect.

included this type of instruction in its first set of national guidelines for law enforcement on the collection of eyewitness evidence.[197] The suggestion for trademark surveys is that relying on questions that include the phrase "if any," though leaning in the right direction, may not be as helpful in gathering valid and reliable data as would more explicitly informing respondents that the product array "may or may not contain" a product from the same company that put out the item they looked at earlier.

## 7.50 Commonly Used Protocols for Testing Selected Trademark Concepts

A wide variety of *protocols* (which refers to how stimuli are presented to respondents and what they are asked to do in response) have been used for testing key concepts in trademark law. Some are known by the names of the cases in which they were first used. At least four have become popular, in the sense of having been used (and sometimes accepted and sometimes rejected) in a number of subsequent cases.

### *7.51 Testing Genericism*

The *Thermos* and *Teflon* formats are not the only ones that have been or can be used for testing whether a mark is generic. They are, however, formats that have been used and accepted (and sometimes rejected) in a number of cases. Both have merits and demerits.[198] Regardless of which format is used, it is suggested that when the brand or common names being tested are shown to respondents, they be presented in all capital letters so as not to implicitly suggest (via the use of lowercase letters) that a mark is generic or implicitly suggest (via the use of an "initial capital" letter) that a mark is a source identifier.

197. U.S. Dep't of Justice, Nat'l Inst. of Justice, Eyewitness Evidence: A Trainer's Manual for Law Enforcement (updated Sept. 2003), http://nij.ncjrs.gov/App/publications/pub_search.aspx?searchtype=all&category=99&sort=title#nijpubs.

198. Itamar Simonson, *An Empirical Investigation of the Meaning and Measurement of "Genericness,"* 84 TRADEMARK REP. 199 (1994); Vincent N. Palladino, *Assessing Trademark Significance: Genericness, Secondary Meaning and Surveys*, 92 TRADEMARK REP. 857 (2002); E. Deborah Jay, *Genericness Surveys in Trademark Disputes: Evolution of a Species*, 99 TRADEMARK REP. 111 (2009). The reader is directed to MCCARTHY, *supra* note 1, §§ 12:15, 12:16 for additional commentary.

### 7.51.1 The *Thermos* Protocol

The issue in *American Thermos Products v. Aladdin Industries*[199] was whether the term "Thermos" was generic or a source identifier. The survey interviewed more than 3,300 respondents and asked 12 "key questions."[200]

1. Are you familiar with the type of container that is used to keep liquids, like soup, coffee, tea, and lemonade, hot or cold for a period of time?
2. Have you yourself ever used (or filled) such a container—that is, the type to keep liquids cold or hot?
3. What was the occasion for using such a container?
4. If you were going to buy one of these containers tomorrow—that is, the type that keeps food and beverages hot or cold—what type of store would you select to make your purchase?
5. What would you ask for—that is, what would you tell the clerk you wanted?
6. Can you think of any other words that you would use to ask for a container that keeps liquids hot or cold?
7. If you were going to describe one of these containers to a friend of yours—what words would come to your mind first to describe a container that keeps liquids hot or cold?
8. Do you, or does anyone else within your household own a container such as we have been talking about?
9. How many are owned by all members of your household?
10. What do you call this (these) containers?
11. Do you know the names of any manufacturers who make these containers that keep liquids hot or cold?
12. Can you name any trademarks or brand names that are used on these containers?

*Thermos* or *Thermos*-like surveys conducted for subsequent cases[201] have modified the wording and winnowed down the number of questions

199. Am. Thermos Prods. Co. v. Aladdin Indus., Inc., 207 F. Supp. 9, 134 U.S.P.Q. 98 (D. Conn. 1962), *aff'd*, 321 F.2d 577, 138 U.S.P.Q. 349 (2d Cir. 1963).

200. *Id.*, at *29 n. 8.

201. *See, e.g.*, Anti-Monopoly, Inc. v. Gen. Mills Fun Group, 684 F.2d 1316, 216 U.S.P.Q. 588 (9th Cir. 1982), *cert. denied*, 459 U.S. 1227 (1983); Nestle Co. v. Chester's Mkt., Inc. 219 U.S.P.Q. 298 U.S.D.C. (D. Conn. 1983); G. Heileman Brewing Co. v. Anheuser-Busch, Inc., 676 F. Supp. 1436, 6 U.S.P.Q.2d 1481 (E.D. Wis. 1987), *aff'd*, 873 F.2d 985, 10 U.S.P.Q.2d 1801 (7th Cir. 1989); *In re* Minnetonka, Inc., 3 U.S.P.Q. 1711 (T.T.A.B. 1987); Pilates, Inc., v. Current Concepts, Inc., 120 F. Supp. 2d 286 (S.D.N.Y. 2000); *In re* Network Assoc., WL 363395 (T.T.A.B. 2005); Nightlight Sys., Inc., v. Nitelites Franchise Sys., Inc., 2007 WL 4563873 (N.D. Ga. 2007); E.T. Browne Drug Co. v. Cococare Prods., Inc., 538 F.3d 185, 87 U.S.P.Q.2d 1655 (3d Cir. 2008); Premier Nutrition, Inc. v. Organic Food Bar, Inc., 2008 WL 1913163 (C.D. Cal. Mar 27, 2008) (unpublished).

asked of respondents. With wording that needs to be case specific in parentheses, the essential questions would seem to be:

1. Are you familiar with (the type of container that is used to keep liquids, like soup, coffee, tea, and lemonade, hot or cold for a period of time)?
2. [IF "YES" TO Q.1:] If you were going to buy one of these (containers) tomorrow—what would you ask for—that is, what would you tell the clerk you wanted?
3. If you were going to describe one of these (containers) to a friend of yours—what words would come to your mind first to describe a (container that keeps liquids hot or cold)?

### 7.51.2 The *Teflon* Protocol

Having adopted a mark by the name of Eflon for their zippers, defendant in *E. I. du Pont de Nemours v. Yoshida International* was arguing that plaintiff's mark "Teflon" was generic, not a source identifier.[202] As Prof. McCarthy aptly describes it: "A 'Teflon Survey' is essentially a mini-course [for the respondent] in the generic versus trademark distinction, followed by a test."[203] Respondents were instructed as follows:

> I'd like to read 8 names to you and get you to tell me whether you think it is a brand name or a common name; by *brand* name, I mean a word like *Chevrolet* which is made by one company; by *common* name, I mean a word like *automobile* which is made by a number of different companies. So if I were to ask you, "Is Chevrolet a brand name or a common name?," what would you say?
>
> Now, if I were to ask you, "Is washing machine a brand name or a common name?," what would you say?
>
> [If respondent understands continue. If not understand, explain again.]
>
> Now, would you say ______ is a brand name or a common name?

The findings from this telephone survey of 1,031 respondents have been reformatted and provided below. Teflon was considered a brand name by two-thirds of the sample (68 percent) and a common name by one-third (31 percent).

202. E.I. du Pont de Nemours & Co. v. Yoshida Int'l, Inc. 393 F. Supp. 502, 185 U.S.P.Q. 597 (E.D.N.Y. 1975).

203. McCarthy, *supra* note 1, § 12:16.

| Name | Brand % | Common % | Don't Know % |
|---|---|---|---|
| STP | 90 | 5 | 5 |
| COKE | 76 | 24 | 0 |
| JELL-O | 75 | 25 | 0 |
| TEFLON | 68 | 31 | 2 |
| THERMOS | 51 | 46 | 3 |
| ASPIRIN | 13 | 86 | 0 |
| MARGARINE | 9 | 91 | 1 |
| REFRIGERATOR | 6 | 94 | 0 |

A number of surveys have subsequently employed the *Teflon* format;[204] some have incorporated modifications, including the following. If, by failing to properly assign one or both of the two "mini test" questions regarding Chevrolet and washing machine to their proper categories, a respondent indicates he or she does not understand the task, the task is not explained again. Instead, that respondent is asked no further questions. The findings can then be presented in two tables, one where the percentages are based only on those respondents who did understand the task and another based on all respondents who passed the screening questions and were qualified members of the intended universe, regardless of whether they understood the task.

The original *Teflon* survey used a total of eight names, the target name (Teflon), three brand names (STP, Coke, and Jell-O) and four common names (thermos, aspirin, margarine, and refrigerator). However, after subtracting the target name, the imbalance of brand and common names among the remaining names might, if seen by the respondent, suggest the answer desired for the target term; if there are four common names but only three brand names, the target term is likely a brand name. Hence, excluding the target term, using an equal number of common and brand names among the remaining names is advised. This means presenting respondents with an odd number of test terms, one of which is the target

204. An incomplete list includes the following. Eagle Snacks, Inc. v. Nabisco Brands, Inc., 625 F. Supp. 571, 228 U.S.P.Q. 625 (D.N.J. 1985); Zimmerman v. Nat'l Ass'n of Realtors, 70 U.S.P.Q.2d 1425, 2004 WL 763936 (T.T.A.B. 2004); Anti-Monopoly, Inc. v. Gen. Mills Fun Group, 684 F.2d 1316, 216 U.S.P.Q. 588 (9th Cir. 1982), cert. denied, 459 U.S. 1227 (1983); Intel Corp. v. Advanced Micro Devices, Inc., 756 F. Supp. 1292, 21 U.S.P.Q.2d 1623 (N.D. Cal. 1991); March Madness Athletic Ass'n, L.L.C. v. Netfire, Inc., 310 F. Supp. 2d 786, 803–04 (N.D. Tex. 2003), *judgment entered*, 2003 WL 22173299 (N.D. Tex. 2003), *aff'd*, 120 F. App'x 540, 73 U.S.P.Q.2d 1599 (5th Cir. 2005); Premier Nutrition Inc. v. Organic Food Bar Inc., 86 U.S.P.Q.2d 1344, 2008 WL 1913163 (C.D. Cal. 2008); *In re* Hotels.com, L.P., 87 U.S.P.Q.2d 1100, 2008 WL 779325 (T.T.A.B. 2008), *aff'd*, 573 F.3d 1300, 91 U.S.P.Q.2d 1532 (Fed. Cir. 2009).

term, with the remainder being equally divided between brand and common names.

As some respondents may think a given name or term is both a brand and a common name, another wrinkle is to provide respondents with "both a brand and a common name" as an additional choice. In any event, the nontarget names selected for use on the list "must be carefully constructed and tailored to the facts of a particular case."[205]

### 7.52 Testing Secondary Meaning

Though none of the various approaches for measuring secondary meaning is identified by a specific case name, in this author's opinion, the most thoughtful discussion of how to conduct such a survey was provided by Palladino.[206] Acknowledging that "[d]esigning questions to measure secondary meaning remains a difficult undertaking, fraught with uncertainty and likely to be less than entirely successful,"[207] Palladino's analysis yields the following suggested questions:

Q1. "Are you familiar with [claimed trademark]?" or "Have you seen, or heard of [claimed trademark]?" IF "YES," ASK Q.2; IF "NO" OR "DON'T KNOW," SKIP Q.2.

Q2. "Do you associate [claimed trademark] with [product identification; e.g., lightbulbs, computers, cars] of one, or more than one company?"

The purpose of Q1 is to ferret out those who might guess in answer to Q2. The findings for Question 2 can then be presented in two tables, one where the percentages are based only on those respondents asked Q2, another based on all respondents who passed the screening questions and were qualified members of the intended universe, regardless of whether they claimed familiarity with the claimed trademark.

In some instances, it may be important to know whether the single unidentified company the consumers have in mind is, in fact, the party claiming secondary meaning. Under these circumstances, noting it is inconsistent with the anonymous source rule, Palladino suggests asking a third question such as:

Q3. "Which company is that?"

205. McCarthy, *supra* note 1, § 12:16.

206. Vincent N. Palladino, *Surveying Secondary Meaning*, 84 Trademark Rep. 155 (1994). *See also* Vincent N. Palladino, *Assessing Trademark Significance: Genericness, Secondary Meaning and Surveys*, 92 Trademark Rep. 857 (2002).

207. Palladino, *Surveying Secondary Meaning*, 84 Trademark Rep. at 185.

An example of where this third question was necessary comes from *Nextel v. Motorola*.[208] There, the issue was whether the distinctive chirping sound associated with the push-to-talk (walkie-talkie-like) feature of phones made for Nextel by Motorola had acquired secondary meaning and, if so, for which of the parties. Past and prospective purchasers of such phones were exposed to three different sounds, one of which was the chirping sound at issue. When asked about that sound, nearly 60 percent of the sample said they associated it with one company. Though this was sufficient to establish that the chirp had acquired secondary meaning, to have stopped asking questions at that point would not have resolved the question of "secondary meaning for whom?" When these respondents were asked to identify which company, approximately 55 percent said Nextel and less than 4 percent said Motorola.

### *7.53 Testing Likelihood of Confusion*

A number of procedures can and have been used for testing whether there is a likelihood of confusion between marks. Probably the most commonly used are the *Eveready* and *Squirt* formats, or some variants thereof. A fundamental difference between the two is that the *Eveready* format does not present the senior user's mark to the respondents, but assumes they already are aware of the mark. In contrast, the *Squirt* format does expose respondents to both plaintiff's and defendant's marks.

Each format has its merits and demerits.[209] Swann suggests that "In cases involving strong marks, the *Eveready* test should be considered the gold standard for fundamental cognitive and marketing reasons."[210] With respect to weak marks, he opines: "The *Squirt* format is the alternative for testing the likelihood of confusion between marks that are weak, but are simultaneously or sequentially accessible in the marketplace for comparison."[211] He adds: "[T]here simply appears to be no way to test whether

---

208. Nextel Commc'ns, Inc. v. Motorola, Inc., 91 U.S.P.Q.2d 1393, 2009 WL 1719598 (T.T.A.B. 2009).

209. For one of the most edifying discussions of the merits and demerits of the two approaches, see Jerre Swann, *Likelihood of Confusion Studies and the Straightened Scope of Squirt*, 98 Trademark Rep. 739 (2008). *See also* Itamar Simonson, *The Effects of Survey Method on Likelihood of Confusion Estimates: Conceptual Analysis and Empirical Test*, 83 Trademark Rep. 364 (1993). For an example of where application of the two approaches yielded dramatically different findings, see *Nat'l Distillers Prods. Co. v. Refreshment Brands, Inc.*, 198 F Supp. 2d 474, 483–84 (S.D.N.Y. 2002). *See generally* McCarthy, *supra* note 1, § 32:173.50 (Survey Formats—Two commonly used formats to test for confusion); *id.* §§ 32:174, 32:177.

210. Swann, *supra* note 142, at 746.

211. *Id.* at 755.

a weak mark will be confused with another's use in a commercial arena where the weak mark does not appear."[212]

### 7.53.1 The *Eveready* Protocol

At issue in *Union Carbide v. Ever-Ready*[213] was use of the name Ever-Ready for lamps. Plaintiff introduced two surveys, a "bulb survey" and a "lamp survey." The latter has become the template for subsequent surveys looking to test likelihood of confusion.[214] The approach began by showing the respondent the test stimulus (an as-sold lamp) and, with the stimulus in view,[215] asking:

Q1. Who do you think puts out the lamp shown here?
Q2. What makes you think so?
Q3. Please name any other products put out by the same concern which you think puts out the lamps shown here.

The district court provided a thoughtful, critical analysis of the survey questions[216] and said the surveys merited "little, if any, weight." On appeal,

---

212. *Id.* at 756. For a prime example, see *Kargo Global, Inc. v. Advance Magazine Publishers, Inc.*, 2007 WL 2258688 (S.D.N.Y. 2007).

213. Union Carbide Corp. v. Ever-Ready Inc., 392 F. Supp. 280, 293 (D. C. Ill. 1975), *rev'd*, Union Carbide Corp. v. Ever-Ready, Inc., 531 F.2d 366, 188 U.S.P.Q. 623 (7th Cir.), *cert. denied*, 429 U.S. 830 (1976), *superseded by statute as stated in* Scandia Down Corp. v. Euroquilt, Inc., 772 F.2d 1423, 227 U.S.P.Q. 138 (7th Cir. 1985).

214. The questions used in *Eveready* are similar to those used in an earlier matter, *Standard Oil Co. v. Standard Oil Co.*, 141 F. Supp. 876 (D. Wyo. 1956), *aff'd*, 252 F.2d 65 (10th Cir. 1958). There, the questions were:

1. If you were to stop at a service station in Michigan, displaying the name SOHIO as shown here, what oil company would you think put out the gas and oil sold there?
2. What is there about the name that suggests that particular oil company to you?
3. Please name any well-known brands or trade names used by that oil company for its gas or oil.

215. Some subsequent uses of the *Eveready* format have left test stimulus (product, photograph, and so on bearing the contested name, trade dress, etc.) in view while the questions were being asked. In other instances, the stimulus has been removed from view. Some argue that leaving the stimulus in view amounts to providing the respondent with a "reading test." Others argue that removing the stimulus from view amounts to providing the respondent with a "memory test." Discussion of this issue is provided in section 7.61.2.

216. Referring to *General Motors Corp. v. Cadillac Marine & Boat Co.*, where a question was condemned as leading, the *Ever-Ready* court wrote:

> There General Motors sought to enjoin the Cadillac Marine & Boat Co. from manufacturing and selling "Cadillac" boats. A survey, consisting of an interviewer showing an interviewee a picture of a "cadillac" boat advertisement and asking (1) who do you think puts out the boats shown . . . and (2) will you please name anything else that you think is put out by the same concern, was introduced in evidence to establish likelihood of confusion. The court, finding the second question defective on the grounds that it was leading and suggestive, stated:

the Seventh Circuit said that was in error. As a consequence, the approach has come into widespread use,[217] but with a number of variations, including subtle changes in the specific wording of questions, and leaving the stimulus in view versus removing the stimulus from view while asking questions.

When the stimulus is removed from view before the *Eveready* questions are asked, the findings may sometimes be ambiguous at best[218] and uninterpretable at worst. Consider *GFA Brands, Inc. v. Balance Bar Co.*[219] where defendant was concerned that plaintiff's Applicant's proposed name Smart Balance for a nutrition and energy bar was likely to be confused with the name Balance Bar, its own nutrition and energy bar. After handing respondents a card that contained the name Smart Balance, respondents in Applicant's survey were instructed: "When respondent is done looking at exhibit card, take back exhibit card, and put it out of sight for the remainder of the interview." With the name Smart Balance having been removed from view, it is entirely possible that a not-insubstantial proportion of respondents may have misremembered the name as Balance Bar. Yet in the considerable number of instances where many consumers know the brand name (e.g., Vaseline Intensive Care Lotion) but few know the manufacturer's name (Chesebrough Ponds), this fundamental type of memory confusion would never be detected. Specifically, under such circumstances, asking the first *Eveready* question, "Based on what you just saw, who or what company do you believe makes the nutrition or energy

---

> To demonstrate the propensity of the question to lead, an examination of the survey booklets provides many instances where a person who drew a complete blank on the initial question was suddenly reminded of cars and General Motors by the way in which the second question is phrased. This reminder was the product, not of the advertisement, but of the second question itself.

*Ever-Ready*, 392 F. Supp. at 293–94 (citing General Motors Corp. v. Cadillac Marine & Boat Co., 226 F. Supp. 716, 736 (W.D. Mich. 1964)).

After devoting several pages to discussing and explaining why it thought the questions were not erroneous, the Seventh Circuit held the district court was "clearly erroneous" in not crediting the survey. *Ever-Ready, Inc.*, 531 F.2d at 386–89. Unlike the survey in *Standard Oil v. Standard Oil*, the Seventh Circuit held the questions were not leading because "this is not a case where the interviewer stated the similar parts of the plaintiff's name." *Id.* at 388.

217. Prof. McCarthy identifies it as "[a] now-standard format," MCCARTHY, *supra* note 1, § 32:174. Swann writes: "Over time, this format has become the gold standard in cases involving strong marks. . . ." Swann, *supra* note 142, at 739. *See, e.g.*, James Burrough, Ltd. v. Sign of Beefeater, Inc., 540 F.2d 266, 192 U.S.P.Q. 555, 564 (7th Cir. 1976); E. & J. Gallo Winery v. Gallo Cattle Co., 12 U.S.P.Q.2d 1657, 1674, 1989 WL 159628 (E.D. Cal. 1989), *modified, aff'd*, 955 F.2d 1327, 21 U.S.P.Q.2d 1824 (9th Cir. 1992), *amended*, 967 F.2d 1280 (9th Cir. 1992); Starbucks U.S. Brands, LLC v. Ruben, 78 U.S.P.Q.2d 1741, 2006 WL 402564 (T.T.A.B. 2006).

218. As one of the factors gatekeepers are to consider, the Advisory Committee's Notes on the December 1, 2000, amendments to FRE Rule 702 identifies "[w]hether the expert has accounted for *obvious* alternative explanations" (emphasis added).

219. T.T.A.B. 2003.

bar with the name that I showed you OR do you not have a belief?" will likely yield a answer of "don't know," so that asking the second *Eveready* question, "What makes you think so?," does not make sense.

Asking the third *Eveready* question is likely to yield findings of indeterminate value. Consider: "What other products or brands, and if any, do you believe come from the same company who makes nutritional energy bar with a name that I showed you?" If, because the name Smart Balance was removed from view, a respondent was confused into remembering the name as Balance Bar, because this question asks "what other products or brands"—that is, other, besides Balance Bar—they would not answer Balance Bar to this question. The same applies to any question that asked: What other brand or company, if any, do you believe is related to, associated with, or has a licensing agreement with whoever makes nutritional energy bar with the name that I showed you belief?[220] Had the stimulus card remained in view—an issue discussed in section 7.61.2—the findings would be interpretable. However, given that the protocol required respondents to retain the brand's name in memory, an obvious alternative explanation is that many respondents were confused at the outset, misremembering the name Smart Balance as Balance Bar, but, given the nature of the *Eveready* questions, this could not be detected. Since this "obvious" alternative explanation was not tested, the survey unnecessarily created a situation where a important alternative explanation for the obtained findings cannot be rejected. Generally speaking, such a protocol can be counted on to provide an undercount—possibly severe—of the level of confusion.

The *Eveready* format may also be problematic when both disputants put out the same products. Asking "Please name any other products put out by the same concern you think puts out the item shown here" does make sense. However, when both disputants put out some or all of the same products, the answers to this question may not provide any insight toward resolving the dispute.

### 7.53.2 The *Squirt* ("Lineup" or "Array") Protocol

The *Squirt* format[221] gets its name from a survey introduced by plaintiff in *SquirtCo. v. Seven-Up*.[222] The issue in that matter was likelihood of confusion between two soft drinks named Squirt and Quirst. The essence of the

220. Recognize that Question 4a seeks to measure two types of confusion—confusion as to association or affiliation and confusion as to sponsorship or authorization—with one question. If one reads this question aloud, it becomes obvious how difficult Question 4a is for respondents to comprehend.

221. Interested readers should also consult McCarthy, *supra* note 1, § 32:177 (Survey Formats—Product "line-up" survey methods).

222. SquirtCo. v. Seven-Up Co., 628 F.2d 1086 (8th Cir. 1980).

*Squirt* format is that respondents are shown an array (sometimes referred to as a "lineup") of stimuli. As described by the Eighth Circuit:

> The [*Squirt*] surveys were postured as "a study of grocery products" and were based on sound alone, with no visual component. Differences in procedures were dictated by the fact that QUIRST soft drink had been available and promoted in Phoenix, albeit for only six weeks, whereas QUIRST soft drink was not available or promoted in Chicago. SQUIRT soft drink was available in both locations.
>
> In Chicago . . . [w]omen 25 and older were interviewed at random as they left the stores. Four radio ads were played to the respondents, one each for SQUIRT soft drink, QUIRST soft drink, LYSOL disinfectant and KRAFT cheese. Then the interviewer elicited the respondents' opinions to the following questions: (1) "Do you think SQUIRT and QUIRST are put out by the same company or by different companies?" and (2) "What makes you think that?" Of 152 interviews in Chicago, 51 respondents (34%) thought SQUIRT soft drink and QUIRST soft drink were put out by the same company, while 84 (55%) thought they were put out by different companies, and 17 (11%) said they didn't know.
>
> In Phoenix, the questionnaire was administered at grocery stores, and the sample was limited to women 25 and older who had purchased soft drinks that day. Because both SQUIRT soft drink and QUIRST soft drink were available, no radio ads were played to establish brand awareness. The same two questions were asked. Of 476 interviews in Phoenix, 110 (23%) thought that SQUIRT soft drink and QUIRST soft drink were put out by the same company, while 161 (34%) thought that they were put out by different companies, and 205 (43%) said they didn't know.[223]

Subsequently developed modifications of the *Squirt* format have incorporated changes to handle criticisms of the original. To avoid the criticism that the allegedly infringing stimulus should not be shown side by side with the first comer's stimulus, researchers now separate exposure to these stimuli. In studies of forward confusion, this often takes the form of exposing respondents to the first comer's stimulus first (either in an array or in isolation), followed by exposing respondents to the allegedly infringing stimulus second (either in an array or in isolation). In studies of reverse confusion, this may involve exposing respondents to the allegedly infringing stimulus first (either in an array or in isolation), followed by exposing respondents to the first comer's stimulus second (either in an array or in isolation). To qualify as being an offspring of *Squirt*, the study

223. *Id.* at 1090 (emphasis added).

must involve an array either in the first instance, in the second instance, or in both; showing respondents one mark in isolation followed by the second mark in isolation would not qualify the survey to be considered a *Squirt* variant. Sometimes, the first and second arrays are shown in the same room (with both being covered at the outset of the interview and both never being uncovered at the same time) or in different rooms, the latter sometimes being called a two-room survey. Another modification is that, unlike using commercials for Lysol disinfectant and Kraft cheese as distracters as was done in the original survey, to make the task more realistic and difficult, the distracter stimuli are generally different brands from within the same product category.

For various reasons, some courts have been more critical of *Squirt* surveys than of *Eveready* surveys. Their criticisms generally have to do with making respondents aware of plaintiff's mark when they might not have been prior to the survey,[224] and the failure of sequential arrays to adequately reflect marketplace conditions.[225]

### 7.54 Testing Dilution

No widely accepted protocols have evolved for testing fame, dilution by blurring, or dilution by tarnishment. A discussion of different procedures for measuring these concepts is provided elsewhere.[226]

## 7.60 Fundamental Respondent Tasks

Regardless of where the survey takes place or how it is administered, respondents are asked to participate in two fundamental tasks—experience stimuli and react to these stimuli. As discussed earlier (section 7.20), the stimuli include the questions the respondents are asked, and the test, filler, comparison, and control items (which may be products, advertisements, marks, trade dress, brochures or other forms of communication, etc.) they are shown, the interviewer if one is part of the survey, and so on. Chapter 8 focuses on the questions asked; chapter 9 covers interviewers and other aspects of administration. Here we focus on the two fundamental respondent tasks.

224. Nat'l Distillers Prods. Co. v. Refreshment Brands, Inc., 198 F. Supp. 2d 474, 484 (S.D.N.Y. 2002).

225. *See, e.g.*, THOIP v. Walt Disney Co., 690 F. Supp. 2d 218, 240 (S.D. (N.Y. 2010); THOIP v. Walt Disney Co., 788 F. Supp. 2d 168, 182 (S.D.N.Y. 2011); Kargo Global, Inc. v. Advance Magazine Publishers, Inc., 2007 WL 2258688 (S.D.N.Y. 2007).

226. *See* Jacob Jacoby, *Considering the Who, What, When, Where and How of Measuring Dilution*, 24(3) SANTA CLARA COMPUTER & HIGH TECH L.J. 601 (2008).

### 7.61 Experiencing Stimuli

#### 7.61.1 Simulating the Marketplace Mindset

The manner in which test stimuli appear in the marketplace generally governs how they should be exposed to respondents in a trademark survey has been discussed. Not yet discussed is the need to provide respondents with a proper *cover story* or rationale for considering the stimuli to which they are exposed.

For obvious reasons, respondents in trademark surveys should not know the survey's true purpose. However, upon being exposed to a stimulus, unless given some framework or guidance, they would have no idea of how, why or for what purpose they are to consider it. Permitting respondents to impose their own hypotheses guarantees that different respondents will apply different mindsets. Some may think that, after reviewing the stimulus, they will be asked whether they like or dislike its functions, colors, illustrations, or whatever. The same applies to respondents shown advertisements. Some may think the purpose of the survey is to determine whether people like the advertisement, the slogans, the spokespersons in the advertisement, and so on. Others may not know what to think. Since different respondents are likely to arrive with different ideas about what they should be considering and why, it is important that all respondents be provided with the same cover story.

Moreover, the cover story needs to be consistent with simulating marketplace conditions, a factor appreciated since Judge Wyzanski opined as follows.

> Another and most significant reason why the evidence of the poll is inadmissible . . . is that under the substantive law the issue is not whether the goods would be confused by a casual observer . . . but . . . whether the goods would be confused by a prospective purchaser at the time he considered making the purchase. If the interviewee is not in a buying mood but is just in a friendly mood answering a pollster, his degree of attention is quite different from what it would be had he his wallet in his hand.[227]

The teaching from this is that, when surveying likely point-of-sale confusion or likely deception, the cover stories need to be realistic and place the respondents into a buying frame of mind. (Instead of placing respondents into a buying frame of mind, cover stories for postsale confusion surveys have respondents imagine seeing someone else wearing or using the goods in question.)

227. Am. Luggage Works, Inc. v. U.S. Trunk Co., 158 F. Supp. 50, 53, 116 U.S.P.Q. 188 (D. Mass. 1957).

Another component of the cover story concerns the amount of time respondents should be given to consider the stimulus. Giving respondents as much time as they wanted to study the marks in question was criticized by at least one court as not reflecting marketplace conditions.[228] In an effort to better simulate marketplace conditions, instead of permitting respondents to take as long as they wish, they should be given instructions such as "please take as long as you *normally* (*typically*, *usually*, *ordinarily*) would when considering whether or not to purchase this item." Additionally, when testing point-of-sale confusion, respondents should be instructed to feel free to handle the product, it that's what they normally would do. When testing postsale confusion, respondents should be instructed not to handle the product.

### 7.61.2 Reading Test versus Memory Test

When surveying likely confusion, likely dilution, or deceptive advertising, after exposing respondents to a test or control stimulus,[229] the researcher has two basic options: either remove the stimulus from view before asking the critical substantive questions, those designed to shed light on the legal issues being tested, or leave it in full view of the respondent while asking these questions.[230] Though every likelihood of confusion or deceptive advertising survey must have used one or the other of these approaches, most courts opining on such matters provide neither favorable nor unfavorable comments on either approach. Those that have provided commentary are divided on which of these procedures to support. As Swann writes:

> Some courts have rejected the first approach [removing the stimulus from view] as a memory test, noting that "[i]n an actual market situation, the product would not disappear from the consumer's eye just as he or she is about to make a purchase," and that removing the stimulus before asking questions may lead to guessing. Other courts have rejected the second approach [leaving the stimulus with the respondent] as a "reading" test, noting that "consum-

---

228. ConAgra, Inc. v. George A. Hormel & Co., 784 F. Supp. 700, 734 (D. Neb. 1992).

229. The "reading test" versus "memory test" issue applies to static stimuli, such as products, labels, advertisements, and so on. It does not apply to dynamic stimuli, such as TV or radio commercials, where one does not normally ask questions while the respondent is actively attending to the stimulus.

230. A practice sometimes used in advertising and marketing research conducted outside the litigation arena is for the stimulus to be removed from view while some questions are asked, then returned to view so that additional questions can be asked. *See, e.g.*, Hill's Pet Nutrition, Inc. v. Nutro Prods., Inc., 258 F. Supp. 2d 1197, 1203 (D. Kan. 2003). Using such a "refresher" procedure, one needs to be careful that the questions asked while the stimulus is out of view do not provide clues to respondents as to what they should look at once the stimulus is returned to view.

ers do not normally meditate over . . . details for any appreciable . . . time" and that the approach often merely results in the repeated . . . playback of the contents of the stimulus.[231]

In opinions not cited by Swann, some courts have approved of removing stimuli from view (memory tests),[232] while others have disapproved of doing so.[233] Some courts have considered leaving stimuli in view (reading tests) favorably,[234] while other courts have considered them unfavorably.[235]

*Union Carbide v. Ever-Ready*,[236] the case presenting us with the *Eveready* protocol, provides a classic example of where a court found problems with leaving the stimulus in view while the respondent was asked questions.

> Carbide introduced in evidence two surveys to establish the likelihood of confusion caused by the term 'Ever-Ready' with its mark EVEREADY. . . . I conclude that the surveys are entitled to little, if any, weight.
>
> First Carbide introduced the minibulb survey in evidence. . . . Each interviewee, after qualifying for the survey, was shown a blister pack of Every-Ready miniature bulbs and asked:

231. Jerre Swann, *A "Reading" Test or a "Memory" Test: Which Survey Methodology Is Correct?*, 95 TRADEMARK REP. 876 (2005) (citing Starter Corp. v. Converse, Inc., 170 F.3d 286, 297 (2d Cir. 1999); Cumberland Packing Corp. v. Monsanto Co., 32 F. Supp. 2d 561, 578 (E.D.N.Y. 1999); Coty US, Inc. v. Frontier Coop. Herbs, 2002 TTAB LREXIS 144, at *21 (T.T.A.B. 2002); Isaly Co. v. Kraft, Inc., 619 F. Supp. 983 (M.D. Fla. 1985), *rev'd in part*, 812 F.2d 1531 (11th Cir. 1986); Am. Home Prods. Corp. v. Procter & Gamble Co., 871 F. Supp. 739, 748 (D.N.J. 1994)).

232. Conopco v. Cosmair, 49 F. Supp. 2d 242, 255 (S.D.N.Y. 1999); E. & J. Gallo Winery v. Pasatiempos Gallo, S.A., 905 F. Supp. 1403, 1409 (E.D. Cal. 1994).

233. Simon Prop. Group L.P. v. mySimon, Inc., 104 F. Supp. 2d 1033, 1052 (S.D. Ind. 2000); Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck, 129 F. Supp. 2d 351, 367 (D.N.J. 2000). *Cumberland*, 32 F. Supp. 2d at 578; Barre Nat'l Inc. v. Barr Labs., Inc., 733 F. Supp. 735, 745 (D.N.J. 1991).

234. McNeil PPC v. Merisant Co., 2004 WL 3316380 (D.P.R. 2004); Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co., 129 F. Supp. 2d 351, 366 (D.N.J. 2000), *aff'd*, 290 F.3d 578, (3d Cir. 2002) ("the Court finds that leaving the products for the respondents to examine rather than taking the products away replicates market conditions"); *Barre Nat'l Inc.*, 773 F. Supp. at 745 n.20.

235. Malletier v. Dooney & Bourke, Inc., 525 F. Supp. 2d 558, 595, 634 (S.D.N.Y. 2007); Malletier v. Dooney & Bourke, 340 F. Supp. 2d 415, 445 (S.D.N.Y. 2004); Franklin Res. v. Franklin Credit Mgmt. Corp., 988 F. Supp. 322, 335 (S.D.N.Y. 1997); Am. Home Prods. v. Procter & Gamble Co., 871 F. Supp. 739, 748 (D.N.J. 1994); Quality Inns, Int'l. v. McDonald's Corp., 695 F. Supp. 198, 219 (D. Md. 1988); Isaly Co. v. Kraft, Inc., 619 F. Supp. 983 (M.D. Fla. 1985), *rev'd in part*, 812 F.2d 1531 (11th Cir. 1986); Am. Greetings Corp. v. Dan-Dee Imps., Inc., 619 F. Supp. 1204, 1216 (D.N.J. 1985), *modified on other grounds*, 807 F.2d 1136 (3d Cir. 1986).

236. Union Carbide Corp. v. Ever-Ready Inc., 392 F. Supp. 280 (D.C. Ill. 1975), *rev'd*, Union Carbide Corp. v. Ever-Ready, Inc., 531 F.2d 366, 188 U.S.P.Q. 623 (7th Cir.), *cert. denied*, 429 U.S. 830 (1976), *superseded by statute as stated in* Scandia Down Corp. v. Euroquilt, Inc., 772 F.2d 1423, 227 U.S.P.Q. 138 (7th Cir. 1985).

> Question 1: Who do you think puts out these mini-bulbs?
> Question 2: What makes you think so?. . .
> Next Carbide introduced the lamp survey in evidence. Again, the purpose was to establish that the use of the term 'Ever-Ready' on the lamps sold by Ever-Ready was likely to confuse the public into believing that the lamps were produced by Carbide. Like the bulb survey, each interviewee was shown the product marked 'Ever-Ready' [and asked]:
> Question 1: Who do you think puts out the lamp shown here?
> Question 2: What makes you think so? . . .
> Question 1 and 2 of the bulb and lamp surveys establish nothing. The evidence shows that in the bulb survey, approximately 600 interviewees who responded 'ever ready' to Question 1 answered 'because it says so on the pack' or 'because I can read it on the blister pack.' At best, such responses show the reading ability of the interviewee. Certainly, the responses are equivocal on the issue of the product's source . . . and to the follow-up Question (2), 'Because it says so' or 'I can read it on the packet,' how does that prove anything other than that the respondent can read the name 'Ever-Ready' on the packet?[237]

Respondents in defendant's survey in *Goya Foods v. Condal*[238] were handed an empty as-sold-and-branded bag of defendant's product and asked "What brand of rice is this?" The survey found a de minimis level of confusion; the court found the study not probative. With the product in front of them, prompted by the questions, respondents are able to scrutinize the product package and label in ways that they might normally not, thereby coming across a feature that might dispel confusion.

Removing the stimulus from view before asking questions is not necessarily a panacea, especially when testing for likely confusion between prominent marks as names. Commenting regarding a situation where respondents were first shown some booklets, then shown some correspondence, the court commented that the survey "proves most of the respondents could read the name 'Franklin' in the booklet and remember it long enough to recognize the name when shown one of the three letters immediately thereafter. . . . Surveys which do nothing more than demonstrate the respondents' ability to read [and remember] are not probative on the likelihood of confusion."[239]

One opinion parses out conditions that make for an acceptable versus unacceptable "reading test."

237. *Id.* at 293 (emphasis added).
238. Goya Foods, Inc. v. Condal Distribs., Inc., 732 F. Supp. 453, 456–57 (S.D.N.Y. 1990).
239. Franklin Res., Inc v. Franklin Credit Mgmt. Corp., 988 F. Supp. 322, 45 U.S.P.Q.2d 1872, 1883 (S.D.N.Y. 1997).

> Louis Vuitton also defends . . . [the] choice of stimulus on the ground that if [the expert] had used a legible close-up of the Dooney & Bourke Multicolor Monogram Mark, then his survey "would not be a real world test. Rather, it would have been merely an irrelevant reading test of the type previously rejected by this Court" in the context of the 2004 confusion survey. . . . However, in that survey, a "heart shaped brass name sign" bearing the name "Dooney & Bourke" in full was prominently featured on the bag during the respondent's initial, close-up viewing of the bag. Here, by contrast, a legible close-up of the Dooney & Bourke Multicolor Monogram Mark would have exposed respondents to a monogram that is at the heart of this case. This would not constitute the kind of reading test that courts traditionally reject.[240]

A reasonable supposition from the findings and opinions in *Union Carbide v. Eveready*, *Goya Foods v. Condal*, *Franklin Resources v. Franklin Credit*, and *Malletier v. Dooney & Bourke* is that when something as prominent and obvious as the brand name is involved, critical questions should not be asked with the stimulus remaining in view. The question remains what to do when the issue concerns content that is detailed, complex, or subtle, such as may be the case when drawing inferences from advertising or in regards to trade dress.

To test the impact of a stimulus on a respondent, the respondent has to be exposed to that stimulus. At that point, the survey researcher has only two options before asking any substantive questions—either leave the stimulus in view or remove it from view. If the stimulus is left in view, the researcher risks being criticized for using a "reading test." If the stimulus is removed from view, the researcher risks being criticized for using a "memory test."[241] How should the researcher proceed? The following comments are intended to provide perspective, not necessarily guidance.[242]

---

240. Malletier v. Dooney & Bourke, Inc., 525 F. Supp. 2d 558, 595 (S.D.N.Y. 2007) (citing Malletier v. Dooney & Bourke, 340 F. Supp. 2d 415, 445 (S.D.N.Y. 2004)).

241. Although it has become customary to distinguishing between reading tests and memory tests, it should be appreciated that interpreting (or misinterpreting) anything we perceive in the outside world, including the meaning of the words we read, necessarily requires using information we have stored in memory. Thus, regardless of whether it is left in front of the respondent or removed from view, interpreting any stimulus impinging upon our senses is, by definition, a memory test. Without using what we have stored in our memories, we could not begin to interpret the outside world. With that in mind, henceforth, the term *memory test* is used here to mean a situation where, *without the benefit of having the stimulus available for review*, respondents are asked questions regarding that stimulus.

242. For other perspectives, see Jerre Swann, *A "Reading" Test or a "Memory" Test: Which Survey Methodology Is Correct?*, 95 TRADEMARK REP. 876 (2005); H.D. Ostberg, *Response to the Article Entitled a "Reading" Test or a "Memory" Test: Which Survey Methodology Is Correct?*, 95 TRADEMARK REP. 1446 (2005).

First, appreciate that reading tests are not the same as tests of comprehension, and it is generally an aspect of comprehension (or miscomprehension) that is at issue. Comprehension, not reading, is the psychological process underlying confusion and deception, and determining likely confusion and likely deception involve testing the accuracy and degree to which consumers comprehend (or miscomprehend) the stimulus they have experienced. Although reading or hearing something is a prerequisite for understanding it, it does not follow that reading or hearing something produces comprehension. Consider the following sentence: "The curve for a polynomial regression using three power terms in which the mean value was regressed onto the trial number is superimposed onto the data to suggest a smoothed function relating impact to order of information acquisition (and giving equal weights to each mean value)."[243] Though able to read the words and thus pass a reading test, many readers are likely unable to comprehend the meaning of this sentence.

Given that they form the backbone for assessing confusion and deception, how are comprehension and miscomprehension generally measured? Not surprisingly, the contrasting views found in court opinions are reflected outside the litigation context. From grade school though graduate school, comprehension is most often measured via closed-book examinations. This also applies to how practitioners and scholars most typically measure advertising comprehension and miscomprehension.[244] That said, comprehension is also tested via open-book exams, such as the reading comprehension section of the Law School Admission Test (LSAT). This suggests that, while open- and closed-book approaches are both acceptable and used for testing comprehension outside the litigation arena, they may not be equally appropriate under all circumstances.

Also pertinent is that, while trademark surveys strive to emulate the marketplace, in one important respect they are more akin to consumers taking tests rather than reaching decisions in the marketplace. Consumers operating in the real world rarely review all the information on a product or product package, even for expensive products. Rather, considerable

243. J. Jacoby, M. Morrin, J. Jaccard, Z. Gurhan & D. Maheswaran, *Attitude Formation as a Function of Incremental Information Input: A Procedure for Studying On-line Processing Models of Attitude Formation*, 12(1) J. CONSUMER PSYCHOLOGY 21, 27 (2002).

244. In a nationwide scale investigation of the comprehension and miscomprehension of advertising and nonadvertising in national magazines funded by the advertising industry (whose methodology was reviewed and approved by panels of applied researchers from the advertising industry, scholars from academia, and researchers and policy makers at the Federal Trade Commission and Food and Drug Administration *prior to* the study being implemented), the test stimuli were removed from view prior to testing message comprehension/miscomprehension. *See* JACOB JACOBY & WAYNE D. HOYER, THE COMPREHENSION AND MISCOMPREHENSION OF PRINT COMMUNICATIONS 88 (1987).

empirical evidence reveals that when making real-world purchasing decisions, to avoid information overload, consumers generally look at only small proportions of the available information,[245] spending perhaps five seconds on frequently purchased products.[246] Given such circumstances, having an interviewer ask questions with the product or advertisement in view could easily lead respondents to search for information they had not looked at prior to the questions being asked.

Having agreed to participate in a survey, respondents are aware they will be asked questions regarding the items shown to them during the course of the interview; if anything, this suggests they are more likely to pay attention to the stimuli than they ordinarily might. While it is true that "[i]n an actual market situation, the product would not disappear from the consumer's eye just as he or she is about to make a purchase,"[247] it also is true that consumers in actual market situations do not consider products and product information with the expectation that they will be asked questions (tested) regarding these items immediately afterward. The pressure to consider more aspects of the stimulus than they normally would are likely to be accentuated when the survey is being administered by an interviewer. If, when they anticipate being asked questions on what they were shown immediately afterward, respondents neglect to consider, or consider insufficiently, the information associated with the stimulus, then asking them questions with the stimulus in front of them likely

245. J. Jacoby, R.W. Chestnut & W. Silberman, *Consumer Use and Comprehension of Nutrition Information*, 4(2) J. CONSUMER RESEARCH 119 (1977); J. Jacoby, G.J. Szybillo & J. Busato-Schach, *Information Acquisition Behavior in Brand Choice Situations*, 3(4) J. CONSUMER RESEARCH 209 (1977); R.W. Chestnut & J. Jacoby, *Consumer Information Processing: Emerging Theory and Findings*, *in* FOUNDATIONS OF CONSUMER AND INDUSTRIAL BUYING BEHAVIOR 119 (A. Woodside, P.D. Bennett & J.N. Sheth eds., 1977); J. Jacoby, R.W. Chestnut & W. Fisher, *A Behavioral Process Approach to Information Acquisition in Non-Durable Purchasing*, 15 J. MKTG. RESEARCH 532 (1978); D.A. Sheluga, J.J. Jaccard & J. Jacoby, *Preference, Search and Choice: An Integrative Approach*, 6(2) J. CONSUMER RESEARCH 166 (1979); J. Jacoby, A. Kuss, D. Mazursky & T. Troutman, *Effectiveness of Security Analyst Information Accessing Strategies: A Computer Interactive Assessment*, 1 COMPUTERS IN HUMAN BEHAVIOR 95 (1985); J. Jacoby et al., *Tracing the Impact of Item-by-Item Information Accessing on Uncertainty Reduction*, 21(2) J. CONSUMER RESEARCH 291 (1994); J. Jacoby et al., *Training Novice Investors to Become More Expert: The Role of Information Accessing Strategy*, 2(2) J. PSYCHOLOGY & FIN. MKTS. (since renamed JOURNAL OF BEHAVIORAL FINANCE) 69 (2001); J. Jacoby, M. Morrin, J. Jaccard, Z. Gurhan & D. Maheswaran, *Attitude Formation as a Function of Incremental Information Input: A Procedure for Studying On-line Processing Models of Attitude Formation*, 12(1) J. CONSUMER PSYCHOLOGY 21 (2002).

246. W.D. Hoyer, *An Examination of Consumer Decision Making for a Common Repeat Purchase Product*, 11(3) J. CONSUMER RESEARCH 822 (1984).

247. Cumberland Packing Corp. v. Monsanto Co., 32 F. Supp. 2d 561, 578 (E.D.N.Y. 1999); *see* Barre Nat'l Inc. v. Barr Labs, Inc., 773 F. Supp. 735, 745 n.20 (D.N.J. 1991) (a pharmacist would not put away a card bearing product information prior to placing an order).

encourages them to search for and consider information they had not considered prior to being asked those questions. Having the product disappear from the respondent's eye prior to being asked the critical question ensures that they answer the question based on what they remember having seen and attended to *when exposed to the stimulus*, not based on what, as a result of having been prompted by the question, they then are led to look at and consider. This suggests that, because it guarantees that the answer is not biased by the question being asked, the memory test approach should be more preferred.

Because it would obviously bias the what respondents would look at and consider, no one advocates asking the critical question *before* presenting the stimulus to the respondent. For the very same reason (namely, because it would obviously bias the what respondents would look at and consider), researcher, counsel, and court might ask, "What justifies asking the question while the stimulus remains in view and accessible by the respondent?" In most instances, the justification will be "because, as in the marketplace, the item is present and can be viewed by the consumer while reaching a purchase decision." However, where no reasonable justification can be proposed, removing the stimulus from view before asking the critical substantive questions may be the proper research approach.

Importantly, suggesting that memory tests may be more likely to yield valid and reliable data than are reading tests should not be interpreted as proposing that, in sequential presentations, the second stimulus or stimulus array should be removed from view while the respondent is being asked the critical substantive questions. Questions such as "If you have any thoughts about this, do any of these items come from the same company as the item I showed you earlier, or do you think none of these items come from the same company as the item I showed you earlier?" ask the respondent to rely upon the information they considered and retained from having been exposed to the first stimulus or stimulus array. As long as the respondent cannot return to and reconsider the first item(s), such questions seem relatively free of the particular validity and reliability issues that infect reading tests.[248]

Nor should this discussion be interpreted as holding that useful information cannot be obtained by asking respondent questions while the stimulus remains in front of them or after it has been returned to them. In point of

248. This is not to say that sequential arrays are free of all validity and reliability concerns. "[A] sequential presentation of materials removed prior to asking the substantive survey question(s) may not replicate the marketplace either. It may merely show the respondents' ability to read and remember the same name as having been in both sets of material." Franklin Res. Inc. v. Franklin Credit Mgmt. Corp., 988 F. Supp. 322, 45 U.S.P.Q.2d 1872 (S.D.N.Y. 1997).

fact, marketing and advertising researchers find that valuable information often can be obtained from such refocus and reexposure protocols. Rather, the purpose is to say that open-book tests have the potential to undermine the possibility of gathering valid data regarding the information consumers actually consider under naturalistic circumstances, and the understandings they take away from this information.

A last factor to consider is the way in which the findings can be expected to cut. In situations where defendant's goods or advertising is alleged likely to cause confusion, deception or to mislead, it seems obvious that *defendant's* survey should not ask questions of respondents while the stimulus remains in front of the respondent. If there was a propensity for the respondent to be confused or deceived, guided by the questions being asked, they could review the stimulus for information that pertains to the question and, in this way, disabuse themselves of any confusion or deception they might otherwise have experienced. Yet suppose *plaintiff* chose to conduct a survey where defendant's stimulus remained in front of the respondents. Assuming defendant had no intent to confuse or deceive then, having paid a goodly sum to develop and disseminate its advertising, defendant should be delighted when consumers pay attention to, read, and seek to understand every word and nuance of that communication. If, using an open-book reading-test procedure—where everything favors the consumer being able to revisit, study, and correctly understand the communication—plaintiff's survey reveals actionable levels of confusion or deception, what better or more direct evidence can there be of the item's capacity to confuse or deceive? Since plaintiff elected to use a protocol that presumably cut against its own interests, it might be reasonable for a court to accept and accord weight to such a survey.

### 7.61.3 Duration of the Experience

When stimuli are left with respondents while they are being questioned regarding those stimuli, what is a reasonable amount of time for respondents to be permitted to view the stimulus? One court accorded a survey "no weight" because, among numerous other flaws, it "allowed respondents to view the test samples for 8–10 minutes while being questioned."[249] Once having been singled out for judicial attention, one can anticipate future courts to consider this issue as well. Various factors might be considered when determining what would be a reasonable amount of time for respondents to be permitted to view a stimulus while being questioned regarding that stimulus. One factor meriting consideration is the density

249. U.S. Polo Ass'n Inc. v. PRL USA Holdings Inc., 101 U.S.P.Q.2d 1487, 1503 (S.D.N.Y. 2011).

of the material, that is, how much content and how long would it take the average respondent to read/review that content. Another factor that might be considered is the level of detail being examined, perhaps permitting less time when the detail is macro in nature (e.g., a brand name, a prominently displayed slogan) than when it is micro in nature (e.g., a phrase buried in the middle paragraph on the back of the package).

## *7.62 Reacting to Stimuli*

Survey respondents have two basic ways of reacting to the stimuli they are shown: behaviorally or verbally.

### 7.62.1 Behavioral Response

Behavior speaks louder than words, especially when it takes place in the marketplace. Yet with rare exception, trademark surveys rely on verbal responses to survey questions, not the respondents' purchasing behavior. It might be argued that, rather than relying on what respondents *say* in response to survey questions, the best way to determine if respondents truly are confused is to rely on what they actually *do* in the marketplace.

Two trademark surveys were located that used a behavioral approach and two others that relied on recall of behavior. In the first matter, it was alleged that defendant's shelf-stable microwaveable food product packaged in a green and white Styrofoam tub bearing the name *Health Selections* was likely to cause confusion with plaintiff's shelf-stable microwaveable food product packaged in a green and white styrofoam tub bearing the name *Healthy Choice*. As described by the court:[250]

> The . . . study was designed to try to examine confusion . . . as to product, as to source, and as to sponsorship. To test for these various possibilities, a consumer survey was designed wherein potential respondents were intercepted on their way into a supermarket that carried one or both of the Healthy Choice or Health Selections products. After being "screened" for eligibility and agreeing to participate, the respondents were shown three products . . . French's Mustard, Heinz Tomato Paste and either Healthy Choice or Health Selections. Respondents were told to look at the products as they would if they saw them in the supermarket and were thinking about buying them.
>
> When the respondents indicated they were finished looking at the products, the interviewer put the products away and asked each respondent to purchase the three products while doing his or her normal shopping in the supermarket. The respondent was

250. ConAgra, Inc. v. George A. Hormel & Co., 784 F. Supp. 700, 724 (D. Neb. 1992).

> given 7 dollars to buy the products. They were also told that they would receive 10 dollars when they returned and answered some questions. Respondents were instructed that if the supermarket was out of the particular brand they had seen, "please don't substitute another. Just come back with the change."
>
> When the respondents returned to the interviewer, the specific brand names of the products were recorded. . . . After all the products were taken from each respondent, the respondent was asked various additional questions [these latter questions being used to assess as to source and sponsorship].

At the time the survey was conducted, both plaintiff's and defendant's products were being test marketed, with each being available in only a few locales nationwide. There were five test conditions, four of which were structured as follows. One hundred fifty consumers in Group 2 were shown Healthy Choice and sent into a supermarket that carried only Health Selections. Thirty consumers in Group 3 were shown Healthy Choice and sent into a supermarket that carried both Healthy Choice and Health Selections. One hundred fifty consumers in Group 4 were shown Health Selections and sent into a supermarket that carried only Healthy Choice. Thirty consumers in Group 5 were shown Health Selections and sent into a supermarket that carried both Healthy Choice and Health Selections. Respondents were tallied as being "confused as to product" if they were told to buy Healthy Choice and brought back Health Selections, or were told to buy Health Selections and brought back Healthy Choice. Although product confusion ranged from 6 percent to 84 percent across these four groups, with the weighted average being approximately 40 percent, because the study was held to be flawed in other respects, the court accorded little weight to these findings.

The second matter to rely on actual consumer behavior rather than verbal reports is described as follows:

> In a store, two adjacent displays [are] set up, one with the original product, the other with the alleged infringer. Entering customers [are] given a coupon for the purchase, at a reduced price of the original product. At the checkout counter, where the coupons are redeemed, an inspector determine[s] which of the two products, the original or the infringer, the consumer selected from the shelf. The frequency with which the customer mistakenly selected the infringer [is taken] as the measure of confusion.[251]

251. Hans Zeisel & David Kaye, Prove it With Figures 156–57 (1997).

Discussed in *SquirtCo. v. Seven-Up Co*, the third survey measured respondents' recall of their purchase behavior.[252] As described by the circuit court:

> The . . . Study was conducted at grocery stores in Phoenix, after QUIRST soft drink had been on the market in Phoenix, for about six weeks. Persons who had used coupons for non-cola soft drinks were asked to recall, without looking, what brand of soft drink they had purchased.
>
> Of the 98 who said they bought QUIRST soft drink, all 98 had QUIRST soft drink. One who said she bought 7-UP soft drink had QUIRST soft drink, one who said she bought SPRITE soft drink had QUIRST soft drink, and one who said she bought SHASTA soft drink had QUIRST soft drink. Of the 70 who said they bought SQUIRT soft drink, 65 had SQUIRT soft drink, two had SPRITE soft drink, and three had QUIRST soft drink. Two who said they bought 7-UP soft drink had SQUIRT soft drink, and two who said they bought SPRITE soft drink had SQUIRT soft drink.
>
> Seven-Up argues that only those three who said they bought SQUIRT soft drink but had QUIRST soft drink were confused between those two marks. Seven-Up also put on expert testimony that the correct base number was 175, or all the respondents because the confusion ran both ways. Three out of 175 is 1.7%. (Seven-Up points out that on that basis the confusion between SQUIRT soft drink and SPRITE soft drink was 3.1%.) The trial court, however, decided that only those 70 respondents who said they bought SQUIRT soft drink made up the relevant base. Three out of 70 is 4.3%, which is the figure the court used.
>
> On the other hand, SquirtCo argues that the three who said they bought SQUIRT soft drink but had QUIRST soft drink were instances of actual confusion. Not only was the methodology of the study novel, but also the admission of survey-type interviews as evidence of actual confusion was without legal precedent. The trial court refused to treat this as actual confusion but rather as indications of likelihood of confusion. The court was particularly concerned that the three respondents were not available for cross-examination. In short, the court gave the investigation the same weight as an opinion survey.

In the fourth matter, *Kroger Co. v. Johnson & Johnson*,[253] plaintiff's survey provided respondents with five seconds to view a shelf containing

252. SquirtCo. v. Seven-Up Co., 628 F.2d 1086, 1090 (8th Cir. 1980).

253. Kroger Co. v. Johnson & Johnson, 570 F. Supp. 1055, 223 U.S.P.Q. 29 (S.D. Ohio 1983).

defendant's products. When a substantial percentage of respondents said they saw plaintiff's Tylenol on the shelf when in fact it was not there, the court accorded the survey weight as evidence of likely confusion.

Though seemingly not relevant for testing genericism, secondary meaning or dilution, surveys focusing on behavioral responses hold great promise for measuring actual or likely confusion, as well as for testing issues in related domains.[254]

### 7.62.2 Verbal Response

Virtually all trademark surveys rely on respondents' answers to survey questions. For that, we turn to chapter 8.

254. Surveys focusing on respondent behavior have been used to resolve, prior to trial, a patent infringement matter, Polaroid Corp. v. Hewlett Packard Co., C.A. No. 06-738 (D. Del. 2007), and a class action matter, Taylor v. JVC Ams. Corp., No. 07-4059 (D.N.J. 2008). The behavioral approach is particularly well suited to address the kind of proof called for by the Federal Circuit in *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009): "For the 'entire market value' rule to apply as the measure of damages for patent infringement, the patentee must prove that the patent-related feature is the basis for customer demand of the accused product."

# chapter 10

# Cleaning, Aggregating, Analyzing, Evaluating, and Reporting Data

## 10.01 Handling, Evaluating, and Reporting the Incoming Data

Shortly after a survey starts being implemented in the field, the data[1] (i.e., the answers the respondents provide to the questions they are asked) begin to arrive. This occurs nearly contemporaneously with online and CATI phone surveys, and a day or two later with mall intercept surveys using paper-and-pencil questionnaires, which generally are express mailed from the field sites to the research firm. The set of information collected from any given study is termed the *data set*. This chapter discusses basic considerations pertaining to how these incoming data are handled, evaluated, and reported.

## 10.10 Data Cleaning

Regardless of how carefully planned or implemented the survey, not all the incoming data will necessarily be reliable. Since unreliable data do not merit being analyzed nor relied upon, various steps should be taken to purge the data set of unreliable or questionable data.[2] In each instance, the review of questionnaires and purging should be done without any regard given to the direction of the answers provided to the substantive

1. As used in this work, *data* is plural; *datum* is singular.
2. See legitimate reasons for limiting a universe, chapter 5, section 5.63.

questions—those measuring the legal matter(s) at issue. Moreover, questionnaires removed from the data set should not be discarded, but placed aside so that they are available should the opposing party or court wish to examine these.

## 10.11 Check-in and Editing

Upon receipt, completed interviews need to be reviewed to ensure that each respondent was qualified to participate in the study and that the questionnaires were properly completed. "The term *editing* is used to refer to procedures for detecting erroneous and/or questionable survey data with the goal of correcting it prior to analysis. Editing includes both checking for answer codes recorded outside the legal range (e.g., a reported age of 197 years) or inconsistent with prior information (e.g., reported age of 18 years and an answer that the respondent fought in the Korean war)."[3]

Where the data have been collected using in-person interviews, editing also includes determining that data recording and question skip patterns were followed as instructed. Some data recording and skip pattern errors may be trivial and provide little or no reason for eliminating an interview from the analysis; others tend to be quite serious, essentially mandating that the afflicted questionnaire be placed aside. Editing will also reveal nonresponse to questions, although this should not be a problem where professional interviewers or well-designed online surveys have been used.

Another aspect of editing is confirming that the correct stimuli were shown and in the correct order. While possible with well-designed questionnaires, this is not always possible with poorly designed questionnaires. Where interviewers have been involved, it is typical for some editing to be undertaken by the field service supervisor prior to mailing the completed questionnaires to the researcher. This is usually done using a red or blue pencil.

For self-administered online questionnaires, editing involves purging the data set of questionnaires where respondents have provided gibberish answers to open-ended questions. Although some may hold that only the data from those questions containing the gibberish answers be purged, on the grounds that the person was not taking the task seriously, the more conservative position is to withhold from the analysis all the data from

3. Norbert Schwarz, Robert M. Groves & Howard Schuman, *Survey Methods*, *in* 1 The Handbook of Social Psychology 143, 170 (D.T. Gilbert, Susan T. Fiske & G. Lindzey eds., 4th ed. 1998).



such questionnaires. On the other hand, illegible (rather than gibberish) answers may only require purging the answer to that particular question, not placing the entire questionnaire aside.

## 10.12 Quality Assurance Checks

Various types of quality assurance checks can be incorporated into questionnaires. *Acquiescence response set* refers to the fact that some respondents are predisposed to give yea-saying rather than nay-saying answers.[4] Many people refuse to participate in surveys. On the whole, those who agree to participate in surveys may tend to be more agreeable people—ones more likely to answer "yes" than "no." For this reason, questions are sometimes included that ask respondents whether they have heard of or are familiar with a number of different names or items, some of which are fictitious (see chapter 8, section 8.36). While the data from a respondent who answers "yes" to one fictitious name or item may or may not be viewed as an isolated error and retained, the data from those who answer "yes" to two or more fictitious items tend to be purged.

A number of different quality assurance checks can be incorporated into online administered questionnaires. One involves the use of CAPTCHA[5] technology designed to detect when computers, rather than human beings, have been programmed to respond to questionnaires. A CAPTCHA question provides an on-screen image of distorted letters and digits, and requires the respondent to type in the letters or digits that appear on the screen in order to continue. Because other computers are thus far unable to solve the distorted CAPTCHA images, users entering a correct solution are presumed to be human. An example of such a question used in one of plaintiff's surveys in *Adidas v. Herbalife*[6] is: *In the box below, please type in the combination of CAPITAL and lowercase letters or numbers to match what you see below, then click NEXT.* Respondents were then given one of the following eight possible letter/number combinations:

4. Jon Krosnick, *Survey Research*, 50 Ann. Rev. Psychology 552 (1999) ("Evidence of acquiescence is voluminous and consistently compelling. . . .").

5. CAPTCHA is an acronym standing for "Completely Automated Public Turing test to tell Computers and Humans Apart."

6. Adidas Am., Inc. v. Herbalife Int'l, Inc., CV No. 09-661-MO (D. Or. Aug. 10, 2010).




If they failed the first attempt they were given a second, last chance with a different combination of symbols. Respondents who type in an incorrect answer are removed from further consideration at this point.

Another concern with self-administered online questionnaires is whether respondents are answering randomly without paying attention to the question. As a check on respondent attentiveness, it is possible to ask screener questions such as *Please select blue from the following list in order to continue with this survey*.

Red

Blue

Yellow

Green

I don't know

Respondents answering anything other than blue are terminated.

Yet another concern with self-administered online questionnaires is that some respondents may have the assistance of others when answering the questions. A way to identify such individuals is to ask a question such as



*Did you answer these questions with help or input from someone else, or did you answer them alone?* The data from those answering that they answered the questions with help or input from someone else should be placed aside.

Online respondents who take an unreasonably long or short time to answer specific questions or the entire questionnaire should be viewed with suspicion. This may indicate that they have gone online or looked elsewhere to come up with their answer(s). For this reason, a good practice is to set reasonable time limits for individual questions or the entire questionnaire. If a questionnaire has been timed in advance to take approximately six minutes to read, then one might place aside the data from those taking less than four minutes or more than ten minutes to answer the questionnaire. Similar lower and upper time thresholds can be set for individual questions as well. As the setting of thresholds is judgment based, they should be reasonable and defensible.

## 10.13 Validation

As applied to survey research, the term *validation*[7] refers to a brief follow-up survey with respondents asking questions to confirm that they did indeed participate in the original survey; higher quality validations also seek to confirm some aspect(s) of the respondent's qualifications for participating in the survey.[8]

Postsurvey validation has primarily been viewed as a check upon unscrupulous interviewers who might fabricate respondents or responses. For this reason, validation is typically used for situations involving interviewer administration, but rarely used for self-administered (e.g., online) administration. Due to standards of professional responsibility in the research industry (see chapter 9, section 9.72) and legal opinions regarding the same, the respondents' identities are not revealed to the lawyer and do not become part of the discovery material. For this reason, it is important for the lawyer to determine whether there was a validation of the interviews, who did it, how it was done, and with what result. A trademark survey without a postsurvey validation conducted by an entity independent of the interviewing service tends to be suspect. As it conflicts with the notion of an independent third party, it seems inappropriate for firms to have one of their divisions conduct the initial interviews, then have another of their divisions conduct the postsurvey validation.

7. There are many different types of scientific validities; discussion of these is beyond the scope of the present volume. A number of the more important varieties are discussed in William R. Shadish, Thomas D. Cook & Donald T. Campbell, Experimental and Quasi-Experimental Designs for Generalized Causal Inference (2002).

8. Postsurvey validation is a form of empirical validation (see chapter 4, section 4.11).

The poststudy validation survey typically begins within a few days subsequent to completion of the original interviews, although this may be delayed when researchers conduct a pilot survey and pause to evaluate the results. Calls should be made at different times of the day and on different days of the week, with at least three validation calls being made in an attempt to reach each respondent.

A properly conducted and reported validation survey contains three key features. First, it needs to be conducted by an independent third party, not by the research firm or by an entity having a business connection with the firm that conducted the original survey. This avoids the problem of having the fox (a firm with a vested interest in not incurring costs for invalid interviews) guard the chicken coop.[9]

Second, the effort needs to be substantial. When postsurvey validation efforts are done in marketing and advertising research not conducted for the purpose of being proffered as evidence in a litigated matter, it is common to recontact somewhere in the order of 10 percent to 25 percent of the original sample. However, surveys conducted for the purpose of being proffered as evidence in a litigated matter usually employ a higher standard, seeking to contact and validate a minimum of 50 percent of the respondents.[10]

Third, an appendix to the survey report should provide a copy of the questionnaire used in the validation effort, as well as a letter from the third-party commissioned to conduct the validation providing a detailed report of the findings. In addition to asking the respondent whether he or she recently participated in a survey where they were asked questions regarding the topic (and possibly stimuli) of interest, better validation questionnaires include at least one or two additional questions designed to determine if the respondent provided a response consistent with their answers to one or more of the qualifying questions on the screener. It goes without saying that the instructions provided to and questions asked of respondents should not be leading or in any other way biasing.

At a minimum, the body of the survey report should contain a table providing the following information:

| | Total % |
|---|---|
| Base = XXX respondents | |
| Reached and judged to be valid (n = ) | |
| Reached and judged to be invalid (n = ) | |
| Reached and gave inconsistent answers (n = ) | |
| Not reached and presumed valid (n = ) | |
| | 100% |

9. Rust Env't & Infrastructure, Inc. v. Teunissen, 131 F.3d 1210, 1219 (7th Cir. 1997) ("The district court discounted Rust's survey because it . . . did not comport with accepted practice for independent validation of the results.").

10. Survey industry codes of ethical practice generally require parental approval be obtained prior to any contact with a minor, so this rate of validation may be difficult to achieve where the sample consists of respondents under the age of 18.



The third party's validation report should provide the unique respondent IDs for those respondents identified as being invalid or having provided inconsistent answers. The data obtained from respondents who are reached and judged to be *in*valid should be removed from the data set and placed aside. Reasons for identifying a respondent as being invalid include (1) the person reached during the validation effort says he or she does not recall having participated in such a survey; (2) the interviewer is told that no such person is available at that phone number; or (3) the phone number provided by the respondent is a nonworking number. As an exercise in caution, the data from respondents who give inconsistent answers should also be placed aside.

Upon being reached during the validation effort, it is not unusual for some respondents who did participate in the original survey to claim not to have participated. As an example, more than 2 percent of those who participated in plaintiff's surveys in *Ferrari v. McBurnie*[11]—and who signed a sheet at the completion of their participation saying they had received a $50 incentive—later claimed not to have participated in the survey. The claim may reflect a genuine memory lapse; a more likely explanation is that having been generous with their time originally, they may wish not to invest any more time and effort in the matter.

In keeping with generally accepted practice in the field, as no concrete reason has been forthcoming to indicate such individuals did not participate, respondents who cannot be reached in the time available for validation are presumed to be valid and their data are included in the analyses.

### 10.14 The Effective or Usable Sample

Although one may have tested and received completed questionnaires from 600 respondents, when this set of returned questionnaires has been cleaned and purged of invalid and questionably reliable respondents, what remains—say, 564 respondents—can be termed the *effective* or *usable* sample. Assuming no additional reasons later surface for placing data

11. Ferrari S.p.A. v. McBurnie, 11 U.S.P.Q.2d 1843, 1846–47 (S.D. Cal. 1989).

aside,[12] the tabulations and statistics that are calculated and the evaluations reached are then based on this lesser number, not all completed and returned questionnaires.

### 10.15 Removing Personally Identifiable Information

Survey respondents typically are promised confidentiality or told their privacy would be respected, that their names and contact information would not be disclosed, and that their answers would never be tied back to them as individuals. Thus, at some point early in the data handling process, either after cleaning or tabulating, in accordance with survey research industry standards,[13] all respondent-identifying information (names, addresses, phone numbers) is either destroyed or disassembled from the data provided by that person. From that point onward, each respondent's is identified by a unique numeric or alphanumeric ID.

## 10.20 Data Tabulation

Surveys are designed to assess the states of minds of individuals who have been selected to be representative of the universe of interest and the focus is on drawing conclusions based upon the entire sample. Doing so normally requires tabulating and aggregating the responses across the individuals in the sample so as to be able to arrive at statistics, such as percentages or averages. There is no requirement for the tabulation and aggregation to be conducted by computer. Especially when one is looking for something specific, such as mention of a particular name, and there are few such mentions among a sample of 400, it may be more efficient to conduct a hand tabulation. Naturally, hand tabulations should be double and triple checked.

Tabulation and aggregation is reasonably easy for answers given to closed-ended questions, but considerably more complicated for answers given to open-ended questions.

12. Additional reasons for placing data aside occasionally surface after the data have been analyzed. In one matter, the court reported that the data gathered by one interviewer: "stand out from those obtained by the rest of the 55 interviewers nationwide in the following ways: (a) [She] was one of only two interviewers nationwide to learn of the lawsuit during her work. (b) She was her own supervisor in the field. (c) She did more interviews on her own . . . than any other interviewer nationwide. (d) She alone was responsible for . . . 25%, of the answers coded as dilution. . . . Eliminating the[se] interviews as anomalous or, at best, unexplained, drops the net dilution rate from 14% to 11.5%." Pharmacia Corp. v. Alcon Labs., Inc. 201 F. Supp. 2d 335, 364 (D.N.J. 2002).

13. See chapter 9, section 9.72.



### 10.21 Tabulating Closed-Ended Data

Tabulation and aggregation of answers given to closed-ended questions is reasonably straightforward and easy. One simply tallies the number of respondents who select each of the closed-ended response options.

The process, however, is not without potential problems. Where, to avoid potential order effects, the response options have been provided in rotated or counterbalanced order across respondents, the researcher needs to be mindful of this fact and some derotation procedure needs to be used before the responses are tallied. The author is aware of at least one instance where this was not done, leading to strange results. Fortunately, the problem was discovered prior to the final report being written and submitted.

In-person interviews conducted in the field generally do not use paper and pencil instruments set up to be machine readable via optical character recognition (OCR) software. Instead, the answers entered on the completed questionnaires are later transcribed into a computer. Better practice is to have this data transferring process done twice, then use the computer to compare the two sets of data entries to identify and eliminate key-punch error. "Although we might think we are entering data carefully, it is practically impossible to enter a large data set in a computer file without initially making at least a few errors. [One researcher] examined a series of data sets from the psychological sciences and discovered that the error rate in recording data was about 1%. More problematic, examination of the nature of the errors revealed that over two-thirds of the errors were biased in the direction of the researcher's hypothesis. We are more likely to catch errors that contradict our hypothesis than those that confirm it, which makes careful proofing even more essential."[14]

### 10.22 Tabulating Open-Ended Data: Coding and Categorizing

Open-ended questions enable respondents to answer using any words, terms, or phrases they wish, and to give answers of varying length and specificity. Not being standardized across respondents, the researcher's objective is to make sense out of these variable and different answers by identifying the major themes, specific words, phrases, or meanings that surface. Tabulating and aggregating the answers given to open-ended questions is considerably more time consuming, less straightforward, and less objective than is the case for answers to closed-ended questions. This is especially so when the recorded answers contain abbreviations,

14. Rick H. Hoyle, Monica J. Harris & Charles M. Judd, Research Methods in Social Relations 433 (7th ed. 2002).

misspellings, or ambiguities, as sometimes occurs with self-administered questionnaires.

Suppose respondents in a likely confusion survey were asked "Why do you think the company that put out this item needed to obtain permission or authorization from Company X in order to do so?" The answers to the question may include because of the colors; because of the colors blue and red; because of the color red; because of the particular shade of egg-shell blue; because of the design on the package; because it just looks like something Company X would put out; maybe because it looks like something Company X would put out; because I have something that looks like this that was put out by Company X; because it looks the same as the item put out by Company X; because it looks similar to the item put out by Company X; because it's big and impressive; because of the logo; because of the Leopard logo; because the name is spelled similarly; because it would be illegal if they didn't get permission from Company X; I don't know; and so on.

The way in which researchers tabulate and make sense out of such answers is via a process termed *coding*. This involves identifying the kinds of answers given to an open-ended question, organizing these into categories and subcategories (called *codes*), assigning numbers to these categories and subcategories, then tabulating all the answers given to the question in terms of these codes. Even if we assume for the moment that the interviewers accurately recorded every word verbatim, this is easier said than done.[15] Often, hundreds of responses have to be put into just a few categories for reporting purposes, and interpreting such responses is more art than science. It is unlikely that two individuals will code 100 responses in the same way. The objective is to keep interpretive discrepancies to a minimum. The problem is described by a Wisconsin trial judge:

> During the cross-examination of [the survey expert], Miller and Heileman were able to point out many coding errors which affected the results of the survey. . . . Some of the criticized coding was plainly erroneous. Other disputes arose because the consumers surveyed gave multiple answers or answers which could arguably be classified in more than one category. [The expert's] report gave no indication of the order in which the multiple responses came to mind. . . . While a certain number of errors and good-faith disputes are unavoidable in quantifying survey data, these errors, combined with the built-in bias, plus the flaws in the universe, design and supervision of the survey have caused the court to place very little weight on the results of [the survey].[16]

15. One authority writes: "In practice, the open-ended question . . . has many more limitations than advantages. . . . There is a much greater risk of interviewer bias. There is no way, even with the best of interviewers, that all the respondent's words can possibly be recorded, so excerpts of what the person says have to be selected. . . . Those who interpret the written replies . . . can attest to the difficulty of trying to decide whether a particular reply falls into one category or another. They can also tell about the difficulty of being completely consistent throughout a study in their interpretation; it is easy to shift one's interpretations over a time period. Also, the whole process of coding is laborious and time consuming, and therefore expensive. One last disadvantage is that the use of the completely open-ended question overweights the replies of the higher socioeconomic groups. These are the more literate people, who know how to express themselves. This group gives the fuller, more elaborate set of replies to an open-ended question." A.B. Blankenship, Professional Telephone Surveys 87–88 (1977).



There are two broad approaches to coding. The most common is termed *data-driven coding*; the other is termed *theory-driven coding*. In some instances, the two approaches are integrated.

The first step in data-driven coding involves identifying the principal kinds of answers given to the open-ended question being analyzed. Common practice is for researchers to look at the answers supplied by the first 35 to 50 or so respondents, then use these as a basis for developing preliminary codes. Additional unique responses will likely surface as subsequent questionnaires are processed, thereby requiring that the preliminary codes be augmented. However, it is generally the case that the first 50 or so open-ended answers provide a sufficient basis for developing the large majority of the codes that will finally be used.

Developing codes is accomplished by examining the answers looking for specific words, phrases, themes, or meanings, then tabulating how frequently each of these surface. Using a simplified example, suppose the first 50 answers to the question "Why do you think the company that put out this item needed to obtain permission or authorization from Company X in order to do so?" were as follows:

| No. | Answer |
|---|---|
| 6 | because of the colors |
| 3 | because of the colors blue and red |
| 2 | because of the color red |
| 1 | because of the design on the package |
| 2 | because it just looks like something Company X would put out |
| 1 | maybe because it looks like something Company X would put out |
| 2 | because of the particular shade of egg-shell blue |

16. G. Heileman Brewing Co. v. Anheuser-Busch, Inc., 676 F. Supp. 1436, 1486–87, 6 U.S.P.Q.2d 1481, 1516 (E.D. Wis. 1987), *aff'd*, 873 F.2d 985, 10 U.S.P.Q.2d 1801 (7th Cir. 1989).

1 because I have something that looks like this that was put out by Company X
4 because it looks the same as the item put out by Company X
1 I don't know, because the name is spelled similarly
8 because it looks similar to the item put out by Company X
1 because it's big and impressive
2 because of the logo
3 because of the Leopard logo
1 because the name is spelled similarly
2 because it would be illegal if they didn't get permission from Company X
10 I don't know
50 TOTAL = 50 Answers

Having identified the words, phrases, themes, or meanings that surfaced in the first 50 responses, the next step is to organize these into categories and subcategories in some meaningful and defensible way. As one possibility, consider the following, where the 50 responses have been organized into 6 major categories (numbered below 10 through 60) and 14 subcategories (numbered below 11–14, 21–24, 31–33, 41–42, 51, and 61–62):

**10. Looks (15 mentions; 30%)**
11 because it looks the same as the item put out by Company X
12 because it looks similar to the item put out by Company X
13 because it just looks like something Company X would put out
14 because I have something that looks like this that was put out by Company X
**20. Color/Colors (13 mentions; 26%)**
21 because of the colors blue and red
22 because of the color red
23 because of the particular shade of egg-shell blue
24 because of the colors (NFS [not further specified])
**30. Design/Logo (6 mentions; 12%)**
31 because of the design on the package
32 because of the Leopard logo
33 because of the logo (NFS)
**40. Other (5 mentions; 10%)**
41 because it's big and impressive
42 because it would be illegal if they didn't get permission from Company X



**50. Ambiguous (1 mention; 2%)**
51 maybe because it looks like something Company X would put out
**60. Don't Know (10 mentions; 20%)**
61 I don't know
62 I don't know, because the name is spelled similarly

A number of things should be noted regarding this set of codes. First, depending upon their objectives, others may come up with totally different but equally rational and defensible coding categories. Second, the coding shown here reflects a conservative approach. Because the respondent qualified his answer with the word "maybe," rather than being coded under the "looks" category, the answer "maybe because it looks like something Company X would put out" is classified as being ambiguous, as the word "maybe" also implies "maybe not." Because it begins with the phrase "I don't know" suggesting the respondent is offering a guess, the answer "I don't know; because the name is spelled similarly" is classified as "I don't know."

Accurate coding requires that attention be paid to the qualifiers respondents incorporate in their answers. In a class action suit where Native Americans sued the National Football League and its Washington, D.C., franchise claiming that the term "redskins" was disparaging, plaintiffs' survey tested the reactions of Native Americans to the term, but without providing any context for the term. On appeal, the court wrote: "[W]ith regard to the tabulation of the results, . . . certain responses were incorrectly tabulated as positive responses [i.e., as representing disparagement]. In particular, these incorrectly tabulated results included those responses where the participant stated that his/her response was dependent on the context in which the word was used [saying, for example, that while it was OK to use the term as the nickname of the NFL team, it was not OK to use it in other contexts] and those responses indicating that others may be offended [while the respondents said they themselves would not be offended, they thought other Native Americans might be]."[17]

To better capture nuances that can be important for interpretation, especially when it comes to the substantive answers that bear directly on the issue(s) in the case, it is usually preferable to develop finer rather than coarser codes. Lumping respondents who gave substantive answers that have different meanings into a single code can be a source of judicial criticism. Consider the court's comments in *24 Hour Fitness v. 24/7 Tribeca Fitness*.

17. Harjo v. Pro-Football, Inc., 50 U.S.P.Q.2d 1705, 1734 (T.T.A.B. 1999).

[The expert] characterized the results as demonstrating that 28% of the respondents reported that their belief that 24/7 and 24 Hour were the same or related was "because of the name." According to [opposing expert], this characterization was misleading because some of those respondents actually stated "because of the name" or a similar statement, while others said "open 24 hours," "24/7," or "It is 24/7 Fitness." [Opposing expert] said that these latter responses should not have been lumped together with those who specifically said something about "the name." Such responses could indicate that the basis for the confusion was an impression that the businesses were both open 24 hours a day, not just the name. He pointed out that the percentage of respondents that clearly stated that "the name" was the basis for their belief were as follows: 4% said "same name," 1% said "because of the name," 1% said "names are similar," and 3% said "same gym/Fitness Club." If only those categories are counted, confusion that is clearly "because of the name" drops [from 28%] to 9%. If "same gym/Fitness Club" is omitted, because it also does not specifically state that the name is the basis for the confusion, the percentage is even lower. . . .

A survey [the same survey expert] performed in another case was also criticized for "lumping" respondents' statements. In *Coors Brewing Co.*, the . . . court found that the open-ended questions the survey asked were "generally reliable," but that some of the results were uninformative because [the expert] had "lumped together the percentage of respondents who said that Coors Light is *diluted* and the percentage of respondents who said that Coors Light is *watered down*." The court found that "it is literally true that in one sense Coors Light is 'diluted,' [in that, after shipping, local water is added to Coors' high gravity brew which has an alcohol content over the statutory maximum], [but] Coors Light does not appear to be 'watered down,' in the sense of containing more water than beer should or than Natural Light does." Ultimately, the court said that "because [there was] no way of knowing what percentage of respondents said that Coors Light is diluted and what percentage said that Coors Light is watered down, this category of responses has no probative value."[18]

Respondents sometimes give multiple answers (e.g., "because of the colors blue and red and also because of the Leopard logo") or give single answers

18. 24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC, 447 F. Supp. 2d 266, 281 (S.D.N.Y. 2006) (quoting Coors Brewing Co. v. Anheuser-Busch Co., 802 F. Supp. 965, 973 (S.D.N.Y. 1992)).



that qualify being assigned to more than one code. Either of these situations can yield percentages that, when totaled, exceed 100 percent. To address this problem, researchers use *netting*, a procedure that counts each respondent only once within a category or subcategory, regardless of how many answers he or she may have given that qualify for that category or subcategory.

*Theory-driven coding* is used when the researcher relies on a priori ideas as to the kinds of answers that would be meaningful in light of the survey's objectives. For example, the critical question in a likely confusion survey may be whether respondents were confused by defendant's use of its logo, nothing else. Respondents who, in answer to a closed-ended question, preliminarily gave an indication of being confused as to source might then be asked an open-ended question such as: "What makes you think this item comes from Company X [the plaintiff]?" Even though not a single respondent mentioned the logo in answer to this question, relying upon theory-driven considerations, defendant's expert may nonetheless include a code for "logo" even though not a single respondent made mention of the logo. By entering zeroes for this code, the expert is able to emphasize the absence of "logo" responses as a reason for confusion. While strict theory-driven coding does not rely on obtained responses to the open-ended questions for identifying the coding categories to develop, it is more commonly used with data-driven coding to develop a single, integrated coding system.

Coding is a subjective process.[19] In any given survey, although yielding reasonably clear-cut assignments in perhaps 90 percent of the verbatims that need to be coded, the remaining verbatims can prove difficult to code. For this reason, the preferred practice is to have the same data independently coded by two coders who then compare their allocations. Where the coders have allocated the same response to different codes, discussion will ensue to resolve the discrepancy. If agreement is not forthcoming, a third person is called in to resolve the issue. In many instances, that third person will be the survey expert. In *U.S. Polo Association Inc. v. PRL USA*, the court "credited" the testimony of an expert where that expert "did discuss how to code certain responses that [a coding supervisor] deemed problematic and read to him over the telephone."[20]

Regardless of how careful the coding, one can expect opposing counsel and expert to contest some borderline allocations, with the court

19. "Coding open-ended questions requires the coder to make judgments, so this process is more subject to error." H. F. Weisberg, J. A. Krosnick & B. D. Bowen, An Introduction to Survey Research, Polling, and Data Analysis 143 (1996). Thus, while open-ended questions are held by some to be less leading or biasing when posed to the respondent, recognize that they end up being more prone to introducing error when analyzed.

20. U.S. Polo Ass'n Inc. v. PRL USA Holdings Inc., 101 U.S.P.Q.2d 1487, 1502 (S.D.N.Y. 2011).

sometimes agreeing with counsel's assertions.[21] To reduce such instances, one should avoid coding responses, especially ambiguous responses, in a way that favors the survey's sponsor.[22] To circumvent most such problems, and providing counsel can resist the urge to over claim, it is a good idea—some would say counsel's responsibility—to review the completed coding with a conservative mindset and raise any concerns or questions with the researcher prior to the report being submitted.

There is little question that the summarization of responses to open-ended questions should not be performed by untrained personnel.[23] However, opinions vary over whether the coders should be informed or not informed regarding the issues or themes the researcher is seeking to identify. One court commented: "While [the] expert's study used a 'double blind' approach, that is, neither the interviewers or the respondents were aware of the purpose of the research or the identity of the party commissioning the survey, the coding was not similarly 'blind': [the expert who was himself the coder] knew the purpose of the research and was employed by 24 Hour. Therefore, his biases could be reflected in the coding of the responses."[24]

Writing in the first edition of *Trademark Surveys*, Welter provides the rationale for an alternative perspective.

> [T]o use professional coders such as those employed by a research organization creates some risk because these coders are accustomed to coding product surveys and advertising surveys, not legal surveys. Even when briefed on the objective of the survey and provided the key words to code, the professional coder generally takes a very literal approach to the recorded responses as opposed to an interpretative approach, and rightly so. To do interpretative coding one needs to understand people in general, the relevant marketplace, the product or service involved in the survey, and the relevant law. Thus, the best coding is done by the survey expert personally and will vary with the expert's knowledge.

21. Pharmacia Corp. v. Alcon Labs., Inc. 201 F. Supp. 2d 335, 364 (D.N.J. 2002) ("When combined with the recoding of the three miscoded test cell responses, the dilution level is reduced even further, to 10.4%."); Louis Vuitton Malletier v. Dooney & Bourke, Inc., 340 F. Supp. 2d 415, 447 (S.D.N.Y. 2004) ("due to several miscoded responses . . . , the survey improperly inflates the number of responses illustrative of 'noise,' which in turn erroneously deflates the confusion figures.").

22. *See* Bd. of Regents v. KST Elec., Ltd., 550 F. Supp. 2d 657, 676–77 (W.D. Tex. 2008), where the expert "coded survey responses in a way that favored Defendants." *See also* Gen. Motors Corp. v. Cadillac Marine & Boat Co., 226 F. Supp. 716, 736 (W.D. Mich. 1964).

23. Sears, Roebuck & Co. v. Allstate Driving Sch., Inc., 301 F. Supp 4 (E.D.N.Y. 1969).

24. 24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC, 447 F. Supp. 2d 266, 281 (S.D.N.Y. 2006).



One has to be able to look at a response and capture the essence of the response by categorizing it with one or two key words. Those key words may or may not have been used by the respondent, but the respondent's words are interpreted to convey that meaning. This is where professional coders fall short, because they code key words spoken by the respondent as opposed to interpreting the response. Key word coding lends itself to errors in meaning and lengthy lists of codes that are often confusing as opposed to clarifying.[25]

More critical than who does the coding is the issue of consistency and even-handedness in coding, especially where different groups (e.g., test and control) have been tested. The failure of coders to apply the same coding rules across all respondents has attracted negative judicial comment. The expert "did not apply the same standard in coding the test and control cells. . . . This inconsistent coding has the effect of exaggerating the net level of reported dilution."[26]

Even-handedness and fairness in coding can easily become an issue when respondents' answers are ambiguous such that they can be interpreted as counting for or against the same party. Describing plaintiff's criticism in of the coding applied in defendant's survey, the court in *Giant Brands v. Giant Eagle* wrote that defendant's expert "improperly counted the respondents who answered 'Giant' as meaning 'Giant,' not 'Giant Eagle.'"[27]

Writing in an another matter, the tribunal said: "in our view, [the expert] improperly calculated the results. For one thing, . . . [we] see, in reviewing the verbatim answers, that [he] counted a significant number of what we consider to be ambiguous responses as among the favorable responses, unfairly skewing the results towards applicant."[28] In another matter, respondents in plaintiff's survey

> were shown four separate items: a plastic cup, available with a beverage purchase at an Exxon gas station convenience store, with the Exxon Cartoon Tiger but not the Exxon house mark on the cup ("Cup I"); a plastic insulated cup with a lid, available for purchase at an Exxon gas station convenience store, with the Exxon Cartoon tiger and the Exxon house mark on the cup ("Cup II"); and

25. Phyllis Welter, Trademark Surveys § 8.06, (Release #5, Aug. 1998). "Coders are often told about the objectives of the questions and of the coding schemes so that the coding process will be easier and less prone to errors." Weisberg, Krosnick & Bowen, *supra* note 19.

26. Pharmacia Corp. v. Alcon Labs., Inc., 201 F. Supp. 2d 335, 364 (D.N.J. 2002). *See also* Revlon Consumer Prods. Corp. v. Jennifer Leather Broadway, Inc., 858 F. Supp. 1268, 32 U.S.P.Q.2d 1659 (S.D.N.Y. 1994), *aff'd without op.*, 57 F.3d 1062 (2d Cir. 1995).

27. Giant Brands, Inc. v. Giant Eagle, Inc., 228 F. Supp. 2d 646, 657 (D. Md. 2002).

28. *In re* Spirits Int'l N.V., 86 U.S.P.Q.2d 1078, 2008 WL 375723, at *10 (T.T.A.B.).

two print advertisements with the Exxon Cartoon Tiger and the Exxon house mark ("Advertisements"). They were then asked two questions:

What company or name or brand, if any, comes to mind when you see this tiger?

What other companies or names or brands, if any, come to mind when you see this tiger?

If participants answered "Kellogg's" or "Frosted Flakes" to either question, [the expert] counted them as associating the product with Kellogg, even if they answered Exxon to the other question as well. On the other hand, [he] only counted a participant as associating the product with Exxon if he or she answered "Exxon" to either questions, and didn't refer to Kellogg at all.[29]

+++++

[The expert] inflated his "confusion" rates by counting respondents as confused even if their responses were not necessarily indicative of reverse confusion. For example, [he] counted as confused respondents who said that the two shirts (shown about a minute apart) displaying the word "Miss" or "Little Miss" were put out by the "same company," even though these respondents did not mention Disney. But if respondents did not identify "Disney" or at the very least one of Disney's famous characters by name in identifying the source of the T-shirts (instead saying "Little Miss" or "Miss" something), this shows mere matching and not whether any of the respondents believed that both sets of shirts were put out by Disney. . . .

Moreover, [he] also counted as confused those respondents who responded that the THOIP shirts were put out by the same company as a "Little Miss Sunshine" T-shirt. But Disney did not put out a "Little Miss Sunshine" shirt—THOIP did—and thus there was no Disney "Little Miss Sunshine" shirt in the first array. Although respondents may have been confusing THOIP's Little Miss Sunshine T-shirt with the 2006 movie by that name, "such irrelevant confusion should not have been counted towards [his] results."[30]

An example of where aggregating the coding may have been appropriate comes from the survey conducted for in *Bay State Savings Bank v. Baystate Financial Services*. There, respondents were asked the following question: "Thinking about the Worcester area and the different types of

29. Kellogg Co. v. Exxon Mobil Corp., 192 F. Supp. 2d 790, 806 (W.D. Tenn. 2001).
30. THOIP v. Walt Disney Co., 788 F. Supp. 2d 168, 183 (S.D.N.Y. 2011).



financial institutions, . . . do you or do you not associate the words 'Bay State' with any particular financial institution or institutions in the Worcester area?" In coding the responses, the expert treated responses of either "Bay State Savings Bank" or "Bay State Bank" the same. "[H]e decided to combine the results because, in his experience, 'people tend to shorten names and don't give full names and full legal names in response to questions.'" Having combined these two responses, the expert "concluded that the measured association between the words 'Bay State' and 'Bay State Savings Bank' was 38.6% and that this showed that the words 'Bay State' acquired secondary meaning."[31]

The problems that surface in coding ambiguous responses stem in part from the fact that open-ended responses are generally considered dichotomously, for example, confused versus not confused, reflects secondary meaning versus does not reflect secondary meaning. Such problems could be avoided if the coding or categorization scheme were expanded so that, in addition to two polar opposites, coders could also use one or two intermediate categories, for example, "probably confused," "possibly confused." In addition to reflecting a more conservative approach, proceeding in this manner likely would reduce the tendency to unfairly over claim; it also would alert the court to the fact that, although some answers might not clearly reflect confusion (or deception and so forth), they were suggestive of same.

Prof. Diamond writes: "In all cases, the verbatim responses should be available so that they can be recoded using alternative criteria. [*See, e.g.*, Coca-Cola Co. v. Tropicana Prods., Inc., 538 F. Supp. 1091, 1094–96 (S.D.N.Y.) (plaintiff's expert stated that respondents' answers to the several open-ended questions revealed that 43% of respondents thought Tropicana was portrayed as fresh squeezed; the court's own tabulation found no more than 15% believed this was true), *rev'd on other grounds*, 690 F.2d 312 (2d Cir. 1982). *See also* McNeilab, Inc. v. American Home Prods. Corp., 501 F. Supp. 517 (S.D.N.Y. 1980); Rock v. Zimmerman, 959 F.2d 1237, 1253 n.9 (3d Cir. 1992) (court found that responses on a change of venue survey incorrectly categorized respondents who believed the defendant was insane as believing he was guilty); Revlon Consumer Prods. Corp. v. Jennifer Leather Broadway, Inc., 858 F. Supp. 1268, 1276 (S.D.N.Y. 1994) (inconsistent scoring and subjective coding led court to find survey so unreliable that it was entitled to no weight), *aff'd*, 57 F.3d 1062 (2d Cir. 1995).]"

Other cases exemplifying the same problem include: "More problematically, the report . . . did not contain a 'verbatim' section that set out the responses of interview respondents recorded on the questionnaires by the interviewers during the survey interviews, such that the Court is

31. Bay State Sav. Bank v. Baystate Fin. Servs., LLC., 2007 WL 6064455, at *7 (D. Mass. 2007).

not able to independently determine whether the responses were properly classified"[32] and "We find the inability to review either the coding rules and procedures or, more importantly, the verbatim responses, lessens the probative value of the survey report's conclusions."[33]

In an observation reflecting the opinions of others as well, Welter wrote: "[P]rofessional coders fall short, because they code key words spoken by the respondent as opposed to interpreting the response. Key word coding lends itself to errors in meaning and lengthy lists of codes that are often confusing as opposed to clarifying."[34] Coding is generally done on a question-by-question basis, so that the coding is confined to the four corners of each question. Responses that the person gave to other questions that could clarify the respondent's intended meaning are ignored.

Although not used as often as it might be, an alternative to question-by-question coding is *through-the-record coding* or *categorizing*. Using this approach, each respondent's answers to any given open-ended question are considered in the context of that respondent's answers to all the other questions she was asked. While the answer given to any single question might not be dispositive, the answers given to two or more questions can clarify the meaning the respondent intended to convey. Using question-by-question coding, this clarification is lost. However, given the broader perspective provided by through-the-record review, many respondents who provide incomplete or ambiguous answers to individual questions can be more accurately placed into a category, for example, definitely confused, probably confused, possibly confused, not confused.

### 10.23 The Data Matrix and Codebook

Coding completed, the next step is tabulation. For small samples, this may be done by hand. In most instances, the data are typed into the computer by one person, with a second person doing an independent input of data that is then compared to the first. Errors can be identified and corrected. Tabulation should be 100 percent verified to minimize errors.

It is useful to view the data set as being typed (i.e., tabulated) into a large matrix or spreadsheet; this array is termed the *data matrix*.[35] Such a matrix is composed of rows and columns. Typically, each row contains the data obtained from a single respondent, while each column (or set of consecutive columns) is devoted to a single measured variable such as the answer to the question on respondent age, the answer to a question on

32. U.S. Polo Ass'n Inc. v. PRL USA Holdings Inc., 101 U.S.P.Q.2d 1487, 1502 (S.D.N.Y. 2011).

33. Stuart Spector Designs, Ltd. v. Fender Musical Instruments Corp., 2009 WL 1017284, at *20 (T.T.A.B.).

34. WELTER, *supra* note 25, § 8.06.

35. HOYLE, HARRIS & JUDD, *supra* note 14, at 425.



being a likely purchaser of the product at issue sometime during the next six months, the answer to a question on likely confusion as to source, and so on. The data entered into the matrix are usually in numerical form, although some columns may be devoted to providing the typed verbatim answers given to an open-ended question.

As an hypothetical example, consider the following seven-columned data matrix.

0001112

0002113

0003211

0004112

What do these numbers mean? In this example, the first four columns are reserved for each respondent's unique ID. The fifth column tabulates the respondent's gender, with an entry of 1 representing male and an entry of 2 representing female. The sixth column tabulates the respondents' answers to a question asking whether he or she is likely to be a purchaser of the product at issue sometime during the next six months, with an entry of 1 signifying an answer of Yes and an entry of 2 signifying an answer of No. The seventh column tabulates the respondent's answer to a question on likely confusion as to source, with an entry of 1 signifying that the person was confused, an entry of 2 signifying that the respondent was not confused, and an entry of 3 signifying an ambiguous response.

Once completed, the data matrix can appear to be an intimidating array of numbers, especially to those not involved in its compilation. Even those involved in its compilation may, over time, misremember or forget what each of the columns and numbers represent. Consider the following from one text.

> As scoring and coding decisions are made and as values are entered in the cells of the data matrix, it is essential that the researcher keep a record of the organization of the data matrix and all of the scoring procedures and coding decisions. This record, called the *codebook*, is essential to guarantee that in the future the coded data can be interpreted. All too often, researchers fail to maintain an adequate and detailed codebook. As a result, when they attempt to return to a set of data after some interval, perhaps as short as a few days or weeks, they have a difficult time reconstructing what the numbers in the data matrix actually mean. Without a codebook, the data matrix is as meaningless as a table of random numbers.[36]

36. *Id.* at 431.

Case 1:23-cv-01437-DAE Document 163-11 Filed 10/24/25 Page 114 of 138



A codebook for the above example would provide the following:

| Columns | |
|---|---|
| 1–4 | Respondent ID |
| 5 | Gender; 1 = Male; 2 = Female |
| 6 | Likely purchaser; 1 = Yes; 2 = No |
| 7 | Confused as to source; 1 = Yes, 2 = No, 3 = Ambiguous |

With respect to the answers to open-ended questions, a thorough codebook would include notations as to what causes responses to be coded one way rather than another.

A fundamental requirement for research to qualify as being scientific is for independent parties to be able to examine and, if desired, replicate and test the original researcher's procedures, coding, and analyses. Among other things, this means that if requested by opposing counsel and expert, the data matrix needs to be provided. If the data matrix is provided but without the codebook, there may be no way for the opposing party to figure out what the numbers in each column signify. In some instances, the absence of a codebook may be because the original researcher did not prepare one. In other instances, opposing counsel may refuse to provide the codebook, arguing that what was done is self-obvious—essentially saying "you figure it out." Recognize that because such a reply violates a fundamental scientific requirement, it may jeopardize admission of the entire survey or having it accorded weight.

### *10.24 Response Rates*

The complex subject of response rate is discussed in chapter 6, section 6.33. As indicated there, the survey research industry has no generally agreed-upon formula for calculating response rate. Since most trademark surveys are nonprobability surveys, it is rare to find an expert report that provides response rate information.

That said, pertinent information can be supplied for nonprobability surveys. The Guide on Survey Research appearing in the Federal Judicial Center's *Reference Manual on Scientific Evidence* calls for providing the following information: "A description of the results of sample implementation, including the number of (a) potential respondents contacted, (b) potential respondents not reached, (c) noneligibles, (d) refusals, (e) incomplete interviews or terminations, and (f) completed interviews."[37]

37. Shari S. Diamond, *Reference Guide on Survey Research*, *in* Fed. Judicial Ctr., Reference Manual on Scientific Evidence 415 (3d ed. 2012). See also section 10.53.3, *infra*.



## 10.30 Data Analysis

Once the data set has been purged of invalid and questionable data and tabulated, it is ready to be analyzed. In most trademark surveys, this means considering and evaluating percentages or the differences between percentages, as between a test and control group.

### *10.31 Size of Effect versus Statistical Significance of the Effect*

Some courts and counsel ask the question, "Is the finding statistically significant?" To answer this question we first have to answer the question "Compared to what—compared to zero? Compared to the findings for a control group?" Actually, the more important question is not the statistical significance of the effect, but the magnitude of the effect: "Is the finding sufficiently large?"

Rarely are the data in trademark surveys analyzed using tests seeking to determine statistical significance. Instead, most trademark surveys rely on considering simple percentages, or the difference between percentages, to determine things like genericism, secondary meaning, likely confusion, and likely dilution. In this regard, the approach employed in trademark law is consistent with an emerging trend in the analysis of psychological data—which the concepts of genericism, secondary meaning, likely confusion, and likely dilution essentially are—where the emphasis is increasingly on the size of the effect, not whether the effect is statistically significant.[38] With large enough sample sizes, even trivial findings—including differences of only 1 percent or 2 percent—can be found

38. C.A. Moser & G. Kalton, Survey Methods in Social Investigation 447 (2d ed. 1972) ("There is noticeable shift in the social science literature—possibly in other fields too—an altogether excessive emphasis on significance test, to the detriment of the estimation of the magnitude of the effects. When all is said and done, what usually is of importance is the magnitude of effects (e.g., the size of the difference between proportions in the population) rather than a test of whether the difference is statistically different or not."). *See also* R.A. Fisher, Statistical Methods for Research Workers 43 (1925, reprinted 2006); Jacob Cohen, *The Earth Is Round (p<.05)*, 49 Am. Psychologist 997–1003 (1994); F.L. Schmidt, *Statistical Significance and Cumulative Knowledge in Psychology*, 1 Psychological Methods 115–29 (1996); L.L. Harlow, S.A. Mulaik & J.H. Steiger eds., What if There Were No Significance Tests? (1997); G.S. Howard, S.E. Maxwell &, K.J. Fleming, *The Proof of the Pudding: An Illustration of the Relative Strengths of Null Hypothesis, Meta-analysis, and Baysian Analysis*, 5 Psychological Methods 315–32 (2000); Joseph Lee Rodgers, *The Epistemology of Mathematical and Statistical Modeling: A Quiet Methodological Revolution*, 65 Am. Psychologist 1–12 (2010).

to be statistically significant.[39] Not surprisingly, triers of fact have been understandably reluctant to predicate decisions on such small differences.

This author is familiar with a likelihood of confusion survey where all the key comparisons between test and control groups, except one, were reported in terms of percentages, with the exception being reported in terms of statistical significance. The comparisons in terms of percentages all showed differences between test and control groups that exceeded 15 percent. Subsequent examination of the one comparison reported in terms of statistical significance revealed that the percentage difference between the test and control groups on that variable was well below 10 percent, never coming close to the 15 percent threshold typically relied upon for determining likely confusion. In other words, though the effect was small, the mention of statistical significance made the finding appear more substantial than actually was the case.

A similar example comes from a deceptive advertising matter (*Scotts v. Pennington*[40]) where defendant's survey report contains the following: "there is a statistically significant difference in percentages of respondents who see the Scott's product as higher in quality when shown the unmodified (test) commercial than among those respondents shown the control commercial." Respectively, these values were 96 percent and 93 percent. In this instance, the 3 percent difference was found to be significant because it was based on 779 respondents in the test group and 759 respondents in the control group. Yet, for all practical purposes, this 3 percent difference is trivial to inconsequential.

To avoid having readers attribute greater meaning to findings than are warranted where a survey reports findings in terms of statistical significance, counsel would do well to consider the magnitude of the effect.

### 10.32 Weighting the Data

As noted in chapter 5, researchers often use some form of quota sampling to generate a sample that better approximates the defined universe. Quotas are best set when the parameters (that is, the characteristics of the universe) are known or can be reasonably estimated. For example, the researcher may learn that a particular universe consists of 65 percent males and 35 percent females. When universe parameters are not known, quotas may be set based upon reasonable judgment. If the obtained sample does not correspond closely to these targeted quotas, or if the quotas

39. David H. Kaye & David A. Freedman, *Reference Guide on Statistics*, in Fed. Judicial Ctr., Reference Manual on Scientific Evidence 83, 169 (2d ed. 2000) ("Statistical significance does not necessarily establish practical significance. With large samples, small differences can be statistically significant.").

40. The Scotts Miracle-Gro Company, Inc. and the Scotts Company LLC, v. Pennington Seed, Inc., U.S.D.C. E.D. Va (Richmond Division) Case No. 3:12-CV-254 (JRS), pending.



are later found less accurate and descriptive of the universe as had been thought, the data can be weighted to more closely approximate what has been learned regarding the universe composition.

*Weighting* is a statistical procedure that, when applied, is intended to have the sample data yield findings better representative of the universe as a whole on one or more characteristics. Suppose that, based upon a priori judgment, a plaintiff's forward confusion survey of defendant's prospective purchasers employed quotas of 65 percent males and 35 percent females and found likely confusion estimates of 20 percent for the male cohort and 10 percent for the female cohort. With these proportions, the average percent confusion for the entire sample would be 16.67 percent—a value uncomfortably close to the 15 percent threshold some triers of fact use for arriving at a determination of likely confusion. Suppose it was subsequently revealed that defendant's universe of purchasers consisted of 80 percent males and 20 percent females. Weighting would involve multiplying the 20 percent estimate obtained with the males by 80 percent (their share of the universe), and multiplying the 10 percent estimate obtained with the females by 20 percent (their share of the universe). This weighting would produce a confusion estimate of 18 percent [(.2 × .8 = 16%) + (.1 × .2 = 2%)], a value that is presumably closer to what would apply to defendant's universe of prospective purchasers as a whole.

Weighting is not always called for, especially when the a priori quotas are reasonable. Because weighting can yield findings in terms of fractional respondents, or because "the numbers don't seem to add up," the computer tabular output from weighted data also prove disconcerting to some. That said, instances arise where weighting is obviously called for. Because age and geographical quotas were not applied a priori, the samples obtained and tested by plaintiff's surveys in *Fair Isaac v. Experian*[41] were seriously unrepresentative. Specifically, the universe was adults who might look up their credit score online. While data revealed that less than 10 percent of the universe consisted of individuals aged 18 to 24, close to 50 percent of the sample came from this age group. Though seriously nonrepresentative of the universe, no attempt was made to weight the obtained data so that they better represented the universe as a whole.

### 10.33 Using Controls to Adjust for "Noise"

Surveys conducted to assess causal propositions generally use controls to gauge and adjust for "noise" (guessing, error due to question wording, etc.). Such adjustment generally takes the form of subtracting the control

41. Fair Isaac Corp. v. Experian Info. Solutions Inc., 2009 WL 4263699 (D. Minn. Nov. 25, 2009).

percentage from the test percentage (see section 10.41, *infra*). Some surveys use two or more controls of the same type, or two or more types of control. In instances where two or more controls of the same type are used, it is not appropriate to add the percentages obtained with each control, then subtract that value from the test value. If such an approach were legitimate, all a party desiring to reduce the difference between the test and control percentages would have to do is use a number of different controls, arriving at a point where the combined control percentage was close to (or even exceeded) the value of the test percentage. Where two or more controls of the same type are used, a conservative approach would be to subtract the control garnering the largest percentage from the corresponding test value. Given that controls are selected (or generated) out of a universe of controls possible (see chapter 7, section 7.31.6), greater justification exists for averaging the percentages associated with the controls and subtracting this average value from the test value.

On occasion, trademark surveys employ two or more types of controls—both within group (e.g., control questions) and between group (e.g., control stimuli); see section 4.24.11. The question becomes how to use these different error estimates, especially when they yield divergent findings. While there are no hard and fast rules, adding the two types of error estimates makes no sense for the same reason given in the preceding paragraph. When attention is confined to within group data, using the within group control makes the most sense. However, when comparing results across groups, there seem to be two options. These are either to average the results for the two types of controls or, if one wants to be exceedingly conservative, to subtract the findings for the control that most cuts against the sponsor of the survey.

## 10.40 Evaluating the Findings

Once the data have been tabulated and analyzed, one turns to evaluating the obtained findings. During evaluation, the overarching question is: Did the study identify and test the correct people on the correct issue using the correct stimuli in a reasonable, nonbiased way? Since no study is perfect, some degree of tolerance for imperfection at the margins is warranted. However, the further the study departs from having identified and tested the correct people on the correct issue using the correct stimuli in a reasonable, nonbiased way, the more the study—and the conclusions drawn there from—begin to approach GIGO ("garbage in, garbage out").

The following sections discuss issues that frequently arise in the evaluation and interpretation of trademark survey data.



## 10.41 Percentages and Net Percentages

Most phenomena measured by trademark surveys are reported and evaluated in terms of percentages. Trademark surveys report percentages for genericism, secondary meaning, likely confusion, fame, likely dilution, and so on. In some instances, thresholds have emerged that seem reasonably consistent across Circuits. Though lower percentages have been accepted, it generally requires a percentage of 50 percent or more to support a determination of secondary meaning.[42] Though lower percentages have been accepted and higher percentages have been rejected, it generally requires a difference between test and control percentages of 15 percent—20 percent to support a determination of likely confusion.[43]

In some instances, a single percentage is meaningful by itself. For example, it is meaningful to report and discuss a secondary meaning finding of 60 percent. In other instances, especially when using controls in conducting causal research (see chapter 4, sections 4.20–4.25), it is the "net difference between percentages" that is the meaningful statistic. For example, the court in *Reed-Union. v. Turtle Wax* affirmed a finding of no infringement where the survey obtained 25 percent confusion in the test group, but 20 percent confusion in the control group, ergo, a net difference of only 5 percentage points.[44]

The most important percentage in a likelihood of confusion survey is not the percent confusion found with the allegedly confusing test item, nor the percent confusion found with the control item. Rather, it is the difference between the two—the *net confusion* that remains after subtracting the percent of confusion obtained with the control from the percent of confusion found with the experimental (test) stimulus. As employed in trademark litigation surveys, the formula is basic: Net effect due to the putative cause = (level of effect found with the test group or question) minus (level of effect found with the control group or question).

42. J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32:190.

43. *Id.* § 32:189. Some courts have translated confusion percentages into the number of consumers likely to be impacted in the marketplace. Regarding a 16 percent confusion finding, the court in *Quality Inns Int'l v. McDonald's Corp.* 695 F. Supp. 198, 8 U.S.P.Q.2d 1633, 1649 (D. Md. 1988), wrote: "Projected across the 144 million people who are considered to be the potential audience for [defendant's] McSleep Inn, well over 20 million would be likely to be confused. This is not an insubstantial number." As another example, considering small percentages (including 7 percent across all age groups and 21 percent for ages 18 and 24), the court in *Wendy's Int'l, Inc. v. Big Bite, Inc.*, 576 F. Supp. 816, 223 U.S.P.Q. 35 (S.D. Ohio 1983), observed that these percentages "translate into large numbers of confused consumers" and was "quite reluctant" to find these percentages "were insubstantial as a matter of law." (A contributing factor was that the court considered defendant's survey to be slanted in favor of finding no likely confusion.)

44. Reed-Union Corp. v. Turtle Wax, Inc., 77 F.3d 909 (7th Cir. 1996).

## 10.42 Confidence Intervals

When newspapers provide the results of surveys they commission, they typically report that the results accurately reflect the universe value (termed a *parameter*) within a certain plus or minus percentage range. Because it will help to better understand trademark survey procedure, see the example provided as Box 10A. Called the *confidence interval*, the "plus or minus percentage range" applies to consumer trademark survey results as well.[45]

**Box 10A**
**Methodology Used in a Newspaper Political Poll**

***How the Poll Was Conducted***

The latest *New York Times*/CBS News Poll is based on telephone interviews conducted Jan. 12 through 17, with 1,154 adults throughout the United States. Of these, 1,021 said they were registered to vote.

The sample of land-line telephone exchanges called [section 9.22] was randomly selected by a computer from a complete list of more than 72,000 active residential exchanges across the country [sampling frame, section 6.21]. The exchanges selected were chosen so as to ensure that each region of the country was represented in proportion to its share of all telephone numbers. [PPS sampling, section 6.21.5]

Within each exchange, random digits were added to form a complete phone number, thus permitting access to listed and unlisted numbers alike [RDD sampling, sections 6.33, 6.42.4, 6.42.5, 9.21, 9.59.1]. Within each household, one adult was designated by a random procedure to be the respondent for the survey [sections 6.23, 6.42.4, 9.21].

To increase coverage, this land-line sample was supplemented by respondents reached through random dialing of cell phone numbers [section 9.22]. The two samples were then combined and adjusted to assure the proper ratio of land-line-only, cellphone-only and dual phone users.

45. Technically speaking, the use of confidence intervals applies only to probability samples. That said, practitioners frequently rely on confidence intervals when evaluating findings from well-conducted nonprobability as well. See related discussion in chapter 6, section 6.32.2.



Interviewers made multiple attempts to reach every phone number in the survey, calling back unanswered phone numbers on different days at different times of both day and evening [section 9.23.3].

The combined results have been weighted [sections 6.21.6, 10.32] to adjust for variations in the sample relating to geographic region, sex, race, Hispanic origin, marital status, age, education and number of adults in the household. Respondents in the landline sample were also weighted to take account of the number of telephone lines in the residence.

In theory, in 19 cases out of 20 [the 95 percent level, section 10.42], overall results based on such samples will differ by no more than three percentage points in either direction from what would have been obtained by seeking to interview all American adults [sections 6.32.2, 10.42]. For smaller subgroups, the margin of sampling error is larger. For example, for the 340 self-described Republican primary and caucus voters the sampling error was plus or minus five points. Shifts in results between polls over time also have a larger sampling error.

In addition to sampling error, the practical difficulties of conducting any survey of public opinion may introduce other sources of error into the poll. Variation in the wording and order of questions, for example, may lead to somewhat different results.

Michael R. Kagay of Princeton, N.J., assisted The Times in its polling analysis. Complete questions and results are available at nytimes.com/polls.

Source: Jeff Zeleny & Dalia Sussman, *Obama is Faulted by Swing Voters in a New Survey*, N.Y. TIMES, Jan. 19, 2012, at A1, A14. Noteworthy is the fact that the description does not provide a response rate. Section numbers in square brackets indicate where these issues are discussed in this treatise.

Researchers test samples because rarely is it possible to test all members of the relevant universe. Regardless of how carefully the survey is designed or executed, the results are unlikely to mirror precisely the characteristics of the universe in question. The confidence interval reflects the variability in findings attributable to taking a sample as opposed to gathering data from the entire universe. The confidence interval is due to *sampling error*, a type of error that occurs when a sample is used as the basis for estimating a value that applies to the universe as a whole. Sampling

Case 1:23-cv-01437-DAE Document 163-11 Filed 10/24/25 Page 118 of 138



error has to do with the fact that if a survey is repeated with a new sample of respondents, somewhat different results are likely to be obtained. For example, Survey 1 might show that 25 percent of the respondents think two products they are shown come from the same company while Survey 2 (conducted in the same manner but with different respondents) might show that 27 percent of the respondents think the two products are from the same company. Sampling error refers to this disparity. Therefore, a range is attached to the sample result, and the universe parameter being estimated is said to fall within this range at the specified confidence level.

The confidence interval is calculated at a particular level, usually, either the 90 percent, 95 percent, or 99 percent level, with the 95 percent level being the most commonly used by scientists. To a statistician, the 95 percent level means that were the study to be repeated 100 times, then the study can be expected to yield a range containing the universe parameter being estimated 95 out of those 100 times. To a decision maker, this information suggests the level of assurance with which one can conclude that the interval constructed from the survey results includes the true universe parameter being estimated. For example, for a sample of 200 respondents, the confidence interval around a finding of 35 percent is plus or minus 7 percent. Thus, if a survey found that 35 percent of 200 respondents in a test group were confused as to the source of goods bearing a particular trademark, it can be said with 95 percent confidence that the level of confusion that would be obtained from a census of the entire universe can be expected to fall within a range of 28 percent to 42 percent. To continue the example, if a net confusion level greater than 15 percent is sufficient for a court to issue a finding of confusion, and a properly conducted survey with 200 respondents shows that 35 percent of the test respondents are confused and few to none of the control respondents are confused, the trier of fact can have a high degree of assurance that the survey and interpretation of it are sufficiently reliable to arrive at a finding of likely confusion in the marketplace.

The chart below provides the "plus or minus" confidence range for sample sizes ranging from 25 to 5,000 and for sample estimates of 50 percent, 60 percent or 40 percent, 70 percent or 30 percent, 80 percent or 20 percent, 90 percent or 10 percent, 95 percent or 5 percent and 99 percent or 1 percent. Several things should be noted regarding these values. First, broader confidence intervals bracket findings closer to 50 percent, but confidence intervals become narrower as the obtained findings move closer to the extremes of 100 percent and 0 percent. For example, a finding of 50 percent obtained with sample of 25 yields a confidence range of ±19.6 while a finding of 1 percent (or 99 percent) obtained with sample of 25 yields a confidence range of ±3.9.



Second, the larger the sample, the narrower the confidence interval around a given value. Unfortunately, as the sample size increases, the cost of the survey increases as well. Thus, a balance between the level of assurance desired and cost is required. Especially as the expected value moves away from 50 percent and toward the extremes, little is to be gained from increasing samples above 500 for each group being tested.

### 95 Percent Confidence Ranges

| | With a Percentage Obtained of: | | | | | | |
|---|---|---|---|---|---|---|---|
| Sample Size | 50% | 40% or 60% | 30% or 70% | 20% or 80% | 10% or 90% | 5% or 95% | 1% or 99% |
| 25 | ±19.6 | ±19.2 | ±18.0 | ±15.7 | ±11.8 | ±8.5 | ±3.9 |
| 50 | 13.9 | 13.6 | 12.7 | 11.1 | 8.3 | 8.0 | 2.8 |
| 75 | 11.3 | 11.1 | 10.4 | 9.1 | 6.8 | 4.9 | 2.3 |
| 100 | 9.8 | 9.6 | 9.0 | 7.8 | 5.9 | 4.3 | 2.0 |
| 150 | 8.2 | 8.0 | 7.5 | 6.6 | 4.9 | 3.8 | 1.6 |
| 200 | 7.1 | 7.0 | 6.5 | 5.7 | 4.3 | 3.1 | 1.4 |
| 250 | 6.3 | 6.2 | 5.8 | 5.0 | 3.9 | 2.7 | 1.2 |
| 300 | 5.8 | 5.7 | 5.3 | 4.6 | 3.5 | 2.5 | 1.1 |
| 400 | 5.0 | 4.9 | 4.6 | 4.0 | 3.0 | 2.2 | 1.0 |
| 500 | 4.5 | 4.4 | 4.1 | 3.6 | 2.7 | 2.0 | 0.9 |
| 600 | 4.1 | 4.0 | 3.8 | 3.3 | 2.5 | 1.8 | 0.8 |
| 800 | 3.5 | 3.4 | 3.2 | 2.8 | 2.1 | 1.5 | 0.7 |
| 1,000 | 3.2 | 3.1 | 2.9 | 2.6 | 1.9 | 1.4 | 0.6 |
| 1,200 | 2.8 | 2.8 | 2.7 | 2.3 | 1.7 | 1.3 | 0.6 |
| 1,500 | 2.5 | 2.5 | 2.4 | 2.1 | 1.6 | 1.1 | 0.5 |
| 2,000 | 2.2 | 2.2 | 2.0 | 1.8 | 1.3 | 1.0 | 0.4 |
| 2,500 | 2.0 | 2.0 | 1.8 | 1.6 | 1.2 | 0.9 | 0.4 |
| 3,000 | 1.8 | 1.8 | 1.7 | 1.5 | 1.1 | 0.8 | 0.4 |
| 4,000 | 1.6 | 1.5 | 1.4 | 1.3 | 1.0 | 0.7 | 0.3 |
| 5,000 | 1.4 | 1.4 | 1.2 | 1.1 | 0.9 | 0.6 | 0.3 |

Because it is the square root of the sample size that factors into the determination of the confidence interval, a substantial change in the sample size is required in order to have much of an impact on the confidence interval. To reduce the confidence interval by approximately one-third, the sample size must be doubled; to reduce it by one-half, the sample size must be quadrupled.

Some courts have taken the confidence interval into account when evaluating survey data. As examples:

> Second, although the survey found that 22% of the respondents believed that "Big O's Bigfoot" and "Big Foot by Vulcan" were owned or operated by the same company, the survey had a margin of error of ± 4.7%. The original 22% value is between one and four percent off from the other four dyads. However, when the margin of error is accounted for, the resulting percentage becomes less statistically significant.[46]
>
> +++++
>
> Although survey evidence is considered relevant in determining whether there is a likelihood of confusion, the survey proffered by the plaintiff in this case was of little evidentiary value. The results simply were not reliable. The . . . margin of error [was] too large. . . . Furthermore, the survey universe was not limited to the likely users of the common services to be offered by both companies, *i.e.,* business people.[47]

As indicated by the table of 95 percent confidence ranges provided above, the closer one gets to the extremes (i.e., 0 percent and 100 percent), the narrower the confidence interval. This fact has also attracted trier of fact attention.

> Fisher-Price argues persuasively that small sample size only makes the results less precise, not wholly inaccurate, and that, because the results in this case showed 0% confusion, even if that result is somewhat imprecise, it is still strong evidence of lack of confusion.[48]

46. Big O Tires, Inc. v. Bigfoot 4X4, Inc., 167 F. Supp. 2d 1216, 1227 (D. Colo. 2001).

47. Alltel Corp. v. Actel Integrated Commc'ns, Inc., 42 F. Supp. 2d 1265, 1274 (S.D. Ala. 1999).

48. Pilot Corp. of Am. v. Fisher-Price, Inc., 344 F. Supp. 2d 349, n.9 (D. Conn. 2004).



## 10.43 Adding Percentages to Arrive at "Overall Likely Confusion"

Likely confusion surveys typically ask separate questions to determine whether respondents were (1) confused as to source or origin, (2) confused as to connection or relationship, or (3) confused as to sponsorship or authorization. The percentages for each type of confusion are then cumulated to arrive at an estimate of "overall likely confusion." Such aggregation is permissible only when each respondent is counted only once across all three categories, regardless of how many types of confusion that person has exhibited. Thus, if 15 percent of the respondents were confused as to source, and a completely different 6 percent of the sample were confused as to sponsorship, then it would be permissible to add the percentages to arrive at an "overall confusion rate" of 21 percent. But if 15 percent of the respondents were confused as to source, and some of the same respondents were among the 6 percent identified as being confused as to sponsorship, then it would not be permissible to add the percentages, as this would amount to double-counting some respondents. The way to avoid this problem is by *netting*, that is, counting each respondent only once regardless of the number of types of confusion he or she might have exhibited. As the following indicates, failure to "net" may attract the court's attention.

> The survey takers then asked the following question: "3. Who or what company, if any, do you think is connected with or gave permission for the music video and CD (the music CD) you just saw?" The next question (# 5) was "who or what company or companies do you think put out the music video and CD (music video) you just saw."
>
> In calculating [the] results, [the expert] inexplicably combines the responses from question three (17.4%) and question five (2.3%) to find that 20% of the respondents "thought Mattel or 'Barbie' was the source, connected with, or gave permission for the 'Barbie Girl' music video and/or music CD." It is unclear why [the expert] combines the answers to questions three and five, as both questions were asked to all 556 participants. [The expert] points to no evidence that the individuals in question three who thought Mattel was connected with the song were a different group of people than the smaller number in question five who thought Mattel put out the music video and CD.[49]

49. Mattel, Inc. v. MCA Records, Inc., 28 F. Supp. 2d 1120, 1135–36 (C.D. Cal. 1998).

### 10.44 Percentages Based on Small Samples

With the possible exception of small-scale surveys done for submission at preliminary injunction hearings, percentages calculated on the basis of small numbers should be viewed cautiously, especially when they approach threshold values, for example, 15 percent for likely confusion. Consider *Constellation Brands v. Arbor Hill Associates*. Defendant's survey involved 52 consumers of alcoholic beverages. "The summary [report] indicates that *based only upon the brand name*, 17.3% of the 52 respondents definitely were confused into believing either that Arbor Hill came from, was connected with, or received authorization from the makers of Arbor Mist. The corresponding percentage for the control brand (Argent Mist) was only 1.9%. Thus, after subtracting for 'noise,' our best empirically derived estimate of likely reverse confusion is (17.3 – 1.9 =) 15.4%."[50] Given a sample of 52 people, 15.4 percent equates to eight people. Moreover, the confidence interval around 15 percent obtained with a sample of approximately 50 respondents is approximately +/- 10 percent. A finding of 15.4 percent thus means that the universe parameter (that is, the true value of the universe as a whole) falls somewhere in the range of 25.4 percent to 5.4 percent. Such findings are not likely to inspire confidence in a trier of fact.

As another example of where a court was cognizant of the limitations accruing to small sample sizes, consider *MasterCard International Inc. v. First National Bank of Omaha*:

> Only 52 respondents completed the Survey, resulting in just 27 individuals reviewing the test cell materials and 25 individuals commenting on the control group materials. The 15.3% level of confusion allegedly measured is a difference of only five individuals' responses to the question of approval posed by the Survey. It is misleading to assert that a figure based on a difference of so few respondents provides an accurate gauge of any confusion on the part of the population making actual decisions among smart card programs offered to financial institutions.[51]

While some courts are aware of the problem created when percentages are calculated based upon small sample sizes, others appear unfazed by such problems. Two examples follow.

> Defendants further state that a survey they commissioned revealed that only four out of 50 individuals surveyed, or 8%, associated the Yield jeans with Guess. A closer examination of Defendants' own survey, however, reveals that more consumers associated the Yield jeans with Guess than with Yield. Of 50 individuals questioned, only ten responded that they thought they knew what company made the jeans with the Yield logo. Of those ten, four (40%) selected "Guess" based on the "logo/symbol/triangle", two (20%) selected "Guess" based on "colors/pocket/denim", one (10%) selected "Gap" based on the "label", one (10%) selected "Levi's" because the jeans "look like Levi's", and only two (20%) stated "Yield" because the "tag/label says Yield." This suggests that twice as many consumers thought that the jeans were made by Guess than by Yield based on comparing the triangular logos, and that three times as many consumers overall thought that the jeans were made by Guess than by Yield.[52]

+++++

> The 24 respondents who were aware of the plaintiffs' Gigante stores were then asked the following question: "[A]s best you can recall, about when was it that you first heard of the Mexican store named Gigante?" Thirteen percent [of 24 respondents equals 3 people] responded that they first heard of the Mexican Gigante before 1970; 17% [4 people] had heard of it between 1970 and 1980; 42% [10 people] had heard of it between 1980 and 1990; 25% [6 people] had heard of it since 1990; and 4% [1 person] did not know/did not recall.[53]

Recognize that "[t]he 24 respondents who were aware of the plaintiffs' Gigante stores" is a subset of the entire sample of 78 qualified Hispanic respondents who participated in the interview. If the objective is to estimate the percent of the Hispanic market aware of Gigante stores, then the 78 qualified respondents, not the subset of 24 respondents, represent the proper base for calculating percentages. Using the base of 78 qualified respondents provides an entirely different picture.

| Heard of Gigante: | Base of 24 | | Base of 78 | |
|---|---|---|---|---|
| | N | % | N | % |
| Before 1970 | 3 | 13 | 3 | 3.8 |
| Between 1970 and 1980 | 4 | 17 | 4 | 5.1 |

50. Constellation Brands, Inc. v. Arbor Hill Assocs., Inc., 535 F. Supp. 2d 347 (W.D.N.Y. 2008).

51. MasterCard Int'l Inc. v. First Nat'l Bank of Omaha, Inc., 2004 WL 326708, at *10 (S.D.N.Y. Feb. 23, 2004).

52. Guess?, Inc. v. Tres Hermanos, 993 F. Supp. 1277, 1283 (C.D. Cal. 1997).

53. Grupo Gigante S.A. de C.V. v. Dallo & Co., 119 F. Supp. 2d 1083, 1094 (C.D. Cal. 2000).

Case 1:23-cv-01437-DAE Document 163-11 Filed 10/24/25 Page 121 of 138



| | | | | |
|---|---|---|---|---|
| Between 1980 and 1990 | 10 | 42 | 10 | 12.8 |
| Since 1990 | 6 | 25 | 6 | 7.7 |
| Don't know | 1 | 4 | 1 | 1.3 |

## *10.45 Interpreting Multiple Tests of Statistical Significance*

Many survey reports will have a section containing computer tabular output running scores or even hundreds of pages, with each page of the output containing perhaps 100 or more numerical entries, either percentages, arithmetic averages, or both. Sometimes this output indicates when the entries are statistically significant, that is, different from each other at a statistically significant level. Though impressive or intimidating, what frequently is lost in the interpretation of such entries is that, given so many tests, some are bound to be statistically significant by chance alone. "Repeated testing complicates the interpretation of significance levels. If enough comparisons are made, random error almost guarantees that some will yield 'significant' findings, even when there is no real effect. . . . Such artifacts are commonplace."[54]

When one conducts a test of statistical significance—say, between test and control group percentages—what that means is that the obtained difference between the percentages needs to reach or exceed a certain threshold value before it qualifies as being statistically significant. These predetermined values have been calculated according to the laws of statistics and take into account, among other things, the size of the sample and the size of the difference. So as to impose reasonably rigorous standards, scientists call a difference between two values "significant" if it is likely to occur less than once out of 20 times by chance (that is, 5 percent or less of the time; the .05 level). Scientists call a difference "highly significant" if it is likely to occur less that once out of 100 times by chance (that is, 1 percent or less of the time; the .01 level). In conducting a test of statistical significance, we essentially assume that the finding obtained in the present instance is being compared to what would be obtained if the same test were done 100 times.

Suppose the computer analysis of a survey's findings involved 3,000 tests of significance, something not hard to imagine, given 100 pages with 14 columns and 12 rows of data per page. (By itself, any single row can involve a large number of tests of significance; for example, the percentage in row A versus the percentage in row B, row A versus row C, row A versus row D,

54. David H. Kaye & David A. Freedman, *Reference Guide on Statistics*, in FED. JUDICIAL CTR., REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 83, 127–28 (2d ed. 2000).



row A versus row E, . . . row B versus row C, row B versus row D, . . . row M versus row N.) Given 3,000 tests of significance across the entire data set, and using the .05 level to calculate significance (which presumes 5 out of every 100 tests to be significant at the chance level), we can expect (5 × 30 =) 150 findings of statistical significance to be chance findings.

The purpose of the example is to illustrate that, when multiple tests of significance have been calculated, caution is advised in interpreting these findings. As a concrete example, one of defendant's survey reports in *Adidas v. Herbalife International*[55] contains the following footnote: "Out of 304 differences, only 8 were significant at the .05 level. Given the multiple comparisons involved, these likely were significant by chance; given 304 tests of significance, one would expect 15 such tests (5 per 100 tests) to be significant by chance alone. Regardless, virtually all these significant differences were on factors that had no bearing on the issue under consideration."

## *10.46 Consider Obvious Alternative Explanations*

A natural inclination is for one to readily accept findings that support one's point of view. Yet doing so can lead both researcher and counsel astray. Before accepting a finding, both researcher and counsel need to consider—and have good arguments for disregarding—obvious alternative explanations for that finding. This is important not only because researcher and counsel can be certain their adversary will engage in such considerations, but because triers of fact are advised to do so as well. The Advisory Committee's Notes on the December 1, 2000, amendments to FRE Rule 702 identify the following as a factor for gatekeeper consideration when evaluating scientific research:

> "Whether the expert has accounted for obvious alternative explanations." *Ambrosini v. Labarraque* (101 F.3d 129, 141 (D.C. Cir 1996)) is cited for the proposition that "the possibility of some uneliminated causes presents a question of weight, so long as the most obvious causes have been considered and reasonably ruled out by the expert."

The Advisory Committee's selection of the word "obvious" is well chosen. From a scientific perspective, the issue is not "possible" or "potential" causes, but "plausible" causes. According to the foremost authorities on the subject, "It is neither feasible nor desirable to rule out all *possible* alternative explanations of a causal relationship. Instead, only *plausible* alternatives constitute the major focus. This . . . [is] because the number

55. Adidas Am., Inc. v. Herbalife Int'l, Inc., CV No. 09-661-MO (D. Or. Aug. 10, 2010).

of possible alternatives is endless."[56] The direct implication of this is that, when considering an alternative explanation, especially one being advanced by an opposing party, triers of fact should consider whether the alternative explanation is plausible and probable or only potential and (remotely) possible. In a deceptive advertising survey, prior beliefs qualify as plausible alternative explanations and are accounted for by randomly assigning respondents to independent (external) control groups.

Discussing a variety of alternative explanations for a survey's findings, the court in one matter wrote: "By failing to consider and account for these and other alternative explanations for his results, [plaintiff's expert] violated basic standards of scientific practice and rendered his results unreliable."[57]

Using terminology employed by the foremost authorities on the subject,[58] two common types of alternative explanations that apply to trademark surveys are termed *selection* and *history*. A third type of alternative explanation is termed *reactivity to the experimental situation,* which occurs when individuals alter their performance or behavior due to the awareness that they are being observed.[59] Such reactivity can take many forms, one of which, termed *demand characteristics*, has surfaced in several reported opinions and is discussed below under that rubric. A fourth type of alternative explanation, termed *experimenter expectancies*,[60] is closely related to the notion of double-blind administration. Since this has previously been discussed in chapter 9, section 9.36.1, it is not discussed below.

### 10.46.1 Selection

Selection refers to situations where, "at the start of the experiment, the average person receiving one experimental condition [e.g., test] already differs from the average person receiving another [e.g., control] condition."[61] Though random assignment of respondents to the various conditions generally takes care of this potential problem, it will not do so in all instances. Hence, preassignment differences between respondents in the test and control group merits being checked, typically by tests of significance. That said, finding a significant difference needs to be considered judiciously. If the average age of the test group, 47.2, was found to be statistically different from the average age of the control group, 49.6, could that really be expected to matter?

56. William R. Shadish, Thomas D. Cook & Donald T. Campbell, Experimental and Quasi Experimental Designs for Generalized Causal Inference 16 (2002).
57. Wells Fargo & Co. v. WhenU.com, Inc., 293 F. Supp. 2d 734 (E.D. Mich. 2003).
58. Shadish, Cook & Campbell, *supra* note 56.
59. *Id.* at 77–78.
60. *Id.* at 78–79.
61. *Id.* at 56.



### 10.46.2 History

*History* "refers to all events that occur between the beginning of the treatment and the posttest that could have produced the observed outcome in the absence of that treatment."[62] The typical trademark survey takes less than 20 to 25 minutes and it may be difficult to imagine external events that might occur between the onset of the interview and measuring the observed outcome. (One possibility in mall intercept studies would be exposure to mall signage between the time the respondent is screened in the mall corridor and then brought into the shielded testing facility.) However, it is not difficult to imagine internal events, such as the questions asked, instructions provided, or stimuli shown to respondents, having exerted a biasing effect on the response. Such possibilities should be considered, and eliminated, before accepting a positive finding.

Trademark surveys occasionally take place in two phases over time.[63] When such is the case, both researcher and counsel also need to consider external factors (e.g., media coverage of the case or its particulars; communications from the vendor to its customers) that might have occurred between phases and have influenced the response.

### 10.46.3 Demand Characteristics

Sometimes referred to as *demand effects*, the term *demand characteristics* was introduced the into the social science literature in 1962. As defined by the term's originator, demand characteristics are "the totality of cues which convey an experimental hypothesis to the subject become significant determinants of subjects' behavior. We have labeled the sum total of such cues as the 'demand characteristics of the experimental situation.'"[64] "The term demand characteristics is used to [describe] the possibility that subjects ask themselves, 'What does the experimenter want me do?' 'What demands are being made upon me?' and then they behave so as to satisfy (or in some cases, resist) those perceived demands."[65] Demand characteristic criticisms have been accepted by some courts and dismissed by others.

Repeated questioning regarding the same issue was identified as a demand characteristic in *GEICO v. Google*. "[T]he survey design introduced 'demand effects' . . . that could have tainted respondents' answers

62. *Id.*
63. For examples of two such longitudinal surveys, see Jacob Jacoby, *Considering the Who, What, When, Where and How of Measuring Dilution*, 24(3) Santa Clara Computer & High Tech L.J. 601, 626–34 (2008).
64. Martin T. Orne, *On the Social Psychology of the Psychological Experiment: With Particular Reference to Demand Characteristics and their Implications*, Am. Psychologist 766, 779 (1962).
65. Robert P. Abelson Statistics as Principled Argument 194 (1995).

Case 1:23-cv-01437-DAE Document 163-11 Filed 10/24/25 Page 123 of 138



that appeared to indicate confusion. A demand effect results when the interviewer's questions or other elements of the survey design influence participants' responses by suggesting what the 'correct' answers might be. . . . In this instance, as noted above, the interviewers repeatedly questioned respondents about their behavior and assumptions with regard to GEICO and obtaining GEICO quotes. Responses to subsequent questions, such as whether the participant thought the Sponsored Links were affiliated with any company, easily could have been influenced by the earlier questions about GEICO, making the participant more likely to assume that 'GEICO' was the right answer or what the interviewer wanted to hear."[66]

In another matter, agreeing with defendant's criticism that "the Disney shirts 'stood out like a bearded man in a lineup with four clean-shaven men,'"[67] the court in *THOIP v. Disney* concluded "In sum, [among other flaws,] because the . . . Survey . . . suffered from demand effects, it is not a reliable indicator of consumer confusion, and is inadmissible."[68]

Modifying the *Squirt* format for assessing likely confusion (see chapter 14) was considered likely to generate demand effects in *Simon Property Group v. mySimon*.

> SPG has modified the *SquirtCo* format in one important respect. The *SquirtCo* format in the reported cases offers the respondent three possible answers: same, different, or don't know. SPG insists on including a fourth answer, that the two web pages are put out by "related but different companies or organizations." SPG has not cited any case approving that additional, ambiguous twist on the *SquirtCo* format, which is likely to create a bias in favor of a finding of confusion. The question about whether the two items are put out by the same or a related source is likely to generate so-called "demand effects" that bias the survey by suggesting to respondents, at least implicitly, that they should believe there is at least some sort of relationship between the different items when the possibility might not even have occurred to the vast majority of consumers who see the items.
>
> . . . .
>
> Respondents viewing the SPG and mySimon home pages might not draw a business connection between them without the proposed

66. Gov't Emps. Ins. Co. v. Google, Inc., 77 U.S.P.Q.2d 1841, 2005 WL 1903128, at *7 (E.D. Va. 2005).

67. THOIP v. Walt Disney Co., 2011 WL 1792585, at *9 (S.D.N.Y. 2010).

68. *Id.* at *10.



> multiple choice answers suggesting the possibility of such a connection. To some extent, these potential demand effects are inherent in the *SquirtCo* format, in which the interviewer is instructed to ask a question that raises the issue about a possible relationship or affiliation between the two marks or entities. However, SPG is trying to take the *SquirtCo* format a step farther than any other court has taken it by introducing an additional possible answer. The court does not necessarily view this problem as so serious by itself as to require exclusion of the home page survey, but it adds to the other reasons for excluding the survey.[69]

The issue of demand characteristics was also raised in *Roederer v. J. Garcia Carrion* where, critiquing plaintiff's survey, defendant's expert "opined that the failure to approximate market conditions turned the survey into a 'matching game' where respondents looked for the 'right' answer. In other words, he opined that the survey created 'demand effects.'"[70] Doing its own analysis, the court rejected the demand characteristics argument, opining "Those statistics indicate that demand effects alone do not account for the level of confusion measured with respect to Cristalino cava and Cristal champagne." Also doing its own analysis, the court in *KIS v. Foto Fantasy* was dismissive of defendant's argument that demand characteristics had any serious impact on the outcome of plaintiff's survey.[71]

In light of increasing court commentary on demand characteristics, consider the following. In the seminal article on the subject, the person who identified the issue and coined the term demand characteristics wrote: "It should be clear that demand characteristics cannot be eliminated from experiments; all experiments will have demand characteristics and these will always have some effect."[72] Further: "As we have pointed out, it is futile to imagine an experiment that could be created without demand characteristics."[73] In some respects, criticizing a survey for having demand effects is like the critic's review of a concert pianist: "He has a weak fourth finger." As it turns out, every pianist has a weak fourth finger.

In light of the fact that it is futile to imagine a survey that does not have demand characteristics, how should argument of demand characteristics be treated. A leading research methodologist offers the following perspective:

69. Simon Prop. Group L.P. v. mySimon, Inc., 104 F. Supp. 2d 1033, 1049–50 (S.D. Ind. 2000).

70. Roederer v. J. Garcia Carrion, S.A., 732 F. Supp. 2d 836, 863 (D. Minn. 2010).

71. KIS, S.A. v. Foto Fantasy, Inc., 204 F. Supp. 2d 968, 972 (N.D. Tex. 2001).

72. Orne, *supra* note 64, at 779.

73. *Id.* at 780.

Potential artifacts of the demand characteristics category do not concern the direct influences of the experimenter; rather, they depend on subjects' *interpretations* of the experimenter's behavior and purposes. Such interpretations, judging by what subjects say afterward, are commonly highly inaccurate.

The demand characteristics argument is quite difficult to meet. Investigators have very limited access, at best, to subjects' states of mind. In fact, subjects may have very limited access to their own states of mind.... The most secure protection against demand characteristics arises in [studies] that can be arranged so that subjects are blind to the [sponsor and] condition.[74]

While there are times when demand characteristics arguments are neither "obvious" nor "plausible," there are times when they represent *clearly obvious alternative explanations* for a survey's findings. Consider plaintiff's survey in *Mooney et al. v. Allianz*,[75] a class action matter where plaintiffs argued that the language (specifically, the terms "up front bonus" or "immediate bonus") used in Allianz' annuity products sales brochures was confusingly deceptive and misleading.[76]

Plaintiffs' survey involved approximately 300 class members who had bought their annuities several years earlier. After being recruited

74. Robert P. Abelson, Statistics as Principled Argument 195 (1995). *See also* Terence A. Shimp, Eva M. Hyatt & David J. Snyder, *A Critical Appraisal of Demand Artifacts in Consumer Research*, 18 J. Consumer Research 273, 281–82 (1991) ("[An] unhealthy offshoot of the emphasis on demand artifacts is that otherwise meritorious studies are challenged on the grounds that they are fatally flawed by demand artifacts. . . . [The problem is that] it is easier for critics to raise the specter of demand bias than it is for researchers to counter such claims. . . . How is one to prove that his or her results are not demand biased? ... Although it would be imprudent for consumer researchers to summarily dismiss demand artifacts and assume that they never threaten the validity of experimental findings, *accusations of demand artifacts must be made judiciously to ensure that the presumption of demand bias does not overrule reason*." (emphasis added)).

75. Mooney et al. v. Allianz Life Insurance Company of North America, U.S.D.C. D. Minnesota, Case No. 06-cv-00545 (ADM/FLN), decided in favor of defendant November 2009, but not reported in F. Supp. 2d, 2010 WL 419962 (D. Minn. 2010). "The jury found that none of the class members were harmed or injured by Allianz's . . . practices." *Id.* at *3. The survey protocol and questionnaire discussed above had been originally designed and implemented by a different expert for plaintiffs' use in a different matter (*Ann* Costello et al. v. Allianz Life Insurance Co. of North America et al. State of Minnesota, County of Hennepin; MC 03-20405), where the outcome was a pre-trial settlement favoring plaintiffs.

76. There was no dispute that defendant was allowed to use the term "bonus." Plaintiffs contended that they had understood the qualifiers "up front" and "immediate" to mean they received a 10% bonus upon signing the contract that they could withdraw immediately. Defendants maintained that, as explained in the contested materials and via the sales agents through whom the plaintiffs were required to purchase the annuities, although the bonus was indeed immediately credited to the purchaser's account, these bonus funds could not be withdrawn until a specified time period had elapsed.



by phone, respondents were sent a Priority Mail package containing an inner envelope to which was affixed a letter asking them not to open the inner envelope until they received a call from the interviewer. When the interviewer called and confirmed that the respondent received the Priority Mail package, the respondent was told: "In this survey we are interviewing people about annuity products. Now please open the Priority Mail package. . . . Please take your time to carefully review the documents we sent you. Take as much time as you need. Let me know when you are finished."

The documents inside consisted of a 2-page Statement of Understanding and a copy of a 12-page sales brochure. After the respondents were done reviewing these materials and answered Yes to the question "Have you fully reviewed the documents we sent?," the interviewer began asking a series of at least eight substantive questions to determine whether the contested language—specifically, the words "upfront" or "immediate"—was a factor that caused the respondents to purchase the annuity in the first place. These included the following:

Q1. When you decided to buy the annuity described in these documents, what features or advantages of this annuity, if any, were important in your decision?

Q2E. When you decided to buy the annuity described in these documents, what other features or advantages of this annuity, if any, were important in your decision?

Q3A. You may have already mentioned it, but what were the most important advantages of this annuity compared to other annuities?

"The term demand characteristics is used to [describe] the possibility that subjects ask themselves, 'What does the experimenter want me do?' 'What demands are being made upon me?' and then they behave so as to satisfy (or in some cases, resist) those perceived demands."[77] In this situation, the demand characteristics are clear and obvious. Having been provided with the Statement of Understanding and sales brochure and then instructed "Please take your time to carefully review the documents we sent you," it is likely an appreciable number of respondents would think "Since you only gave me these two items and then asked me to carefully review them, the demand upon me is to find the answer that must be somewhere in those materials." Since the phrases "up front bonus" and "immediate bonus" were prominently displayed in the brochure, and since respondents could continue to refer to the brochure when answering these

77. Robert P. Abelson Statistics as Principled Argument 194 (Lawrence Erlbaum Associates 1995).

Case 1:23-cv-01437-DAE Document 163-11 Filed 10/24/25 Page 125 of 138



questions, it is not surprising that an appreciable number answered that the "up front bonus" and "immediate bonus" was the feature or advantage that was important in their decision to buy the annuity. It would have been a simple matter to determine whether what appear to be clear and obvious demand characteristics were indeed operating. All that would have been necessary was to have asked the same questions of a control group of class members who were not provided with the Statement of Understanding and sales brochure, yet no control group of any sort was used. Nor were any questions asked to confirm that the respondents remembered receiving and reviewing the brochures at the time of purchase.

In most situations, the demand is not so clear and obvious as it was in *Mooney v. Allianz*. The best advice regarding demand effects may be the following: "Although it would be imprudent for consumer researchers to summarily dismiss demand artifacts and assume that they never threatened the validity of experimental findings, accusations of demand artifacts must be made judiciously to ensure that the presumption of demand bias does not overrule reason."[78]

## 10.47 Considering Appreciable Differences across Testing Venues

When, as is typically the case with mall intercept surveys, testing has been conducted at several geographically dispersed sites around the country, a question that sometimes arises is what to do when substantial differences emerge in the findings obtained at different sites. In most such instances, the data from one site are found to appreciably (perhaps significantly) differ from the data obtained at the other sites.

Where significant differences are found across sites, the data should be scrutinized to see if some biasing factors might have been introduced that would explain the differences. If biasing factors are identified, the conservative approach is not to rely upon the tainted data. In rare instances, this can mean relying on the data from the anomalous outlier site rather than from the other sites. Consider the following analysis from *Cartier v. Four Star Jewelry*, where the court, evaluating a claim of secondary meaning, did exactly that.

> What is noteworthy to the Court, however, is the considerable discrepancy in findings at the Atlanta mall *vis a vis* the results obtained in surveying shoppers at the other five malls. Of the six malls involved in creating the Roper Report, only the Atlanta mall was anchored by upscale retail establishments. . . . Further, in Atlanta, 69% of survey respondents owned a watch worth at least $2,500, compared to the 41% of respondents at the other locales. For those who did not already own a fine watch, 55% of the participants were "very likely" to purchase one in the near future, compared to 15% of the participants who answered in similar fashion at the other malls. Accordingly, the court concludes that the population of survey respondents at the Atlanta mall was the most representative of the Cartier consumer population. Here, 63% of the participants associated the style and design of the Tank Francaise with one company, 60% of respondents associated the Tank Americaine with one company, and 60% associated the style or design of the Panthere with one company.[79]

78. Shimp, Hyatt & Snyder, *supra* note 74, at 282.



In instances where no biases have been identified, two different approaches have been applied. One is to disregard the data from the single anomalous site and rely only on the data from the remaining sites. Understanding that no biases have been identified, this approach may be overly conservative.[80] A second approach is to rely on the data from all the sites. An argument in support of doing so is that, when a number of different testing sites (e.g., 8 to 12 or more) have been used, it would not be unusual to find a significant difference by chance. A second argument in support of relying on all the data is to appreciate that one is generally seeking to extrapolate the findings to the nation as a whole and arrive at a single conclusion, for example, there is (or is not) a likelihood of confusion. In some ways, this parallels a presidential election. When different candidates win different states, we do not end up claiming Candidate D is president in California, Massachusetts, and New York while Candidate R is president in Idaho, Indiana, and Iowa. Regardless of how different the results may be from each other, through the Electoral College, we aggregate the votes across all the states and declare a winner based on that.

## 10.48 Considering Answers to "Why?" Questions

Although empirical studies by social scientists have cast some doubt on our ability to provide valid self-reports regarding our mental processes (see chapter 8, section 8.05), the answers to "Why do you say that?" types of questions are often considered valuable in evaluating survey data. Prof. McCarthy, for example, writes that questions used to assess likely confusion "should be followed up by the important question: 'Why do you say that?'

79. Cartier, Inc. v. Four Star Jewelry Creations, Inc., 348 F. Supp. 2d 217, 230 (S.D.N.Y. 2004).

80. *See* Friesland Brands, B.V. v. Vietnam Nat'l Milk Co., 221 F. Supp. 2d 457, 462 (S.D.N.Y. 2002) ("Fourth, the differences in results between the two locations does not, in itself, invalidate the survey.").

Case 1:23-cv-01437-DAE Document 163-11 Filed 10/24/25 Page 126 of 138



Often, an examination of the respondents' verbatim responses to the 'why' question are the most illuminating and probative part of a survey, for they provide a window into consumer thought processes in a way that mere statistical data cannot."[81] In particular, the answers to "Why?" questions has been used to identify and parse out confusion due to nonactionable reasons.

Some courts pay particular attention to the answers to "Why?" questions. For example, the expert in *Cumberland Packing Corp. v. Monsanto*[82] had asked respondents for the reasons for their selection, but had not analyzed the reasons, so the court did. The court looked at the respondents who selected the test product and not the control product. Twenty-six out of thirty-five respondents (75 percent) who selected the test product said they did so for reasons unrelated to the legal issue. The measurement of confusion went from 30 percent of 117 respondents to 8 percent.

### *10.49 Interpreting Control Percentages*

A clarification is in order. In an earlier article, your author wrote: "in the best of all possible worlds, it would not be desirable for a control to yield confusion estimates that exceeded 10 percent. If it did, the control itself would begin to reach an actionable level of confusion and its utility as a control thereby compromised."[83] That article also drew a distinction between natural and derived controls.[84] The former are products or communications that exist in the real world of commerce; the latter are products or communications that have not been introduced into the world of commerce but were specially constructed to serve as controls for the study at hand. Because they are constructed so that only the key feature of interest is changed, thereby producing a control as close as possible to the test stimulus except for that feature, derived controls tend to be more stringent than natural controls, that is, more likely to garner responses reflecting likely confusion or deception. The comment regarding it not being desirable for controls to yield confusion estimates that exceeded 10 percent applied to natural controls, as there is widespread agreement that one should not select as a control a product or communication that might itself exhibit an actionable level of confusion or deception. However, this does not apply to derived controls, especially those developed to be rigorous.

As it makes no sense taking action against something that does not and probably never will exist in the natural world of commerce, how

81. McCarthy, *supra* note 42, § 32:175.

82. Cumberland Packing Corp. v. Monsanto Co., 32 F. Supp. 2d 561, 1999 U.S. Dist. LEXIS 262 (E.D.N.Y. 1999).

83. Jacob Jacoby, *Experimental Design and the Selection of Controls in Trademark and Deceptive Advertising Surveys*, 92(4) The Trademark Reporter 890, 932 (2002).

84. *Id.* at 918.



should a derived control that yields a high level of likely confusion or likely deception, say 50 percent or more, be considered? The answer—as a tough control that is doing what it should be doing, namely, serving its intended function of estimating the error rate due to guessing, respondent acquiescence, problems with the question itself, and so forth. It is important not to lose sight of the fact that the essential consideration is not the magnitude of the error estimate, but whether, when the control percentage is subtracted from the test percentage, the "net" exceeds 15 percent (or whatever value the court considers to be appropriate). This situation is akin to one of the Drug X scenarios discussed in chapter 4 (section 4.22) in which 65 percent of those receiving Drug X containing the active ingredients said it lessened their pain while 35 percent of those receiving a placebo not containing the ingredients identified as ameliorating pain said it lessened their pain. It would be nonsensical to hold that because 35 percent of the patients in the control group said it lessened their pain, the study's findings were flawed and should be ignored. The difference of 30 percentage points in pain amelioration is substantial, highly significant with sample sizes of more than 100, and evidence that Drug X successfully caused a lessening of pain for a not-insubstantial proportion of the population. The same logic applies to interpreting control group findings of confusion or deception that exceed 15 percent. If, when the percentage obtained with the control is subtracted from the percentage obtained with the test, the net difference exceeds 15 percent (or whatever threshold the trier of fact deems appropriate), then the findings merit being accorded their proper weight.

## 10.50 Reporting the Findings

As discussed below, there are instances where courts have pointed to omissions in the survey report as a reason for according a survey little or no weight, and there are instances where courts have pointed to inaccuracies in the survey report as a reason for according a survey little or no weight. The following sections consider what information should be provided when reporting survey findings. According to the Amendment to Rule 26 of the Federal Rules of Civil Procedure (effective December 1, 2010), earlier drafts of the expert report are no longer required.

### *10.51 General Guidelines*

#### 10.51.1 The Manual for Complex Litigation Factors

The Federal Judicial Center's *Manual for Complex Litigation, Fourth* (section 11.493) sets forth a number of factors for triers of fact to consider

when evaluating survey research and testimony regarding said research. These factors are noted below. Although some factors pervade the entire process (particularly #1), to more closely track the sequence of activities that typically occurs during the research process, the order in which they are cited here departs from the original.

1. The process was conducted so as to ensure objectivity;
2. The population was properly chosen and defined;
3. The sample chosen was representative of that population;
4. The questions asked were clear and not leading;
5. The survey was conducted by qualified people following proper interviewing procedures;
6. The data gathered were accurately reported;
7. The data were analyzed in accordance with accepted statistical principles.

As these have been specifically identified as factors for trier of fact consideration, a prudent recommendation is that, in writing their reports, experts be responsive by indicating how each factor has been addressed.

### 10.51.2 Daubert and FRE 702

Many courts will have *Daubert* in mind when evaluating reports of survey research.[85] Hence, the factors identified in *Daubert* should also be considered when writing and evaluating survey reports. Amended in 2000, the Federal Rule of Evidence 702 Advisory Committee notes succinctly summarize the five original *Daubert* factors as follows:

1. [W]hether the expert's technique or theory can be or has been tested—that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability;
2. whether the technique or theory has been subject to peer review and publication;
3. the known or potential error rate of the technique or theory when applied;
4. the existence and maintenance of standards and controls;
5. whether the technique or theory has been generally accepted in the scientific community.

85. Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993).



Augmented in successor rulings,[86] the Advisory Committee's Notes on the December 1, 2000, amendments to FRE Rule 702 identified the following additional factors for a gatekeeper's consideration:

6. Research conducted for the purpose of being proffered as evidence in a litigated matter, all other things being equal, does not merit lessened weight as compared to research not conducted for the purpose of being proffered as evidence in a litigated matter.
7. "Whether the expert has unjustifiably extrapolated from the accepted premise [and data] to an unfounded conclusion."
8. "Whether the expert has accounted for obvious alternative explanations." *Ambrosini v. Labarraque* (101 F.3d 129, 141 (D.C. Cir 1996)) is cited for the proposition that "the possibility of some uneliminated causes presents a question of weight, so long as the most obvious causes have been considered and reasonably ruled out by the expert."
9. "Whether the expert 'is being as careful as he would be in his regular professional work outside his paid litigation consulting.'" (quoting *Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997)).
10. "Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give."

As *Kumho* stressed, not all 10 factors will be applicable in all cases.[87]

### 10.51.3 The Reference Manual on Scientific Evidence Factors

Under the heading "Does the Survey Report Include Complete and Detailed Information on All Relevant Characteristics?," Prof. Diamond, the author of the Reference Guide on Survey Research, writes:

> The completeness of the survey report is one indicator of the trustworthiness of the survey and the professionalism of the expert who is presenting the results of the survey. A survey report generally should provide in detail:
>
> 1. The purpose of the survey;
> 2. A definition of the target population and a description of the sampling frame;

86. Gen. Elec. Co. v. Joiner, 522 U.S. 136 (1997); Kumho Tire Co. v. Carmichael, 526 U.S 137 (1999). *See also* Margaret A. Berger, *The Supreme Court's Trilogy on the Admissibility of Expert Testimony*, *in* FED. JUDICIAL CTR., REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 9 (3d ed. 2012).

87. *Kumho*, 526 U.S at 150, 151 (Rule 702 inquiry is "flexible"; the Daubert factors "do not constitute a definitive checklist or test"; "we can neither rule out, nor rule in, for all cases and for all time the applicability of these factors"; the factors "do not necessarily apply in every instance in which the reliability of scientific testimony is challenged.").

3. A description of the sample design, including the method of selecting respondents, the method of interview, the number of callbacks, respondent eligibility or screening criteria and method, and other pertinent information;
4. A description of the results of sample implementation, including the number of (a) potential respondents contacted, (b) potential respondents not reached, (c) noneligibles, (d) refusals, (e) incomplete interviews or terminations, and (f) completed interviews;
5. The exact wording of the questions used, including a copy of each version of the actual questionnaire, interviewer instructions, and visual exhibits;
6. A description of any special scoring (e.g., grouping of verbatim responses into broader categories);
7. A description of any weighting or estimating procedures used;
8. Estimates of the sampling error, where appropriate (i.e., in probability samples);
9. Statistical tables clearly labeled and identified as to source of data, including the number of raw cases forming the base for each table, row, or column; and
10. Copies of interviewer instructions, validation results, and code books.[88]

While your author agrees with these desiderata, online panel providers normally are very close to the vest in terms of revealing how many invitations were actually sent out and have been reluctant to provide detailed information on "eligibles." Thus, satisfying some of the desiderata identified in Number 4, above, may not always be possible.

### 10.51.4 Scientific Standards

There are many kinds of surveys, most of which do not qualify as being scientific. Indicating that trademark surveys are to be designed, conducted, and reported in a manner that is consistent with scientific standards, all three editions of the Federal Judicial Center's *Reference Manual on Scientific Evidence* have contained a chapter titled Survey Research.

At core, scientific standards require that the report be complete enough to enable independent evaluation and, if considered necessary, replication by others. While the reports of scientific research published in peer reviewed journals rarely contain such detail, they are published with the general understanding that requests for the underlying documentation

88. Shari S. Diamond, *Reference Guide on Survey Research*, *in* Fed. Judicial Ctr., Reference Manual on Scientific Evidence 415–16 (3d ed. 2012).



will be honored. Failure to provide such documentation can be sufficient to discredit the research.

### 10.51.5 Professional Standards

Several professional associations whose members conduct and are consumers of survey research have set forth factors that should be found in reports of survey research. These associations include AAPOR (the American Association of Public Opinion Research), CASRO (the Council of American Survey Research Organizations), and ARF (the Advertising Research Foundation).

The following material regarding reporting survey results comes from AAPOR's published Best Practices:

> Disclose all methods of the survey to permit evaluation and replication.
>
> Excellence in survey practice requires that survey methods be fully disclosed and reported in sufficient detail to permit replication by another researcher and that all data (subject to appropriate safeguards to maintain privacy and confidentiality) be fully documented and made available for independent examination. Good professional practice imposes an obligation upon all survey and public opinion researchers to include, in any report of research results, or to make available when that report is released, certain minimal essential information about how the research was conducted to ensure that consumers of survey results have an adequate basis for judging the reliability and validity of the results reported. Exemplary practice in survey research goes beyond such standards for "minimal disclosure," promulgated by AAPOR and several other professional associations (e.g., CASRO and NCPP) by (a) describing how the research was done in sufficient detail that a skilled researcher could repeat the study, and (b) making data available for independent examination and analysis by other responsible parties (with appropriate safeguards for privacy concerns).
>
> A comprehensive list of the elements proposed for disclosure by one or more sources which in combination, exceed the "standards for minimum disclosure" proposed by any one of the professional organizations includes:
>
> - who sponsored the survey, and who conducted it;
> - the purpose of the study, including specific objectives;
> - the questionnaire and/or the exact, full wording of all questions asked, including any visual exhibits and the text of any

preceding instruction or explanation to the interviewer or respondents that might reasonably be expected to affect the response;

- a definition of the universe the population under study which the survey is intended to represent, and a description of the sampling frame used to identify this population (including its source and likely bias);
- a description of the sample design, including cluster size, number of callbacks, information on eligibility criteria and screening procedures, method of selecting sample elements, mode of data collection, and other pertinent information;
- a description of the sample selection procedure, giving a clear indication of the methods by which respondents were selected by the researcher, or whether the respondents were entirely self-selected, and other details of how the sample was drawn in sufficient detail to permit fairly exact replication;
- size of samples and sample disposition the results of sample implementation, including a full accounting of the final outcome of all sample cases: e.g., total number of sample elements contacted, those not assigned or reached, refusals, terminations, non-eligibles, and completed interviews or questionnaires;
- documentation and a full description, if applicable, of any response or completion rates cited (for quota designs, the number of refusals), and (whenever available) information on how non respondents differ from respondents;
- a description of any special scoring, editing, data adjustment or indexing procedures used;
- a discussion of the precision of findings, including, if appropriate, estimates of sampling error with references to other possible sources of error so that a misleading impression of accuracy or precision is not conveyed and a description of any weighting or estimating procedures used;
- a description of all percentages on which conclusions are based;
- a clear delineation of which results are based on parts of the sample, rather than on the total sample;
- method(s), location(s), and dates of interviews, fieldwork or data collection;
- interviewer characteristics;
- copies of interviewer instructions or manuals, validation results, codebooks, and other important working papers; and



- any other information that a layperson would need to make a reasonable assessment of the reported findings.[89]

The following material regarding reporting survey results comes from CASRO's published Code of Standards and Ethics for Survey Research:

III. Responsibilities in Reporting to Clients and the Public

A. When reports are being prepared for Client confidential or public release purposes, it is the obligation of the Research Organization to insure that the findings they release are an accurate portrayal of the survey data, and careful checks on the accuracy of all figures are mandatory.

B. A Research Organization's report to a Client or the Public should contain, or the Research Organization should be ready to supply to a Client or the Public on short notice, the following information about the survey:

1. The name of the organization for which the study was conducted and the name of the organization conducting it.
2. The purpose of the study, including the specific objectives.
3. The dates on or between which the data collection was done.
4. A definition of the universe that the survey is intended to represent and a description of the population frame(s) that was actually sampled.
5. A description of the sample design, including the method of selecting sample elements, method of interview, cluster size, number of callbacks, Respondent eligibility or screening criteria, and other pertinent information.
6. A description of results of sample implementation including (a) a total number of sample elements contacted, (b) the number not reached, (c) the number of refusals, (d) the number of terminations, (e) the number of non-eligibles, (f) the number of completed interviews.
7. The basis for any specific "completion rate" percentages should be fully documented and described.

89. Am. Ass'n of Pub. Opinion Research, Best Practices, http://www.aapor.org/Best_Practices1.htm#best12.

8. The questionnaire or exact wording of the questions used, including Interviewer directions and visual exhibits.
9. A description of any weighting or estimating procedures used.
10. A description of any special scoring, data adjustment or indexing procedures used. (Where the Research Organization uses proprietary techniques, these should be described in general and the Research Organization should be prepared to provide technical information on demand from qualified and technically competent persons who have agreed to honor the confidentiality of such information).
11. Estimates of the sampling error and of data should be shown when appropriate, but when shown they should include reference to other possible sources of error so that a misleading impression of accuracy or precision is not conveyed.
12. Statistical tables clearly labeled and identified as to questionnaire source, including the number of raw cases forming the base for each cross-tabulation.
13. Copies of Interviewer instructions, validation results, code books, and other important working papers.[90]

The *ARF Criteria for Marketing and Advertising Research* is available online.[91] An earlier version[92] suggested numerous "Key Questions" and "Quality Checkpoints" to be considered at each point in the survey research process, and in reporting survey research (e.g., "B-6: Is there a precise statement of the universe or population the research is meant to represent?"). The concluding section of the earlier version contains the following.

> Release of research findings should be accompanied by a description of the procedures in enough detail so that a good researcher could redo the study without further information.
>
> All of the gathered information should be available for inspection. Suppression of information unfavorable to the sponsor, or

90. Council of Am. Survey Research Orgs., Code of Standards and Ethics for Survey Research, http://www.casro.org/.

91. http://s3.amazonaws.com/thearf-org-aux-assets/downloadsresearch/GuidelinesForMarketResearch.pdf.

92. ARF GUIDELINES HANDBOOK 9–54 (1984; reprinted 1990).



> embarrassing to the responsible researcher, destroys the credibility of reported findings.[93]

## 10.52 Fully Report What Was Done

"The completeness of the survey report is one indicator of the trustworthiness of the survey and the professionalism of the expert who is presenting the results of the survey."[94] While there are no length requirements, rarely can the expert report provide a complete report in a few pages. An expert who provides "excerpts"[95] or two-page summaries[96] cannot be expected to do be taken seriously.

A complete report—which includes not only the body of the report, but various appendices as well—will contain sections describing the background and survey objectives, what the expert did as a basis for designing and implementing the survey, how the survey was implemented, how the data were analyzed, and the findings and conclusions. Sometimes a separate "Principal Findings" section will be provided immediately after discussion of the background and objectives.

As a general observation, it is better if reports are more detailed rather than less detailed. Courts are sometimes inclined to do their own analyses of the data and can only do so only when the appropriate level of detail is provided. Parties may not get a second chance to provide data in a form suitable for trier of fact analysis.[97] The sections below elaborate upon and augment the various guidelines noted in sections 10.51.1 through 10.51.5, *supra*.

93. *Id.*

94. Diamond, *Reference Guide on Survey Research*, *supra* note 88, at 315.

95. *See* Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., 240 F.3d 832, 841 (9th Cir. 2001) ("Brush submitted excerpts from a consumer survey.... Nor did the submission address the format of the survey or its methodology. Without any information regarding the survey design, questions, or methodology, the district court did not abuse its discretion by ascribing little weight to the survey excerpts submitted by Brush.").

96. Constellation Brands, Inc. v. Arbor Hill Assocs., Inc. 535 F. Supp. 2d 347, 369 (W.D.N.Y. 2008).

97. Franklin Res., Inc. v. Franklin Credit Mgmt. Corp., 988 F. Supp. 322, 336 (S.D.N.Y. 1997) ("No comparable analysis of the reasons for the responses given during the supplemental survey is possible, since the [reported] results of that survey . . . do not give that information."). Indeed, the data of interest to the trier of fact may be available, but not in a readily usable form. For example, the Special Masters in *Malletier v. Dooney & Bourke, Inc.* commented: "Furthermore, an unknown proportion of respondents may have qualified only because they had bought a 'handbag' or 'purse or wallet' costing more than the required amount 'in the past year or two,' but were not likely to do so in 'the next year or so.'" Although respondents in this survey had been asked questions that provided the answer to this very question, these data had never been compiled. 525 F. Supp. 2d 558, 605 (S.D.N.Y. 2007).

### 10.52.1 Background and Objectives

An early section of the report should briefly describe the background and objectives of the survey. It should indicate when the expert was contacted and by whom, and briefly summarize the key issues as they pertain to the survey. Some of this information will be provided orally by counsel, and may be accompanied by a showing of the products, marks, and so on involved in the dispute. If one has been prepared and filed, more detailed information generally will be obtained from the complaint and answer.

An important report element is for the expert to specify the survey objective(s), that is, what he or she was asked to find out. Typically, this involves a statement of the legal issue(s) being tested, for example, "The objective was to determine whether the particular colors of Brand X's trade dress have acquired secondary meaning in the minds of the relevant public."

### 10.52.2 Activities Prior to Implementing the Survey

#### *10.52.2.1 Information Consulted or Relied On*

Whether provided in the body of the report or as an appendix, the expert needs to identify the documents and items supplied by counsel as a basis for the expert forming an understanding of the case and planning how the survey needs to be structured. This author's experience has been that some counsel prefer to have all the information they provided identified and listed, while others prefer the expert to identify and list only those items actually relied upon.

As part of the expert's training and general experience, the expert likely will have consulted some relevant literature along the way, for example, texts on survey research methodology. Unless these items are used and cited in the report itself, the expert has no obligation to identify all the texts, articles, and other materials, that he or she has ever reviewed prior to being engaged for the project. If, in the course of developing ideas for structuring the survey, the expert consults and relies upon specific material pertaining to the instant project (e.g., a description of the industry), such materials should be disclosed. Similarly, if the expert has conducted one or more store visits to see how the product is displayed, or gone online to view one of both of the disputant's websites, these details probably should be mentioned as well.

#### *10.52.2.2 The Universe Definition*

One of the most important tasks the expert engages in prior to implementation of a survey is identifying and defining the relevant universe (see chapter 5). Not only is this essential, but it is a prerequisite for implementing any trademark survey. Until and unless one can clearly identify just who's states of mind are relevant and to whom the results of the survey will be extrapolated, one cannot begin sampling respondents from that universe.



Defining the universe takes place prior to gathering data. The universe represents the target against which the adequacy of the sampling can be judged. Expecting the universe to be inferred from a description of the screening question used to obtain the sample is inadequate. The universe definition provides the survey's target. Without a target, there is no way to tell whether or how well the questions asked and information obtained hit that target. (Or, as one wag put it, "To be sure of hitting the target, shoot first and call whatever you hit the target.") Accordingly, the report should contain a clearly stated definition of the universe(s) to which the survey findings will be extrapolated.

#### *10.52.2.3 Qualitative Research*

Most data collection and analysis relies on using numbers; for this reason, it is termed *quantitative*. Data collection or data evaluation that is non-numerical is termed *qualitative research*. Examples include unstructured interviews and focus groups (see chapter 4, section 4.13.4). When it comes to evaluating qualitative data, reliance is placed largely upon researcher impression and judgment.

Some experts conduct qualitative research as a basis for developing their ideas regarding how to structure their follow-up quantitative survey. When this is the case, mention of this fact should be made either in the body of the report or in an appendix. Moreover, such description should be reasonably detailed. As is so for quantitative research, for qualitative research to qualify as being scientific, researchers need to provide sufficient descriptions of what they did so that other researchers can, if they wish, evaluate and perhaps even attempt to replicate their procedures and findings. As witnessed by the following excerpt, without such detailed description, qualitative research amounts to little more than ipse dixit and can lead to embarrassing cross-examinations and having one's entire testimony and survey rejected by the court.

> During trial, [the researcher] stated that in his opinion, all doctors influenced the purchasing decision for CM because it would be unethical for them to administer a product which they did not feel was the best product. He came to this opinion by conducting a so-called pre-test where he contacted physicians and asked them questions so that he could become knowledgeable about the subject matter for the survey. The physicians that he contacted were not

part of the actual survey. In addition, [he] gave inconsistent testimony about how many physicians he interviewed for this pre-test. First he said 6, then he said 10, then he said it may be about 9 or so. He also stated that these physicians were friends, and friends of friends, all of whom were in the New Jersey and Pennsylvania area, not nationwide. Furthermore, [he] testified that at least one of them was not even a radiologist or an interventional cardiologist. [He] then went on to state that all of the physicians in the pre-test stated that they personally make the decision as to what contrast agent they administer to patients, however yet again, the question of whether they were involved in the purchasing decision was never asked. The Court finds the quantum of [his] testimony to be unclear and his methods for conducting the survey not consistent with usual accepted practices; for these reasons the Court strikes the testimony and survey results of [the expert] as unreliable.[98]

Conducting qualitative research as a foundation for developing a trademark survey is all well and good. However, when the surveyor relies upon this research, perhaps mentioning it as a way of enhancing the credibility of what was done, then it is incumbent upon the researcher to provide a detailed description indicating how many people were contacted, whether they were members of the relevant universe, what (if anything) they were shown, the specific questions they were asked, and so on.

#### *10.52.2.4 The Research Design*

As defined in chapter 1, "a *survey* is defined as any data collection operation that gathers information from human respondents by means of a standardized questionnaire in which the interest is in aggregates rather than particular individuals."[99] Many trademark surveys are designed to test existing states of mind among the relevant public—for example, whether a mark is generic, has acquired secondary meaning, or is famous. Other trademark surveys are designed to test whether an action by one party is likely to cause a state of mind among the relevant public—for example, cause confusion, cause dilution, or cause deception. These latter types of issues require that basic survey designs be merged with another research strategy termed experimentation (see chapter 4, sections 4.20 through 4.25.8).

98. Bracco Diagnostics, Inc. v. Amersham Health, Inc., 627 F. Supp. 2d 384, 448 (D.N.J. 2009).

99. Stanley Presser, *The Use of Survey Data in Basic Research in the Social Sciences*, *in* 2 Surveying Subjective Phenomena 93, 95 (C. Turner & E. Martin eds., 1984).



Experiments generally involve respondents being randomly assigned to different exposure conditions or groups (see section 4.24) and/or exposing respondents to different test and control stimuli or treatments (see chapter 7). The report should provide a detailed description of the experimental design, the different groups involved, the test and control stimuli used, and the rationale for their selection or creation.

#### *10.52.2.5 Pretests and Pilots*

The terms pretesting and piloting are widely used in the scientific literature, with some authors using the terms interchangeably and others distinguishing between the two, but different writers giving them different definitions. For present purposes, we make the following distinction (see chapter 9, section 9.80).

*Pretesting* refers to testing either some aspect of or the entire survey for purposes of improving the survey; there is no intent of predicating opinions or conclusions upon the findings obtained from the pretest. In contrast, *piloting* refers to designing a survey to the same exacting standards as one would for a full survey, then conducting a limited test for the purpose of determining the kind of findings that conducting the full survey is likely to yield.

There is no requirement for the expert to conduct either pretests or pilot studies. But if either is conducted, the researcher needs to be forthcoming and describe these in sufficient detail. This means reporting the findings, any changes that were introduced for the main survey as a consequence of the pretest or pilot, and the justification for these changes. Failing to do so can garner court criticism.[100]

### 10.52.3 Activities during Survey Implementation

#### *10.52.3.1 Identify Principal Subcontractors*

Many trademark surveys are designed by an individual or firm, then implemented by one or more subcontractors. In-person interviewing will typically use different interviewing services at the various locations where interviewing is conducted. The postsurvey validation is typically handled by another independent party or firm. And there may be other subcontractors.

The identities and physical or e-mail addresses of the expert's principal subcontractors should be identified in the report. While this can be handled via footnotes, insertion of an appendix briefly describing the principal subcontractors and their qualifications should be considered.

100. *See* Louis Vuitton Malletier v. Dooney & Bourke, Inc., 340 F. Supp. 2d 415, 447 (S.D.N.Y. 2004).

Case 1:23-cv-01437-DAE Document 163-11 Filed 10/24/25 Page 133 of 138



#### 10.52.3.2 Describe Sampling Procedures

An important aspect of an expert report is describing how the respondents were selected to participate in the survey. For an online survey, this may involve drawing a sample from a commercial panel provider's existing panel. Alternatively, sampling may be accomplished by conducting a telephone screening and prerecruit, and directing individuals who qualify to an online site. For a telephone survey, this may involve random-digit dialing or drawing the sample from directories or some other list. For surveys conducted at central location testing facilities (such as are typically situated in shopping malls), this may involve intercepting and screening potential respondents in the shopping center corridors or prerecruiting them by phone.

How the sample of respondents was obtained should be described in some detail. The researcher should also describe any quotas that were used. Quotas can be set for gender, age brackets, geographical locale, people who buy certain types of goods, people who shop at certain types of retail outlets or online, and so on.

Sampling applies to more than selecting respondents (see chapter 6). It also applies to selecting some out of all the available testing venues, selecting some out of all the available test stimuli, selecting or developing control stimuli out of a universe of possibilities, and so on. The report should indicate the bases upon which these other survey elements were selected. For example, "to test likely confusion, the survey tested defendant's sport slacks and t-shirts which, together, account for 85 percent of defendant's sales. While defendant sells several styles of sport slacks and t-shirts, its two top-selling sport slacks and t-shirts (Models # ___, ___, ___ and ___, accounting for 60 percent of the total sales of these garments) were selected to represent the entire line."

#### 10.52.3.3 Provide Blank Copies of the Questionnaires and Copies of any Supervisor and Interviewer Instructions

Interpreting respondent answers requires that we know the questions asked to evoke their answers. Although the requirement to do so would seem obvious, some reported decisions have excluded reports for failing to include copies of the questionnaires. "[A]lthough the summary states that the consumers 'were asked a series of questions designed to assess confusion as to source, confusion as to association or connection, and confusion as to sponsorship or authorization, and the reasons for their confusion,' it does not provide the actual questions asked or answers given."[101]

101. Constellation Brands, Inc. v. Arbor Hill Assocs., Inc., 535 F. Supp. 2d 347, 369 (W.D.N.Y. 2008).



The Survey Research Guide in the FJC's *Reference Manual on Scientific Evidence* suggests that "a copy of each version of the actual questionnaire, interviewer instructions, and visual exhibits" be provided. This desideratum is reasonable where a limited number of versions of the questionnaire have been used. However, in some instances (for example, where computer programming results in randomizing a large number of response options), it is possible for a survey to end up using 20, 50 or more versions of the questionnaire. Given such trivial differences across versions, one would hope triers of fact would have reasonable expectations as to the number of versions that need be provided.

#### 10.52.3.4 Provide Exemplars or Photographs of Stimuli

When trademark surveys involve the use of stimuli (e.g., products, website pages, photographs), exemplars of these should be provided as appendices to, or along with the report. Failure to do so may be a reason for the court according a survey little if any weight. Commenting on the "summary report" it received and excluded, the court in *Constellation Brands v. Arbor Hill Associates* wrote: "The summary does not include photographs of the actual bottles used."[102]

#### 10.52.3.5 Identify the Implementation Dates

The report should identify the dates when interviewing began and ended. It should also identify the dates when the postsurvey validation began and ended. While identifying the implementation dates may seem trivial, it enables others to determine whether something unusual might have occurred during those time periods (e.g., publicity in the media, letters or e-mails sent to prospective respondents) that might have affected the respondents' answers to the questions.

### 10.52.4 Data Analysis and Reporting

#### 10.52.4.1 The Raw Data

The term *raw data* refers to the original form in which the data were physically recorded. These physical recordings may result from keystrokes entered in an online or CATI-administered telephone survey, or be handwritten entries made by interviewers on hardcopy questionnaires during in-person (e.g., central location testing) interviewing. The raw data are the fount out of which tabulation, aggregation, analysis, and evaluation of the survey proceed.

It is customary for the other side to request copies of the raw data and to be provided with same after each respondent's name and other

102. *Id.*

personally identifying information have been redacted. Not only does the failure to provide the raw data violate the requirements for reporting scientific research, but courts have held it to reduce the credibility of a survey.[103]

While reports typically provide a summary of the raw data for the substantive questions asked on the main questionnaire, some reports fail to provide either a summary or the raw data for the questions asked on the screener questionnaire. As this omission may become notable and a focus of criticism from the other side or the court, it seems advisable to provide these data as well, perhaps as an appendix.

*10.52.4.2 Level of Detail*

Sometimes there is a tension between writing too much and increasing the court's reading load or risk boring the court, or writing too little and risk being criticized for not being sufficiently forthcoming. As long as the analyses and discussion are clear, the preferable approach is to be detailed. Courts seeking to find answers to their specific questions may opine negatively when such detail is not provided, particularly in regard to the substantive questions asked on the main questionnaire.

> The problem with the survey questions is further exacerbated by the lack of data in [the] expert report. Although it provided a specific breakdown of responses for the background, usage and qualifying questions [asked on the screener], no such information was provided for the responses to the screen shots [the substantive questions asked on the main questionnaire]. Instead, only combined totals were presented. . . . Accordingly, the court has no data on how many "yes" responses occurred . . . for Instruments 1, 2 and 3.[104]

*10.52.4.3 Responses to Open-Ended Questions*

The preferred practice is for the verbatim responses to open-ended questions to be typed, proofed, and provided as an appendix to the report. Where the data have been gathered by interviewers, the open-ended responses often will have been typed and proofed, if only to make it easier for the expert and those who code the responses to review, filter, and sort

103. Ferrari S.p.A. v. McBurnie, 11 U.S.P.Q.2d 1843, 1847 (S.D. Cal. 1989) ("The credibility of defendants' survey was also placed into question because the raw data (original questionnaires and answers) upon which the survey was based, was destroyed during the course of the litigation before plaintiff could review it. Thus plaintiff could not check on the accuracy of defendants' results.").

104. 1-800 Contacts, Inc. v. Lens.com, Inc. 755 F. Supp. 2d 1151, 2010 WL 5150800, at *9 (D. Utah Dec. 15, 2010).



the responses. When gathered via self-administered online questionnaires, the open-ended responses will already be in electronic form and should be provided to the adversary in this form. A deplorable practice is to print hardcopy of these data, then convert these pages to pdf files before providing them to the opposing party. Since pdf files are essentially photos that do not permit filtering and sorting, providing the data this way requires that the opposing party have the verbatim responses re-typed before they can be re-analyzed. The expert has an obligation to provide the codebook and coding rules applied to the open-ended data both to the court and to the adversary (see sections 10.23 and 10.23, *supra*).

*10.52.4.4 Identify the IDs of Respondents Relied upon for Conclusions*

All expert reports provide aggregate percentages; for example, "27% of the respondents were confused; 54% of them responded in a way that exhibited secondary meaning for the trade dress." In the majority of instances, the expert reports do not indicate how these aggregate percentages were arrived at; specifically, they fail to identify the respondents counted as being confused (exhibiting secondary meaning, etc.) on which questions. It is left to the opposing party (and court) either to accept these percentages, or to try and figure out for themselves which respondents were counted on which questions.[105] As this practice violates the spirit of scientific inquiry, this author has come around to providing respondent-by-question matrices to indicate the IDs of respondents tallied as confused (diluted, reflecting secondary meaning, etc.) and the specific question(s) on which they were tallied as such. Providing such a matrix makes for greater accountability of the expert.

*10.52.4.5 Provide Base Numbers on Tables, Charts, and Figures*

On occasion, one comes across expert reports containing tables, charts, figures, or exhibits that report or present percentages or averages, but fail to indicate the number of respondents upon which the percentages or averages have been calculated. Such exhibits can be misleading. Failing to indicate the number of respondents upon which the calculation is based should be viewed as a flaw and failure to abide by professional standards (see section 10.51.5, *supra*).

105. To be meaningful, a survey should show the reason that each interviewee found confusion. *See* Cumberland Packing Corp. v. Monsanto Co., 32 F. Supp. 2d 561, 572–77, 1999 U.S. Dist. LEXIS 262 (E.D.N.Y. 1999).

### 10.53 A Checklist for Expert Reports

Expert reports vary considerably in length, organization, and, more importantly, contents. Despite the fact that it is a prerequisite for planning any survey, a substantial proportion of experts neglect to provide a clear definition of the universe to which the findings are intended to be extrapolated. Other reports fail to include other required or important information.

Provided below is an illustrative template. It is not intended to, nor does it purport to, be exhaustive or definitive regarding the elements that should be provided in an expert report. Rather, it is meant to be illustrative of the content that this author believes should in most instances appear somewhere in the expert report. Those preparing and submitting expert reports can use this as a checklist to ensure that they have included content on the salient points. Those evaluating or critiquing expert reports can also use this as a checklist to determine whether content on the salient points has been included.

Title page—Providing names of expert and sponsor, date

Table of Contents (including a list of Appendices)

BODY OF REPORT:

Background and Objectives

- Background—nature of the dispute and identities of the disputant; when the expert was contacted, by whom, and what the expert was asked to do
- Objective(s)—clear statement of the issue being tested
- Materials Provided and Relied Upon—identified here or in an appendix

Principal Findings and Conclusions—essentially an Executive Summary

- Overview of Test Protocol—brief description of number of respondents, groups, how tested, etc.
- Principal Findings
- Overall Conclusions and Opinions

Research Protocol

- Overall Design—if an experiment, describe test stimuli, the rationale for selecting or creating controls, etc.
- Design Principles and Standards
- The universe definition(s)—clear statement of same
- The sampling plans—for respondents, sites, stimuli, etc.
- The questionnaires—a description of each question and its purpose; discussion of what was done to avoid order effects; etc.



Interviewing procedures and supervision

- Interviewer training
- Implementation period

Data recording

- Field check-in and editing
- Post survey validation—identify validation subcontractor, provide the questions asked and a report of findings

Data analysis—coding rules; what would be required for respondents to be identified as confused? for mark to be considered famous? etc.

Report of Findings—detailed discussion of pertinent findings divided into subsections as appropriate

Certification—"Pursuant to 28 U.S.C. Section 1746, I declare that, based upon the information available to me, to the best of my knowledge, the foregoing is true and correct." signed and dated

APPENDICES:

A1:Expert's credentials, qualifications, vita

A2:Lists responsive to Rule 26 of the Federal Rules of Civil Procedure, Depositions and Discovery

B: List of documents and materials relied upon

C: Identification, brief description of principal subcontractors

D: Stimuli: photos, videos, audios of (test and control) stimuli

E: Blank copies of screener and main questionnaires

F: Supervisor and interviewer instructions

G: Validation questionnaire and report

H: Typed answers to open-ended questions (if generated)

I: Computer tabular output (if generated)

J: Table of respondent-by-question matrix—showing respondent ID numbers and question(s) on which they were judged to be confused, reflect secondary meaning, etc.

### 10.54 Accurately and Fairly Report What Was Done

Not only is it important to fully report what was done, it also is important to do so accurately and fairly. As discussed in section 10.22, *supra*, courts

are prone to look unfavorably upon an expert claiming that ambiguous responses support his or her client's theory of the case. Other items to consider are the following.

### 10.54.1 Double-Check All Data Entries

One can be certain that opposing counsel and their experts will seek to find and bring to the court's attention every flaw in an opposing survey and expert report. One of the more embarrassing but easily corrected flaws are individual data entries that are inaccurate (e.g., writing "32.6 percent of the respondents were confused" when the correct value is 22.6 percent) or fail to add up, as in data columns. A discrepancy as small as the difference between 450 and 451 received negative attention from the court in *Toys "R" Us v. Canarsie Kiddie Shop*.[106] Eliminating such flaws requires double- and triple-checking every numerical entry made in the body of the report, especially where these have been hand-calculated. It is not unusual for courts themselves to spot and comment upon such errors.[107]

Regarding tabular data provided in the body of the report, do the numbers provided in each column add up to the total number indicated at the bottom of the column? Do the percentages provided in each column add up to 100 percent? If not, either enter the correct data or explain why there is no need for correction (e.g., multiple responses; rounding error; not all respondents were asked this question, in which case, provide a *balance line*[108]). A related question is: Do the entries in the body of the text accurately reflect the numbers provided in the more detailed computer tabular output provided as an appendix to the report? Courts report being adversely moved by errors in categorization or tabulation.[109]

### 10.54.2 Ensure Accurate Descriptions

The expert needs to ensure that the descriptions provided accurately describe the survey and what was done. Anything else can undermine the expert's credibility. Whether called to their attention or noticed on their own, courts generally pay attention to details. Examples:

> [The expert's] report indicates that while conducting the survey, he utilized the front panel of the 5 pound package of defendant's

106. Toys "R" Us v. Canarsie Kid Shop, 559 F. Supp. 1189 (E.D.N.Y. 1983). *See also* Gen. Motors Corp. v. Cadillac Marine & Boat Co., 226 F. Supp. 716 (W.D. Mich. 1964) (tabulations were held to be "neither accurate not truly reflective").

107. *E.g.*, Mattel, Inc. v. MCA Records, Inc., 28 F. Supp. 2d 1120, 1135 n.11, (C.D. Cal. 1998) ("It is unclear from where the 2.3% figure came, as [the expert's] summary lists 4% of respondents answering "Mattel/Barbie" to question five.").

108. A balance line is a line added at the bottom of a column of data used to indicate the number or percentage of respondents not asked the question.

109. *E.g.*, ITC v. Certain Cubes Puzzles, 219 U.S.P.Q. 322 (1982).



> Lamb Meal and Rice Formula. He admitted at the hearing that he actually just showed consumers a photograph of the front panel of that package in conducting his survey.[110]

+++++

> The succeeding paragraphs, summarizing other aspects of the responses to the survey, are all premised upon the question ¶ 19 says was put to the respondents, namely, "whether each of the three companies was in the booklet they had just reviewed." But that question was not actually put to the respondents. Rather, after showing a respondent one of the three letters, the interviewer asked: "Was there a product or service in the booklet I showed you that is from the same source or company as this?" That is a different question, and I think the difference is material.[111]

Courts can be especially sensitive to the expert claiming more than is justified from the data.[112]

### 10.54.3 Reporting Percentages Calculated on Reduced Bases

In some instances, it may make sense to indicate how specific portions of the sample (e.g., females; respondents living in locales where both plaintiff and defendant sell their goods; consumers of the first comer's goods) responded. An occasional practice is to report the data in terms of the subset of respondents who said they previously were aware of the mark, or the advertisement, and so on. When reporting the data for subsets, one needs to be careful that such reports are not misleading, which they easily can become. The question is: What is the proper base of respondents upon which to calculate percentages—the entire sample or some reduced number of respondents (e.g., only those aware of the item)?

Prof. McCarthy writes:[113] "If in a survey of 200 persons, only 20 persons mistakenly thought that the accused product was made by (or sponsored by or affiliated with) the senior user, the percentage of 'confused' persons appears to be only 10%. However, if further probing reveals that only 30 of the 200 even knew of the senior user's mark, then is the 'real' confused percentage 20 of those 30, that is, 66.6%? In my view, both percentage figures

110. Hill's Pet Nutrition, Inc. v. Nutro Prods., Inc., 258 F. Supp. 2d 1197, 1203 (D. Kan. 2003).

111. Franklin Res., Inc. v. Franklin Credit Mgmt. Corp., 988 F. Supp. 322, 335 (S.D.N.Y. 1997).

112. *See, e.g.*, Gen. Motors Corp. v. Cadillac Marine & Boat Co., 226 F. Supp. 716, 736 (W.D. Mich. 1964); Loctite Corp. v. Nat'l Starch & Chem. Corp., 211 U.S.P.Q. 237, 251 (S.D.N.Y. 1981).

113. 6 McCarthy, *supra* note 42, § 32:185.

are 'correct.' They are simply different ways to express the significance of the same state of mind of those surveyed."

With all due respect for Prof. McCarthy, for whom your author has the greatest admiration, your author is of the opinion that holding "both percentage figures are correct" is incorrect for two reasons. First, it can lead to strange findings and stranger judgments. Consider Prof. McCarthy's example using different hypothetical numbers: Suppose only four out of the 200 persons sampled were aware of the senior user and only two of these individuals mistakenly thought the accused product was made by (or sponsored by or affiliated with) the senior user. Is the percentage of "confused" persons only 1 percent (2 out of 200) or 50 percent (2 out of 4)? One can imagine the hue and cry that would arise were a court to predicate a judgment upon the 50 percent figure.

More importantly, in this author's opinion, the controlling question needs to be "What is the proper universe?" If the universe is defined as "prospective purchasers of the product at issue" and the 200 respondents had been screened, qualified, and selected on that basis, then the proper base would be all 200 respondents. On the other hand, if the proper universe is defined as "prospective purchasers who were aware of the senior user's brand of the product at issue" and respondents had been screened, qualified, and selected on that basis, then the proper base would be the four respondents aware of the senior user's brand.[114] Perhaps the closest any case has come to adopting the latter position is with respect to a survey of movie-goers in *Tri-Star Pictures, Inc. v. Unger*, wherein the court concluded that the percentages were "significant enough to be probative of secondary meaning."

> A consumer survey . . . concluded that the words "River Kwai," in connection with the title of a motion picture, have achieved secondary meaning among a large segment of the American movie-going public. Indeed, out of 200 people interviewed in [a] telephone survey, 42% of all respondents had heard of or seen a motion picture with the words "River Kwai" in the title. Seventy-four percent of those respondents identified that motion picture as Bridge. [A] mall survey of 100 people disclosed that 51% of all respondents had heard of or seen a motion picture with the words "River Kwai" in the title. Again, approximately 73% of those respondents gave a description of Bridge. Although these numbers are not conclusive

114. Under the latter scenario, the puzzling question is why one would bother to select and test 196 people who were not members of the defined universe.



> evidence of secondary meaning, they are significant enough to be probative of secondary meaning.[115]

Describing percentages of 42 percent, 74 percent, 51 percent, and 73 percent, the *Tri-Star Pictures* court may have thought the telephone and mall surveys demonstrated that a large segment of the American movie-going public associated the words River Kwai with the word Bridge. Yet when calculated on the samples that had been selected to be representative of the American movie-going public, the actual percentages that associated the words River Kwai with the word Bridge turns out to be (.42 × .74 =) 31 percent and (.51 × .73 =) 37 percent, a level that many courts have considered borderline for establishing secondary meaning.

On the other hand, it appears that more courts take the position that the proper universe consists of those who are prospective purchasers of the generic type of product or offering rather than those aware of a disputant's specific variety of that product or offering.

That said, there is nothing wrong with reporting percentages for subgroups of respondents. Sometimes, such information can be highly meaningful. What is wrong is failing to give at least equal emphasis in the report to the percentages based upon the entire sample of qualified respondents when the latter represents the universe to which the findings need to be extrapolated. Doing otherwise amounts to re-defining the universe after the study has been conducted.

Commenting on a likelihood of confusion survey, the court in *Roederer v. J. Garcia Carrion* wrote: "Defendants first contend that the survey was underinclusive because respondents were limited to those already aware of CRISTAL champagne. . . . Defendants contend that the level of actual confusion was only one-third of 23.1%, or 7.7%. To some extent, the restriction of respondents to those already aware of CRISTAL champagne artificially inflated the confusion level measured by the survey."[116]

Consider a secondary meaning survey conducted for plaintiff in *Lund v. Kohler* where the proper universe was identified as "members of the [interior design and plumbing] trade and . . . other individuals who were in the market for high-end faucets." The expert "then narrowed the sample '[t]o ensure that respondents were familiar with the VOLA faucet. . . .'

115. Tri-Star Pictures, Inc. v. Unger, 14 F. Supp. 2d 339 (S.D.N.Y. 1998).

116. Roederer v. J. Garcia Carrion, S.A., 732 F. Supp. 2d 836, 875 (D. Minn. 2010). *See also* Paco Sport, Ltd. v. Paco Rabanne Parfums, 86 F. Supp. 2d 305, 322 n.17 (S.D.N.Y. 2000) ("The Court finds Paco Rabanne's approach, limiting its universe to consumers aware of its products, inappropriate because even a weak brand could demonstrate a high degree of confusion because of the limited nature of the universe being surveyed. The Court therefore agrees with Paco Sport's expert . . . that the more appropriate practice is to survey all prospective purchasers.").

Case 1:23-cv-01437-DAE Document 163-11 Filed 10/24/25 Page 138 of 138



Respondents were shown a photograph of the VOLA faucet (without names or identifying information) and asked a screening question: 'Are you familiar with the faucet pictured in the photograph?' Respondents who answered 'No' to this question were not included in [the] survey results. . . . This move was questionable. [The expert] had already limited the 'consuming public' to prospective purchasers of high-end lavatory fittings, including members of the interior design and architectural trade. To further remove anyone who could not identify VOLA by sight stacks the deck in Lund's favor."[117]

### 10.55 A Perspective for Evaluating Survey Evidence

As a social scientist and scholar, your author readily acknowledges that one can find perfection described in social science textbooks on research methodology (e.g., consider discussions of sampling where probability sampling is held out as the gold standard). As someone who is also a practitioner, your author acknowledges that the perfection described in textbooks is rarely if ever attainable in practice, either in the ivied halls of academia or in the applied world of marketing and advertising research or trademark surveys. This is due in part to the fact that, while various aspects of research methodology can be focused upon as isolated subjects in a text, they need to operate in an integrated, near-simultaneous fashion when conducting research where, for the most part, tradeoffs often need to be made. Add to this the fact that trademark surveys are designed to measure mental states and processes that are hidden from direct view. While measuring physical phenomena (e.g., the gravitational pull of distant astronomical objects) carries with it the possibility of confirmation by comparison to external criteria, such external criteria typically are missing when measuring mental phenomena. Moreover, unlike widgets on an assembly line, humans have their own agendas for participating or not, and inclinations as to what is going on when they do participate. When humans serve as respondents (and interviewers), and when humans design, analyze and interpret studies designed to measure mental phenomena, it should come as no surprise that perfection is an unrealizable ideal.

No study is perfect; there are only degrees of imperfection. For the present moment in the development of the social sciences, that is sufficient. Among other benefits, it enables interpretations to be based upon empirical data gathered from members of the relevant population rather than relying upon one person's unique, but also human and therefore fallible intuition. Court and counsel would do well to relinquish the idea of perfection in trademark survey research. Held to such a standard, all

117. I.P. Lund Trading ApS v. Kohler Co., 118 F. Supp. 2d 92, 109 (D. Mass. 2000).



surveys will necessarily fail. On the other hand, held to more reasonable standards, in most instances, one will be able to identify and parse out higher quality surveys upon which one can rely from lower quality surveys upon which one should not rely. As Prof. McCarthy writes: "The proper approach is to view such [survey] evidence with some understanding of the difficulty of devising and running a survey and to use any technical defects only to lessen evidentiary weight, not to reject the results out-of-hand."[118] Hopefully, that has been a lesson imparted by this treatise.

118. *Id.* § 32:178.